**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **CLAUDE LEE WOODS,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 1:08cv98-MEF** |
| | ) | **(CR No. 1:04-cr-00012-UJ-VPM)** |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

<u>**UNITED STATES'S RESPONSE TO § 2255 MOTION**</u>

COMES NOW the United States of America ("the Government") by and through its

attorneys, Leura G. Canary, United States Attorney, and Sandra J. Stewart, Assistant United

States Attorney, and in compliance with this Court's February 12, 2008 order, as amended on

March 13, 2008, responds to Petitioner Claude Lee Woods's Motion Under § 2255 To Vacate,

Set Aside, Or Correct Sentence By A Person In Federal Custody, as follows:

## I. PROCEDURAL HISTORY AND RELEVANT FACTS

On January 21, 2004, a grand jury for the Middle District of Alabama returned a one-

count indictment against Petitioner Claude Lee Woods ("Woods") charging him with a violation

of the Controlled Substances Act. *See* GX A (Doc. 1)[1], a copy of the indictment in this case.[2]

Specifically, the indictment charged that, on or about August 14, 2003, in Dothan, Alabama, in

the Middle District of Alabama, Woods knowingly and intentionally possessed with the intent to

_____

[1]References to "Doc." are to the docket entries and documents in the criminal record in
this case, criminal case number 1:04-cr-00012-UJ-VPM.

[2]All exhibits referenced int this response are attached to the response and are being filed
contemporaneously with the response.

distribute 50 grams or more of methamphetamine, a Schedule III Controlled Substance, in

violation of 21 U.S.C. § 841(a)(1).  *See* GX A.  At his arraignment, Woods, represented by Kevin

Butler, initially pleaded not guilty.  (Doc. 11)

      Mr. Butler filed a Motion To Suppress Stop, Search and Seizure and Citations of

Authority on behalf of Woods.  *See* GX B (Doc. 15), a copy of the suppression motion.  In the

motion, Woods asked that "all evidence and statements illegally seized as a result of the stop,

search and seizure of the vehicle driven by Claude Lee Woods on August 14, 2003," be

suppressed because such evidence and statements were seized in violation of the Fourth and Fifth

Amendments to the United States Constitution.  *Id*. at 1.  Specifically, Woods alleged the search

was illegal on the following grounds:

1.     "The stop of Mr. Woods' vehicle was not based upon probable cause or information indicating that he had violated any traffic laws."  Instead, the stop was pretextual and unconstitutional.

2.     " ... [E]ven if there was probable cause to stop the vehicle, there was not an articulable and reasonable suspicion to continue to detain Mr. Woods after information had been gathered to write the traffic citation."

. . .

" ... Mr. Woods was stopped for a minor traffic violation.  All questioning by Detective Elkins should have been limited to the basis for the car stop.  Therefore, the questioning regarding Mr. Woods' probation/parole status and trip itinerary were improper and prohibited.  However, regardless of the propriety of the questioning of Mr. Woods, Detective Elkins had not gathered information which gave rise to an articulable and reasonable suspicion that the vehicle driven by Mr. Woods contained contraband."

. . .

"As there was not an articulable and reasonable suspicion the vehicle contained contraband, the continued detention for purposes of the search was improper and unconstitutional."

3.      There was no probable cause for the subsequent search of the vehicle.

*Id*. at 3-7.

After the motion to suppress was filed, counsel for Woods filed an Unopposed Motion To Continue Trial Date, *see* GX C (Doc. 18), a copy of the motion to continue, along with a Waiver Of Right To Speedy Trial, *see* GX D (Doc. 18, Attachment 1), a copy of the Waiver Of Right To Speedy Trial.  In the motion for a continuance, Woods represented he needed more time to prepare the case for the suppression hearing and for trial.  *See* GX C at 1. The Waiver Of Right To Speedy Trial was signed by Woods and represented that Woods, "after being first advised of his right to a speedy trial as guaranteed him by the Sixth Amendment of the United States Constitution and the implementation of said right in 18 U.S.C. § 3161, hereby waives his right to a speedy trial as to the January 10, 2005, trial term."  *See* GX D.  The Court granted the continuance, finding "the ends of justice served by continuing this case outweigh the interests of the public and the defendant in a speedy trial."  *See* GX E (Doc. 24), a copy of the Court's order granting the continuance.

Counsel for Woods also filed an Unopposed Motion To Continue Suppression Hearing, asking the Court to continue the scheduled suppression hearing due to a personal matter requiring him to be out of state the week the suppression hearing was set.  *See* GX F (Doc. 22), a copy of Wood's motion to continued the suppression hearing.  Two days later, Mr. Butler asked the Court's permission to withdraw as counsel for Woods because Woods had retained Susan R. James to represent him in the case.  *See* GX G (Doc. 26), a copy of the Motion To Withdraw As Counsel.  Ms. James entered her appearance as counsel for Woods on that same date, *see* GX H (Doc. 25), a copy of Ms. James's Notice of Appearance, and Mr. Butler was later permitted to

withdraw as counsel for Woods after the suppression hearing, *see* GX M (Doc. 33), a copy of the

Court's order granting Mr. Butler's motion to withdraw.

After the Government filed its response to Woods's suppression motion, *see* GX I (Doc.

21), a copy of United States's Response To Motion To Suppress, the Court held a suppression

hearing on the motion on January 18, 2005, *see* GX J, a copy of the January 18, 2005 suppression

hearing in this case.  At that hearing, the following facts were established:

> At approximately 10:00 p.m. on 14 August 2003, David Elkins ["Elkins"],
> a vice and intelligence officer with the Dothan, Alabama police department, and
> his partner, Jon Riley ["Riley"], were leaving a store parking lot when they saw
> Woods proceeding south on Alabama highway 231 in Dothan.  (TR. 3-5).  They
> exited the parking lot and turned in a southward direction when they noticed
> Woods "crossing the fog line"  (TR. 6).  After he crossed the line "at least three
> times", Elkins turned his emergency lights, signaling Woods to stop (TR. 7).
> Woods, who was driving a black Cadillac Eldorado, stopped approximately a
> quarter of a mile down [the] highway (TR. 7-8, 25).  After Woods stopped, Riley
> notified the police department of the stop and requested a "marked unit" at the
> scene (TR. 11).

> According to Elkins, he and Riley suspected that Woods may have been
> driving under the influence of alcohol (TR. 9).  When they stopped him, Elkins
> approached the driver's side, while Riley approached the passenger side; Woods
> was alone in the vehicle (TR. 9-10).  Neither man drew a weapon (TR. 10, 36).
> When Elkins advised Woods that he was stopped because of the "weaving", 
> Woods apologized and said that "he was on the phone speaking with a girl in
> Georgia" (Id.).  Elkins saw the telephone (Id.).  There is some evidence that the
> officers knew that he was talking on his cell phone.  Riley said that as they
> pursued Woods, he was "just not paying attention, talking on the cell phone, that
> type thing." (TR. 76).

> After Elkins examined Woods' drivers license and his proof of insurance,
> he "noticed an open bottle of beer" in Woods' lap; when he asked Woods how
> much he'd had to drink, and Woods replied that he "had just opened that beer and
> he had had one prior to that" (TR. 11).  Elkins also stated that there was "a faint
> odor of marijuana coming from the vehicle, and on the driver's armrest of the
> door was a package of [cigarette] rolling papers"  (TR. 12-13).  Riley also smelled
> marijuana (TR. 80) and saw the cigarette papers, which he said were in "plain
> view" (TR. 90-91).

Elkins said that he didn't smell alcohol (either on Woods' person or from the open bottle), and he also said that he did not notice anything about the appearance of Woods' eyes or his speech (TR. 37, 61-62). Riley, however, testified that he and a third officer, John Givens, smelled alcohol on Woods' person (TR. 81). Elkins then asked Woods if he were on parole or probation, and Woods replied that he "was on parole out of Georgia . . . for a drug violation" (TR. 17). Elkins then asked Woods to exit the car so that the patrol officers on the scene could conduct a field sobriety test (TR. 14).

They asked Woods "if there was anything illegal in his vehicle", and Woods replied "there was not" (TR. 14). Elkins then asked Woods for permission to search the vehicle, but Woods declined to consent (TR. 14). Nevertheless, Elkins searched the vehicle because he believed that he would find marijuana "[b]ased on the smell and the rolling papers, the time it took [Woods] to stop and him [sic] moving around as we were stopping him" (TR. 15).

As Elkins searched Woods' vehicle, he found "a [plastic] zippered bag with a zipper broken underneath the driver's seat" (TR. 18). Because the bag was partially opened, Elkins could see its contents before he touched it (TR. 45-46). Elkins opened the bag and found methamphetamine inside (TR. 19). He also found a "little silver colored metal cigarette box in between the driver's seat and the center console" containing "a bag of marijuana" and "more methamphetamine" (TR. 20). They found no indication that marijuana had been smoked or burned in the vehicle, but they did find marijuana seeds on the floor (TR. 42). Thereafter, the officers placed Woods in handcuffs (TR. 21).

After the field sobriety test was conducted, officers learned that Woods "was not too impaired to drive" (TR. 50). They continued to search the vehicle, ultimately removing two sets of electronic scales (located in the back seat in a bag) (TR. 22). When they searched Woods' person (Id.), he had "some money on him" but no contraband was found (Id.). Woods was arrested for possession of marijuana second degree (Id.). The entire search of the vehicle took approximately "four or five minutes" (TR. 50). Officers also issued him a citation for having an open alcoholic beverage (Id.).

The officers removed from Woods' vehicle the bag of marijuana and the methamphetamine. Woods later entered a guilty plea to the marijuana charge in Dothan municipal court (TR. 21-22).

*See* GX L, a copy of this Court's Recommendation Of The Magistrate Judge, at 1-5 (footnotes omitted).

After the suppression hearing, retained counsel, Ms. James, filed a Supplement To Motion To Suppress And Request To File Out Of Time.  *See* GX K (Doc. 28), a copy of the supplemental suppression motion.  In that motion, Ms. James renewed previous arguments made in the initial motion to suppress and she also argued:

4.    "There was no probable cause to seize the defendant or search the vehicle and seize the contents of same and the seizure of the persons exceeded the scope of the stop."

5.    The initial stop was unreasonably pretextual where no traffic violation occurred nor was a citation issued for the alleged traffic violation.

*See* GX K at 3-6.

In its Recommendation Of The Magistrate Judge, the Court rejected Woods's arguments and recommended that the motion to suppress be denied in all respects.  *See* GX L at 11.  In rejecting Woods's arguments, the Court found that the initial stop by the officers was not pretextual and was based on probable cause.  *See* GX L at 6-7.  The officers "initiated their stop of Woods because he was driving erratically, 'crossing the fog line', 'weaving', and using his cell phone while driving."  *Id*. at 7.  The Court also found that there was sufficient probable cause for the officers to search Woods's vehicle once it was stopped.  *Id*. at 7-9.  "When an experienced police officer detects the odor of marijuana in a vehicle and views cigarette rolling papers from a driver who admits that he is currently on probation for a drug violation, he and any other 'reasonably prudent [person]' is justified in 'believ[ing] that the vehicle contains contraband.' "  *Id*. at 9 (footnote omitted).  Finally, the Court concluded that, because Woods was driving his car at the time of his arrest, a finding of probable cause alone satisfied the automobile exception to the Fourth Amendment warrant requirement, and that the search was therefore lawful.  *Id*. at 9-

6

11.  In a subsequent order, the Court made clear that its ruling denying the motion to suppress applied to both the original motion to suppress and Woods's supplement to the motion to suppress.  *See* GX N (Doc. 34), a copy of the Court's order clarifying its Recommendation on the motion to suppress as supplemented.

Woods filed a Motion For Leave Of Court To File Objections To Magistrate Reports And Recommendations Out Of Time, *see* GX O (Doc. 35), a copy of the motion to file out-of-time, along with Woods's Objections To The Magistrate Reports And Recommendations Of March 25, 2005 And March 31, 2005, *see* GX P (Doc. 36), a copy of Woods's objections.  "After an independent review of the file, including full consideration of the Defendant's Objection," the district court overruled Woods's objections, adopted the Recommendation Of The Magistrate Judge, and denied Woods's motion to suppress, as supplemented.  *See* GX Q (Doc. 39), a copy of the district court's order adopting the magistrate's recommendation.

After the motion to suppress, as supplemented, was denied, Woods filed a Motion To Extend Time For Change Of Plea And Placement On Next Trial Term along with a Waiver Of Speedy Trial Rights.  *See* GX R, a copy of the motion to extend the time for a change of plea and placement on next trial term, and GX S, a copy of Woods's Waiver Of Speedy Trial Rights.  In support of the motion to extend the time for change of plea or trial term, counsel for Woods represented that Woods was in negotiations with the Government in an attempt to resolve the case by means of a plea.  *See* GX R at 1, ¶ 1.  Counsel represented that she had been in contact with the DEA in Panama City, Florida, and AUSA Redmond about resolving the case, but to do so, further negotiations and a proffer were necessary.  *Id*. at 1, ¶ 4.  At the time Woods filed the motion, the change of plea was set for April 11, 2005, and trial was set for April 18, 2005.  *Id*. at

1, ¶ 1. Woods filed his motion on April 8, 2005. *Id*. at 2. Concluding that "a continuance of this case is warranted and that the ends of justice served by continuing this case outweighs the best interest of the public and the defendant in a speedy trial," the Court granted Woods's motion for a continuance, continuing the case from the April 18, 2005 trial term to the May 16, 2005 trial term. *See* GX T (Doc. 42), a copy of the order continuing the trial date.

In connection with his motion for a continuance, as noted above, Woods also filed a Waiver Of Speedy Trial Rights, which he personally signed, and which read as follows:

> The undersigned Defendant, Claude Woods, after being first advised of his right to a speedy trial as guaranteed him by the Sixth Amendment of the United States Constitution and the implementation of said right in 18 U.S.C. § 3161, hereby requests trial in this matter be set sometime after the April trial term and foregoes/waives any speedy trial issues pertaining to the resetting of this case.

> A waiver of speedy trial has been filed previously. A new waiver is being executed. Woods, however, by signing the waiver does not waive his speedy trial rights relating to the time period before he was actually brought into federal custody on this case.

*See* GX S.

Woods's case went to trial before a jury on May 23, 2005. *See* GX U, a copy of the May 23, 2005 transcript of Woods's trial. The testimony at trial established the following:

On August 14, 2003, Woods was the sole driver of a black Cadillac Eldorado. *See* GX U at 18, 20. Woods was seen by Dothan Vice and Narcotics Officers David Elkins ("Elkins") and Jon Riley ("Riley") to be driving erratically and weaving across the fog line. *Id*. at 19, 20, 36, 37, 52. Riley and Elkins effected a stop of the Cadillac. *Id*. at 20-21. Elkins and Riley approached the Cadillac and saw Woods in the driver's seat with an open bottle of alcohol in his lap, cigarette rolling papers on the door armrest, and smelled marijuana. *Id*. at 23-24, 53. The

officers then searched the vehicle and found:  a black zippered case containing methamphetamine under the driver's seat; a Crown Royal bag containing numerous empty sandwich bags; a silver metal box containing a small amount of marijuana and methamphetamine between the driver's seat and the center console; two sets of digital scales; a metal lockbox on the floorboard on the front passenger side containing a roll of $100 bills totaling $2000; and scattered marijuana seeds on the driver's side floorboard.  *Id*. at 25-29, 56.

Victor Bravenec ("Bravenec"), a chemist with the Drug Enforcement Administration ("DEA"), testified that he tested three exhibits that he found were respectively:  149.1 grams of methamphetamine of 93% purity; .45 grams of methamphetamine of 97% purity; and 1.9 grams of methamphetamine of 88% purity.  *Id*. at 59, 62-69.

Devin Whittle ("Whittle"), an agent with DEA for nine years, testified that the three exhibits, identified by Bravenec as methamphetamine, were taken from the vehicle driven by Woods by the Dothan Police Department officers and placed in his custody.  *Id*. at 74-75. Whittle further testified that, in his experience, first as a narcotics officer with the Montgomery Police Department and later as a DEA agent, the amount of the drugs recovered, the plastic sandwich bags, the digital scales, and the manner of packaging and amount of money recovered, indicated that Woods was involved as a distributor of illegal narcotics.  *Id*. at 74, 77-80. Specifically, Whittle detailed that the purchase price for a gram of methamphetamine was, conservatively, $200; that it was unusual for a user to have large amounts of methamphetamine; that users rarely carried scales because they typically bought in smaller amounts; that the sandwich bags found were typically used to separate methamphetamine units for distribution; that it was unusual for a user to have a large amount of cash; that the $2000, made up of $100

bills, indicated that the person was selling drugs in $100 increments; and that the fact that the

$2000 was separated from other monies and secured in a safe, indicated Woods's desire to

protect something of value to him.  *Id*. at 79-81.

The jury returned a verdict of guilty as charged in the indictment.  *Id*. at 141.

Before sentencing, counsel for Woods filed a Sentencing Memorandum in which she

argued, among other things, that the Court should consider as mitigation, and as grounds for a

downward departure for acceptance of responsibility, that he was in plea negotiations with the

Government, but was forced to trial before he could come to an agreement with the Government.

*See* GX V, a copy of Woods's Sentencing Memorandum, at 3-4, ¶¶ 7-9.  Specifically, counsel for

Woods represented, in the Sentencing Memorandum, the following:

> 7.    Further Woods was attempting to give a proffer to the government
> which was thwarted by intervening circumstances beyond his control.  Woods and
> counsel were under the impression that agents from the Northern District of
> Florida Drug Enforcement Administration were traveling to Montgomery early in
> the week prior to the beginning of the trial term.  Woods was transported to the
> U.S. Attorney's Office for a meeting with the agents.  He and counsel were
> advised the agents could not make it.  Without the proffer and based on the
> limited time left in the day, Woods was desirous of passing his case to the next
> trial term.

> 8.    Counsel had understood this court to leave open this possibility if
> the proffer could not be accomplished within the required time frame.  The
> Honorable Truman Hobbs had a different interpretation and was concerned that
> the plea had been left open for so long.  He was unsympathetic to the logistical
> problems associated with coordinating the proffer session with agents from
> Florida.  As a result, Woods felt he was compelled to try the case and the trial
> followed.  Woods argues given more time he would have worked out a more
> favorable plea agreement (based on cooperation) that simply could not be resolved
> before the close of business on the eve before trial.  Counsel recognizes the
> Government and this Court may believe this could have been done earlier, it
> simply was not and it was not Woods['s] fault.

> 9.    Pretrial the undersigned was successful in having the case

continued due to the need to resolve issues regarding Woods['s] criminal history. This, in part, caused some of the delay in disposition of this case as did the unavailability of the out of town interviewing agents. These factors should also add to Woods['s] position he actually accepted responsibility for his criminal conduct.

*Id*. At the sentencing hearing on October 13, 2005, counsel for Woods pressed these same arguments:

> MS. JAMES [DEFENSE COUNSEL]: In this particular case as to objection one, we did – let me back up and I think I need to set the state here. I am kind of starting from the back going forward but I think it's important. We spoke with the government, or at least I spoke with Susan Redmond on a number of occasions about Mr. Woods possibly cooperating with the government. There was at some point during the trial – well, we had a motion to suppress the evidence and we lost on that.
>
> At some point during the litigation Ms. Redmond and/or Mr. Whittle made me aware that there might be some interest in Mr. Woods in Pensacola – not in Pensacola, but in Panama City, the Northern District of Florida area. In consideration of that information Mr. Woods and I, of course, wanted to know as much as we could about what was going on in Florida, the possibility of a proffer, the possibility of maybe – if we entered a plea maybe making that part of this situation here.
>
> And the Court may recall we had a telephone conference I believe with regard to the status of this case and at that point Ms. Redmond and I both – and she can correct me if I am wrong, I can't remember everything – but I think we both made the Court aware of the situation in Florida and the fact that we were trying to meet with the agents from Florida and do a proffer. My recollection of what the Court said was I am going to leave it on this trial term. If you can't get that worked out get back with the Court. I took that to mean if we couldn't get it done that the Court, Your Honor specifically, might be inclined to put us over to the next term because we were dealing with things beyond Ms. Redmond's control because they were agents from Florida.
>
> Well, and she thought that we can get it done quickly, and I did too, so she had it set I believe on a Tuesday, like a week before the trial was to commence. For some reason that fell through and we reset it for Friday. This would be Friday, the eve of the – Friday right before the trial [was] to begin on Monday. We went over this proffer session, expecting the agents to be there, and they couldn't come. And that was about 12:00 o'clock noon. Well, sometime during

the course of I think that very day Judge Hobbs had, of course, been assigned the case and once he realized that the plea had not been accomplished and things had kind of been left open Judge Hobbs was not pleased with that at all and basically said you are either going to plead today or we are going to trial Monday.

And in fairness to Mr. Woods I want the Court to know that I think that put him really at somewhat of a disadvantage. And I am not saying it was the Court's fault or Ms. Redmond's fault or my fault, it was just a combination of factors that happened there, because quite frankly I believe that if we could have proffered with those agents and known where we stood with regard to the totality that Mr. Woods would have entered a guilty plea. So Friday afternoon we told the government that we had no choice but to go to trial. We told Judge Hobbs. Well, in fact, we tried to reach Judge Hobbs to tell him our dilemma that the agents didn't come and he had already left and as I understand had told Stan or somebody, I don't remember, that he was going to be out I guess doing something and not to call him unless we had a plea. So given that warning, I did not attempt to reach him because we didn't have a plea, we just had a problem.

So I want you to know from the outset we have never denied that he possessed the hundred and 40.09 grams of methamphetamine that was found in his vehicle. Our defense – given the fact that we lost the suppression hearing, our defense was that it was for his own possession. And I do expect if the Court will indulge us to hear briefly from him with regard to the extent of his substance abuse problem.

*See* GX W, a copy of the October 13, 2005 sentencing hearing in this case, at 3-6. These arguments were rejected by the district court. *Id*. at 15. In rejecting the argument that Woods's failure to timely negotiate a guilty plea he wanted to enter established any mitigating circumstances, the Court told Woods that, if he did have any information that might be helpful to the Government, he might still be eligible for a downward reduction in his sentence pursuant to Rule 35 of the Federal Rules of Criminal Procedure. *Id*. Specifically, with regard to a Rule 35 motion, the Court told Woods:

... I will say that if you have information that could be used by law enforcement that you were not able to provide in time to negotiate an acceptable plea agreement, should you have retained the desire to plead guilty without having to go to trial in this case, that is always available to you through a Rule 35 departure

after you are sentenced today, the information that you have would still be beneficial to the government.  So I just remind you of that.  I am sure you are aware of that, but I will remind you of that, that if you do provide information to the government that is helpful to them and aids them in their investigation of anyone else involved in other criminal activity, be it in the Middle District of Alabama or elsewhere, that would be something that I could certainly look favorably upon if it were filed in the form of a Rule 35 motion to affect your sentence.

*Id*.

Before sentencing Woods, the district court heard from Woods on his objections to the presentence report; it overruled Woods's objections; it heard argument from Woods's counsel; and it heard from Woods himself.  *Id*. at 6-20.  The Court adopted the factual statements contained in the presentence report and found that Woods's offense level was 32 and his criminal history category was VI, resulting in a Sentencing Guidelines range of from 210 months to 262 months in prison and a fine range of from $17,500 to $4,000,000.  *Id*. at 10-11.  The Court then sentenced Woods to 262 months in prison, to be followed on his release from custody by a supervised release period of five years, subject to mandatory, general, and special conditions.  *Id*. at 20-21.  Woods was also ordered to pay a special assessment fee of $100, and a fine was waived due to Woods's inability to pay.  *Id*.

After Woods's sentence was pronounced and objections to that sentence were heard, counsel for Woods notified the Court that Woods had some additional issues that he wished counsel to raise at that time.  *Id*. at 19-20, 25.  One of those issues involved Woods's right to a speedy trial.  *Id*.  At the hearing, counsel for Woods, and Woods himself, presented the speedy trial issue to the Court as follows:

MS. JAMES [DEFENSE COUNSEL]:  Judge, now if I may be just briefly heard on two other issues.  Kevin Butler had this case – let me back up.  When

13

Mr. Woods was arrested he was arrested in Dothan and he actually was prosecuted by the City of Dothan for the possession of a small amount of marijuana. There was some dispute that he was charged with having an open container because he had an open bottle of beer in there. We never had any – I don't think that case has ever been prosecuted. ...

The case was referred to the feds for prosecution and he was indicted in January of '04, and not – then he was taken into custody by Georgia because of his parole violation and then he ultimately was brought here for trial in November. For purposes of the record I do want him to just articulate very quickly that chronology. But here's the dilemma. When I got the case Mr. Woods was being represented by Kevin Butler of the Federal Public Defender's office, and, of course, at that point pretrial motion deadlines had passed.

Kevin had filed a motion to suppress. I supplemented the motion to suppress. We had a hearing. I didn't file any speedy trial motion, I didn't file any double-jeopardy motion. Mr. Woods and I have had many occasions to speak during my representation and he has always been very convinced that his speedy trial rights have been violated and that his conviction should have been barred based on double-jeopardy because of the separate civil forfeiture.

Mr. Butler and I in filing waivers of speedy trial subsequent to his being brought to federal custody, we both styled them – and quite frankly I picked up the language from Mr. Butler – that we are waiving speedy trial rights but not any that preceded. In other words, that window of possible speedy trial violation, we both protected. Now, I am not sure if that was based on Mr. Woods' insistence, just a precautionary thing, but Mr. Butler did it and I followed suit.

In speaking to Mr. Woods I have repeatedly told him that if Mr. Butler or I missed a speedy trial issue or if we missed a double-jeopardy issue that he would have a clear claim against both of us for ineffective assistance of counsel which would probably more appropriately be raised in a post-conviction 28 U.S.C. Section 2255. We visited again this morning and I told him that I would bring this to the Court's attention, not so much that I am asking the Court to rule because I realize we are far past that deadline, but in the event that he decides to go pro se, hire a different lawyer or whatever, I did want to make it a part of the record.

. . .

MS. JAMES: And the last thing, Judge, very quickly, was his speedy trial. Again, without going into all the details of what Kevin and I did or didn't do, tell the Court real briefly why you think – so you have got your record – why you

think the speedy trial rights were violated.  With permission, Judge, may he?

THE COURT:  He may.

THE DEFENDANT:  It's my understanding, Judge, they had 70 days after they indict me to get me to trial.  It's very apparent by my indictment that it took them ten months to get me to arraignment, not even counting trial.  Whenever I got arrested, Your Honor, they placed a hold on me that I could not get out.  And that's way before my parole or anything like that was violated.  That's while I was in Dothan they placed a hold on me that I could not get out.  From that time, I am not sure, but I believe they had 30 days to indict me after my arrest, and it took them five months to indict me, and then another ten months to get me to arraignment after that.  So it's 15 months from the time of my arrest to my arraignment, not the hundred and 80 days maximum, which I believe, Your Honor, is far and above the speedy trial.  So I believe I was denied due process on the speedy trial law.  I may be wrong.

THE COURT:  How were you prejudiced, Mr. Woods, other than the delay?  Was there evidence that was lost or witnesses that were not available at the trial because of the delay?

THE DEFENDANT:  Well, there may have been some witnesses in my case that I could not have got in touch with because I had lost contact with them.

THE COURT:  Are you aware of any witnesses that weren't available because of the 15 month delay?

THE DEFENDANT:  There was a girl that was in the car with me – well, not actually in the care with me, that was following me to Georgia, that I couldn't reach after that, that was following me down to Florida.

THE COURT:  Isn't she the one that got lost in Columbus, from my reading your presentence report?

THE DEFENDANT:  Yes, sir.

THE COURT:  That's a long way from Columbus to Dothan.  So she didn't see what went on in Dothan, did she?

THE DEFENDANT:  Sir?

THE COURT:  It's a long way from Columbus, Georgia to Dothan so she wasn't present in Dothan when you were arrested and she did not see what took

15

place in Dothan, did she?

THE DEFENDANT: No, sir. But she was well aware of what was going on. Whether I was in Columbus or Dothan doesn't matter, she was still aware of what was going on, and why I had the drugs and all that. But I could no longer get in touch with her and I still don't know how to get in touch with her. I have got it wrote down – Ruth, I don't know her last name but I have it written down. Ruby, I know her first name but I don't know her last name, but I have all that in my paperwork at the jail.

THE COURT: Any response from the government?

MS. REDMOND [AUSA]: Judge, again, I don't believe this is properly brought at this time, in addition to which the Defendant has actually stated no actual prejudice which would give grounds possibly to form the basis for the motion.

MS. JAMES: Judge, the only thing I would say – it's his motion – the only thing I would add to that is there were some – there was discussion about trying to locate this woman as a witness, and given that he was in Dothan and she was lost in Columbus, it would have been part of our defense if we had been able to get her and assuming that she would have confirmed what he told the police when he was arrested that they were following each other, that he was, in fact, moving to Florida, that that's why his car was loaded, the extent of his substance abuse problem, and the fact that the drugs were for their joint use because they were going down there to party. That's why he had the three thousand dollars, he was going to lay up in a motel room and do all that meth. So I think it would have at the least lended further support to our simple possession defense.

MS. REDMOND: Judge?

THE COURT: Any response?

MS. REDMOND: I apologize because I just need to make this clear. If, in fact, that's what the Defendant is putting on as a – on the record as a defense, I would note for the record that that, in fact, then would give grounds to a cause for the State of Georgia as he was on parole at that time and was not authorized to leave the State of Georgia, let alone remove himself to the State of Florida.

MS. JAMES: He was already – I think the record, maybe not before the Court, but he was already in trouble with Georgia when he took off, weren't you?

THE DEFENDANT: Well, I would have been, but not that day.

16

THE COURT:  Without saying that your motion for a violation of the Speedy Trial Act is timely, to the extent that it is germane to any issue before me at sentencing, motion denied.

*Id*. at 25-27, 31-35.

A final judgement was entered in this case on October 17, 2005.  *See* GX X (Doc. 64), a copy of the final judgment in this case.  Woods timely filed a notice of appeal (Doc. 65), and, ultimately, a brief in the United States Court of Appeals for the Eleventh Circuit.  In his brief to that Court, Woods raised the following issues:

I.       Whether the evidence was sufficient to sustain a conviction.

Issue I – Woods contends that the uncontradicted evidence was that he possessed the drugs found in his vehicle the night of the August 14, 2003 arrest.  There was no evidence of distribution or intent.  The only distribution evidence was provided by DEA Agent Devin Whittle which he admitted was his opinion and speculation.

II.      Whether the court erred in denying the motion to suppress.

Issue II – The stop of Woods was pretextual.  The officers gave conflicting testimony.  Evidence through Government witnesses supports Woods' claim that the evidence should have been suppressed.  There was no probable cause for the search.

III.     Whether the court erred in sentencing Woods.

Issue III – Woods argues the Court should have modified the Criminal History Score based on consolidated cases, determined his Criminal History Score over-represents the seriousness of his past criminal conduct, that he should have received a 3E1.1 downward departure for acceptance of responsibility, and that all sentencing factors should have been determined by the jury beyond a reasonable doubt.

IV.      Whether the court erred in denying Woods' motions to dismiss for speedy trial and double jeopardy.

Issue IV – Woods argues that the District Court abused its discretion denying his motion for dismissal based on a speedy trial violation and double

17

jeopardy violation.

*See* GX Y, a copy of Woods's 11th Circuit brief in this case, at 1 ("Statement Of The Issues")

and 27-28 ("Summary Of The Argument").  After the Government filed its brief in response, *see*

GX Z, a copy of the Government's 11th Circuit brief in this case, attached to this response, the

Eleventh Circuit rejected Woods's arguments and affirmed the district court in an unpublished,

per curiam opinion, *see* GX AA, a copy of the Eleventh Circuit's February 9, 2007 decision in

this case, *United States v. Woods*, No. 05-15999 (11th Cir. Feb. 9, 2007) (unpub.).  Specifically,

with regard to the issues raised in Woods's § 2255 motion, the Court found there was no merit to

the claim that Woods's stop was pretextual:

> Here, we conclude from the record that the district court correctly denied
> Woods's motion to suppress because there was probable cause for the traffic stop
> and probable cause for the search of Woods's car.  First, construing the evidence
> in the light most favorable to the government, the traffic stop was not pretextual
> because the officers observed Woods weave over the fog line at least three times.
> This weaving was sufficient to establish probable cause that a traffic violation
> occurred because weaving indicates that the driver may be under the influence of
> alcohol, which is a traffic violation in Alabama.  ...

*See* GX AA, *United States v. Woods*, No. 05-15999, slip op. at 5 (11th Cir. Feb. 9, 2007)

(unpub.).  With regard to Woods's speedy trial issue, the Eleventh Circuit found the issue was

without merit whether brought under the Speedy Trial Act or under the speedy trial clause of the

Constitution.  Specifically, the Court found:

> Woods does not indicate whether his motion to dismiss for violation of his
> speedy trial rights relies on the Speedy Trial Act or the Speedy Trial Clause of the
> Constitution.  However, Woods's arguments before the sentencing court
> concerning a specific number of days allowed between phases of a criminal
> prosecution indicates that he relied on the Speedy Trial Act.[1] ...  The Speedy Trial
> Act provides, in pertinent part, that "[f]ailure of the defendant to move for
> dismissal prior to trial or entry of a plea of guilty or nolo contendere shall
> constitute a waiver of the right to dismissal under this section." ...

The record demonstrates that Woods did not move for dismissal until the sentencing hearing, after his trial and conviction.  Therefore, Woods waived any right to have the case dismissed for violation of the Speedy Trial Act, ... and we affirm the district court's denial of his motion to dismiss for violation of speedy trial rights.

_____

[1]Although we address Woods's argument under the Speedy Trial Act, Woods's argument would also fail under the Speedy Trial Clause because he caused any delay that existed between his indictment and trial, given that he was in state prison after the indictment and filed two written and signed speedy trial waivers before his trial commenced. ...

See GX AA, *United States v. Woods*, slip op. at 13-14.  Woods did not further appeal his conviction or sentence.

Woods filed his motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255 on February 6, 2008.

## II.  CLAIMS RAISED IN THE § 2255 MOTION

In his § 2255 motion, it appears that Woods has raised the following claims for relief:

1.     That both his counsel, Kevin Butler and Susan James, were ineffective for failing to file a motion to dismiss the indictment on the grounds that Woods's speedy trial rights were violated.

2.     His appellate counsel, Susan James, was ineffective for failing to file a petition for rehearing or a petition for a writ of certiorari on the suppression issue regarding the pretextual unconstitutional search.

3.     The search in this case was unconstitutional due to the fact that Woods's initial stop was pretextual.

4.     His counsel was ineffective and the prosecutor engaged in misconduct when they failed to inform Woods that "Florida" was willing to consolidate the Alabama and Florida cases, and Woods was prejudiced as a result.

5.     The judge in his case told Woods that he could get a Rule 35 downward departure of his sentence if he helped Alabama and Florida authorities, but Woods never got any help in his case.

19

Woods's third ground for relief is barred from this Court's review because it was raised and decided adversely to Woods in his direct appeal.  Woods's fifth and last ground for relief is barred because it could have been raised on appeal, but was not, and it is without merit. Finally, Woods's three ineffective assistance of counsel claims should be rejected because, as to each claim, Woods has failed to demonstrate either deficient performance or prejudice.

## III.  RESPONSE TO CLAIMS FOR RELIEF

A.     <u>Woods Has Met The One-Year Statute of Limitations Under 28 U.S.C. § 2255.</u>

Woods has filed his § 2255 motion in a timely manner under paragraph six of 28 U.S.C. § 2255, which provides a one-year period of time to seek relief under the rule.  Section 2255 states that a motion must be filed within one year from

> (1)  the date on which the judgment of conviction becomes final;
>
> (2)  the date on which the impediment to making a motion created by governmental action in violation of the Constitution and laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;
>
> (3)  the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (4)  the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255 ¶ 6.  The relevant date for purposes of Woods's § 2255 motion is paragraph (1), the date on which the judgment of conviction became final.

The final judgment in Woods's criminal case was entered on October 17, 2005.  *See* GX X (Doc. 64).  He timely appealed his conviction and sentence to the United States Court of Appeals for the Eleventh Circuit, which issued its opinion in the case on February 9, 2007.  *See*

GX AA.  A judgment of conviction becomes final for someone who appeals to an appellate

court, but not to the Supreme Court thereafter, when the time for seeking certiorari review in the

Supreme Court expires.  *See Close v. United States,* 336 F.3d 1283, 1284-85 (11th Cir. 2003);

*Kaufman v. United States*, 282 F.3d 1336, 1337-39 (11th Cir. 2002).  Woods had 90 days from

the February 9, 2007 opinion in which to file a petition for a writ of certiorari in the United States

Supreme Court, and his conviction and sentence became final for purposes of § 2255 when that

90 days was ended.  *See* Sup.Ct. R. 13(1) and (3); *see also Close v. United States*, 336 F.3d at

1284-85.  His conviction and sentence became final, therefore, on May 10, 2007.  Under § 2255,

Woods then had until May 10, 2008 – one year after May 10, 2007 – to file his motion.  He filed

the instant motion on February 6, 2008.  It is, therefore, timely under the limitation period in §

2255 ¶ 6(1).

**B.    Claim 3 Of Woods's § 2255 Motion Is Barred From This Court's Review
Because It Was Decided Adversely To Him On Direct Appeal, And He Cannot
Relitigate That Claim In This § 2255 Proceeding.**

On direct appeal of his sentence, Woods raised the following claim:

II.  Whether the court erred in denying the motion to suppress.

. . .

Issue II – The stop of Woods was pretextual.  The officers gave conflicting
testimony.  Evidence through Government witnesses supports Woods'
claim that the evidence should have been suppressed.  There was no
probable cause for the search.

*See* GX Y, at 1, 28.  In its unpublished opinion in this case, the Eleventh Circuit addressed the

issue and rejected it.  *See* GX AA, *United States v. Woods*, No. 05-15999, slip op. at 5 (11th Cir.

Feb. 9, 2007) (unpub.).  In claim 3 of his motion, Woods raises the exact same claim.  That claim

is barred from this Court's review.  As the Eleventh Circuit noted in *United States v. Nyhuis*,

"[o]nce a matter has been decided adversely to a defendant on direct appeal it cannot be re-

litigated in a collateral attack under section 2255."  *See United States v. Nyhuis*, 211 F.3d 1340,

1343 (11th Cir. 2000) (internal quotation marks omitted), *citing United States v. Natelli*, 553

F.2d 5, 7 (2d Cir. 1977).

**C.    Claim 5 Of Woods's § 2255 Motion Is Barred From This Court's Review Because It Could Have Been Raised On Direct Appeal, But It Was Not, And It Is Otherwise Without Merit.**

In issue 5 of his § 2255 motion, which is contained in Exhibit 1 to the motion, Woods

claims that the judge in his case told Woods that he could get a Rule 35 downward departure of

his sentence if he helped Alabama and Florida authorities, but Woods never got any help in his

case.  It appears as though Woods is arguing that the district court erred in advising him about his

rights under Federal Rule of Criminal Procedure 35 and to the extent he is so arguing, that claim

is barred from review in this collateral proceeding because it could have been raised on direct

appeal of his conviction and sentence, but it was not.  Further, because Woods has not presented

this Court with any cause or prejudice to overcome his procedural default, the claim should be

rejected.

A motion under § 2255 cannot be used as a substitute for appeal, *see Burke v. United

States*, 152 F.3d 1329, 1331 (11th Cir. 1998), and claims not raised on direct appeal that could

have been are generally barred from review in § 2255 proceedings, *see Massaro v. United States*,

538 U.S. 500, 504 (2003); *McCoy v. United States*, 266 F.3d 1245, 1258 (11th Cir. 2001).  In

*Mills v. United States*, 36 F.3d 1052 (11th Cir. 1994), the Eleventh Circuit succinctly

summarized the law concerning procedural default as follows:

> Generally speaking, an available challenge to a criminal conviction or sentence must be advanced on direct appeal or else it will be considered procedurally barred in a [Section] 2255 proceeding....  A ground of error is usually "available" on direct appeal when its merits can be reviewed without further factual development....  When a defendant fails to pursue an available claim on direct appeal, it will not be considered in a motion for [Section] 2255 relief unless he can establish  cause for the default and actual prejudice resulting from the alleged error....  Alternatively, under the fundamental miscarriage of justice exception, "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default....

*Id*. at 1055-56 (internal citations omitted).  *See also McCoy v. United States*, 266 F.3d at 1258 ("A claim not raised on direct appeal is procedurally defaulted unless the petitioner can establish cause and prejudice for his failure to assert his claims on direct appeal.").  The burden of demonstrating cause and prejudice or a miscarriage of justice is on the movant.  *See*, *e.g.*, *Bousley v. United States*, 523 U.S. 614, 622 (1998) ("Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice,'... or that he is 'actually innocent[.]' ").

As noted, Woods offers nothing to support a cause and prejudice, or actual innocence, analysis, and the burden to establish those things is on him.  Because he has failed in his burden, this Court should reject claim 5 of the § 2255 motion.

However, even if this Court were to address the merits of Woods's claim, it should reject the claim because the district court did not err in telling Woods that, if he cooperated with the Government after sentencing, and the Government filed a Rule 35 motion to downwardly depart from the sentence, the Court would entertain such a motion.  *See* GX W at 15.  Contrary to

Woods's assertions, the district court never told Woods he would get a downward departure if a Rule 35 motion was filed, but only that such a procedure "is always available to you," and that if Woods "did provide information to the government that is helpful to them and aids them in their investigation of anyone else involved in other criminal activity, be it in the Middle District of Alabama or elsewhere, that would be something that I could certainly look favorably upon if it were filed in the form of a Rule 35 motion to affect your sentence." *Id*. The information the district court provided Woods was accurate and was in no way in error.

Moreover, not only did the Court never tell Woods he would get help on his sentence, i.e. a downward departure in his sentence, but Woods has never helped the Government in investigating other criminal activity. He does not represent to this Court that he has, and he cannot. Therefore, he was not, and is not, entitled to any "help in his case."

Woods's fifth claim for relief is barred from this Court's review and, even if it were not, it has no merit. Therefore, it is due to be rejected.

**D.    All Of Woods's Ineffective Assistance Of Counsel Claims Should Also Be Rejected Because, As To Each Claim, Woods Has Failed To Establish That His Counsel's Performance Was Deficient And That He Was Prejudiced As A Result.**

In addition to the substantive claims addressed above and which are barred from this Court's review, Woods raises the following three claims of ineffective assistance of counsel:

1.    That both his counsel, Kevin Butler and Susan James, were ineffective for failing to file a motion to dismiss the indictment on the grounds that Woods's speedy trial rights were violated.

2.    His appellate counsel, Susan James, was ineffective for failing to file a petition for rehearing or a petition for a writ of certiorari on the suppression issue regarding the pretextual unconstitutional search.

4.      His counsel was ineffective and the prosecutor engaged in misconduct when they failed to inform Woods that "Florida" was willing to consolidate the Alabama and Florida cases, and Woods was prejudiced as a result.

As demonstrated below, counsel's performance was not deficient with respect to any of these claims of ineffective assistance of counsel.  Woods has also wholly failed to meet his burden of demonstrating prejudice.

**1.      The *Strickland* Test For Ineffective Assistance Of Counsel Claims**

To succeed on a claim of ineffective assistance of counsel, a petitioner must prove both that his counsel's performance was deficient and that that deficient performance prejudiced his case.  *Strickland v. Washington,* 466 U.S. 668, 694 (1984); *see also Rompilla v. Beard*, 545 U.S. 374, 380 (2005) ("Ineffective assistance under *Strickland* is deficient performance by counsel resulting in prejudice.").  More specifically, Woods must show that: "(1) counsel's performance was deficient because it fell below an objective standard of reasonableness; and (2) the deficient performance prejudiced the defense."  *Stewart v. Sec'y, Dep't. Of Corr.*, 476 F.3d 1193, 1209 (11th Cir. 2007).

In reviewing counsel's performance to determine whether it meets constitutional requirements, a reviewing court must engage in a " 'highly deferential' review of counsel's performance and 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.' "  *Jennings v. McDonough*, 490 F.3d 1230, 1243 (11th Cir. 2007), *citing Strickland v. Washington*, 466 U.S. at 689.  "As a result of this presumption, a petitioner must show that no

competent counsel would have taken the action that his counsel did take," and where the record

is incomplete or unclear about why counsel acted as he did, the reviewing court must "presume

that he did what he should have done, and that he exercised reasonable professional judgment."

*Jennings v. McDonough*, 490 F.3d at 1243 (internal quotation marks and citations omitted).

The standard for judging counsel's performance is "reasonableness under prevailing

professional norms." *Stewart v. Sec'y, Dep't. of Corr.*, 476 F.3d at 1209 (internal quotation

marks and citations omitted); *see also Rompilla v. Beard*, 545 U.S. at 380. Moreover, the test for

whether counsel's actions or inactions were reasonable "is not whether counsel could have done

something different; instead, [the court] must consider whether the performance fell within the

broad range of reasonable assistance... ." *Id.* "The burden of persuasion is on the petitioner to

prove by a preponderance of the evidence that counsel's performance was unreasonable." *Id.*

The Eleventh Circuit has described a petitioner's burden with regard to the deficient

performance prong of an ineffective assistance of counsel claim as follows:

> Because there is such a wide range of constitutionally acceptable performance, a
> petitioner seeking to rebut the presumption of adequate performance must bear a
> heavy burden:
>
>> The test has nothing to do with what the best lawyers would have done.
>> Nor is the test even what most good lawyers would have done. We ask
>> only whether some reasonable lawyer at the trial could have acted, in the
>> circumstances, as defense counsel acted at trial. ... We are not interested
>> in grading lawyers' performances; we are interested in whether the
>> adversarial process at trial, in fact, worked adequately.
>
>> ... Thus, in order to show that counsel's performance was unreasonable, the
>> petitioner must establish that *no competent counsel would have taken the
>> action that his counsel did take....*

*Grayson v. Thompson*, 257 F.3d 1194, 1216 (11th Cir. 2001) (internal citations omitted); *accord*

*Grossman v. McDonough*, 466 F.3d 1325, 1345 (11th Cir. 2006).

To succeed on an ineffective assistance of counsel claim, the petitioner must not only show deficient performance, but must also show that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different. *See Jennings v. McDonough*, 490 F.3d at 1243. The Eleventh Circuit has described a petitioner's burden in demonstrating that his counsel's deficient performance prejudiced his case as also "high," noting that it is not enough to show that any errors had some conceivable effect on the outcome of the proceeding. *See Stewart v. Sec'y, Dep't. of Corr.*, 476 F.3d at 1209; *Robinson v. Moore*, 300 F.3d 1320, 1343-44 (11th Cir. 2002).

Finally, as the Eleventh Circuit has noted, "[i]t is well established that a habeas petitioner must demonstrate both deficient performance and prejudice, and that a failure to demonstrate either prong constitutes a failure to demonstrate ineffective assistance of counsel." *Bottoson v. Moore*, 234 F.3d 526, 532 (11th Cir. 2000); *accord, Robinson v. Moore*, 300 F.3d at 1343. The reviewing court "can evaluate either the prejudice or the performance prong first and, if either one cannot be met, [the petitioner's] claim must fail." *Dingle v. Sec'y for Dep't. of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007).

### 2. Claim That Counsel Were Ineffective Because They Failed To File Motions To Dismiss The Indictment On The Grounds That Woods's Speedy Trial Rights Were Violated

Woods's first claim of ineffective assistance of counsel is that both Mr. Butler and Ms. James were ineffective in their representation of him because they failed to file motions to dismiss the indictment on the grounds that Woods's speedy trial rights were violated. Woods does not allege on what grounds such a motion should have been based. Instead, he only makes

the claim in the vaguest terms and alleges that, although he signed a waiver of his speedy trial

rights, "a clause was added to the waiver."  He also alleges that Ms. James admitted at sentencing

that she was ineffective in failing to file the motion to dismiss on the basis of a speedy trial

violation.[3]

Twice, in connection with motions for a continuance filed by him, Woods filed waivers

of his speedy trial rights.  The first Waiver of Right To Speedy Trial, signed by Woods

personally, was filed in connection with an Unopposed Motion To Continue Trial Date filed by

Mr. Butler on Woods's behalf.  *See* GXs C and D.  The motion for continuance of the trial date

was requested by Mr. Butler so that the Court would have sufficient time to consider his motion

to suppress and so that he could have more time to prepare for both the motion to suppress

hearing and for trial.  *See* GX C at 1, ¶¶ 3-4.  The speedy trial waiver signed by Woods states that

Woods signed the waiver after being first advised of his right to a speedy trial and that he was

waiving his right to a speedy trial "as to the January 10, 2005, trial term."  *See* GX D.  The court

granted Woods's motion to continue the trial date, noting that he had waived his right to a speedy

trial and concluding "that the ends of justice served by continuing the case outweigh the interests

of the public and the defendant in a speedy trial."  *See* GX E at 2.

After Mr. Butler filed this motion for a continuance, Woods retained Susan James to

represent him.  *See* GX G and H.  Ms. James also filed an unopposed motion for a continuance of

the trial date, after Woods's suppression motion was denied, representing in that motion that she

---

[3]In her affidavit, Ms. James states that, if there is any merit to Woods's Speedy Trial Act claim, then she was ineffective.  See Affidavit of Susan G. James at 1-2.  However, "trial counsel's admission that [her] performance was deficient 'matters little,' " because the inquiry is an objective one.  *See Jennings v. McDonough*, 490 F.3d at 1243 (internal citation omitted).

28

needed more time to try to resolve the case through plea negotiations.  *See* GX R.  Along with

that motion for a continuance, Woods filed a Waiver Of Speedy Trial Rights that he personally

signed.  *See* GX S.  In that waiver, Woods again represented that he signed the waiver only "after

being first advised of his right to a speedy trial, and he specifically requested that the "trial in this

matter be set sometime after the April trial term and foregoes/waives any speedy trial issues

pertaining to the resetting of this case."  *Id*.  Further, the waiver contained the following cryptic

statements, included in the waiver allegedly because they had also been included in the previous

waiver, *see* GX W at 14, although they had not:  "A waiver of speedy trial has been filed

previously.  A new waiver is being executed.  Woods, however, by signing the waiver does not

waive his speedy trial rights relating to the time period before he was actually brought into

federal custody on this case."  *Id*.

Despite these repeated waivers of his speedy trial rights, Woods claims his counsel

should have filed motions to dismiss his indictment on the grounds his speedy trial rights were

violated.  But because Woods twice agreed to waive his right to a speedy trial in this case so that

he could have more time to prepare his case, and the court found good cause to grant those

continuances, he cannot now complain because his trial did not occur within 70 days of his

indictment or first appearance.

Woods was indicted on January 27, 2004.  *See* GX 1.  He was not brought before a

magistrate for an initial appearance on that charge (because he was in custody in another

jurisdiction) until November 17, 2004.  *See* Doc. 12.  At that time, his trial was set for the

January 10, 2005 trial term, well within the 70 day timeframe.  *Id*.  His first motion for a

continuance and waiver of speedy trial rights were filed on December 22, 2004, thirty-five days

after the initial appearance on the charge, *see* GXs C and D, and the case was set over for the April 18, 2005 trial term, *see* GX E at 2.  The second motion for a continuance and waiver of speedy trial rights were filed after the unsuccessful suppression hearing and before the April 18, 2005 trial term – on April 8, 2005.  *See* GX R and S.  The second motion for a continuance was also granted and the case was reset for trial during the May 16, 2005 trial term.  *See* GX T at 2. Woods was tried on May 23, 2005.  *See* GX U.  Under these facts, counsel were not ineffective for not filing a motion to dismiss the indictment on speedy trial grounds.

Mr. Butler's and Ms. James's performances with regard to the speedy trial act claim were not deficient for two reasons.  First, their actions were not deficient because both counsel made reasonable decisions to advise Woods of his speedy trial rights and to get him to waive those rights so that they could properly prepare for the suppression hearing, a possible plea, and for trial.  Their strategic decisions were sound and Woods has not demonstrated to the contrary. Moreover, because Woods personally chose to waive his speedy trial rights after being advised of those rights, his counsel were not ineffective in, at the same time as waiving those rights, asserting those rights on Woods's behalf.  Again, their decisions not to take inconsistent positions before the Court were reasonable under professional norms.

Second, Mr. Butler and Ms. James were not deficient in failing to allege that Woods's speedy trial rights were violated because more than 70 days passed between his indictment and when he was brought before the Court for his first appearance or that he was not brought to trial within 70 days of his indictment.  For Speedy Trial Act purposes, Woods's 70 days began to run from the date Woods was first brought before a magistrate judge on November 17, 2004, not 70 days from his indictment as Woods asserts.  *See* 18 U.S.C. § 3161(c)(1) ("In any case in which a

plea of not guilty is entered, the trial of the defendant charged in an information or indictment with the commission of an offense shall commence within seventy days from the filing date (and making public) of the information or indictment, ***or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs***.").

Moreover, it does not matter that the Government filed a writ of habeas corpus ad prosequendum on Woods, who was incarcerated in Georgia, after the indictment, but did not obtain his custody within 70 days of the indictment. Woods both misperceives the nature of that writ and how it affects the speedy trial issue. Woods was incarcerated in Georgia at the time of his indictment in federal court on the basis of a parole violation, *see* Docs. 7, 8, 9, and while he alleged at sentencing he was only being held based on the federal indictment, *see* GX W at 32, that fact was refuted by the Government, *id*. at 34-36, and rejected by the Court, *id*. at 36. So even if the writ somehow affected the speedy trial act claim, "[f]or the time limit of the Act to commence a person must be held for the purposes of answering a federal charge." *United States v. Shahryar*, 719 F.2d 1522, 1524-25 (11th Cir. 1983). And, "if one is held by state officers on a state charge and subsequently turned over to federal authorities for federal prosecution, the starting date for purposes of the Act is the date that the defendant is delivered into federal custody." *Id*. at 1525. *See also United States v. Rodriguez-Franco*, 749 F.2d 1555, 1559 (11th Cir. 1985) ("[I]n computing the 70 day limitation under the Speedy Trial Act, time spent in state custody awaiting probation revocation proceedings is excludable."). Because the writ did not affect the application of the speedy trial act claim in this case, counsel were not deficient for failing to file a motion to dismiss the indictment on the basis of that 10–month period of time

between indictment and first appearance.[4]

Further, Woods has not only failed to demonstrate deficient performance, but he has also failed to demonstrate prejudice with regard to his Speedy Trial Act claim. He does not allege any prejudice in his motion, but assuming he is alleging the same prejudice he alleged at sentencing, *see* GX W at 32-34 – his failure to be able to locate a possible witness – that argument cannot withstand scrutiny. First, Woods did not allege at sentencing that but for the delay in his case, he would have been able to locate the witness, Ruth or Ruby or whatever her name was. *See* GX at 33-34. Instead, he represented to the Court that he could not locate her after his arrest at all. It is just as likely that he could have located her with more time to do so as it is that he could have located her if the case had not been delayed. There is simply no basis on which this Court can find the delay in this case is what caused Woods to be unable to locate an important witness in his case.

Second, while Ruth or Ruby may have been able to support some of Woods's contentions as to why he was going to Florida, it does not appear that her testimony would have refuted any of the elements of the offense. At most, this witness *may* have presented some corroboration of Woods's defense that he did not intend to distribute the large amount of methamphetamine in his possession. Therefore, not only has Woods not shown that a possible witness for him was lost because of the delay in bringing him to trial, he has also failed to show that that witness would have changed the outcome of his case. It is his burden to demonstrate that but for the delay, he would not have been convicted. The burden of demonstrating prejudice is on him, and he has

---

[4]Contrary to Woods's allegation in his motion, Ms. James did not admit that she was ineffective with regard to the speedy trial act claim at sentencing. *See* GX W at 3-6.

clearly not met that burden.  Therefore, this Court should reject this claim of ineffective assistance of counsel.

     **3.**     **Claim That Appellate Counsel Was Ineffective For Failing To File A Petition For Rehearing Or A Petition For Certiorari On The Suppression Issue Regarding A Pretextual Unconstitutional Search**

In his next claim, Woods argues his appellate counsel was ineffective for failing to file a petition for rehearing in the Eleventh Circuit Court of Appeals, or a petition for a writ of certiorari in the Supreme Court, raising the suppression issue regarding a pretextual unconstitutional search.  This claim has no merit both because there was no deficient performance and because there was no prejudice from the failure of counsel to raise the issue.

In her first affidavit filed in connection with this proceeding, appellate counsel, Ms. James, a very experienced appellate practitioner, explained that she did not file a petition for rehearing or suggestion for rehearing en banc because "she did not believe that Woods's issues were sufficiently unique and/or ones that the Eleventh Circuit would hear en banc or the United States Supreme Court" would hear.  *See* Affidavit of Susan G. James at 3-4.  Her assessment of this issue was within reasonable professional norms, and Woods has not demonstrated to the contrary.  *See*, *generally*, *Stewart v. Sec'y, Dep't of Corr.*, 476 F.3d 1193, 1209 n.25 ("When courts are examining the performance of an experienced [appellate] counsel, the presumption that his conduct was reasonable is even stronger.") (internal citation and quotation marks omitted).

Rule 35 of the Federal Rules of Appellate Procedure provides, in relevant part, that "[a]n en banc hearing or rehearing is not favored and ordinarily will not be ordered unless:  (1) en banc consideration is necessary to secure or maintain uniformity of the court's decisions; or (2) the

33

proceeding involves a question of exceptional importance."  En banc consideration was not necessary to secure or maintain uniformity of the Eleventh Circuit's decisions on the issue of pretext in the Fourth Amendment probable cause context, nor did the pretext issue involve a question of exceptional importance in that it was already resolved in the Circuit.  Moreover, the panel in this case issued an unpublished per curiam opinion in the case – including on the pretext issue – a clear indication that the panel deciding the case did not find any of the issues addressed in the opinion to be of exceptional importance.  Therefore, neither panel rehearing under Rule 40, Fed. R. App. P., nor rehearing en banc under Rule 35, Fed. R. App. P., were likely to be granted in this case.  Therefore, Ms. James's determination that, in her experience, rehearing and rehearing en banc were not called for in this case was a reasonable professional decision.

The decision not to file a petition for a writ of certiorari in the Supreme Court was also a reasonable professional decision.  Although the Supreme Court has the discretion to grant certiorari for any compelling reason, it hears less than 100 cases each year and generally limits review to cases for one of the following reasons:

(a)  a United States court of appeals has entered a decision in conflict with the decision of another United States court of appeals on the same important matter; has decided an important federal question in a way that conflicts with a decision by a state court of last resort; or has so far departed from the accepted and ususal course of judicial proceedings, or sanctioned such a departure by a lower court, as to call for an exercise of this Court's supervisory power;

(b)  a state court of last resort has decided an important federal question in a way that conflicts with the decision of another state court of last resort or of a United States court of appeals;

(c)  a state court or a United States court of appeals has decided an important question of federal law that has not been, but should be, settled by this Court, or has decided an important federal question in a way that conflicts with relevant decisions of this Court.

34

*See* S.Ct. R. 10. Moreover, "[a] petition for writ of certiorari is rarely granted when the asserted error consists of erroneous factual findings or the misapplication of a properly stated rule of law." *Id*. The issue Woods argues counsel should have raised involved none of the types of issues identified by the Court in its rules as appropriate for certiorari review, and at most, it involves the misapplication of a properly stated rule of law, which is an issue that is rarely granted review. Ms. James, an experienced appellate lawyer, is presumed to have been familiar with this rule and her decision that the pretext Fourth Amendment issue was not appropriate for certiorari review was reasonable.

Because Ms. James's performance in not filing either a petition for rehearing in the Eleventh Circuit or one for certiorari in the Supreme Court was not deficient, Woods's argument fails. However, it also fails because Woods has not demonstrated prejudice – he has not demonstrated that he would likely have succeeded on appeal, had the issue been raised. To the contrary, the Eleventh Circuit correctly analyzed and decided the issue. Therefore, Woods was not prejudiced by counsel's failure to file either petition. Woods is simply entitled to no relief on this claim.[5]

---

[5]While Ms. James notes in her supplemental affidavit that Woods did not instruct her to file a petition for rehearing or a petition for writ of certiorari, *see* Supplemental Affidavit of Susan G. James, Attorney at Law, Woods's instructions one way or the other are inapposite. While a defendant has the right to have his attorney file a notice of appeal on his behalf when he instructs his attorney to do so, *see Rodriquez v. United States*, 395 U.S. 327 (1969); *Roe v. Fores-Ortega*, 528 U.S. 470 (2000), he does not also have the right to instruct his attorney how to approach or pursue that appeal. Such strategic decisions are for appellate counsel to make based on her expertise. Moreover, petitions for rehearing and rehearing en banc in the 11th Circuit and petitions for writ of certiorari in the Supreme Court are applications for discretionary review, and there is no right to counsel in seeking either of these forms of review. *See Ross v. Moffitt*, 417 U.S. 600 (1974). Therefore, there can be no ineffective assistance of counsel for failing to pursue this type of appellate review.

4.     **Claim That Counsel Was Ineffective And The Prosecutor Engaged In Misconduct When They Failed To Inform Woods That "Florida" Was Willing To Consolidate The Alabama And Florida Cases, And Woods Was Prejudiced As A Result**

In his final ineffective assistance of counsel claim, Woods argues that his counsel was ineffective and the prosecutor engaged in misconduct when they failed to inform Woods that "Florida" was willing to consolidate the Alabama and Florida cases, and Woods was prejudiced as a result. The problem with Woods's last claim is that he provides no evidence to support his allegation that "Florida" was willing to consolidate his Alabama case with his Florida case, and the affidavits provided by his counsel and the prosecutor in this case specifically refute that contention. *See* Affidavit of Susan G. James at 2-3; Affidavit of Susan R. Redmond, *see* GX BB. While there appears to have been some discussions and negotiations with prosecutors in Florida about Woods's providing cooperation to Florida in exchange for some consideration in his Alabama case, there is no evidence that there was any willingness on the part of Florida – or necessary agreement on the part of Alabama – to consolidate any cases. Because there is no evidence that either Florida authorities or the United States Attorney's Office for the Middle District of Alabama ever indicated a willingness to consolidate Woods's underlying conviction here with any Florida case, Woods has not demonstrated that his counsel or the prosecutor failed to inform him of anything affecting his conviction. Therefore, he has failed to demonstrate either deficient performance or prejudice, or prosecutorial misconduct of any kind.

## IV.  MISCELLANEOUS

Woods has failed to plead facts or present sufficient evidence or argument demonstrating that he is entitled to an evidentiary hearing, and his claims for relief should be denied without

such a hearing.  *See Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977); *see also Gordon v. United States*, 496 F.3d 1270, 1281 (11th Cir. 2007) ("An evidentiary hearing is not required when 'the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief.' "), *citing* 28 U.S.C. § 2255.; *Chandler v. McDonough*, 471 F.3d 1360, 1363 (11th Cir. 2006) (Where a defendant fails to proffer any evidence that he would seek to introduce at a hearing, he is not entitled to an evidentiary hearing).  Should this Court determine that Woods has made any arguments not addressed in this response, the Government would request the opportunity to further respond to those arguments.

Any facts not specifically admitted in this response are denied, and the arguments made as to each claim raised are asserted in the alternative.

## V. CONCLUSION

For the above reasons, Petitioner Claude Lee Woods has failed to demonstrate that he is entitled to any relief from this Court, and his § 2255 motion should be denied without an evidentiary hearing.

Respectfully submitted this 11th day of April, 2008.

LEURA G. CANARY
UNITED STATES ATTORNEY


/s/  Sandra J. Stewart
SANDRA J. STEWART
Assistant United States Attorney
131 Clayton Street
Montgomery, AL  36101-0197
(334) 551-1764
(334) 223-7135

37

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **CLAUDE LEE WOODS,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 1:08cv98-MEF** |
| | ) | **(CR No. 1:04-cr-00012-UJ-VPM)** |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on April 11, 2008, I electronically filed the foregoing response and attachments with the Clerk of the Court using the CM/ECF system and mailed, postage prepaid, a copy of this response to the *pro se* Defendant/Petitioner as follows:

Claude Lee Woods
Rg. #11560-002
U.S.P. Big Sandy
P. O. Box 2068
Inez, KY  41224

Respectfully submitted,

LEURA G. CANARY
UNITED STATES ATTORNEY

/s/  Sandra J. Stewart
SANDRA J. STEWART
Assistant United States Attorney
131 Clayton Street
Montgomery, AL  36101-0197
(334) 551-1764
(334) 223-7135

38

**FILED**

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

JAN 2 1 2004

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) CR. NO. 04-12-S |
| | ) [21 USC 841(a)(1)] |
| CLAUDE LEE WOODS | ) |
| | ) |
| | ) INDICTMENT |
| | ) |

The Grand Jury charges:

<u>COUNT 1</u>

On or about the 14th day of August, 2003, in Dothan, Alabama,
in the Middle District of Alabama,

CLAUDE LEE WOODS,

defendant herein, did knowingly and intentionally possess with
intent to distribute 50 grams or more of methamphetamine, a
Schedule III Controlled Substance, in violation of Title 21, United
States Code, Section 841(a)(1).

A TRUE BILL:

*Craig Smith*

Foreperson

*Leura J. Canary*
LEURA GARRETT CANARY
UNITED STATES ATTORNEY

*Susan R. Redmond*
Susan R. Redmond
Assistant United States Attorney

```
AO396-C
GOVERNMENT
EXHIBIT

CASE
NO.

EXHIBIT
NO.     A
```

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| V. | ) | CR NO. 1:04CR12 |
| | ) | |
| CLAUDE LEE WOODS | ) | |

## MOTION TO SUPPRESS STOP, SEARCH AND SEIZURE AND CITATIONS OF AUTHORITY

COMES NOW, the Defendant, Claude Lee Woods, by and through undersigned counsel, Kevin L. Butler, and pursuant to the Fourth and Fifth Amendments to the United States Constitution, moves this Court for an Order suppressing all evidence and statements illegally seized as a result of the stop, search and seizure of the vehicle driven by Claude Lee Woods on August 14, 2003.

This evidence includes, but is not limited to: (a) any and all physical evidence seized from the vehicle or Mr. Woods on August 14, 2003, (b) any and all statements made as a result of the illegal stop, search and seizure of the vehicle, and (c) any other "fruit" of the illegal stop, search and seizure.

### Facts

During the evening hours of August 14, 2003, Mr. Woods was operating his vehicle safely, in compliance with all traffic laws and within posted speed limits in the 5700 block of South Oats Street in Dothan, Alabama. Mr. Woods' vehicle was a "customized" black Cadillac El Dorado displaying a valid Georgia license plate. Nevertheless, at approximately, 10:10 p.m., Dothan Police Detective Dave Elkins elected to stop Mr. Woods' vehicle because it had allegedly crossed the "fog

1



GOVERNMENT
EXHIBIT

CASE
NO.

EXHIBIT
NO.    B

lane". Detective Elkins was driving an unmarked police vehicle that was equipped with emergency lights. After noticing the emergency lights in Detective Elkins' vehicle and finding a safe area to stop, Mr. Woods stopped his vehicle.

Detective Elkins then approached the driver's door and (1) informed Mr. Woods that he was being stopped for crossing the fog line and (2) ask for Mr. Woods' drivers license, vehicle registration and insurance. While making these inquiries, Detective Elkins noticed an open beer container between Mr. Woods' legs and allegedly observed cigarette rolling papers in the driver's door arm rest. Though no burnt marijuana was ever located within the vehicle, Detective Elkins also allegedly smelled marijuana within the vehicle. Based upon these observations, Detective Elkins asked Mr. Woods, "how much he'd been drinking?" Mr. Woods allegedly informed the office, "one beer." Mr. Woods was then asked to pour onto the ground the beer that had been between his legs.

Detective Elkins then began to inquire into matters completely unrelated to the basis for the vehicle stop. Specifically, Detective Elkins asked whether Mr. Woods was on probation or parole and the nature of Mr. Woods' travels. After responding to these questions, Mr. Woods was asked to step out of his vehicle and was patted down. No weapons or contraband were found pursuant to the "pat down".

Though the basis for the stop was an alleged traffic violation, Mr. Woods posed no danger the officers, and Mr. Woods' conduct did not suggest weapons or contraband were in the vehicle, Officer Elkins asked permission to search Mr. Woods' car. Mr. Woods **denied** consent. Nevertheless, Officer Elkins searched the vehicle. Pursuant to that warrantless search, Officer Elkins found what he believed to be "zip-locked" baggies containing methamphetamine and approximately 5.5 grams of marijuana in a "zip-locked" baggy.

2

Mr. Woods now moves to suppress the search of his vehicle.

### Argument

The stop of Mr. Woods' vehicle was not based upon probable cause or information indicating that he had violated any traffic laws. Therefore, the subsequent stop, search and seizure were improper. Additionally, even if there was cause to stop the vehicle, there was not an articulable and reasonable suspicion to continue to detain Mr. Woods after information had been gathered to write the traffic citation. Finally, there was not probable cause for the subsequent search of the vehicle. Therefore, all evidence seized as a result of the unconstitutional stop, search, and seizure must be suppressed.

### *Vehicle Stop Was Unconstitutional*

Police may only stop a vehicle if the totality of circumstances show that there is probable cause to believe occupant(s) have violated the law (i.e. committed a traffic violation or some other offense). *United States v. Arvizu*, 122 S.Ct. 744 (2002). And though a police officer may order an individual out of the vehicle once it is stopped, there must be some legitimate basis (i.e. traffic violation) for the stop of the vehicle. *Wren v. United States*, 517 U.S. 806 (1996); *Pennsylvania v. Mimms*, 434 U.S. 106 (1977).

In this case, there was no reasonable basis or justification for the stop. Mr. Woods was not violating any traffic rules or laws. Additionally, the officers had no cause to believe he was engaged in any illegal conduct. Mr. Woods' stop was pretextual. Mr. Woods was not stopped because he had committed any traffic infraction or because the officers had cause to believe he was engaged in any criminal behavior. As the stop of the vehicle was pretextual and unconstitutional, the ensuing search must be suppressed.

3

***Continued Detention of Mr. Woods and his Vehicle Detention Was Illegal***

Even if this Court determines the vehicle stop was based upon probable cause to believe the driver had committed a driving violation, because the officer had no articulable and reasonable suspicion that the vehicle contained contraband, the continued seizure of Mr. Woods and the vehicle were improper and in violation of the Constitution.

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." Const. Amend IV. "[Searchers conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 88 S.Ct. 507, 514 (1967) (internal citations omitted).

One of the exceptions is that police officers may briefly stop and question an individual the officer articulably and reasonably believes may be engaged in criminal activity. *Terry v. Ohio*, 88 S.Ct. 1868 (1968). However, "reasonable suspicion" may not be based on the officer's hunch, but requires that the police officer be able to point to specific and articulable facts which reasonably warrant the intrusion. *Id*. (citing, *Terry v. Ohio* at 1879); *United States v. Perkins*, 348 F.3d 965, (11th Cir 2003); See also, *United States v. Mackle*, 102 F.3d 470, 475 (11th Cir. 1996) (police are required to articulate some objective justification for the stop).

In *United States v. Pruitt*, 174 F. 3rd 1215 (11th Cir. 1999), the Eleventh Circuit addressed the implication of the Fourth Amendment in a routine traffic stop and the application of the *Terry* standard. In *Pruitt*, the defendant was stopped for a traffic violation and asked to accompany the officer to his vehicle. While in the vehicle the officer asked the defendant questions unrelated to the

4

traffic citation.    The officer then questioned the passengers on matters unrelated to the traffic

violation.   Prior to writing the citation, the officer then asked if the defendant had any contraband

and whether he could search the vehicle.   When the defendant stated he had no contraband and

would not allow the search, the officer ordered a K-9 inspection of the vehicle and narcotics were

subsequently found.   The Eleventh Circuit held that the detention of the defendant and the

subsequent search and seizure was illegal.   The Court held:

> "In justifying [the search of an automobile], the `reasonableness' standard requires
> that a police officer `be able to point to specific and articulable facts which, taken
> together with rational inferences from those facts, reasonably warrant that intrusion.'
> In this regard, reasonable suspicion is determined from the totality of the
> circumstances and from the collective knowledge of the officer involved in the stop."
> ...
> "Nevertheless, `reasonable suspicion' must be more than an inchoate `hunch,' and
> the Fourth Amendment accordingly requires that police articulate some minimal,
> objective justification for an investigatory stop. ... **[Once an officer has briefly
> stopped a motor vehicle operator for the purpose of issuing a traffic violation
> (i.e., a ticket), the officer's continuing detention of the vehicle's occupants is
> authorized under the Fourth Amendment only if the officer can point to
> `specific and articulable facts which, taken together with rational inferences
> from those facts, reasonably warrant the intrusion.'"**

> *Pruitt*, 174 F. 3d at 1219. (emphasis added)

The Court further found that the questioning during an alleged traffic stop for a driving infraction

should be limited to questions regarding the drivers "license, registration and insurance papers." *Id.*

at 1220.   Unless there is articulable and reasonable suspicion of criminal activity, additional

questioning was irrelevant and a violation of *Terry*.  *Id.*; See also *United States v. Perkins*, 348 F.3d

965, (11th Cir 2003).

In this case, Mr. Woods was stopped for a minor traffic violation.   All questioning by

Detective Elkins should have been limited to the basis for the car stop.   Therefore, the questioning

regarding Mr. Woods probation/parole status and trip iternary were improper and prohibited. However, regardless of the propriety of the questioning of Mr. Woods, Detective Elkins had not gathered information which gave rise to an articulable and reasonable suspicion that the vehicle driven by Mr. Woods contained contraband.

It is anticipated that the government will allege that the "smell" of burnt marijuana was the fact that gave rise to suspicion necessary for the continued detention of Mr. Woods. However, none of the physical evidence seized at the scene support Detective Elkins' assertion that he smelled marijuana. Specifically, all narcotics that were found were in sealed containers and there was not exposed or burnt residue of marijuana.

As there was not an articulable and reasonable suspicion the vehicle contained contraband, the continued detention for purposes of the search was improper and unconstitutional.

***Search of the Vehicle Was Not Supported By Probable Cause***

After Mr. Woods denied Detective Elkins permission to search the vehicle, it was search by police. However, in order to conduct the warrantless search of Mr. Woods' vehicle, there had to be more than an articulable and reasonable suspicion that it contained contraband (i.e. the standard to continue to detain Mr. Woods). Detective Elkins needed probable cause to believe that the vehicle contained contraband. *Chambers v. Maroney*, 399 U.S. 42 (1970). Therefore, Officer Elkins needed information showing there was a fair probability that contraband would be found in the vehicle. *Illinois v. Gates*, 462 U.S. 213 (1983).

However, as discussed above, there was not even justification for a continued *Terry/Perkins* detention of Mr. Woods. Therefore, Officer Elkins had absolutely no justification to disregard the Fourth Amendment and simply search the vehicle based upon the information he had gather to this

6

point. Detective Elkins was acting on pure speculation when he began the search. This form of police intrusion is strictly prohibited by the Constitution. For these reasons the search of the vehicle mus be suppressed.

WHEREFORE, Mr. Woods asks this Court to enter an order suppressing all evidence seized during and subsequent to the stop of the vehicle he was driving in Dothan, Alabama on August 14, 2003. This evidence includes, but is not limited to:

(a)    any and all physical evidence seized from the vehicle;

(b)    any and all statements made by Mr. Woods after any stop of the vehicle; and

(c)    any and all evidence obtained as a result or "fruit" of any such seizures.

Dated this 16th day of December 2004.


Respectfully submitted,


s/ Kevin L. Butler
KEVIN L. BUTLER
First Assistant Federal Defender
201 Monroe Street, Suite 407
Montgomery, Alabama 36104
Phone: (334) 834-2099
Fax: (334) 834-0353
E-mail: kevin_butler@fd.org
AZ Bar Code: 014138

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| V. | ) | 2:04cr12 |
| | ) | |
| CLAUDE LEE WOODS | ) | |

### CERTIFICATE OF SERVICE

I hereby certify that on December 16, 2004, I electronically filed the foregoing with the Clerk

of Court using the CM/ECF system which will send notification of such filing to the following:

Susan R. Redmond, Esquire
Assistant United States Attorney
One Court Square, Suite 201
Montgomery, Alabama 36104


Respectfully submitted,


s/ Kevin L. Butler
KEVIN L. BUTLER
First Assistant Federal Defender
201 Monroe Street, Suite 407
Montgomery, Alabama 36104
Phone: (334) 834-2099
Fax: (334) 834-0353
E-mail: kevin_butler@fd.org
AZ Bar Code: 014138

*(handwritten notations in top right margin)*

# IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| V. | ) | 1:04cr12 |
| | ) | |
| CLAUDE LEE WOODS | ) | |

## UNOPPOSED MOTION TO CONTINUE TRIAL DATE

COMES NOW the Defendant, Claude Lee Woods, by and through undersigned counsel, Kevin L. Butler, and respectfully moves, pursuant to 18 U.S.C. 3161 §§ (h)(1)(F); (h)(8)(b)(i) and (h)(8)(b)(iv), to continue the trial of this matter past the currently scheduled January 10, 2005 trial term.  In support of this Motion, defendant would show the following:

1.    Mr. Woods has been charged in this Court with possession with the intent to distribute more than 50 grams of methamphetamine in violation of 21 U.S.C. § 841(a)(1).

2.    On December 16, 2004, Mr. Woods filed a motion to suppress physical evidence seized and/or statements made as a result of what Defendant claims was an illegal traffic stop of his vehicle on August 14, 2003.

3.    This requested continuance is sought to allow careful consideration and resolution of Defendant's pending motion to suppress prior to a trial of this matter.

4.    Further, undersigned counsel and his case investigator will be traveling to Dothan to investigate information which is relevant and material to the case, suppression motion and trial preparation  However, it is not possible for all investigation to be completed before the trial date of January 10, 2005.

1



A088-C
**GOVERNMENT EXHIBIT**

CASE
NO.

EXHIBIT
NO.    C

5.    Mr. Woods' waiver of speedy trial is attached to this Motion.

6.    The United States, through Assistant United States Attorney Susan Redmond, has no
      opposition to this requested continuance.

7.    Requests for a continuance of trial are addressed to the sound discretion of the trial court.
      *United States v. Darby*, 744 F.2d 1508, 1521 (11th Cir. 1984), reh. denied 749 F.2d 733, cert.
      denied 471 U.S. 1100 (1985).

8.    Additionally, pursuant to 18 U.S.C. 3161 §§ (h)(1)(F); (h)(8)(b)(i) and (h)(8)(b)(iv), this
      court has the discretion and it is in the interest of justice to continue trial to allow the defense
      necessary and additional time to prepare.

      FOR THE REASONS ABOVE, Mr. Woods respectfully requests that this Motion be granted,
the trial in this matter be continued from the January 10, 2005 trial docket.

                          Respectfully submitted,


                          s/ Kevin L. Butler
                          KEVIN L. BUTLER
                          First Assistant Federal Defender
                          201 Monroe Street, Suite 407
                          Montgomery, Alabama 36104
                          Phone: (334) 834-2099
                          Fax: (334) 834-0353
                          E-mail: kevin_butler@fd.org
                          AZ Bar Code: 014138

2

**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **V.** | ) | **1:04cr12** |
| | ) | |
| **CLAUDE LEE WOODS** | ) | |

---

### CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2004, I electronically filed the foregoing with the Clerk

of Court using the CM/ECF system which will send notification of such filing to the following:

Susan Redmond, Esquire
Assistant United States Attorney
One Court Square, Suite 201
Montgomery, Alabama 36104


Respectfully submitted,


s/ Kevin L. Butler
KEVIN L. BUTLER
First Assistant Federal Defender
201 Monroe Street, Suite 407
Montgomery, Alabama 36104
Phone: (334) 834-2099
Fax: (334) 834-0353
E-mail: kevin_butler@fd.org
AZ Bar Code: 014138

3

04-0051
SPC
S/

# IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE MIDDLE DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| V. | ) | 1:04cr12 |
| | ) | |
| CLAUDE LEE WOODS | ) | |

## WAIVER OF RIGHT TO SPEEDY TRIAL

The undersigned Defendant, after being first advised of his right to a speedy trial as guaranteed him by the Sixth Amendment of the United States Constitution and the implementation of said right in 18 U.S.C. § 3161, hereby waives his right to a speedy trial as to the January 10, 2005, trial term.

_Claude LL Woods_
CLAUDE LEE WOODS

DATE: _12-21-04_

1

GOVERNMENT
EXHIBIT

CASE
NO.

EXHIBIT
NO.    D

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| V. | ) | 1:04cr12 |
| | ) | |
| CLAUDE LEE WOODS | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on December 21, 2004, I electronically filed the foregoing with the Clerk

of Court using the CM/ECF system which will send notification of such filing to the following:

Susan R. Redmond, Esquire
Assistant United States Attorney
One Court Square, Suite 201
Montgomery, Alabama 36104

Respectfully submitted,

s/ Kevin L. Butler
KEVIN L. BUTLER
First Assistant Federal Defender
201 Monroe Street, Suite 407
Montgomery, Alabama 36104
Phone: (334) 834-2099
Fax: (334) 834-0353
E-mail: kevin_butler@fd.org
AZ Bar Code: 014138

2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

UNITED STATES OF AMERICA,    )
                             )
v.                           )        CASE NO. 1:04CR12
                             )
CLAUDE LEE WOODS             )

## ORDER

The defendant has moved for continuance of the trial of this case and has waived his

right to speedy trial.  While the granting of a continuance is left to the sound discretion of the

trial judge, ***United States v. Warren***, 772 F.2d 827, 837 (11th Cir. 1985), the court is, of

course, limited by the requirements of the ***Speedy Trial Act***, 18 U.S.C. §3161 ["The Act].

The Act provides generally that the trial of a defendant in a criminal case shall commence

within 70 days of the latter of the filing date of the indictment or the date the defendant

appeared before a judicial officer in such a matter. 18 U.S.C. §3161(c)(1). ***See United States***

***v. Vassar***, 916 F.2d 624 (11th Cir. 1990).  The Act excludes from this 70-day period any

continuance that the judge grants "on the basis of [her] findings that the ends of justice served

by taking such action outweigh the best interest of the public and the defendant in a speedy

trial". 18 U.S.C. §3161(h) (8) (A).

In this case, the defendant advised the court at the pretrial conference that he needed

additional to time to prepare for trial, including time for the court's processing of the

defendant's motion to suppress.  An evidentiary hearing is now set for 18 January 2005.

There is only one defendant in this case, and the government does not object to a



GOVERNMENT EXHIBIT

CASE NO.

EXHIBIT NO. *E*

continuance. Moreover, the defendant is willing to waive his right to a Speedy Trial under the Act. The court concludes that the ends of justice served by continuing this case outweigh the interests of the public and the defendant in a speedy trial.

Accordingly, it is hereby ORDERED as follows:

1.    The motion for continuance (Doc. #18) filed by the defendant be GRANTED and that this cause be set on the 18 April 2005 trial term.

2.    This case is reset for pretrial conference on 21 March 2005 at 9:00 a.m. in Courtroom 5-A, Frank M. Johnson, Jr. United States Courthouse Complex, One Church Street, Montgomery, Alabama. Pending before this court is a Motion to Suppress (Doc. #15) which has been set for an evidentiary hearing by separate order.

DONE this 4th day of January, 2005.

/s/ Vanzetta Penn McPherson
VANZETTA PENN MCPHERSON
UNITED STATES MAGISTRATE JUDGE

00 0001
SRR

# IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE MIDDLE DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| V. | ) | CR NO. 1:04CR12 |
| | ) | |
| CLAUDE LEE WOODS | ) | |

## UNOPPOSED MOTION TO CONTINUE SUPPRESSION HEARING

**COMES NOW**, the Defendant, Claude Lee Woods, by and through undersigned counsel,

Kevin L. Butler, and respectfully moves the Court for an Order continuing the Suppression Hearing

currently scheduled for January 12, 2005.  In support of this Motion, the undersigned would state

the following:

    1.    Undersigned counsel will be out of state on a personal matter from January 11 thru

January 14, 2005.

    2.    Counsel for the Government, Susan R. Redmond, has been contacted and has no

objections to continuing the Suppression Hearing in this matter.

**WHEREFORE**, undersigned counsel requests an Order be entered continuing the

Suppression Hearing.

Dated this 4th day of January 2005.

Respectfully submitted,

s/ Kevin L. Butler
KEVIN L. BUTLER
First Assistant Federal Defender
201 Monroe Street, Suite 407
Montgomery, Alabama 36104
Phone: (334) 834-2099
Fax: (334) 834-0353
E-mail: kevin_butler@fd.org
AZ Bar Code: 014138

1



GOVERNMENT
EXHIBIT

CASE
NO.

EXHIBIT
NO.  F

**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **V.** | ) | **2:04cr12** |
| | ) | |
| **CLAUDE LEE WOODS** | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on January 4, 2005, I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system which will send notification of such filing to the following:

Susan R. Redmond, Esquire
Assistant United States Attorney
One Court Square, Suite 201
Montgomery, Alabama 36104

Respectfully submitted,

s/ Kevin L. Butler
KEVIN L. BUTLER
First Assistant Federal Defender
201 Monroe Street, Suite 407
Montgomery, Alabama 36104
Phone: (334) 834-2099
Fax: (334) 834-0353
E-mail: kevin_butler@fd.org
AZ Bar Code: 014138

2

04.0001
SRR
SR

## IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| V. | ) | CR NO. 1:04CR12 |
| | ) | |
| CLAUDE LEE WOODS | ) | |

## MOTION TO WITHDRAW AS COUNSEL

**COMES NOW** the undersigned counsel, Kevin L. Butler, and hereby moves this Court for an Order granting his motion to withdraw from representing defendant Claude Lee Woods, and in support of this motion states the following:

1.       Undersigned counsel has been informed that Defendant Claude Lee Woods has retained Susan James to represent him in this cause.

WHEREFORE, premises considered, undersigned counsel hereby prays that his motion to withdraw as counsel for Claude Lee Woods in the above-styled cause be granted and an Order issued permitting his withdrawal.

Respectfully submitted,

s/ Kevin L. Butler
KEVIN L. BUTLER
First Assistant Federal Defender
201 Monroe Street, Suite 407
Montgomery, Alabama 36104
Phone: (334) 834-2099
Fax: (334) 834-0353
E-mail: kevin_butler@fd.org
AZ Bar Code: 014138

1

AO88B-C
**GOVERNMENT
EXHIBIT**

CASE
NO.

EXHIBIT
NO.   G

**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **V.** | ) | **2:04cr12** |
| | ) | |
| **CLAUDE LEE WOODS** | ) | |

### CERTIFICATE OF SERVICE

I hereby certify that on January 6, 2005, I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system which will send notification of such filing to the following:

Susan R. Redmond, Esquire
Assistant United States Attorney
One Court Square, Suite 201
Montgomery, Alabama 36104

Respectfully submitted,

s/ Kevin L. Butler
KEVIN L. BUTLER
First Assistant Federal Defender
201 Monroe Street, Suite 407
Montgomery, Alabama 36104
Phone: (334) 834-2099
Fax: (334) 834-0353
E-mail: kevin_butler@fd.org
AZ Bar Code: 014138

2

QH 0001
SRR
SK

# IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE MIDDLE DISTRICT OF ALABAMA
### SOUTHERN DIVISION

UNITED STATES OF AMERICA,  *
          *
  PLAINTIFF,     *
          *
v.          * CASE NO.  1:04CR12
          *
CLAUDE LEE WOODS,   *
          *
  DEFENDANT.    *

## NOTICE OF APPEARANCE

Comes now the undersigned counsel and enters her appearance in this cause as Counsel

for Claude Lee Woods.

Respectfully submitted,


s/Susan G. James

SUSAN G. JAMES
Attorney at Law
600 South McDonough Street
Montgomery, Alabama 36104
Phone: (334) 269-3330
Fax: (334) 834-0353
E-mail: sgjamesandassoc@aol.com
Bar No: JAM012


## CERTIFICATE OF SERVICE

I hereby certify that on January 6, 2005, I electronically filed the foregoing with the Clerk

of Court using the CM/ECF system which will send notification of such filing to the following:



AO88-C
**GOVERNMENT
EXHIBIT**

CASE
NO.

EXHIBIT
NO. H

United States Attorney
P.O. Box 197
Montgomery, Alabama, 36101

Respectfully submitted,

s/Susan G. James
SUSAN G. JAMES
Attorney at Law
600 South McDonough Street
Montgomery, Alabama 36104
Phone: (334) 269-3330
Fax: (334) 834-0353
E-mail: sgjamesandassoc@aol.com
Bar No: JAM012

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | **CASE NO. 01:04-CR-12-M** |
| | ) | |
| CLAUDE LEE WOODS | ) | |

### UNITED STATES'S RESPONSE TO MOTION TO SUPPRESS

COMES NOW the United States of America, by and through its attorney, Leura Garrett Canary, United States Attorney, and responds to Defendant/Movant Claude Lee Woods's Motion To Suppress evidence as follows:

### I. FACTUAL FOUNDATION FOR THE SEARCH

1. On August 14, 2003, Dothan, Alabama police officers initiated a stop on a weaving vehicle that had crossed the fog line along the edge of the road three times. The vehicle continued for a quarter mile before stopping, during which time the driver could be observed bending over in a manner consistent with placing something under the seat. When the vehicle finally stopped, the officers determined that the driver was defendant Claude Lee Woods.

2. Officers observed that Woods had an open bottle of an alcoholic beverage between his legs, detected the odor of burnt marijuana, and observed cigarette rolling papers in plain view upon the armrest of the vehicle.

3. Woods informed the officers that he was on parole for a controlled substance violation, that his vehicle had been weaving because he was talking on his cellular telephone, and that it took him longer to pull over because he was looking for a safe place to stop the car.



GOVERNMENT EXHIBIT

CASE NO.

EXHIBIT NO.  I

4.  Woods informed the officers that there were no guns or drugs in his vehicle.  He also refused consent for a search of his vehicle.

5.   The officers considered the combined circumstances of cigarette rolling papers in plain view, the odor of burnt marijuana, the length of time that it took Woods to stop his vehicle, and the appearance that he was concealing some object under his seat after signaling for him to pull over. Their law enforcement experience led them to believe that these facts justified a non-consensual, warrantless search of the vehicle.

6.  The search revealed that a substance resembling methamphetamine was located beneath the seat occupied by Woods, and another quantity of the same substance, with marijuana, was found in a metal box located between the driver's seat and the console.  Also located in the vehicle were two sets of scales, and $2,000 in currency.   The white substance field tested positive for methamphetamine.

7.  Woods was issued a citation for driving with an open container of alcohol and arrested for possession of marijuana.

8.  Laboratory tests confirmed that the white substances were methamphetamine.  The total weight of the controlled substances possessed by Woods was approximately 300 grams of methamphetamine and 25.5 grams of marijuana.

## II.  WOODS'S MOTION TO SUPPRESS

9.   Woods disputes the legality of the officers' stop of Woods's vehicle and seeks the suppression of all physical evidence found during the search (including the methamphetamine, marijuana, scales, and all other evidence), and all statements made after the stop of the vehicle.

2

10. Woods's primary contention is that the initial stop and brief detention were not justified, and that the search lacked probable cause.

### III. APPLICABLE CASELAW

11. The United States Court of Appeals for the Eleventh Circuit has found it reasonable to stop a weaving vehicle, due to the probability that the driver of such is either intoxicated, thus violating state law, or falling asleep, and that weaving does indeed constitute a valid basis for a traffic stop. United States v. Harris, 928 F.2d 1113, 1116 (11th Cir. 1991). Therefore, the absence of a definite traffic violation prior to the stop does not render it illegal, and Wood's contention that such absence rendered the stop pretextual, and the ensuing search illegal, is not supported by caselaw. See also United States v. Pollock, 926 F.2d 1044, 1047 (11th Cir. 1991) (finding adequate support for concluding that the stop of a weaving vehicle was based on an "objective violation of a statute for which the patrol regularly made stops, with or without suspicion of drug-related activity.")

12. The next phase of Woods's argument contends that no reasonable suspicion existed for the officers's questioning on topics unrelated to his automobile, and the resulting delay unrelated to the time that it took the officers to check his license, registration and insurance papers. Several Circuits have found that an officer may "ask about the purpose and itinerary of a driver's trip during the traffic stop," as these questions help officers to "determine whether a traffic violation has taken place." United States v. Brigham, 382 F.3d 500, 507-08 (5th Cir. 2004) (collecting cases holding the same).

13. Reasonable suspicion was prompted by Woods's consumption of alcohol while driving, cigarette rolling papers in plain view, and the smell of burnt marijuana emanating from his car. The Constitution does not provide Woods with any expectation of privacy in the odors emanating from

3

his car. Hearn v. Board of Public Education, 191 F.3d 1329, 1332 (11th Cir. 1999). Each of these factors, all of which were readily apparent to the officers through their sensory perception skills, contributed to the investigative instinct to gather more information about Woods.

14.  Woods also argues that there was no probable cause for the search. Probable cause is present "[W]hen the facts and circumstances would lead a reasonably prudent [person] to believe that the vehicle contains contraband, probable cause exists. United States v. Wilson, 894 F.2d 1245, 1254 (11th Cir. 1990) (quoting United States v. Alexander, 835 F.2d 1406, 1409 (11th Cir. 1988)). The officers's visual observation of cigarette rolling papers, the smell of marijuana, Woods's delay and action before stopping his car, and knowledge that he was on parole for a controlled substance offense all contributed to probable cause in this case. Woods's focus on whether his responses to the officers provided probable cause for the search is not relevant where probable cause was based not on Woods's statements, but on his actions, the plain view sighting of tools used in drug ingestion, and the smell of contraband. See United States v. Zubia-Melendez, 263 F.3d 1155, 1162 (10th Cir. 2001) (courts should defer to the ability of trained law enforcement to distinguish between innocent and suspicious actions).

15.  Woods's refusal to permit the officers to search his vehicle should not result in the suppression of the fruit of the search. A warrantless search of a vehicle is permitted "if the facts of the case would have justified a warrant, 'even though a warrant has not actually been obtained.'" United States v. Watts, 329 F.3d 1282, 1285 (11th Cir. 2003) (quoting United States v. Ross, 456 U.S. 798, 809, 102 S.Ct. 2157 (1982)). The only requirements are that a car be readily mobile and that probable cause exists to believe it contains contraband. Watts, id., quoting Pennsylvania v. Labron, 518 U.S. 938, 940, 116 S.Ct. 2485 (1996).

4

16. Woods's vehicle was clearly operational at the time of the traffic stop, and the combined circumstances that created probable cause for a search complete the factual requirements for a warrantless search. Therefore, his motion to suppress the fruits of the search should be denied.

## IV. CONCLUSION

For the above reasons, the motion to suppress is without merit.

Respectfully submitted this 28th day of December, 2004.

Respectfully submitted,

LEURA GARRETT CANARY
UNITED STATES ATTORNEY

/s/ Susan Redmond
SUSAN REDMOND
Assistant United States Attorney
Post Office Box 197
Montgomery, Alabama 36101-0197
(334) 223-7280
(334) 223-7135 fax
susan.redmond@usdoj.gov

5

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | **CASE NO. 01:04-CR-12-M** |
| | ) | |
| **CLAUDE LEE WOODS** | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on December 28, 2004, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Kevin L. Butler.

Respectfully submitted,

LEURA GARRETT CANARY
UNITED STATES ATTORNEY

/s/ Susan Redmond
SUSAN REDMOND
Assistant United States Attorney
Post Office Box 197
Montgomery, Alabama 36101-0197
(334) 223-7280
(334) 223-7135 fax
susan.redmond@usdoj.gov

6



Page 3

```
 1            IN THE UNITED STATES DISTRICT COURT FOR
 2              THE MIDDLE DISTRICT OF ALABAMA
 3                    NORTHERN DIVISION
 4
 5
 6   UNITED STATES OF AMERICA
 7
 8        vs.              CR. NO. 04-12-S
 9
10   CLAUDE LEE WOODS
11
12      *   *   *   *   *   *   *   *   *   *
13              SUPPRESSION HEARING
14      *   *   *   *   *   *   *   *   *
15        Before Hon. Vanzetta Penn McPherson,
16        Magistrate Judge, at Montgomery, Alabama,
17        Commencing on January 18, 2005
18      *   *   *   *   *   *   *   *   *
19
20
21   APPEARANCES: For the Government: Susan Redmond
22                            Assistant U.S. Attorney
23        For the Defendant: Susan G. James,
24                            Attorney at Law
25
```

GOVERNMENT EXHIBIT

CASE NO.

EXHIBIT NO. J

---

Page 3 (right column)

1  THE CLERK: If you would raise your right hands. Do
2  you and each of you solemnly swear or affirm that the
3  testimony you give in this cause will be the truth, the whole
4  truth, and nothing but the truth, so help you God?
5  THE WITNESS: So swear.
6  THE WITNESS: Yes, ma'am.
7  MS. REDMOND: The government calls Dave Elkins.
8  THE COURT: Please spell your name, sir.
9  THE WITNESS: David Elkins, E-L-K-I-N-S, Your Honor.
10  THE COURT: Proceed.
11  DAVID ELKINS, witness for the Government, having
12  been duly sworn or affirmed, testified as follows:
13  DIRECT EXAMINATION
14  BY MS. REDMOND:
15  Q. Mr. Elkins, are you employed?
16  A. Yes, ma'am.
17  Q. What do you do?
18  A. I am a police officer.
19  Q. Where?
20  A. City of Dothan.
21  Q. How long have you been with the City of Dothan as a
22  police officer?
23  A. Since July of '98.
24  Q. July?
25  A. July of '98.

---

Page 2

1  (The above case coming on for hearing at Montgomery,
2  Alabama, January 18, 2005, before Honorable Vanzetta Penn
3  McPherson, Magistrate Judge, the following proceedings were
4  had commencing at 11:05 a.m.:)
5  THE COURT: United States of America versus Claude
6  Lee Woods, case number on 04-12. The Defendant in this case,
7  Claude Lee Woods, filed a Motion to Suppress evidence in this
8  case. The government's response has been filed. Today's
9  proceeding is an evidentiary hearing on the motion. How many
10  persons expect to testify for the Defendant?
11  MS. JAMES: None, Your Honor.
12  THE COURT: How many persons expect to testify for
13  the government?
14  MS. REDMOND: One, possibly two present in the
15  courtroom, Your Honor.
16  THE COURT: Representing the Defendant is Ms. Susan
17  James. The attorney representing the government is Ms. Susan
18  Redmond. Are both sides ready to begin?
19  MS. REDMOND: Yes, ma'am.
20  MS. JAMES: Yes, Your Honor. May we have the rule?
21  THE COURT: Yes, the rule has been invoked by the
22  Defendant. Please call your first witness, Ms. Redmond.
23  MS. REDMOND: The government was unsure whether the
24  Court would choose to swear both witnesses at the same time.
25  THE COURT: Yes, thank you.

---

Page 4

1  Q. Thank you. And what are your duties? At the present time
2  what are your present duties with the Dothan PD?
3  A. I am currently assigned to the patrol division.
4  Q. How long have you been so assigned?
5  A. A little over a year.
6  Q. Prior to that what did you do?
7  A. I was assigned to the vice and intelligence division.
8  Q. How long did you do that?
9  A. Almost three years.
10  Q. So August 14th of 2003 you would have been with vice and
11  intel?
12  A. Yes, ma'am.
13  Q. And at that point did you have a partner?
14  A. Yes, ma'am.
15  Q. Who was your partner, please?
16  A. Jon Riley.
17  Q. And did you all share a vehicle?
18  A. Yes, we would ride together.
19  Q. Okay. And specifically if you would, tell us what you
20  would do for vice and intelligence with Dothan police
21  department.
22  A. Enforce narcotics, prostitution, alcohol, follow up on
23  informant information and patrol division cases.
24  Q. And on August 14th, 2003 did you have occasion to run
25  into the Defendant in this case, Claude Woods, or encounter

Page 5

1 the Defendant in this case, Claude Woods?
2 A. Yes, ma'am.
3 Q. Tell us about that, please. How did it start?
4 A. We stopped him on a traffic stop, about the 57 hundred
5 block of South Oates.
6 Q. What were you doing prior to stopping Mr. Woods?
7 A. We were coming from Wal-Mart.
8 Q. Okay. And was that you and your partner at the time, Mr.
9 Riley?
10 A. Yes.
11 Q. Okay. And were you operating a vehicle?
12 A. Yes.
13 Q. Were you driving?
14 A. Yes.
15 Q. Okay. And what, if anything, happened as you were
16 shopping at Wal-Mart?
17 A. When we were leaving Wal-Mart I observed a Cadillac
18 going southbound on South Oates.
19 Q. Where is South Oates? Where is South Oates?
20 A. Highway 231 South.
21 Q. In Dothan.
22 A. Correct.
23    THE COURT: Is that O-A-T-E-S?
24    THE WITNESS: Yes, Your Honor.
25 Q. Okay. What, if anything, did you do upon observing this

Page 6

1 Cadillac?
2 A. Seen him crossing the fog line, weaving.
3 Q. Okay. And tell us, give us an idea of what Highway 231
4 is out there, how many lanes?
5 A. It's a four-lane highway.
6 Q. Okay.
7 A. Two northbound, two southbound, it's a business area.
8 Q. Is it well lit?
9 A. Pretty well.
10 Q. Okay. Is it well maintained?
11 A. Yes, ma'am.
12 Q. The roadway. Okay. And about what time of day or night
13 was it?
14 A. A little after 10:00 o'clock when we stopped him.
15 Q. Is that at night?
16 A. Yes, ma'am.
17 Q. Was it raining at all, was it overcast?
18 A. No, ma'am.
19 Q. Okay. And how was the traffic flow?
20 A. About normal, not heavy, not light.
21 Q. Okay. What, if anything, caused you to notice this black
22 Cadillac?
23 A. He was crossing the fog line.
24 Q. Okay. Did he only do that once?
25 A. No, he did it at least three times.

Page 7

1 Q. Okay. And were you behind him or were you still
2 stationary at the Wal-Mart watching this occur?
3 A. No, we were behind him on Oates.
4 Q. Okay. And what happened after you saw him cross the fog
5 line several times?
6 A. We turned on our lights to stop him.
7 Q. Okay. In order to cross the fog line -- tell me what the
8 fog line is.
9 A. The fog line is the solid line on the shoulder of the
10 road.
11 Q. Is that the white line?
12 A. Yes, ma'am.
13 Q. So this person -- was this person in -- you said it was
14 a four-lane highway?
15 A. Correct.
16 Q. Okay. Two going -- two lanes going?
17 A. North and two south.
18 Q. Okay. And was he in the -- the Cadillac, was it in the
19 left lane or the right lane?
20 A. Would have been in the right lane.
21 Q. Once you watched him cross over the fog line several
22 times what did you do?
23 A. We stopped him, or turned on our lights to stop him.
24 Q. Describe the vehicle you were in.
25 A. It's a 2001 Dodge Ram pickup truck, extended cab.

Page 8

1 Q. It did not have police decals on it?
2 A. No, ma'am.
3 Q. Did it have lights on it?
4 A. Yes, ma'am.
5 Q. Were they police issue lights?
6 A. Yes, ma'am.
7 Q. Was this a police vehicle?
8 A. Yes.
9 Q. Okay. And you initiated your lights?
10 A. Correct.
11 Q. And are those the blue lights?
12 A. Yes, it's a visor light, it's on the visor. They are
13 LED lights, you turn the visor down and turn the lights on.
14 And also has wig-wags on the headlights.
15 Q. What are wig-wags?
16 A. Makes the headlights blink.
17 Q. And what happened after you turned your lights on?
18 A. He didn't immediately pull over for us so we had to turn
19 on our siren.
20 Q. Did he pull over then?
21 A. It took him a quarter of a mile give or take to stop for
22 us.
23 Q. And the Cadillac eventually pulled over; is that
24 correct?
25 A. Yes, ma'am.

Page 9

1  Q. And what happened once the vehicle pulled over?

2  A. Well, we, you know, called it, we made a traffic stop

3  and to have a marked unit meet us.

4  Q. Okay. Let me go back. Why did you initiate the vehicle

5  stop?

6  A. Because of the weaving, suspected he might be DUI.

7  Q. Was that a conclusion or a belief that you shared with

8  your partner?

9  A. Yes.

10  Q. Okay. And once you stopped the vehicle you got out of

11  your own; is that correct?

12  A. Correct.

13  Q. Did you approach the Cadillac?

14  A. Yes, ma'am.

15  Q. What was your partner doing at this time?

16  A. He was also approaching the Cadillac.

17  Q. Okay. Tell us about where you were in approaching the

18  Cadillac?

19  A. I went up to the driver's side door.

20  Q. Where did your partner go?

21  A. The passenger side.

22  Q. Were you armed at that point?

23  A. Yes, ma'am.

24  Q. Did you have your weapon out?

25  A. No, ma'am.

Page 10

1  Q. Okay. Were you wearing anything that would indicate that

2  you were a police officer?

3  A. Just a badge.

4  Q. Okay. Where was that badge located?

5  A. I believe it would have -- at that time it was on my hip

6  next to my firearm.

7  Q. Was your partner wearing anything that would have

8  indicated that he was a police officer?

9  A. Yes, ma'am.

10  Q. What was that?

11  A. He had his badge.

12  Q. Okay. Did your partner have his weapon drawn?

13  A. Not to my knowledge, he didn't.

14  Q. What happened once you approached the vehicle on the

15  driver's side?

16  A. I spoke with the driver, gathered his information.

17  Q. Okay. Tell us about that conversation with the driver.

18  A. I told him we stopped him for weaving and he said he was

19  sorry, that he was on the phone speaking with a girl in

20  Georgia.

21  Q. Could you see a phone?

22  A. Yes, he did have a cell phone.

23  Q. Okay. And did he, while you were -- strike that. Once he

24  made that statement to you what did you do next?

25  A. You know, I got his driver's license and his proof of

Page 11

1  insurance.

2  Q. What, if anything, happened next?

3  A. I noticed an open bottle of beer in his lap and asked

4  him how much he had been drinking. He said he had just opened

5  that beer and he had one prior to that.

6  Q. Okay. What, if anything, happened after that?

7  A. I asked him out of the vehicle, do a field sobriety

8  test.

9  Q. Prior to approaching the vehicle had you made the police

10  department aware of the stop?

11  A. Yes, ma'am.

12  Q. How did you do that?

13  A. By radio.

14  Q. Okay. And was the radio in your vehicle?

15  A. Correct.

16  Q. Okay. So before you got out of your vehicle you radioed

17  in?

18  A. Investigator Riley did.

19  Q. Okay. And what was the purpose of radioing in to the

20  department?

21  A. To let them know where we were and what we were doing

22  for safety reasons, and we also wanted a marked unit to meet

23  us.

24  Q. Let me go back for just a second. You work vice and

25  intelligence or worked vice and intelligence at that time; is

Page 12

1  that correct?

2  A. Correct.

3  Q. Why would you stop a weaving vehicle?

4  A. Well, if he is DUI, I mean still enforce the laws, state

5  laws.

6  Q. Okay. And is it standard procedure once you are out with

7  a vehicle to radio it in?

8  A. Yes, ma'am.

9  Q. And did you at that point request any backup?

10  A. Yes, ma'am.

11  Q. Okay. What was the request?

12  A. Was for a marked unit to meet us.

13  Q. Okay. And is that standard procedure?

14  A. Had he been DUI, yes, because they would have to

15  transport for us or take the DUI themselves.

16  Q. Okay. You as a vice and intelligence officer would not

17  have taken him in and done the paperwork?

18  A. No, because we can't transport in our vehicles.

19  Q. Okay. When you went up to the car did you, other than

20  seeing the cell phone and the open bottle of beer, smell or

21  see anything else?

22  A. Yes, ma'am.

23  Q. What?

24  A. There was a faint odor of marijuana coming from the

25  vehicle, and on the driver's armrest of the door was a

| Page 13 |
|---|
| 1 package of rolling papers. |
| 2 Q. When you went up to the car -- now, this is August of |
| 3 2003; is that correct? |
| 4 A. Correct. |
| 5 Q. Were the windows up or down on the driver's side? |
| 6 A. I don't recall if I had asked him to roll it down or if |
| 7 he had rolled it down prior to us walking up to the door. |
| 8 Q. But when you got to the car -- let me go back. Is it |
| 9 after you see the cell phone and the open bottle of beer that |
| 10 you noticed the smell of marijuana or is that prior to the |
| 11 cell phone and the beer? |
| 12 A. It's all about the same time, ma'am. |
| 13 Q. And did I understand you to say that you saw papers? |
| 14 A. Correct. |
| 15 Q. And what kind of papers are those? |
| 16 A. A Cigarette rolling papers. |
| 17 Q. Okay. Were you familiar with those? |
| 18 A. Yes, ma'am. |
| 19 Q. Had you had cases in the past in which you had come |
| 20 across rolling papers? |
| 21 A. Yes, ma'am. |
| 22 Q. Okay. And did you at that point know the purpose of the |
| 23 rolling papers? |
| 24 A. Had a good suspicion, yes, ma'am. |
| 25 Q. What was your suspicion? |

| Page 14 |
|---|
| 1 A. That they are used to roll marijuana cigarettes. |
| 2 Q. And was it my understanding that you said you asked him |
| 3 out of the car? |
| 4 A. Yes. |
| 5 Q. And the purpose of that was? |
| 6 A. We could conduct field sobriety and pat him down. |
| 7 Q. Was it still your belief at that point that you had a |
| 8 possible DUI? |
| 9 A. Still a possibility, yes, ma'am. |
| 10 Q. Was patrol on the scene by this time? |
| 11 A. Yes, ma'am. |
| 12 Q. Okay. And did you, in fact, initiate or do the field |
| 13 sobriety test? |
| 14 A. No, I did not. |
| 15 Q. Who did the field sobriety test? |
| 16 A. The patrol unit. |
| 17 Q. Okay. What did you do, if anything? |
| 18 A. Asked him if there was any -- asked Mr. Woods if there |
| 19 was anything illegal in his vehicle. |
| 20 Q. Did he respond? |
| 21 A. Yeah, he said there was not. |
| 22 Q. What did you do after that? |
| 23 A. I then said well, do you mind if I search, and he told |
| 24 me I wasn't searching his fucking car. |
| 25 Q. And did you, in fact, search his vehicle? |

| Page 15 |
|---|
| 1 A. Yes, ma'am, I did. |
| 2 Q. What was the point in searching his vehicle, what was |
| 3 your belief? |
| 4 A. I believed there to be marijuana in the vehicle. |
| 5 Q. Based on what? |
| 6 A. Based on the smell and the rolling papers, the time it |
| 7 took him to stop and him moving around as we were stopping |
| 8 him. |
| 9 Q. Okay. Let's go back for just a second. You just said he |
| 10 was moving around in the vehicle when you stopped him? |
| 11 A. Yes, ma'am. |
| 12 Q. Okay. At what point did you see him moving around in the |
| 13 vehicle? |
| 14 A. As we were pulling him over. As we had already lit them |
| 15 up to stop him. |
| 16 Q. So you had already initiated your lights? |
| 17 A. Correct. |
| 18 Q. And you saw him moving around in the vehicle? |
| 19 A. Correct. |
| 20 Q. Tell us about the movement of the Defendant in the |
| 21 vehicle. |
| 22 A. Like looked as if he was trying to hide something or |
| 23 bending around the seat area. |
| 24 Q. How many seats are there in the vehicle? |
| 25 A. It's a two-door car, so two. |

| Page 16 |
|---|
| 1 Q. So what seat is he bending around? |
| 2 A. The driver's seat. |
| 3 Q. When you noticed -- can you give the Judge an idea of |
| 4 what you mean when you say he is bending around, what way is |
| 5 he bending? |
| 6 A. More or less forward, not back, just -- |
| 7 Q. Not back? |
| 8 A. No. |
| 9 Q. Okay. And did you see his arms moving? Could you see his |
| 10 arms? |
| 11 A. No, like I said, just movement. |
| 12 Q. Other than the conversation you had with him asking for |
| 13 his driver's license and registration and insurance |
| 14 information did you have any other conversation with him of a |
| 15 personal nature? |
| 16 A. Yes, I asked him if he was on probation or parole. |
| 17 Q. Why? |
| 18 A. Because it's something I normally ask on traffic stops. |
| 19 Q. For what reason? |
| 20 A. Because if you run somebody and they come back with |
| 21 probation or parolee we have to do what we call a field |
| 22 contact card on them. |
| 23 Q. A field contact card? |
| 24 A. Yes, ma'am. It has all their personal information on it |
| 25 and just a brief narrative on how we came in contact with |

## Page 17

1  them because the parole board gives an administrative message
2  if somebody ran their parolee or probationer and they would
3  have a little number and they could run it and get a copy of
4  the field contact card if they want to know why their parolee
5  was ran.
6  Q. Is that something unique to you or is that something
7  your department does?
8  A. The department does it.
9  Q. Did he give you information about whether or not he was
10  a parolee or on probation?
11  A. Yes, ma'am.
12  Q. What, if anything, did he tell you?
13  A. Said he was on parole out of Georgia.
14  Q. Did he tell you for what?
15  A. He said for a drug violation.
16  Q. Was this prior to you smelling the marijuana?
17  A. No.
18  Q. Was this prior to you seeing the rolling papers?
19  A. It was about the same time. It was before I asked him
20  out of the vehicle.
21  Q. Did the information that he was on probation for a drug
22  offense in any way, shape or form add to your belief that you
23  would find marijuana --
24  A. Yes, ma'am.
25  Q. -- in the vehicle?

## Page 18

1  A. It did heighten it, you know.
2  Q. Tell us about what you were doing while the patrol
3  officer was conducting the field sobriety test.
4  A. Looking around the seat of the vehicle.
5  Q. When you say the seat of the vehicle, what seat?
6  A. The driver seat.
7  THE COURT: You were searching the car while they
8  were doing the field sobriety test?
9  THE WITNESS: Yes, Your Honor.
10  Q. What, if anything, did you find?
11  A. A found a zippered bag with a zipper broken underneath
12  the driver's seat.
13  Q. All right. Stop there for just a minute. Can you -- give
14  us an understanding, was it a plastic or a cloth or a vinyl
15  bag?
16  A. It was a plastic bag.
17  Q. Was it a zip-loc-type bag?
18  A. No, ma'am, it actually had a zipper.
19  Q. Was it -- did it have color? Was it clear? Could you
20  see through it?
21  A. No, you couldn't see through it, no, ma'am.
22  Q. Okay. And you said that the zipper was broken; is that
23  correct?
24  A. Yes, it wouldn't zip shut.
25  Q. So it was an open container?

## Page 19

1  THE COURT: Ms. Redmond, don't lead, please.
2  MS. REDMOND: Yes, ma'am.
3  Q. Could you see into the bag?
4  THE COURT: He has answered that question, he said
5  you couldn't see in it.
6  Q. What, if anything, did you do with the bag?
7  A. Recovered it.
8  Q. Okay. What did you do after you recovered it?
9  A. Opened it all the way up.
10  Q. What, if anything, did you find inside?
11  A. Some methamphetamine.
12  Q. Did you know it to be methamphetamine at the time?
13  A. I was pretty sure it was methamphetamine.
14  Q. Was it --
15  THE COURT: How?
16  THE WITNESS: Based on my training and experience,
17  ma'am.
18  THE COURT: Based on -- tell me what you saw that
19  led you to believe it was meth.
20  THE WITNESS: The way the bag was sitting the zipper
21  wouldn't shut so you could see where the zipper was and with
22  my flashlight looking at it it looked like methamphetamine.
23  Inside the bag was sandwich baggies.
24  THE COURT: What about it looked like
25  methamphetamine?

## Page 20

1  THE WITNESS: Just the structure of it, Your Honor,
2  it didn't -- it's not quite like sugar, it's a little coarser
3  and almost like a clear rock salt maybe, small particles of
4  it.
5  THE COURT: All right.
6  Q. What, if anything, did you do with the bag and the
7  materials inside at that point?
8  A. I continued looking around the driver's seat.
9  Q. What, if anything, did you find?
10  A. A -- like a little silver colored metal cigarette box in
11  between the driver's seat and the center console.
12  Q. And what, if anything, did you do with that box?
13  A. Opened it up.
14  Q. What, if anything, did you see inside?
15  A. A bag of marijuana. A little sandwich baggie that
16  contained some marijuana and two other little zip-loc baggies
17  containing what I believed to be more methamphetamine.
18  Q. Have you had experience in the past with marijuana?
19  A. Yes, ma'am.
20  Q. Okay. And how did you recognize it as marijuana?
21  A. Just looked like marijuana, green marijuana.
22  Q. Okay. And what, if anything, did you do at that point?
23  A. Took it all back to the vehicle.
24  Q. To what vehicle, please?
25  A. Over to where they were standing over between the

## Page 21

1  vehicles.
2  Q. Okay. And what, if anything, did you do at that point?
3  A. We placed Mr. Woods in handcuffs.
4  Q. All right. And what else, if anything else, did you do?
5  A. I field-tested the methamphetamine -- what I thought to
6  be methamphetamine and it did show the presence of
7  methamphetamine.
8  Q. Did you do anything else?
9  A. Just took it as evidence and continued to search the
10  rest of the vehicle.
11  Q. Okay. What did you do with Mr. Woods or what was done
12  with Mr. Woods if you know?
13  A. He was searched again. He had some money on him that
14  was taken from him, and he was placed in the patrol car.
15  Q. Did you have any other contact with Mr. Woods?
16  A. Yes. He was taken down to our office and I was going to
17  interview him and he said he didn't want to talk.
18  Q. Okay. Did you -- other than -- let me go back. What did
19  you arrest Mr. Woods, what was the charge?
20  A. Possession of marijuana second degree.
21  Q. Okay. Did you give him -- or arrest him on anything else
22  or give him any other citations or anything of that nature?
23  A. He was issued a citation for open alcoholic beverage.
24  Q. And are you aware of the outcome of the possession of
25  marijuana second degree charge?

## Page 22

1  A. He pled to it.
2      MS. REDMOND: Judge, may I have just a moment?
3      THE COURT: Yes.
4      (Pause)
5      THE COURT: Mr. Woods entered a plea to the
6  possession of marijuana second degree charge?
7      THE WITNESS: Yes, Your Honor.
8      THE COURT: Was this a state charge?
9      THE WITNESS: It was a city charge, municipal
10  charge.
11      THE COURT: In the Municipal Court of Dothan?
12      THE WITNESS: Yes, ma'am, City of Dothan.
13      MS. REDMOND: Briefly, Your Honor.
14  Q. Officer, other than the drugs and the bags that you have
15  discussed here today, did you remove anything else from the
16  car of Mr. Woods?
17  A. There were some scales, some electronic scales.
18  Q. Where were they?
19  A. I think there was two sets.
20  Q. I'm sorry?
21  A. I believe there were two sets. They were in the back
22  seat in a bag.
23  Q. And briefly, what happened to the bottle of beer?
24  A. Mr. Woods dumped it out.
25      THE COURT: Hold on a moment. You said this was a

## Page 23

1  two-seater and now you are referring to a back seat.
2      THE WITNESS: There was only two doors, Your Honor,
3  I'm sorry.
4      THE COURT: It was a two-door car, not a two-seater.
5      THE WITNESS: Correct.
6  Q. If you would, would you explain, you said it was a
7  Cadillac.
8  A. Yes, ma'am.
9  Q. And it had two doors.
10  A. Yes, ma'am.
11  Q. Two front seats?
12  A. Correct.
13  Q. And a back seat.
14  A. Correct.
15  Q. When did Mr. Woods dump out the beer?
16  A. About the time I asked him out of the vehicle.
17  Q. And was that before or after you asked for consent to
18  search the vehicle?
19  A. I don't recall.
20  Q. Did you run the information that Mr. Woods provided you
21  in respect to his driver's license, vehicle registration and
22  insurance, did you have an opportunity to run those, that
23  information?
24  A. We ran his driver's license, yes, ma'am.
25  Q. When did you do that? At what point during the time you

## Page 24

1  were with Mr. Woods?
2  A. It was sometime during the stop.
3  Q. Okay. Was that before or after you asked for consent to
4  search the vehicle?
5  A. I am not sure.
6  Q. Did you run the information or did your partner or did
7  the patrol officer?
8      THE COURT: Why is this relevant?
9      MS. REDMOND: Judge, one of the issues that the
10  defense has raised is that the timing, that they had
11  initiated -- excuse me, that they extended the time of this
12  encounter so that they could search the car, and one of the
13  issues I wanted to attempt to clear up for the Court is the
14  time frame, that the search of the vehicle was taking place
15  while the -- during the time that the information was being
16  run and that the field sobriety test was being conducted.
17      THE COURT: All right. Go on.
18  Q. Did you run that information?
19  A. I'm not sure which one of us ran it, it was either
20  myself or probably Mr. Riley.
21  Q. And I think you are unsure when it took place or running
22  the information took place; is that correct?
23  A. Correct.
24      MS. REDMOND: Thank you, nothing further, Your
25  Honor.

Page 25

1    THE COURT: Ms. James?

2    MS. JAMES: Thank you.

3    CROSS-EXAMINATION

4    BY MS. JAMES:

5    Q. Good morning, is it Officer Elkins?

6    A. Yes, ma'am.

7    Q. My name is Susan James and I represent Mr. Woods in this

8    matter, I have a few questions for you. As I understand it

9    you are now a patrol officer; is that correct?

10   A. Yes, ma'am.

11   Q. And at the time that this stop occurred you were working

12   vice and narcotics; is that right?

13   A. Yes, ma'am.

14   Q. And your primary goal or assignment was I guess to stop

15   the prostitution and the drug trafficking around your area.

16   A. Yes, ma'am.

17   Q. Okay. Now, tell us and describe for the Court what type

18   vehicle Mr. Woods was driving on the night that you stopped

19   him?

20   A. A Cadillac Eldorado, black.

21   Q. Would you agree with me that the vehicle was kind of

22   jazzed up, it had nice rims and was a little bit flashy?

23   A. It was a nice car.

24   Q. Okay. And you have testified that you stopped him for

25   crossing the white fog line. Now, the fog line, so that we

Page 26

1    are clear for the record, on a four-lane road on the

2    right-hand-side is a solid white line; correct?

3    A. Yes, ma'am.

4    Q. You refer to that as the fog line.

5    A. Yes, ma'am.

6    Q. And on the center line we have typically the broken or

7    hashed lines; correct?

8    A. Yes, ma'am.

9    Q. And then on the left-hand-side of the road the -- I

10   guess you would call it the passing side there's a yellow

11   line there, is it not?

12   A. No, it would also have a fog line on 231.

13   Q. Okay. But it's not yellow? Is that line yellow or is it

14   a white line also?

15   A. I believe it's white, ma'am.

16   Q. But you would refer to those, would you not, as fog

17   lines?

18   A. Yes, ma'am.

19   Q. Both of the lines on each -- the outside of each of the

20   lanes, the right lane and the left lane?

21   A. Yes, ma'am.

22   Q. When you have described for the Court that Mr. Woods'

23   vehicle crossed the fog line on three occasions you are

24   talking about the one on the right-hand-side of the road;

25   correct?

Page 27

1    A. Correct.

2    Q. Now, describe for us how he crossed that line. I mean

3    was his tire just riding close to it or did he actually

4    deviate as if running off the road? Help me with that.

5    A. His vehicle went over the line. He didn't go off the

6    road so-to-speak but he did go over the line.

7    Q. Okay. So there are reasons that people might touch that

8    fog line that aren't impaired, would you agree with that?

9    A. Yes, ma'am.

10   Q. And a plausible explanation for crossing that line could

11   be that someone was fiddling with the radio or fiddling with

12   the cell phone or talking; correct?

13   A. Correct.

14   Q. So when you observed this occur he had not run off the

15   road at all, is that your testimony? This situation of the

16   fog line, he never actually ran off the road?

17   A. Correct.

18   Q. He was just a little too close to that line for your

19   comfort, would you agree with me?

20   A. No, he had crossed the line but he did not run off the

21   road.

22   Q. Okay. How far would you say you followed him?

23   A. A mile maybe, maybe a little more.

24   Q. You followed him a mile before you activated your

25   service lights and your siren?

Page 28

1    A. About a mile, maybe a little more.

2    Q. Okay. How close were you to him?

3    A. We were able to get up behind him before we turned on

4    our lights.

5    Q. And when you were behind him would it be fair to say

6    your car was under cover enough without the lights activated

7    it probably wouldn't have been recognizable as a law

8    enforcement vehicle?

9    A. Yes, ma'am, you are right.

10   Q. You actually got in behind him. Are you coming out of

11   the Wal-Mart on 231 going towards Panama City?

12   A. Correct.

13   Q. And that's the new big Wal-Mart on the right-hand-side

14   of the road before you get to the flee market area; is that

15   correct?

16   A. Yes, ma'am.

17   Q. He was traveling, you said Oates Street, right?

18   A. Oates, 231, yes, ma'am.

19   Q. That's the same as 231, right?

20   A. Yes, ma'am.

21   Q. So if I refer to it as 231 I will be correct.

22   A. Yes, ma'am.

23   Q. Now, before you get -- there's also 231 that actually

24   kind of comes straight around -- the Ross Clark Circle,

25   that's 231 as well, isn't it?

**Page 29**

1  A. No, ma'am, it's the --

2  THE COURT: Hold on, is the place where this

3  happened in question?

4  MS. JAMES: The place where they picked him up is,

5  Your Honor. In other words where they first observed him.

6  THE COURT: Okay. Go ahead.

7  Q. So you were actually -- you didn't come from Ross Clark

8  Circle?

9  A. No, we were coming out of the Wal-Mart.

10  Q. So you were coming out of the Wal-Mart. Were you sitting

11  there pulling out of the Wal-Mart as he passed in front of

12  you?

13  A. Obviously, yes, ma'am.

14  Q. Okay. In other words you turned out of Wal-Mart

15  southbound behind him?

16  A. We turned out of Wal-Mart, I don't know if I seen him

17  when he initially passes us or right in that area, yes,

18  ma'am.

19  Q. Okay. What was your assignment at that point, were you

20  to patrol the 231 area?

21  A. No, we were working.

22  Q. Okay. But you had elected to go southbound; correct?

23  A. Correct.

24  Q. And you would agree with me if you had elected to go

25  northbound that would have taken you back into the city area

**Page 30**

1  of Dothan; correct?

2  A. Correct.

3  Q. So you are there and you see him pass actually in front

4  of you before you get behind him, right?

5  A. Correct.

6  Q. And at that point if you are -- I guess he is going in

7  front of you and you are sitting stationary at the Wal-Mart,

8  right? Were you at the light?

9  A. Yes.

10  Q. Okay. You are at the light. He passes in front of you,

11  at that point you don't see him -- you are not following him

12  so you don't see him pass or cross over a fog line, do you?

13  A. No, ma'am.

14  Q. But you turn out behind him and was he traveling at a

15  reasonable rate of speed?

16  A. I mean keeping up with traffic, yes, ma'am.

17  Q. So you get in behind him fairly close; correct?

18  A. Correct.

19  Q. And you follow him, you say for approximately one mile,

20  was that before the stop?

21  A. Yes, ma'am.

22  Q. All right.

23  A. Before we turned on our lights.

24  Q. At that point during that mile did you activate your

25  lights and your siren?

**Page 31**

1  A. I am trying to think. It took about a quarter mile after

2  we turned on our lights and siren for him to stop.

3  Q. Okay. So you would agree with me then that you followed

4  him three quarters of a mile before you activated your lights

5  and attempted to make the traffic stop?

6  A. It might have even been a mile, ma'am.

7  Q. So at that point you had followed him long enough to

8  observe what you say is this crossing over the fog line.

9  A. Yes, ma'am.

10  Q. Now, in following him you obviously saw that he had a

11  Georgia tag; correct?

12  A. Correct.

13  Q. And he was in a pretty jazzed up vehicle with tinted

14  windows, you remember that, don't you?

15  A. Yeah, it was a nice vehicle.

16  Q. At what point during that time you were following him

17  did you actually call for your backup unit?

18  A. As we called out the traffic stop.

19  Q. So you had actually made the stop when you called for

20  the unit?

21  A. Yes, we advised dispatch where we were is when we called

22  for the marked unit.

23  Q. Okay. I am going to show you --

24  MS. JAMES: May I approach the witness, Your Honor?

25  THE COURT: Yes.

**Page 32**

1  Q. I am going to show you -- well, let me ask you a

2  question first. Tell me what was the location on 231 where he

3  was stopped?

4  A. South of Festival Drive.

5  Q. And is there a particular description like the one

6  hundred block or 57 hundred I think you said?

7  A. Yes.

8  Q. So which was it?

9  A. The 57 hundred block.

10  MS. JAMES: Now, may I approach the witness, Your

11  Honor?

12  THE COURT: Yes.

13  Q. I am going to show you what I have marked for

14  identification purposes as Defendant's Exhibit 1 and ask if

15  you are familiar with that document, sir?

16  A. Yes, ma'am.

17  Q. Okay. And does it have some -- I guess some case

18  information relative to this stop as well as your report or

19  narrative of what transpired with the stop?

20  A. Yes, ma'am.

21  Q. All right. Now, you have testified here today that the

22  stop occurred at the 57 hundred block of South Oates Street;

23  correct?

24  A. Correct.

25  Q. And that it occurred for weaving; is that right?

## Page 33

1 A. Correct.

2 Q. And you also put that in your report, did you not, which

3 is Defendant's Exhibit 1?

4 A. Yes, ma'am.

5     MS. JAMES: At this time, Your Honor, I would move

6 for admission of Defendant's Exhibit 1.

7     MS. REDMOND: No objection.

8     THE COURT: Is that Officer Elkins' report?

9     MS. JAMES: Yes.

10 Q. Is it your report, sir?

11 A. Yes.

12     THE COURT: And its date?

13     MS. JAMES: 8/14/03; is that right?

14     THE WITNESS: Yes, Your Honor.

15     THE COURT: Admitted.

16     MS. JAMES: Thank you.

17 Q. Let me also show you for identification purposes what I

18 have marked as Defendant's Exhibit 2 and ask if you can

19 identify this, sir?

20 A. It's the complaint for possession of marijuana.

21 Q. Okay. Would that be your signature?

22 A. Yes.

23 Q. And would this be the complaint that was filed in the

24 Municipal Court of Dothan?

25 A. Yes, ma'am.

## Page 34

1 Q. And is this the complaint relative to the seizure of the

2 marijuana you contend was found in the vehicle?

3 A. Yes.

4 Q. Okay. Now, on this we have green leafy substance

5 suspected to be marijuana, did you write that?

6 A. No.

7 Q. Okay. Who would have written that?

8 A. Probably the officer over at the jail who took him over

9 there for me and then I filled in the name down here.

10 Q. Okay.

11 A. And the case number.

12 Q. So that's not your writing there.

13 A. No, ma'am.

14 Q. Would that be your writing, Claude Woods?

15 A. Yes, ma'am.

16 Q. And would that be your writing, 65 hundred South Oates?

17 A. Yes, ma'am.

18 Q. You have just testified --

19     MS. JAMES: Your Honor, I would move for the

20 admission of Defendant's Exhibit 2.

21     THE COURT: Its date?

22     MS. JAMES: August 15th, 2003.

23     MS. REDMOND: No objection.

24     THE COURT: Admitted.

25 Q. Now, you put in your report, sir, it was the 57 hundred

## Page 35

1 block and you put in your sworn complaint it was the 65

2 hundred block, is there any reason for the discrepancy?

3 A. No, ma'am, made a mistake on the one for that complaint.

4 Q. So your sworn complaint was the one that you made your

5 mistake on.

6 A. Yes, ma'am.

7 Q. All right. Now, the purpose for your being in this

8 Dodge truck, I am assuming that that's so that you will be

9 under cover?

10 A. Yes, ma'am.

11 Q. All right. And when you -- you said on direct

12 examination that you felt that the driver of the vehicle may

13 have been DUI; is that right?

14 A. Yes, ma'am.

15 Q. But you have also agreed there could have been other

16 reasons other than DUI for this alleged going over the fog

17 line, right?

18 A. Yes, ma'am.

19 Q. You stopped the vehicle. Now, were you driving the

20 undercover truck?

21 A. Yes, ma'am.

22 Q. Okay. And did both of you exit the vehicle and approach

23 the Defendant's vehicle?

24 A. Yes.

25 Q. At that point were you in plain clothes?

## Page 36

1 A. Yes, ma'am.

2 Q. Okay. And I believe you have said the only thing that

3 you had identifying you as law enforcement was a badge on

4 your hip?

5 A. Correct.

6 Q. Would that have been concealed, would you have a jacket

7 on or anything of that nature?

8 A. No.

9 Q. So it was pretty obvious that you had the badge?

10 A. Yes.

11 Q. And would -- that same would be true for your partner,

12 right?

13 A. Yes.

14 Q. And your partner being Investigator Riley?

15 A. Yes, ma'am.

16     THE COURT: What is his first name?

17 A. Jon, J-O-N.

18 Q. All right. So you walk up to the vehicle, now do you

19 draw your weapon or anything of that nature?

20 A. No, ma'am.

21 Q. You drive up and you are making a stop because you

22 believe that he's under the influence of alcohol, right?

23 A. Correct.

24 Q. And I am assuming that you immediately noticed the

25 Smirnoff Ice bottle that was between his legs.

## Page 37

1  A. Yes, ma'am.

2  Q. And the first thing you did was ask him for his license

3  and his proof of insurance; is that correct?

4  A. Yes.

5  Q. Did you smell any alcohol?

6  A. Nothing that was very strong, no.

7  Q. All right. Did you see any sort of -- you had your

8  flashlight; correct?

9  A. Correct.

10  Q. Were you using your flashlight at this time?

11  A. Yes, ma'am.

12  Q. Did you notice whether his eyes were bloodshot?

13  A. Not that I noticed.

14  Q. Or speech slurred, did you notice that?

15  A. No, ma'am.

16  Q. All right. Now, at this point you take the license,

17  he's still in the vehicle, right?

18  A. Yes.

19  Q. And you take the insurance papers. Now, normally your

20  practice -- and you are a patrol officer now; is that

21  correct?

22  A. Yes.

23  Q. Were you a patrol officer before you went on vice and

24  narcotics?

25  A. Yes, ma'am.

## Page 38

1  Q. Wouldn't it be customary that once you get the license

2  and once you get the insurance that you run a check on it to

3  make sure who you are dealing with, isn't that normal?

4  A. Yes.

5  Q. But you have testified here today that you are not sure

6  whether you did that or whether your partner did that and

7  when you did it; is that right?

8  A. That's correct.

9  Q. Now, you were -- you said you smelled a faint marijuana

10  smell.

11  A. Correct.

12  Q. Marijuana smell in that some marijuana had been burned,

13  would that be what you were smelling?

14  A. Yes, ma'am.

15  Q. Okay. Well, in your situation where you are standing

16  there, he is still seated in the vehicle, you have your

17  flashlight, did you have occasion to observe the ashtray of

18  the car that he was traveling in to see if there were any

19  roaches or any marijuana in the ashtray?

20  A. Nothing that I could see from the outside of the

21  vehicle, no, ma'am.

22  Q. So you looked but you didn't see.

23  A. Correct.

24  Q. So at this point we have him in the vehicle, you have

25  used your light and you don't see marijuana burning or

## Page 39

1  appearing to be in the ashtray or anywhere around his person;

2  correct?

3  A. Correct.

4  Q. But you say that you observed rolling papers after

5  you -- well, you observed rolling papers while he was in the

6  vehicle?

7  A. Yes, ma'am.

8  Q. All right. You said on the driver's armrest; is that

9  correct?

10  A. Correct.

11  Q. Okay. So if he is seated in the vehicle the driver's

12  armrest is actually right -- I mean it's on the door of the

13  left-hand-side of the car; correct?

14  A. Yes, ma'am.

15  Q. The driver's side, he is still sitting in the vehicle,

16  does he not have his arm covering it?

17  A. No.

18  Q. Where were his arms?

19  A. Either on the steering wheel or in his lap because it

20  wasn't covered.

21  Q. So are you actually looking inside the vehicle with your

22  light at some point in time?

23  A. Observing everything in the vehicle that I can, yes,

24  ma'am.

25  Q. When you say rolling papers are these the same type

## Page 40

1  rolling papers that you can buy in any convenience store?

2  A. Yes, ma'am.

3  Q. And are they rolling papers consistent with something

4  one could use to roll tobacco?

5  A. Yes, ma'am.

6  Q. A cigarette, could that be -- that same type papers?

7  A. Yes, ma'am.

8  Q. So before you -- well, let me go back. How quick was it

9  after you went up and asked for the registration that you

10  asked him to step out of the vehicle?

11  A. A couple of minutes tops.

12  Q. Okay. And had the patrol unit that you had requested,

13  had it arrived yet?

14  A. At about the same time.

15  Q. He had arrived about the same time you asked him to step

16  out of the vehicle.

17  A. Yes.

18  Q. Okay. Now, the black and white, it was a black and white

19  unit?

20  A. Yes, ma'am.

21  Q. Do you remember the name of the officer in the black and

22  white unit?

23  A. Officer Givens.

24  Q. Givens, was he accompanied by any other officers?

25  A. No.

Page 41

1  Q. Did you specifically ask for Givens or was he just
2  dispatched from the radio dispatcher?
3  A. He was dispatched. Obviously it was his zone for the
4  evening, is what I am assuming.
5  Q. What conversation did you have with Givens with regard
6  to what you wanted him to do?
7  A. I told him we thought we might have a DUI and him and
8  Investigator Riley spoke with Mr. Woods at the back of the
9  car.
10 Q. Okay. Was your undercover truck equipped with a camera?
11 A. No, ma'am.
12 Q. Was the black and white unit equipped with a camera?
13 A. I do not know.
14 Q. Okay. But based on your knowledge of the case there's
15 not a film of this stop.
16 A. Correct.
17 Q. Now, when Mr. Woods was asked to go to the back of the
18 vehicle with the patrol officer Mr. Givens and with Mr.
19 Riley, you stayed up by the vehicle; correct?
20 A. Correct.
21 Q. And that is when you began to look around in the
22 vehicle, right?
23 A. Yes.
24 Q. I mean look further.
25 A. Yes.

Page 42

1  Q. All right. At that point the only thing that you have
2  seen in the vehicle that raised any suspicion for you was the
3  presence of rolling papers; correct?
4  A. That I seen?
5  Q. Uh-huh.(positive response)
6  A. Yes, ma'am.
7  Q. All right. At what point did you ask Mr. Woods if you
8  could search the vehicle?
9  A. After he was out of the vehicle.
10 Q. And your reason for that was what?
11 A. The smell of marijuana, the rolling papers, the time it
12 took him to stop for us and his movement.
13 Q. Okay. We know obvious that you completely searched the
14 vehicle; correct?
15 A. Correct.
16 Q. You didn't find one single thing in that vehicle to
17 indicate that marijuana had been smoked in the vehicle, did
18 you?
19 A. Other than the marijuana, no, ma'am.
20 Q. You found marijuana but you didn't find burned
21 marijuana, you found leafy green marijuana; correct?
22 A. Correct.
23 Q. Contained, concealed within a metal silver box, right?
24 A. That and marijuana seeds on the floor, yes, ma'am.
25 Q. Off course, you didn't see the marijuana seeds before

Page 43

1  you began the search, right?
2  A. No, ma'am.
3  Q. So your search at that point was -- we know after you
4  completed it that you had found marijuana and you found what
5  you believed to be methamphetamine; correct?
6  A. Correct.
7  Q. Now, the bag that you were describing for Ms. Redmond,
8  it was actually like a little shaving kit, wasn't it?
9  A. Something similar, yes, ma'am.
10 Q. And it was concealed under the front seat of the
11 driver's side of the car, was it not?
12 A. Correct.
13 Q. And you actually had to do some maneuvering, you had to
14 get down and shine a light underneath that seat to find it,
15 right?
16 A. To see it, yes, ma'am.
17 Q. And when you saw it it was zipped almost completely
18 shut, was it not?
19 A. No, the zipper was broke on the bag, ma'am.
20 Q. So it had not been zipped at all?
21 A. No, it was open.
22 Q. All right. And you say you saw some substance that you
23 have described here for the Court today, how was it that you
24 saw that if it was in the bag?
25 A. The bag was laying on its side and the part that zipped

Page 44

1  was facing the front of the vehicle. Does that make sense,
2  ma'am?
3  Q. Uh-huh.(positive response)  What you are saying is that
4  the zipper part that wasn't zipped was actually the closest
5  to your view?
6  A. Yes, ma'am, thank you.
7  Q. Okay. And did you observe what you believed to be
8  methamphetamine in that bag before you actually touched the
9  bag?
10 A. Yes.
11 Q. And then you went ahead --
12     THE COURT: While it was on the floor?
13     THE WITNESS: Yes, ma'am. It was under the driver's
14 seat of the car.
15     THE COURT: Let me see if I can understand this.
16 There is -- what color is the bag?
17     THE WITNESS: I don't recall that, Your Honor. I
18 think it was --
19     THE COURT: There is a plastic zippered bag that you
20 can not see through.
21     THE WITNESS: Correct.
22     THE COURT: The zipper is not completely zipped.
23     THE WITNESS: The zipper doesn't zip, Your Honor.
24     THE COURT: All right. But it has a zipper.
25     THE WITNESS: Correct.

Condenselt™

| Page 45 |
|---|

1    THE COURT: And the zippered side of the bag faces
2 the front of the vehicle?
3    THE WITNESS: It was laying on its side like this,
4 Your Honor.
5    THE COURT: I understand, but did the zippered side
6 of the bag face the front of the vehicle?
7    THE WITNESS: Yes, Your Honor. I think. I am
8 confused now. When I looked under the seat that was the part
9 I could see, Your Honor.
10    THE COURT: Here's the bag. (indicating) Here's the
11 zipper.
12    THE WITNESS: Okay.
13    THE COURT: Was it lying like this?
14    THE WITNESS: Yes, ma'am.
15    THE COURT: With the zippered part facing the front
16 of the vehicle?
17    THE WITNESS: Yes, ma'am.
18    THE COURT: You were outside of the car?
19    THE WITNESS: That was after I started searching the
20 vehicle, I did not see the bag prior to that.
21    THE COURT: Regardless of what Ms. James asked you,
22 what I am asking you is did you see what was in that bag
23 before you picked it up?
24    THE WITNESS: Yes, Your Honor.
25    THE COURT: How?

| Page 46 |
|---|

1    THE WITNESS: You could see the white stuff in the
2 bag, Your Honor, because the zipper wasn't zipped.
3    THE COURT: I understand, but you told me the
4 zippered side was facing the front of the vehicle.
5    THE WITNESS: And I was leaning under the front
6 seat, Your Honor.
7    THE COURT: You were leaning down?
8    THE WITNESS: This was after I started searching the
9 vehicle, ma'am.
10    THE COURT: I'm sorry, I thought you meant before
11 you began your search.
12    THE WITNESS: No, Your Honor.
13    THE COURT: Go on.
14 Q. So that we have the record clear, you have your report
15 in front of you, do you not?
16 A. Yes, ma'am.
17 Q. Directing your attention to what is now in evidence as
18 Defendant's Exhibit 1, on the second page of your narrative
19 do you not describe this bag as a -- I observed a purple
20 Crown Royal bag and a small black zippered case under the
21 driver's seat near the front of the seat?
22 A. Correct. It was black.
23 Q. So the bag was black but it also -- was it contained
24 within the Crown Royal bag?
25 A. No, ma'am. The Crown Royal bag was full of empty

| Page 47 |
|---|

1 sandwich baggies.
2 Q. So the Crown Royal bag was in the same proximity of the
3 brown zippered bag?
4 A. Correct.
5 Q. Both were stuffed or stashed under the driver's seat?
6 A. Yes, ma'am.
7 Q. Where was the Crown Royal bag in relation to the black
8 zippered back?
9 A. Next to it.
10 Q. Okay. Now, you have described for the Court this
11 substance earlier as a white textured -- tell me again what
12 it looked like, the substance?
13 A. Almost kind of looks like similar to a rock salt maybe.
14 Q. Okay. And you believed based on your experience that
15 that might be ice methamphetamine?
16 A. Yes, ma'am.
17 Q. All right. And you do not recall today whether the
18 windows were down when you approached the vehicle?
19 A. No, ma'am.
20 Q. So you just don't remember?
21 A. Correct.
22 Q. Now, the question that you asked, you say it's
23 department policy that you inquire as to whether people are
24 on probation or parole; is that right?
25 A. No, ma'am. What I am saying is department policy if they

| Page 48 |
|---|

1 are for us to do a field contact card.
2 Q. Okay. Is it your testimony here today under oath that
3 every stop that you make that you inquire of whether or not a
4 person is on probation or parole?
5 A. Probably 90 some odd percent, yes, ma'am, I do.
6 Q. And do you do that in part because you deal with a lot
7 of folks who have been in trouble?
8 A. Well, I like to know if they are, but I can get a jump
9 on my paperwork as well.
10 Q. Okay. Well, you don't do -- at that point in time you
11 really weren't doing routine patrols, right?
12 A. Correct.
13 Q. You were really out there looking for folks who were
14 involved in the drug trade.
15 A. Correct.
16 Q. Was there anything about Mr. Woods or his appearance
17 that suggested to you that he was on probation or parole?
18 A. No, ma'am.
19 Q. Isn't it a fact that you learned he was on Georgia
20 parole after you all ran his license?
21 A. No, ma'am.
22 Q. That didn't happen.
23 A. No, ma'am.
24 Q. All right. Well, when he told you that he was on parole
25 from the State of Georgia for a drug violation what did you

Page 49

1  do, did you do a field contact report?
2  A. No, because I ended up arresting him.
3  Q. Okay. Well, I thought your testimony on direct was that
4  you want to get a jump on your paperwork because you are
5  required by your department to fill out a field contact.
6  A. If it came back on the hit notes.
7  Q. Okay.
8  A. Does that make sense?
9  Q. So you are saying because this man was, in fact, on
10 parole and you arrested him that there was no need for you to
11 do a field contact, is that what you are saying?
12 A. Correct.
13 Q. When was it that you learned that there was a warrant
14 for his arrest in Georgia?
15 A. The next day.
16 Q. And how did you learn that?
17 A. When I spoke with the pardons and parole board in
18 Georgia.
19 Q. Okay. Do you not recall when you took him to the station
20 that you actually made a comment to him that I can't remember
21 you didn't act nervous because there was that warrant out for
22 you in Georgia, do you remember saying that to him?
23 A. No.
24 Q. You didn't have that conversation with him at all? Your
25 answer is no?

Page 50

1  A. Correct.
2  Q. Now, if you need to, take a minute to look over your
3  report but I want you to tell me where in this narrative
4  there is any reference to Officer Givens doing a field
5  sobriety test.
6  A. There is none.
7  Q. All right. Tell us what field sobriety test Officer
8  Givens did do.
9  A. I do not know.
10 Q. Well, did you stay there on the scene until the field
11 sobriety test was conducted and completed?
12 A. He was doing that while I was searching the vehicle,
13 ma'am.
14 Q. Okay. Well, what, if anything, was learned from this
15 field sobriety test?
16 A. That he was not too impaired to drive.
17 Q. Okay. And Officer, I guess Riley, would have been
18 involved with the field sobriety test?
19 A. Yes, ma'am.
20 Q. How long do you think the search took?
21 A. Four or five minutes.
22 Q. It's clear I think, and you will agree, that he was not
23 under arrest at the time that you began searching the
24 vehicle, right?
25 A. Correct.

Page 51

1  Q. And it was not until after you located the substances
2  that you believed were controlled substances that you placed
3  him under arrest; is that correct?
4  A. Correct.
5  Q. Do you recall -- you said on direct examination that you
6  asked him to step out of the car for the purpose of the field
7  sobriety and that you patted him down; is that correct?
8  A. Correct.
9  Q. In your report you merely state that he was patted down
10 for officer safety.
11 A. Yes, ma'am.
12 Q. Is there some reason you left out the field sobriety
13 part of it?
14 A. I just didn't put it in there.
15 Q. Okay. You said that there was -- he was not impaired to
16 the extent that he couldn't drive.
17 A. Correct.
18 Q. So I am assuming from that statement you all did not
19 take him to the station and administer any further alcohol-
20 related test?
21 A. No, because he was not arrested for DUI.
22 Q. You testified he was arrested for an open container; is
23 that right?
24 A. Issued a citation, yes, ma'am.
25 Q. And he was arrested for possession of marijuana; is that

Page 52

1  right?
2  A. Correct.
3  Q. And did you also arrest him for possession of
4  marijuana -- of drug paraphernalia?
5  A. No, ma'am.
6  Q. All right. Now, in the discovery that we have been
7  provided by the government it only reveals the City Court,
8  the Dothan City Court matters relating to the possession of
9  marijuana that he pled guilty to, are you familiar with that?
10 A. Yes, ma'am.
11 Q. I have not been able to locate anything that shows that
12 a citation was issued for open container.
13 A. He has an active warrant with the City of Dothan for it
14 right now.
15 Q. He does?
16 A. Yes, ma'am.
17 Q. And do you have any explanation as to why that wouldn't
18 have been dealt with in City Court at the same time this was?
19 A. I don't know.
20 Q. He has been in city custody since his arrest; is that
21 right?
22 A. I believe so.
23 Q. Okay. Now, in your report, and I am directing your
24 attention to page five --
25 A. Uh-huh. (positive response)

## Page 53

1  Q. -- you indicate that Officer Givens advised us that
2  Woods had three hundred and three dollars in his front right
3  pants pocket and another five hundred inside his wallet; is
4  that correct?
5  A. Correct.
6  Q. Why would Officer Givens have been involved in searching
7  him if his purpose on the scene was to deal with an alcohol-
8  related issue?
9  A. Because the unit at that point was going to transport
10 for us, we don't have a caged unit so we can't transport.
11 Q. So at that point he was searching him I guess at your
12 direction?
13 A. Yes, ma'am.
14 Q. And without your having entered the car and started
15 looking around under the seat with your flashlight you
16 couldn't see that bag, could you?
17 A. No, ma'am.
18 Q. And I am saying the bag under the driver's seat, the
19 Crown Royal bag or the black zippered bag.
20 A. No, ma'am.
21 Q. And you couldn't see in plain view the metal container
22 between the console and the driver's seat.
23 A. No, ma'am.
24 Q. When you requested permission of Mr. Woods to search the
25 vehicle you said a few moments ago he told you you couldn't

## Page 54

1  search his car; is that right?
2  A. No, ma'am, he told me I couldn't search his fucking car,
3  quote.
4  Q. But it was clear to you he didn't want you to search the
5  car; correct?  Right?
6  A. Correct.
7  Q. And you told him you were going to search it anyway,
8  right?
9  A. Correct.
10 Q. What was the reason?  There's three officers there, he's
11 on the side of the road, he has been searched for weapons,
12 you are what, five minutes from your police station at that
13 point, maybe five or ten minutes?
14 A. Correct.
15 Q. Was there some reason that you did not seek some sort of
16 authority from the Magistrate or the Court to conduct the
17 search that you conducted?
18 A. I didn't need to.
19 Q. And the reason being because of your combination of
20 suspicions that you say you had.
21 A. Yes, ma'am.
22     THE COURT:  why did you ask for consent?
23     THE WITNESS:  Your Honor, I just asked him anyway,
24 it doesn't hurt to double up on it.
25     THE COURT:  So you asked for consent even though you

## Page 55

1  did not think you needed it.
2     THE WITNESS:  Correct, Your Honor.
3  Q. Now, you didn't write a citation or do anything that
4  night regarding the methamphetamine or suspected
5  methamphetamine, did you?
6  A. Did I write a citation?
7  Q. You didn't write any sort of -- he wasn't charged that
8  night -- let me clear that up.  He wasn't charged that night
9  with the possession of methamphetamine or suspected
10 methamphetamine, was he?
11 A. No, ma'am.
12 Q. Because you had planned to make an inquiry of the DEA to
13 see if they would be interested in the prosecution; is that
14 right?
15 A. Correct.
16 Q. And you contacted Mr. Whittle and he checked with his
17 folks and said they would take the case, right?
18 A. Correct.
19 Q. And you have done that on numerous occasions, haven't
20 you?
21 A. That would be the first time they have ever taken one of
22 my cases.
23 Q. Okay. Based on your area, and I am saying the Dothan
24 area, it's fairly common that you all have all sorts of out
25 of town travelers coming through there on 231, would you

## Page 56

1  agree?
2  A. Yes, ma'am.
3  Q. And also on 84, right?
4  A. Yes, ma'am.
5  Q. People from Georgia use that to get to Panama City, that
6  route?
7  A. Correct.
8  Q. And people from Alabama and all over the country; is
9  that right?
10 A. Yes, ma'am.
11 Q. Do you make many stops similar to this one where you
12 actually stop someone for a traffic violation and you find
13 drugs?
14 A. Yes, ma'am.
15     THE COURT:  Relevance?
16     MS. JAMES:  Well, I think, Judge -- I mean the whole
17 matter is going to his credibility as to what he thought he
18 smelled or thought he saw, and there's some allegations in
19 the motion that Mr. Butler prepared that this was a
20 pretextual stop as opposed to a routine traffic stop, and so
21 I think it's relevant for that purpose to show that he is
22 more involved in looking for drugs than traffic stops.
23     THE COURT:  Is there any doubt that given your
24 assignment at the time that you were more interested in
25 looking for drugs than making traffic stops?  Would you agree

Page 57

1  that given your assignment at the time you were more
2  interested in looking for drugs than you were in making
3  traffic stops?
4         THE WITNESS: I would like to make a case on a
5  traffic stop, Your Honor.
6         THE COURT: I understand, but that doesn't answer my
7  question. Given your assignment at the time, is it
8  reasonable to conclude that you were more interested in
9  looking for and finding drugs than you were in making traffic
10 stops?
11        THE WITNESS: Yes, ma'am. Yes, Your Honor. I'm
12 sorry.
13        THE COURT: Okay. Proceed.
14        MS. JAMES: Just a moment, Judge.
15 Q. Do you know if Mr. Givens did any documentation with
16 regard to the field sobriety test that you testified he did?
17 A. No, ma'am.
18 Q. So would it be safe to say then that there's not any
19 sort of record or any sort of reference in any documents
20 related to this case that would address the field sobriety
21 test?
22 A. Correct.
23 Q. And was there a reason that you did not wait to
24 determine the outcome of the field sobriety test before you
25 began searching the vehicle?

Page 58

1  A. Just based off what I had already seen.
2  Q. You didn't find any weapon in the vehicle, did you?
3  A. No, ma'am.
4  Q. And you didn't find any weapon on his person.
5  A. No, ma'am.
6  Q. Did you notice that the vehicle's windows were tinted?
7  A. Yes, they were.
8  Q. And can you give me your department regulation that
9  requires the contact -- you say the -- dealing with your
10 question about parole and probation, is there a department
11 regulation on that?
12 A. I do not know if it's in our PDO's or not, it's called
13 performing a PDO-106.
14        MS. JAMES: Judge, may I have one second to consult
15 with the client?
16        THE COURT: Yes.
17        MS. JAMES: May I have just a follow-up, Judge?
18        THE COURT: Yes.
19 Q. I asked you earlier about a statement that you made or I
20 was questioning you about a statement that you made to Mr.
21 Woods regarding the parole warrant status, do you remember
22 that?
23 A. Uh-huh. (positive response)
24 Q. And I asked you if you had told him something about I
25 can't believe you weren't nervous knowing that you had that

Page 59

1  warrant, you remember that?
2  A. Yes, ma'am.
3  Q. You remember my question?
4  A. Yes, ma'am.
5  Q. And your response was no, that you did not have that
6  statement or did not make that statement; correct?
7  A. Correct.
8  Q. Is it possible that you could have had a similar
9  conversation to that about which I questioned you a couple of
10 days after the arrest in the presence of Mr. Whittle?
11 A. That's a possibility, yes, ma'am. Because I didn't know
12 about the warrant until the next day.
13 Q. So it's possible that a couple of days after the arrest
14 when you and Mr. Whittle were together in his presence that
15 you may have made the statement I can't believe that you
16 weren't nervous because of the warrant?
17 A. Along those lines or I can't believe you even stopped,
18 something like that, yes, ma'am.
19 Q. Okay. And directing your attention back to your report,
20 that's now in evidence as Defendant's Exhibit 1, you say in
21 there as a basis I guess for your stop that while talking to
22 Woods I observed that he was very nervous, do you remember
23 that?
24 A. Yes, ma'am.
25 Q. And then you have admitted now that a couple of days

Page 60

1  later you told him you were surprised that he wasn't nervous;
2  correct?
3  A. About the warrant, yes, ma'am.
4         MS. JAMES: That's all I have, thank you.
5              REDIRECT EXAMINATION
6  BY MS. REDMOND:
7  Q. Officer, are you familiar with the term interdiction?
8  A. Yes, ma'am.
9  Q. Were you doing -- was that part of your detail that
10 evening, were you doing interdictions?
11 A. No, ma'am.
12 Q. Had you prior to that evening done an interdiction? Had
13 you ever stopped a car for drug --
14 A. Yes, ma'am.
15 Q. Okay. And was that part and parcel of what you all were
16 doing that evening?
17        THE COURT: He has already said it wasn't.
18        MS. REDMOND: Thank you, Your Honor.
19 Q. You had indicated under direct that when you approached
20 the car after Mr. Woods stopped he indicated that he had been
21 talking on a cell phone; is that correct?
22 A. Correct.
23 Q. Where were his hands when you approached the vehicle?
24 A. I am not sure I remember exactly.
25 Q. Thank you.

Page 61

1    MS. REDMOND: Nothing further.

2    MS. JAMES: I have no further questions, Your Honor.

3    THE COURT: All right. I have a question, Officer

4    Elkins. When did you smell the marijuana?

5    THE WITNESS: While I was at the window talking to

6    Mr. Woods.

7    THE COURT: So his window was down?

8    THE WITNESS: Yes, Your Honor.

9    THE COURT: Did you determine that Mr. Woods had

10   been drinking from the open container between his legs?

11   THE WITNESS: That, he said he had just opened that

12   one and he had drank one prior to that.

13   THE COURT: And what was it that he had opened?

14   THE WITNESS: It was a bottle of Smirnoff Ice.

15   THE COURT: What is that?

16   THE WITNESS: It's like a beer with a lemon flavor.

17   I have never drank one so --

18   THE COURT: And you smelled no alcohol on his

19   breath?

20   THE WITNESS: Nothing strong, no, ma'am.

21   THE COURT: Did you smell anything at all?

22   THE WITNESS: No, ma'am.

23   THE COURT: So you didn't even smell the alcohol

24   coming from the glass or can.

25   THE WITNESS: It was a bottle. No, ma'am.

Page 62

1    THE COURT: You didn't smell that either.

2    THE WITNESS: (Witness shakes head in the negative.)

3    No, Your Honor.

4    THE COURT: You gave four reasons for this search,

5    or your belief that you had the authority to search at that

6    time. Number one was the smell of the marijuana, number two

7    your having seen the rolling papers, number three, the time

8    it took Mr. Woods to stop, and number four, his forward

9    movement at the time of the stop; is that correct?

10   THE WITNESS: Correct, Your Honor.

11   THE COURT: Once Mr. Woods told you that he was on

12   the phone talking to somebody in Georgia, did you reject that

13   as to why it took him a while to stop?

14   THE WITNESS: No, because he told me he was looking

15   for a safe place to stop is why he didn't pull over.

16   THE COURT: Did you reject the reason he gave you?

17   Obviously if you determined he was looking for a safe place

18   to stop that would not be a reason to search it.

19   THE WITNESS: Correct.

20   THE COURT: So I have to conclude that you rejected

21   that.

22   THE WITNESS: Yes, Your Honor.

23   THE COURT: Why did you reject that as his reason

24   for why it took him so long to stop?

25   THE WITNESS: Because of the movement and then when

Page 63

1    you could smell and the rolling papers, I thought he was

2    hiding some weed.

3    THE COURT: Tell me again about this movement, he

4    just moved forward?

5    THE WITNESS: It was almost as if -- it's hard to

6    say because you can't see him moving his hands, but most

7    people when you stop them, you know, they pull over, they may

8    reach towards the glove box to get their insurance or to

9    their purse or get their wallet, it wasn't like that, it just

10   wasn't a normal movement as if trying to get your wallet or

11   going to your purse or something along those lines.

12   THE COURT: How many times did he move?

13   THE WITNESS: I am not exactly sure, Your Honor.

14   THE COURT: Well, what was it about it that aroused

15   your suspicion?

16   THE WITNESS: Just when we turned on the lights and

17   he was moving around, I mean for me if it doesn't look

18   normal, which I am automatically thinking somebody is trying

19   to hide a gun or dope or something along those lines. Just

20   hard to explain I guess, Your Honor.

21   THE COURT: I see. So, in fact, you did not believe

22   him when he told you why it took him so long to stop.

23   THE WITNESS: No, Your Honor.

24   THE COURT: Where are the two exhibits?

25   THE CLERK: (complies)

Page 64

1    (Pause)

2    THE COURT: Ms. Redmond, which exception to the

3    warrantless -- the search of a warrantless search come under.

4    MS. REDMOND: Judge, I believe this is exigent

5    circumstances based on the fact that it is a highway stop.

6    There is reasonable suspicion, it's a vehicle and it is

7    easily mobile.

8    THE COURT: Wasn't he arrested for possession of

9    marijuana?

10   MS. REDMOND: After the marijuana was found, yes,

11   ma'am. That's after the search is conducted.

12   THE COURT: Talk to me again about what makes this

13   exigent.

14   MS. REDMOND: Judge, my belief is, and I think what

15   we have argued in the Motion to Suppress, in part is what the

16   11th Circuit has found. And I think -- let me go back,

17   Judge. Our argument is that the stop of the vehicle was

18   reasonable based on the fact that the Defendant's car was

19   weaving. That's based on United States versus Harris. That

20   the officer's actions in soliciting personal information was

21   reasonable. The fact that the Defendant -- excuse me, the

22   officer smelled marijuana and saw rolling papers in a -- in

23   the vehicle, coming from -- the odor emitting from the

24   vehicle, the fact that it's on a highway and that the car is

25   mobile, I think gives rise to exigent circumstances that it

Condenselt™

**Page 65**

1  was necessary for the officer at that point to search the
2  vehicle.
3      THE COURT: And Ms. James, the Defendant contests
4  the stop, his detention and the search.
5      MS. JAMES: Yes, Your Honor.
6      THE COURT: Thank you.
7      MS. JAMES: Judge?
8      THE COURT: Next witness?
9      MS. JAMES: Your Honor, based on this that's gone
10  on, may I ask two more questions?
11      THE COURT: Yes.
12          RECROSS-EXAMINATION
13  BY MS. JAMES:
14  Q. Officer Elkins, I'm going to show you --
15      MS. JAMES: May I approach the witness, Your Honor?
16      THE COURT: Yes.
17  Q. -- what I have marked for identification purposes as
18  Defendant's Exhibit 3 and ask if you can identify this?
19  A. It's a warrant for Mr. Woods' arrest from the State of
20  Georgia.
21  Q. Is that the warrant that you became aware of after the
22  arrest had happened?
23  A. Yes, ma'am.
24  Q. Okay. And this would be a warrant for his arrest based
25  on a probation -- excuse me, a parole violation, would you

**Page 66**

1  agree?
2  A. Some kind of violation, ma'am.
3  Q. And this is a document that you actually came into
4  possession of as a result of your involvement in the case; is
5  that correct?
6  A. Yes, it may be. Yes, ma'am.
7      MS. JAMES: At this time we would move for admission
8  of Defendant's Exhibit 3, Your Honor.
9      MS. REDMOND: No objection.
10      THE COURT: Defendant's Exhibit 3 is admitted.
11  Q. Now, let me direct your --
12      MS. JAMES: May I again question him, Your Honor,
13  from here?
14      THE COURT: Yes.
15  Q. Let me direct your attention to the date on this
16  document. Does this not indicate it was done on August 13th
17  of 2003?
18  A. Correct.
19  Q. And would it not be a fact, sir, that was one day before
20  you executed this traffic stop on Mr. Woods?
21  A. Correct.
22  Q. And so when you asked him if he was on probation or
23  parole and he responded yes, was it not a natural thing for
24  you to want to inquire at that time if there was a warrant?
25  A. That's why we ran him NCIC.

**Page 67**

1  Q. Okay. And did you -- so the fact that he was wanted at
2  that time would have given you a reason that you could have
3  arrested him?
4  A. Had it been entered, yes, ma'am.
5      THE COURT: Had it been entered, what does that
6  mean?
7      THE WITNESS: The Georgia pardons and parole, Your
8  Honor, did not put the warrant into NCIC, they hold them,
9  according to the probation officer I spoke with over there, a
10  couple of days and try to execute them themselves, and I
11  wasn't made aware of the warrant until I spoke with them.
12      THE COURT: After the arrest.
13      THE WITNESS: Correct, Your Honor.
14  Q. You didn't know --
15      MS. JAMES: May I proceed, Your Honor?
16      THE COURT: Yes.
17  Q. When you were searching the vehicle or immediately prior
18  to your searching the vehicle did you have any thought in
19  your mind that Mr. Woods could have jumped in that vehicle
20  and left the scene with that car?
21  A. Possibility, but with us there I didn't think so at the
22  time.
23  Q. And he was with two officers at the back of the vehicle;
24  correct?
25  A. Correct.

**Page 68**

1  Q. And at the time you decided you would execute the search
2  of that vehicle you didn't know whether you were going to be
3  able to arrest him for DUI or not, did you?
4  A. No, ma'am.
5  Q. Because they were at that point conducting this field
6  sobriety test; correct?
7  A. Correct.
8  Q. So it wouldn't have been unreasonable for you to at
9  least wait until the conclusion of that test to see if he was
10  going to be arrested; correct?
11  A. I guess, yes.
12  Q. Because if he had been arrested then, of course, you
13  could have searched the vehicle incident to a lawful arrest;
14  correct?
15  A. Correct.
16  Q. And two other questions. You did not issue a citation
17  for unlawful lane crossing, did you?
18  A. No.
19  Q. And under the Alabama Traffic Code you could have issued
20  one for this weaving, could you not?
21  A. He was still in his lane, he didn't come into the other
22  lane, but I could have, I am sure.
23  Q. And who wrote the --
24      THE COURT: Ms. James, I didn't ask about any of
25  that.

## Page 69

1     MS. JAMES: Ma'am?
2         THE COURT: I didn't ask about any of that. Next
3  witness.
4         MS. REDMOND: Judge, I just have one, and it's based
5  on the Court's questioning.
6             REDIRECT EXAMINATION
7  BY MS. REDMOND:
8  Q. Officer, do you still have -- I think the Court might
9  have it -- the report that was entered into evidence?
10        MS. REDMOND: It was Officer Elkins' report, does
11 the Court have that?
12        THE COURT: Yes.
13        MS. REDMOND: If I may, Your Honor. (complies)
14 Q. Officer Elkins, you recognize that document I have just
15 placed before you; is that correct?
16 A. Yes, ma'am.
17 Q. And that's the report that you issued in this case; is
18 that correct?
19 A. Yes, ma'am.
20        THE COURT: That's Defendant's Exhibit 1? Or 2?
21 Q. Is that labeled Defendant's Exhibit 1?
22 A. It's 1.
23 Q. Thank you. Would you please turn to page four of
24 Defendant's Exhibit 1. Sixth paragraph. The Court asked you
25 in giving the reasons and rationale for believing that you

## Page 70

1  did not require a warrant to search the vehicle, you gave as
2  one of those reasons the length of time it took the Defendant
3  to pull over; do you remember that, the Court's line of
4  questioning?
5  A. Correct.
6  Q. Okay. And the Court asked you or stated that you
7  apparently had rejected the Defendant's claim that he was
8  looking for a safe place to pull over; do you remember that?
9  A. Yes, ma'am.
10 Q. From your report on the fourth page is there any
11 indication of why you rejected the Defendant's contention
12 that he was looking for a safe place to pull over?
13 A. Because he passed a very safe place, Festival Drive,
14 right there at 231.
15 Q. What particularly was safe or in your estimation safe
16 about Festival Place?
17 A. It's lit, it's off 231, there's no oncoming traffic.
18 Q. What is Festival Place?
19 A. Festival Drive is where they hold the National Peanut
20 Festival.
21 Q. Is it a park area?
22 A. Once you drive up into it, it is. Yes, ma'am. They hold
23 fairs and what not up there.
24        MS. JAMES: Judge, that prompts one question, may I?
25        THE COURT: Yes.

## Page 71

1             RECROSS-EXAMINATION
2  BY MS. JAMES:
3  Q. The Festival Drive is kind of like -- it's a fairly
4  large entrance into that area of the Festival, the Peanut
5  Festival; is that right?
6  A. Yes, ma'am.
7  Q. And you don't have any reason to believe that Mr. Woods,
8  a traveler from out of state, would have been familiar with
9  that drive or to where it led.
10 A. No.
11        MS. JAMES: That's all.
12        MS. REDMOND: Nothing further for the government,
13 Your Honor.
14        THE COURT: You may step down.
15        MS. REDMOND: And Judge, the other witness that the
16 government thought it might call, the government has elected
17 not to call that witness, the government rests at this time.
18        THE COURT: Thank you.
19        MS. JAMES: Your Honor, given the fact that the
20 government is not calling that witness I would like to call
21 him.
22        THE COURT: All right.
23        MS. JAMES: Mr. Riley, Investigator Riley. May I
24 proceed, Your Honor?
25        THE COURT: Yes. Mr. Riley, you have been sworn.

## Page 72

1         MS. JAMES: May I have permission to lead?
2         THE COURT: Yes.
3         JON RILEY, witness called by the Defendant,
4  having been previously duly sworn or affirmed, testified as
5  follows:
6              DIRECT EXAMINATION
7  BY MS. JAMES:
8  Q. State your name, please.
9  A. Investigator Jon Riley.
10 Q. Where are you employed, sir?
11 A. City of Dothan.
12 Q. How long have you been employed with Dothan?
13 A. Six years.
14 Q. And what is your present job?
15 A. Narcotics investigator.
16 Q. And back in August, on August 14th of 2003 were you
17 working in the same capacity?
18 A. Yes, ma'am.
19 Q. And did you have a partner at that time?
20 A. I did.
21 Q. And who is the partner?
22 A. Investigator David Elkins.
23 Q. Okay. Did you all have occasion to encounter Claude
24 Woods, the Defendant seated at the counsel table?
25 A. We did.

Page 73

1  Q. Okay. Explain to the Court how that happened.
2  A. We first noticed him, or I should say Investigator
3  Elkins first notified him coming. We were at the light at
4  Wal-Mart and I was actually looking down at whatever I had
5  just bought, I don't remember what it was, and he mentioned
6  to me, he said look at the car there that's kind of driving
7  off the road a little bit. That's when I looked up and
8  noticed it.
9  Q. So you were sitting stationary at Wal-Mart; is that
10 correct? The light at Wal-Mart?
11 A. Yes, ma'am. The best I can remember, or maybe driving
12 up to it.
13 Q. Okay. And so at that point in time traffic was
14 progressing down 231 southbound; correct?
15 A. Yes, ma'am.
16 Q. So at that point you all had not followed him; is that
17 right?
18 A. No, ma'am.
19 Q. You just -- he just said look at that car and how it's
20 driving before you turned behind it and began to follow; is
21 that right?
22 A. Yes, ma'am.
23 Q. And after you turned behind him you turned southbound
24 away from Dothan; is that correct?
25 A. Yes, ma'am.

Page 74

1  Q. Was that for the purpose of following the vehicle?
2  A. Yes, ma'am.
3  Q. And what happened after you began to follow the vehicle?
4  A. Basically I noticed that he was on the cell phone and
5  that he was not staying within his line of travel, mostly
6  going to the right and kind of clipping the grass on the side
7  of the road.
8  Q. Okay. And how many times did he do that?
9  A. I know three times that I can remember.
10 Q. Okay. Well, when he passed in front of you two sitting
11 at the light you were in the passenger side of the vehicle;
12 is that right?
13 A. Yes.
14 Q. And Mr. Elkins was driving?
15 A. Yes, ma'am.
16 Q. What possibly could you all have seen at that point that
17 indicated that this driver might have been having a problem?
18 A. I was looking down, I didn't see anything until he
19 pointed it out to me.
20 Q. And he pointed it out and said look at that car?
21 A. Right.
22 Q. And that car had some nice rims on it, didn't it?
23 A. I don't remember. It was -- for what they call on the
24 street it was a little tricked out, yes, ma'am.
25 Q. Tricked out.

Page 75

1  A. Yes, ma'am.
2  Q. And tricked out would mean -- let me back up a minute.
3  Do you see more tricked out vehicles with people that deal
4  with drugs than average citizens?
5  A. No, ma'am.
6  Q. All right. What does tricked out --
7     THE COURT: What does that mean?
8     THE WITNESS: I'm sorry, Judge, a little flashier
9  than usual.
10    THE COURT: Thank you.
11 Q. All right. How long did you all follow the subject
12 vehicle?
13 A. Two or three minutes maybe.
14 Q. About how long?
15 A. Probably closer to two minutes.
16 Q. How long would that be distance wise?
17 A. Probably three or four miles by the time he actually
18 stopped.
19 Q. Okay. At what point if at all did you activate your
20 service lights?
21 A. A mile or two down the road.
22 Q. All right. Were you in fast pursuit?
23 A. No, ma'am.
24 Q. He was driving the speed limit?
25 A. More or less, I am sure, yes, ma'am.

Page 76

1  Q. Okay. When you say he crossed over, not completely off
2  the road, tell us how that -- how you observed that or what
3  you observed?
4  A. We were right behind him and he just kept hitting the
5  fog line on the right side of the road, just not paying
6  attention, talking on the cell phone, that type thing.
7  Q. When you say touching it?
8  A. He actually touched the grass I know three times.
9  Q. Okay. Now, how did you observe him talking on the cell
10 phone?
11 A. Well, up until the point to where he finally stopped
12 it's fairly well lit through there at night because that's a
13 business district and there are street lights.
14 Q. Okay. So you could see in the vehicle pretty well?
15 A. Up until about Festival Drive is where he could have
16 stopped and I think the street lights stop somewhere in
17 there.
18 Q. Did you communicate to Investigator Elkins that you
19 observed him on the cell phone?
20 A. I am sure I did at some point.
21 Q. Okay. And you would agree with me that someone talking
22 on the cell phone could be paying less attention to detail
23 and to your driving than one that would not be talking on the
24 cell phone, would you agree with that?
25 A. Yes, ma'am, I would agree with that.

Page 73 - Page 76

**Page 77**

1  Q. Okay. So you all activate your service lights, did you
2  turn on your siren?
3  A. Not at first. I think we just did the lights at first.
4  Q. Okay.
5  A. And he didn't stop.
6  Q. You all were in a pickup truck, right?
7  A. Yes, ma'am.
8  Q. Does it look like a typical unmarked vehicle? I mean do
9  you have the tinted windows and all that in it?
10 A. Yes, ma'am.
11 Q. And it's an extended cab I believe?
12 A. Yes, ma'am.
13 Q. All right. What happened after he pulled over?
14 A. Investigator Elkins walked to the driver's door and I
15 approached the passenger door. Of course, we called it in on
16 the radio before we got out of the vehicle.
17 Q. Are you saying you called in the tag number?
18 A. Yes, ma'am.
19 Q. All right. When you approached the passenger side was
20 the window up or down?
21 A. It was up. Eventually he let it down.
22 Q. Did you notice if his vehicle had a sunroof?
23 A. I don't remember.
24 Q. All right. Well, when you walked up to the passenger
25 side what happened? What did you do?

**Page 78**

1  A. I just kind of stood there for safety purposes.
2  Q. What was Detective or Officer Elkins doing?
3  A. He approached Mr. Woods and explained to him why we had
4  stopped him and asked him for his driver's license.
5  Q. And did he comply?
6  A. He did.
7  Q. What happened after he complied with that request?
8  A. I think he asked him for some insurance papers next.
9  Q. All right. And did he comply with that?
10 A. Yes, ma'am.
11 Q. And then what happened after that?
12 A. Eventually -- I think the very next thing was
13 Investigator Elkins indicated to me that he had an open
14 container of alcohol and thought that he might be driving
15 under the influence of alcohol.
16 Q. Okay. And as a result of that what happened?
17 A. He asked him to step out of the vehicle and I believe at
18 that point I called for a patrol car to respond.
19 Q. All right. How long did it take for the patrol car to
20 get there?
21 A. He was just right up the road, so a minute or two at the
22 very most.
23 Q. And the reason for calling the patrol car would have
24 been what?
25 A. To assist in giving the field sobriety test since we

**Page 79**

1  don't do those every day in investigations, we might have
2  been a little rusty at it, a patrol officer does it almost
3  probably every day he is at work, so --
4  Q. Okay. Do you know the officer's name that responded?
5  A. It was John Givens.
6  Q. And what happened when Mr. Givens got there?
7  A. Mr. Woods was brought back to -- behind his vehicle out
8  of traffic and Officer Givens began giving the field sobriety
9  test.
10 Q. And were you observing that?
11 A. Yes, ma'am.
12 Q. And what kind of test did he give him?
13 A. He gave him the horizontal --
14       THE COURT: Is that relevant? Why would it be when
15 he didn't fail it?
16       MS. JAMES: Again, Your Honor, it goes to
17 credibility.
18       THE COURT: Did Elkins testify about that? I don't
19 recall your asking Elkins.
20       MS. JAMES: I did. I asked him what test and he said
21 he didn't know.
22       THE COURT: Oh. Then you have nothing to impeach.
23       MS. JAMES: May I approach ex parte and tell you
24 why?
25       THE COURT: Yes.

**Page 80**

1       (At which time a side-bar conference was had between
2  the Court and counsel, which conference was not attended by
3  the court reporter.)
4       THE COURT: All right. Continue.
5  Q. Now, tell me what other things he did with regard to the
6  field sobriety test?
7  A. I believe he did the horizontal gaze nystagmus, the eye
8  test, the quick one-legged stand, and I think that's when we
9  both determined together while he had been drinking, it was
10 obvious, we could smell it, he wasn't under the influence of
11 alcohol.
12 Q. Okay. Now, what was Officer Elkins doing at the time?
13 A. He probably at that point was searching his -- the
14 Cadillac.
15 Q. Okay. And for what reason?
16 A. He had smelled the odor of marijuana, and plus when we
17 were trying to pull him over it took him a while to stop and
18 it looked like he was shoving something under the driver's
19 seat.
20 Q. Did you smell the odor of marijuana?
21 A. Yes, ma'am.
22 Q. Did you do a report?
23 A. No, ma'am.
24 Q. You didn't do a report in regard to any of this
25 investigation that you are describing?

Page 81

1    A. No, ma'am.

2    Q. All right.

3        THE COURT: One moment. Officer, you said you did a
4    horizontal engagement, you did the quick one-legged stand,
5    and by that time you concluded that he was not under the
6    influence of alcohol.

7        THE WITNESS: Yes, ma'am.

8        THE COURT: Then you said but it was obvious we
9    could smell it?

10        THE WITNESS: We could smell alcohol, but I mean not
11    to -- we didn't feel like he was under the influence of
12    alcohol.

13        THE COURT: How do you know Officer Elkins smelled
14    alcohol?

15        THE WITNESS: Well I say we, I mean myself and
16    Officer John Givens, the ones doing the field sobriety test,
17    we could smell it on his person as in away from the vehicle.

18        THE COURT: Thank you. Go ahead.

19    Q. Based on your experience and in vice and narcotics does
20    burning or burned marijuana smell differently than marijuana
21    that has not been burned?

22    A. Absolutely, yes, ma'am.

23    Q. All right. Based on your involvement in this stop and
24    investigation did you all find in the vehicle any evidence of
25    any burned marijuana?

Page 82

1    A. I certainly didn't.

2    Q. Okay. Now, you were armed when you had him at the back
3    of the vehicle; correct?

4    A. As in what, firearm?

5    Q. Yes.

6    A. Yes, ma'am.

7    Q. And I am assuming that Officer Givens was in uniform?

8    A. He was.

9    Q. And he was armed as well?

10    A. Yes, ma'am.

11    Q. And at that point that you all had Mr. Woods at the back
12    of the vehicle he was not free to go, was he?

13    A. No, ma'am. We were conducting a field sobriety test.

14    Q. Okay. And at that point there wasn't much chance of him
15    getting in that car and driving off, was there?

16    A. No, ma'am.

17    Q. All right. At what point did you all run his driver's
18    license?

19    A. I honestly don't recall. I didn't run it, I believe
20    Elkins ran it and if I did I don't remember when.

21    Q. Okay. What, if anything, did you learn from the -- are
22    you satisfied that the license were checked?

23    A. Yes, ma'am.

24    Q. But it was not you that checked it?

25    A. I certainly don't remember checking them.

Page 83

1    Q. All right. What, if anything, was learned as a result of
2    that driver's license having been run?

3    A. That he was on probation.

4    Q. Okay. When you ran it they came back and it was a hit?

5    A. Probation out of Georgia I believe.

6    Q. Okay. Were you -- did you ask him any questions?

7    A. No, ma'am. The only thing I pointed out to him was that
8    he could have stopped at Festival Drive a quarter mile back
9    down the road and it would have been safer for him and us
10    instead of in the grass.

11    Q. What is your agency policy with regard to dealing with
12    probation and parolees?

13    A. Mainly do a field contact card unless there's a warrant
14    on them, other than that we just do a field contact card and
15    forward it to the agency that has them under supervision.

16    Q. Is that regardless of whether you cite them for any
17    violation or not?

18    A. Yes, ma'am. Because if you run the driver's license and
19    there will be a -- what is called a hit, their probation
20    officer will find out there was a hit and they are going to
21    want to know why the police had contact with them.  If it was
22    a field interrogation, if it was a criminal offense,
23    whatever, they are going to want to know, so you always need
24    to write it down and forward it so when they call the
25    department and ask the records division they will know.

Page 84

1    Q. Okay. How was it -- explain to the Court how it was that
2    that information was provided to you.  Did you hear it on the
3    radio, was it told to you by Elkins or what?

4    A. I think the preliminary information came over the radio
5    and then later we confirmed it through a hard copy from the
6    NCIC paperwork.

7    Q. Okay. Now, when you say you heard it over the radio does
8    that mean you were in the car or outside the car when you
9    heard it?

10    A. I don't remember. We have got portable radios,
11    walkie-talkies, so we can be outside the car or inside the
12    car and talk to our dispatch.

13    Q. Would it be your practice -- let me back up a second.
14    How long did you work with Elkins as a partner?

15    A. We worked the road together some, and for a few months,
16    probably two months, and then we worked narcotics for, I
17    don't know, a little less than a year together.

18    Q. Okay. Would it be your practice and his when you were
19    working together to run the driver's license about as quickly
20    as you could?

21    A. Yes, ma'am.

22    Q. Is that almost an automatic thing that as soon as you
23    get them you call them in?

24    A. Yes, ma'am.

25    Q. And do you have any reason to think that was not done in

1  this case?

2  A. No, ma'am.

3  Q. Okay.

4      MS. JAMES: May I have just a moment, Judge?

5      THE COURT: Yes.

6  Q. Did you observe Officer Elkins' search of the vehicle at

7  all?

8  A. Somewhat.  I could see Officer Elkins where he was, but

9  I was more or less looking at Mr. Woods during the field

10  sobriety test for a second opinion just in case he was what

11  we call DUI, we could have two officers' opinion.

12  Q. Tell the Court what you observed in relation to what

13  Officer Elkins actually did from the time he was taken from

14  the car, or he stepped out of the car?

15  A. He approached me and asked me did I smell marijuana and

16  I told him yes, I smelled it emitting from the vehicle. And

17  he said can you smell anything else?  I told him well,

18  obviously the smell, I could smell it.  I don't know how

19  strong it's going to smell in here but I could smell it coming

20  from the vehicle. At that point he searched the vehicle and I

21  was with Mr. Woods, I can't tell you specifically what he

22  did.

23  Q. You didn't actually physically observe him make any sort

24  of entry into the vehicle or --

25  A. I mean I saw Investigator Elkins go into the vehicle but

1  specifically what he looked at, where he reached, I can't

2  tell you that, I was looking at Mr. Woods. But I mean I was

3  right there, I could tell he was in the vehicle.

4  Q. At what point was Mr. Woods placed under arrest?

5  A. I believe when Investigator Elkins found what he

6  believed to be methamphetamine right under the driver's seat.

7  Q. And did you see what kind of packaging it was in?

8  A. I believe it was in a Crown Royal bag.  And then

9  something else, it was inside a Crown Royal bag, some other

10  type of container.

11  Q. Okay. And you observed that?

12  A. When he put it on the trunk, I saw it then.

13  Q. Was it still in the bag?

14  A. No, I mean he opened it up.

15  Q. I am saying when it was placed on the trunk was the --

16  you said it was in something within the Crown Royal bag.

17  A. Right, right.

18  Q. Was it within the Crown Royal bag?

19  A. He opened it up, showed it to me, showed it to Mr.

20  Woods.

21  Q. Show the Court how that happened.  We are talking a

22  Crown Royal, purple liquor bag, right?

23  A. Right.

24  Q. What does he do, peel that off and there's a container

25  within that that contained the methamphetamine?

1  A. As best I can remember.

2  Q. Okay. You say you smelled marijuana, how strong an odor

3  was it?

4  A. It wasn't extremely faint but at the same time it wasn't

5  extremely powerful either. It seemed -- it didn't smell like

6  an odor of marijuana or it didn't smell like it was the new

7  green marijuana, I could tell it was the burnt marijuana.

8  Q. Is it your practice to ask people when you stop them,

9  all the people you stop if they are on probation or parole?

10  A. Mine personally, not necessarily, unless I have a

11  suspicion.

12  Q. And when you were at the passenger window incident to

13  this stop you didn't see any controlled substances in plain

14  view, did you?

15  A. No, ma'am.

16  Q. And at the time that Mr. Woods was in the back with you

17  and Officer Givens he was not placed under arrest until the

18  search was conducted; correct?

19  A. That is correct.

20  Q. And tell us what the controlled substance that you all

21  believed was methamphetamine, tell us what it looked like.

22  A. Crystallized glass shards, I guess is the best way to

23  describe it, very small flecks of glass shards.

24  Q. Do you know if Officer Givens' parole unit was equipped

25  with a camera?

1  A. No, ma'am, I don't.

2  Q. And I am assuming that without activation of your lights

3  that there would be nothing related to your vehicle that

4  would suggest that it was a law enforcement vehicle, would

5  there?

6  A. That is correct.

7  Q. Do you and/or at the time that you were working with

8  Officer Elkins did you all make a number of traffic stops out

9  there on 231?

10  A. Absolutely not.

11  Q. Did you write the ticket for the open container?

12  A. No, ma'am, I believe Investigator Elkins did.

13  Q. Okay. And how about the -- well, I don't think I need

14  that.

15      MS. JAMES:  May I consult my client, Your Honor?

16      THE COURT:  Yes.

17      MS. JAMES:  Your Honor, I don't have any further

18  questions.

19      THE COURT:  How do you spell Givens?

20      THE WITNESS: G-I-V-E-N-S.

21      THE COURT:  G-I-B-E-N-S?

22      THE WITNESS:  G-I-V.

23      THE COURT:  Oh, it is Givens. Did you ask for

24  permission to search the car?

25      THE WITNESS: I didn't, Investigator Elkins did

Page 89

1  though.
2      THE COURT: What did Mr. Woods say?
3      THE WITNESS: He said you are not searching my F'ing
4  car.
5      THE COURT: At the time he refused permission to
6  search the car did you believe there was probable cause to
7  search the car?
8      THE WITNESS: In my opinion, yes, ma'am, just based
9  on the odor of marijuana.
10     THE COURT: Tell me what you base that on.
11     THE WITNESS: On the odor of marijuana that was
12 emitting from the vehicle.
13     THE COURT: Anything else?
14     THE WITNESS: Well, the thing that made me nervous,
15 because this was not a pretext stop, the thing that made me
16 nervous is he was reaching under his seat and it was obvious
17 that he was reaching under his seat. Of course, you are
18 thinking weapons at that point and officer safety more so
19 than worrying about is there dope in the car or not. And the
20 fact that he had a wonderful place to stop that would have
21 been safe from traffic at the Peanut Festival entrance and he
22 went a quarter mile down the road where we were in the grass
23 and next to the road which was not exactly safe with semi
24 trucks going by.
25     THE COURT: So the odor of marijuana, his reaching

Page 90

1  under his seat and the fact that he didn't stop at Festival
2  Drive.
3      THE WITNESS: Yes, ma'am.
4      THE COURT: And what was it about the fact that he
5  didn't stop at Festival Drive that helped to establish
6  probable cause?
7      THE WITNESS: Well, when we hit the lights he kept
8  going. We hit the siren, he kept going. Festival Drive has
9  two lanes and because it was closed, the Peanut Festival was
10 not open, there were two lanes he could have pulled off in
11 being in a well lit area for his safety, for our safety and
12 being 20 or 30 feet off the right-of-way, and not being in
13 the grass where you don't know what you are driving over and
14 cars and trucks going by that are two or three feet right by
15 you when you are standing at the driver's door.
16     THE COURT: Did you see any cigarette papers in the
17 car?
18     THE WITNESS: Yes, ma'am. You mean like rolling
19 papers?
20     THE COURT: Yes.
21     THE WITNESS: Yes, Your Honor, I did.
22     THE COURT: Before the search?
23     THE WITNESS: Yes, ma'am.
24     THE COURT: Where were they?
25     THE WITNESS: They were kind of on -- where his left

Page 91

1  hand would have been if he had put it on the door where the
2  handle was, laying right there. They were in plain view, the
3  cigarette papers were.
4      THE COURT: Thank you. Let's take a five minute
5  recess.
6      (At which time, 12:50 p.m., a recess was had until
7  12:57 p.m., at which time the hearing continued.)
8      THE COURT: Ms. Redmond.
9      MS. REDMOND: Judge, the government has no questions
10 of this witness.
11     MS. JAMES: Judge, I have one follow-up question.
12 Q. You testified that one thing that caused you to be
13 suspicious was his passing this Festival Drive; is that
14 right?
15 A. Yes, ma'am.
16 Q. And Festival Drive is actually -- it's a fairly large
17 road that goes into the park, right?
18 A. Yes, ma'am.
19 Q. Now there's a median in between, isn't there? Between
20 the two lanes, or is there?
21 A. No, I think they just put cones up.
22 Q. Okay. They put cones up. You observed that Mr. Woods had
23 Georgia plates, right?
24     MS. REDMOND: Judge, this is beyond the scope of the
25 Court's questioning.

Page 92

1      THE COURT: It is.
2      MS. JAMES: Well, I was trying to -- maybe I didn't
3  do it succinctly, Judge, but what I am trying to get to is he
4  thinks it was a safe place but we don't know that Mr. Woods
5  thought it was a safe place.
6      THE COURT: Well, ask that question.
7  Q. How do you know that Mr. Woods thought it was a safe
8  place?
9  A. I don't know for a fact that he thought it was a safe
10 place.
11     MS. JAMES: That's all I have.
12     THE COURT: Anything further?
13     MS. REDMOND: Nothing from the government.
14     THE COURT: You may step down.
15     MS. JAMES: We have no further witnesses, Your
16 Honor, at this time we would rest.
17     THE COURT: Thank you. Make sure, please, parties,
18 lawyers, that the deputy clerk has all of the original
19 exhibits. I recall there were three admitted, all three for
20 the Defendant, no exhibits admitted from the government; is
21 that correct?
22     MS. REDMOND: Yes, Your Honor.
23     THE COURT: Thank you.
24     MS. JAMES: Your Honor, would the Court entertain a
25 supplemental briefing on this matter? I did not do the

Page 93

1    original Motion to Suppress and I think I have some
2    additional authority I would like to submit to the Court. I
3    am not asking for any lengthy period of time.
4         THE COURT: submit your additional authority on or
5    before Friday, the 21st.
6         MS. JAMES: Thank you.
7         THE CLERK: court is recessed.
8         (At which time, 12:59 p.m., the hearing was
9    adjourned.)
10        *   *   *   *   *
11        I certify that the foregoing is a correct transcript
12   from the record of proceedings in the above-entitled matter.
13   This the 16th day of February, 2006.
14
15                Official Court Reporter
16
17
18
19
20
21
22
23
24
25

04. 0001
SRR

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION



UNITED STATES OF AMERICA,          *
                                   *
     PLAINTIFF,                    *
                                   *
v.                                 * CASE NO.  1:04CR12
                                   *
CLAUDE LEE WOODS,                  *
                                   *
     DEFENDANT.                    *


**SUPPLEMENT TO MOTION TO SUPPRESS AND REQUESTS TO FILE**

**OUT OF TIME**

Comes now Claude Lee Woods by and through undersigned counsel

and files this his supplement to his Motion to Suppress and request to file out of

time and in support thereof states the following:

1. A suppression hearing was conducted on January 18, 2005 at which time

evidence and testimony was received.

2. At the conclusion of the hearing the undersigned sought and obtained

permission to file this supplement which was due on January 21, 2005.  Counsel

was unable to timely file due to serious computer problems still unresolved.

Counsel's secretary is now operating from her personal laptop.

3. Woods submits that the testimony of the arresting officers fails to establish

probable cause and that the stop was pretextual. In further support of his position he offers the additional legal argument to follow.

## ARGUMENT

Georgia license plates and a "tricked"[1] out vehicle were certainly not enough to provide reasonable suspicion of drug activity. As noted by the Eleventh Circuit in *United States v. Tapia*, 912 F.2d 1367 (1990) traveling on the interstate with Texas license plates (not yet a crime in Alabama) does not provide a minimal, particularized basis for a conclusion of reasonable suspicion on the part of the officer. The allegations of erratic driving to the point of warranting a stop is negated by the fact that the officers did not immediately pull the vehicle over and allowed it to travel in excess of several miles before activating the emergency equipment.

Further the second officer to testify, John Riley, indicated that they began following the vehicle before they noticed any alleged erratic driving.[2] This is contrary to the testimony of officer Elkins who testified they were already following the vehicle when the alleged erratic driving began.

---

[1]As the Court may recall Riley testified this is a vehicle with a number of added accessories.

[2]They were sitting at a light in front of Wal Mart as the vehicle passed south bound on Highway 231. The officers turned right going away from Dothan and began following the subject vehicle.

2

The burden of proof is upon the government to establish an exemption to the Fourth Amendment requirement. See *United States v. Jeffers*, 342 U.S. 48, 51, 72 S. Ct. 93,96 L Ed. 59 (1951)  Law enforcement was without probable cause to make the stop, therefore the fruit of the poisonous tree doctrine applies and the evidence should be suppressed.

In *United States v. Purcell*, 236 F. 3d 1274, 1277 (11 th Cir. 2001) the following standard applicable to vehicle stop and searches was stated:

> The Fourth Amendment protects individuals from unreasonable search and seizure. A traffic stop is a seizure within the meaning of the Fourth Amendment ... Because a routine traffic stop is only a limited form of seizure, it is more analogous to an investigative detention than a custodial arrest ... Therefore, we analyze the legality of these stops under the standard articulated in *Terry v. Ohio* ... Under *Terry*, an officer's actions during a traffic stop must be 'reasonably related in scope to the circumstances which justified the interference in the first place'... Furthermore, the duration of the traffic stop must be limited to the time necessary to effectuate the purpose of the stop... The traffic stop may not last 'any longer than necessary to process the traffic violation' unless there is articulable suspicion of other illegal activity....

There was no probable cause to seize the defendant or search the vehicle and seize the contents of same and the seizure of the persons exceeded the scope of the stop. Elkins testimony regarding his question to Woods about his parole status is

3

suspect. The more possible explanation regarding the information is that it was

provided via police dispatch and was used by Elkins to further profile Woods.

It was stated in *Brinegar v. United States*, 388 U.S. 160,

175 (1949) that:

[Probable cause] mean[s] more than bare suspicion:
Probable cause exists where the facts and circumstances
within their [the Officers] knowledge and of which they had
reasonable trustworthy information [are] sufficient in
themselves to warrant a man of reasonable caution in the
belief that an offense has been or is being committed.

This question should be determined by a totality of the circumstances. *United*

*States v. Mendenhall*, 446 U.S. 544, 557 (1980). The burden is on the prosecution to

prove such facts. *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968).

Based upon the facts of this case there was no sufficient cause to justify the stop.

The subsequent search and seizure of the vehicle in question was illegal. *United States*

*v. Purcell*, supra. Elkins testimony that he smelled burning marijuana is also suspect

given that no evidence of smoking marijuana was found in the vehicle.

In the case at bar, as in *United States v. Smith*, 799 F.2d 704, (11th Cir. 1986), no

traffic violation occurred nor was a citation issued for the alleged traffic violation. In

Smith, the Court noted that in determining when an investigatory stop is unreasonably

pretextual, the proper inquiry, again, is not whether the officer could validly have made

4

the stop but whether under the same circumstances a reasonable officer would have made the stop in the absence of the invalid purpose. In this case it appears analogous to the improper type motive rejected by the Fifth Circuit in *United States v. Cruz*, 581 F.2d 535 (5th Cir. 1978) (en banc).

The Fifth Circuit held the stop was an unreasonable seizure under the Fourth Amendment because its purported rationale was merely a pretext for an invalid purpose. Finding the testimony of the deputy inherently unbelievable, the court concluded that the deputy did not stop the car because of a possible traffic violation but instead was "hunting for illegal aliens and stopped [the] automobile to inspect its occupants." 581 F.2d at 542.

As the Court noted in Smith, supra, were we to abandon the rule of Cruz - - which, of course, this panel cannot do - - police officers could easily make the random, arbitrary stops denounced in Terry. With little more than an inarticulate "hunch" of illegal activity an officer could begin following a vehicle and then stop it for the slightest deviation from a completely steady course. This possibility was denounced more than 30 years ago by the Florida Supreme Court in a case remarkably similar to the present one holding

... " that such a feeble reason would justify a halting and searching would mean that all travelers on the highway would hazard such treatment, for who among them

5

would not be guilty of crossing the center line so much as a foot from time to time. All could, therefore, be subjected to inconvenience, ignominy and embarrassment. *Collins v. State*, 65 So.2d 61, 63 (Fla. 1953). Like the Supreme Court of Florida, we believe that such a result would run counter to our Constitution's promise against unreasonable searches and seizures by law enforcement officials." This is precisely what happened in the case at bar.

As the Eleventh Circuit noted in *United States v. Smith*, supra. [D]rug trafficking is a serious menace to this nation, and law enforcement agencies should use every available means toward its eradication - provided that the methods do not offend the protections of the Constitution. Here a single six-inch deviation from a drivers course did not give reasonable grounds for a stop. Accordingly, the stop was an unreasonable seizure under the Fourth Amendment." The same is true in this case and the evidence should be suppressed.

Respectfully submitted,


s/Susan G. James

SUSAN G. JAMES
Attorney at Law
600 South McDonough Street
Montgomery, Alabama 36104
Phone: (334) 269-3330

6

Fax: (334) 834-0353
E-mail: sgjamesandassoc@aol.com
Bar No: JAM012

## CERTIFICATE OF SERVICE

I hereby certify that on January _____, 2005, I electronically filed the foregoing
with the Clerk of Court using the CM/ECF system which will send notification of such
filing to the following:

United States Attorney
P.O. Box 197
Montgomery, Alabama, 36101

Respectfully submitted,

s/Susan G. James
SUSAN G. JAMES
Attorney at Law
600 South McDonough Street
Montgomery, Alabama 36104
Phone: (334) 269-3330
Fax: (334) 834-0353
E-mail: sgjamesandassoc@aol.com
Bar No: JAM012

7

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

UNITED STATES OF AMERICA,    )
                                             )
v.                                           )    CASE NO.  01:04CV12-F
                                             )
CLAUDE LEE WOODS                 )

## RECOMMENDATION OF THE MAGISTRATE JUDGE

This case is pending on the Motion to Suppress Stop, Search and Seizure, filed on 16

December 2004 (Doc. # 15) by the defendant, CLAUDE LEE WOODS ["Woods"].    The

government filed its response on 28 December 2004 (Doc. # 21).    The defendant contends that

he was illegally stopped on 14 August 2003 and that evidence was unlawfully seized from his

vehicle, leading to the unlawful seizure of other evidence.    He asks that it be excluded pursuant

to the Fourth Amendment to the U.S. Constitution.

The court conducted an evidentiary hearing on 18 January 2005.    Based upon the

motion, the government's response, and the evidence admitted at the hearing, the Magistrate

Judge concludes that the motion should be denied.

## I.    FACTS

At approximately 10:00 p.m. on 14 August 2003, David Elkins ["Elkins"], a vice and

intelligence officer with the Dothan, Alabama police department,[1] and his partner, Jon Riley

---

[1]    Elkins had been employed as a Dothan police officer since July 1998 (TR. 3).  At the
time of the evidentiary hearing, he had been a patrol officer for approximately one year
(TR. 4).  As vice officers, they enforced laws related to "narcotics, prostitution, and
alcohol" and followed up on "informant information and patrol division cases". (TR. 4)



AO86-C
**GOVERNMENT
EXHIBIT**

CASE
NO.

EXHIBIT
NO.    L

["Riley"], were leaving a store parking lot when they saw Woods proceeding south on Alabama highway 231 in Dothan. (TR. 3-5).    They exited the parking lot and turned in a southward direction when they noticed Woods "crossing the fog line" (TR. 6).[2]    After he crossed the line "at least three times", Elkins turned his emergency lights, signaling Woods to stop (TR. 7). Woods, who was driving a black Cadillac Eldorado, stopped approximately a quarter of a mile down with highway (TR. 7-8, 25).    After Woods stopped,[3] Riley notified the police department of the stop and requested a "marked unit" at the scene (TR. 11).

According to Elkins, he and Riley suspected that Woods may have been driving under the influence of alcohol (TR. 9).    When they stopped him, Elkins approached the driver's side, while Riley approached the passenger side; Woods was alone in the vehicle (TR. 9-10). Neither man drew a weapon (TR. 10, 36).    When Elkins advised Woods that he was stopped because of the "weaving", Woods apologized and said that "he was on the phone speaking with a girl in Georgia" (Id.)    Elkins saw the telephone (Id.).    There is some evidence that the officers knew that he was talking on his cell phone.    Riley said that as they pursued Woods, he was "just not paying attention, talking on the cell phone, that type thing" (TR. 76).

After Elkins examined Woods' drivers license and his proof of insurance, he "noticed

---

[2]    The fog line is the solid white line on the extreme right and left sides of the highway (TR. 26). Woods was driving within the posted speed limit (TR. 75).

[3]    Elkins testified that they stopped Woods in the 5700 block of South Oates in Dothan (the same as Highway 231). His written report dated 14 August 2003, and admitted as Defendant's Exh. 1, stated that the stop was made in the 5700 block of South Oates, but his sworn complaint stated that it was made in the 6500 block. Elkins testified that he "made a mistake on the one for that complaint" (TR. 34-35).

2

an open bottle of beer" in Woods' lap; when he asked Woods how much he'd had to drink, and Woods replied that he "had just opened that beer and he had had one prior to that" (TR. 11).[4] Elkins also stated that there was "a faint odor of marijuana coming from the vehicle, and on the driver's armrest of the door was a package of [cigarette] rolling papers" (TR. 12-13). Riley also smelled marijuana (TR. 80) and saw the cigarette papers, which he said were in "plain view" (TR. 90-91).

Elkins said that he didn't smell alcohol (either on Woods' person or from the open bottle), and he also said that he did not notice anything about the appearance of Woods' eyes or his speech (TR. 37, 61-62). Riley, however, testified that he and a third officer, John Givens, smelled alcohol on Woods' person (TR. 81). Elkins then asked Woods if he were on parole or probation, and Woods replied that he "was on parole out of Georgia . . . for a drug violation" (TR. 17).[5] Elkins then asked Woods to exit the car so that the patrol officers on the scene could conduct a field sobriety test (TR. 14).

They asked Woods "if there was anything illegal in his vehicle", and Woods replied "there was not" (TR. 14). Elkins then asked Woods for permission to search the vehicle, but Woods declined to consent (TR. 14). Nevertheless, Elkins searched the vehicle because he believed that he would find marijuana "[b]ased on the smell and the rolling papers, the time it

---

[4]     Woods later dumped the open beer on the ground (TR. 23).

[5]     Elkins acknowledged that, when he learned that Woods was indeed on parole in Georgia for a drug violation, that information "heighten[ed]" his suspicion that he would find marijuana in the vehicle (TR. 17-18).

3

took [Woods] to stop and him [sic] moving around as we were stopping him" (TR. 15).[6]

As Elkins searched Woods' vehicle, he found "a [plastic] zippered bag with a zipper broken underneath the driver's seat" (TR. 18).    Because the bag was partially opened, Elkins could see its contents before he touched it (TR. 45-46).    Elkins opened the bag and found methamphetamine inside (TR. 19).[7]    He also found a "little silver colored metal cigarette box in between the driver's seat and the center console" containing "a bag of marijuana" and "more methamphetamine" (TR. 20).    They found no indication that marijuana had been smoked or burned in the vehicle, but they did find marijuana seeds on the floor (TR. 42).    Thereafter, the officers placed Woods in handcuffs (TR. 21).

After the field sobriety test was conducted, officers learned that Woods "was not too impaired to drive" (TR. 50).    They continued to search the vehicle, ultimately removing two sets of electronic scales (located in the back seat in a bag) (TR. 22).    When they searched Woods' person (Id.), he had "some money on him" but no contraband was found (Id.).[8]    Woods was arrested for possession of marijuana second degree (Id.).    The entire search of the vehicle took approximately "four or five minutes" (TR. 50).    Officers also issued him a citation for

---

[6]    Elkins testified that as they approached Woods' vehicle from behind, he "looked as if he was trying to hide something or bending [sic] around the seat area" (TR. 15).

[7]    Elkins recognized the substance as methamphetamine because of his "training and experience (TR. 19).  He said that the substance was "not quite like sugar, it's a little coarser and almost like a clear rock salt maybe, small particles of it" (TR. 20).  Significantly, however, Elkins "field-tested" the substance "and it did show the presence of methamphetamine" (TR. 21).

[8]    Woods had $303.00 in his "pants pocket and another [$500.00] inside his wallet" (TR. 53).

4

having an open alcoholic beverage (Id.).

The officers removed from Woods' vehicle the bag of marijuana and the methamphetamine. Woods later entered a guilty plea to the marijuana charge in Dothan municipal court (TR. 21-22).

## II. DISCUSSION

The search in question was clearly not conducted pursuant to Woods' consent[9] or incident to an arrest.[10] The issue then is whether the officers had probable cause to conduct a warrantless search of Woods' vehicle in the absence of those factors.

According to Elkins and Riley, they stopped the vehicle because it was crossing the fog line repeatedly, or weaving. Elkins provided four reasons to establish probable cause for searching Woods' vehicle:

1. the smell of marijuana

2. the rolling papers which he saw in the vehicle

3. the time it took for Woods to stop his vehicle[11]

---

[9]    Woods specifically declined to consent.

[10]    Elkins acknowledged that Woods was not under arrest when the search began; he was not placed under arrest until the controlled substances were found inside his vehicle (TR. 50).

[11]    Woods told Elkins he didn't stop immediately because he was looking for a "safe place" to do so. Elkins rejected that reason because Woods "passed a very safe place, Festival Drive", located just off 231, an entrance to Festival Place where an annual festival is held (TR. 70). Elkins admitted, however, that since Woods was from Georgia, he had no reason to believe that Woods was familiar with Festival Drive or where it led (TR. 71).

4.    Woods' forward movement in the vehicle when he was stopped[12]

(TR. 62)[13]

The government acknowledges that the search was warrantless and contends that it was lawful as a search under exigent circumstances (TR. 64). Woods, on the other hand, challenges the stop, arguing that it was pretextual, as well as the subsequent search and seizure of the drugs and paraphernalia. Thus, to find that the search was lawful, the court must find that there was probable cause to search the Woods' vehicle *and* there were exigent circumstances. *United States v. Tobin*, 923 F.2d 1506, 1510 (11th Cir.1991) (en banc), cert. denied, 502 U.S. 907, 112 S. Ct. 299, 116 L. Ed. 2d 243 (1991).

## A.    *The Vehicle Stop*

Although Woods contends that the stop "was not based upon probable cause or information indicating that he had violated any traffic laws",[14] the evidence supports the

---

[12]    In response to the Court's request to describe the allegedly suspicious movement, Elkins replied as follows: "It was almost as if - it's hard to say because you can't see him moving his hands, but most people when you stop them, you know, they pull over, they may reach towards the glove box to get their insurance or to their purse or get their wallet, it wasn't like that, it just wasn't a normal movement as if trying to get your wallet or going to your purse or something along those lines" (TR. 63). Riley, on the other hand, said that "it looked like [Woods] was shoving something under the driver's seat", implying that he [Riley] could see Woods' hands or arms (TR. 80).

[13]    Riley provided essentially the same reasons (TR. 89-90). Although Elkins knew that Woods was talking on his cell phone while officers were pursuing him (TR. 76), that information did not alter his conclusion that the conduct reflected in items 3 and 4 above was suspicious (TR. 62).

[14]    Doc. # 15, p. 3.

conclusion that the officers initiated their stop of Woods because he was driving erratically, "crossing the fog line", "weaving", and using his cell phone while driving.    Moreover,    the decisions of the Court of Appeals indicate that Elkins and Riley had probable cause to search Woods' vehicle.

First, both officers smelled the odor of marijuana emitting from the vehicle, and both officers observed cigarette rolling papers in plain view on the driver's armrest.    Second, Woods had an open container of alcohol in the vehicle (an act which constitutes an offense under Alabama law).[15]    Third, Woods acknowledged before the search that he was on probation in the state of Georgia for a drug conviction. All of that evidence is undisputed.

Finally, after the stop, the officer saw an open bottle of beer in Woods' lap, smelled an odor of marijuana coming from the vehicle and saw rolling papers on the driver's armrest.[16]

Citing **Carroll v. United States,** 267 U.S. 132, 69 L. Ed. 543, 45 S. Ct. 280 (1925), the Supreme Court has affirmed the lawfulness of such a search in **Wyo. v. Houghton**, 526 U.S. 295, 300 (1999).    There, officers in Wyoming stopped a defendant for speeding, and noticed a hypodermic syringe in his shirt pocket.    A warrantless search ensued, the validity of which was affirmed by the Supreme Court because officers had reason to believe that the vehicle contained contraband.    **Id.**

---

[15]    See § 32-5A-330 (b), Code of Alabama:   "It is unlawful for a person to have in his or her possession alcoholic beverages in an open container in the passenger area of a motor vehicle of any kind on a public highway or right-of-way of a public highway of this state."

[16]    At the very least, Woods was operating his vehicle in a manner that could have jeopardized his own safety and the safety of others.

7

The Court of Appeals has specifically found that, under similar circumstances, an investigatory stop was lawful. *United States v. Harris*, 928 F.2d 1113, 1116 (11th Cir. 1991). These are the predicate facts in *Harris*:

> On March 26, 1989, Dooly County, Georgia, Deputy Sheriff Craig Peavy parked his patrol car (facing north) under the Exit 36 bridge on Interstate 75 in Dooly County to perform stationary radar surveillance on southbound traffic. At approximately 10:55 a.m., Peavy noticed a 1989 Dodge Dynasty travelling north on Interstate 75, "run off the edge of the road" into the emergency lane. Peavy followed the car. While following the car, Peavy saw the car again weave over the edge of the emergency lane. Concerned that the driver of the car might be drunk or falling asleep, Peavy stopped the car.

*United States v. Harris*, 928 F.2d 1113, 1114 (11th Cir., 1991).  Although the defendant in *Harris* ultimately gave his consent to search his vehicle, the court did not equivocate in finding the stop to have been lawful.

B.    *The Vehicle Search*

1.    **Probable Cause**

The first issue for the court's consideration here is whether probable cause existed to search Woods' vehicle.

> Probable cause exists " "when the facts and circumstances would lead a reasonably prudent [person] to believe that the vehicle contains contraband.' " The Supreme Court echoed this analysis when it adopted the totality of the circumstances test for determining when information provided by an informant rises to the level of probable cause. *Illinois v. Gates*, 462 U.S. 213, 230, 103 S. Ct. 2317, 2328, 76 L. Ed. 2d 527, 543 (1983).

8

*United States v. Talley*, 108 F.3d 277, 281 (11th Cir., 1997).      *See also United States v. Clark*, 559 F.2d 420, 424 (5th Cir.), *cert. denied*, 434 U.S. 969, 98 S. Ct. 516, 54 L. Ed. 2d 457 (1977); *United States v. Nixon*, 918 F.2d 895 (11th Cir. 1990).  When an experienced police officer detects the odor of marijuana in a vehicle and views cigarette rolling papers from a driver who admits that he is currently on probation for a drug violation, he and any other " reasonably prudent [person]" is justified in "believ[ing]" that the vehicle contains contraband".[17] Thus, the officers had probable cause to search Woods' vehicle.

### 2.    Warrantless Search

Given probable cause to search, the second issue presented by the parties' arguments is whether an officer can conduct a warrantless search of a vehicle under these circumstances. It is clear    - and Woods' would presumably agree -   that an officer can conduct a warrantless search  or seizure of a   vehicle   if there exists  probable cause  to believe  that the vehicle contains contraband or other evidence which is subject to seizure under the law and there exist exigent circumstances which necessitate a search  or seizure.  *United States v. Alexander*, 835 F.2d 1406, 1409 (11th Cir. 1988).

However, in *Carroll v. United States, supra*, the Supreme Court crafted an automobile exception to the requirement of a warrant when probable cause exists, and constitutional analysis of automobile searches proceeds under a different framework from analysis of

---

[17]      *United States v. Talley*, 108 F.3d at 281.

9

searches of homes or other buildings.    267 U.S. at 153.    In defending warrantless automobile searches, the government is not required to demonstrate the traditional exigencies required elsewhere.

For example, generally recognized situations in which exigent    circumstances exist include: "danger of flight or escape; danger of harm to police    officers or the general public; risk of loss, destruction, removal, or concealment of evidence; and hot pursuit of a fleeing suspect." Further, the Court of Appeals has held that the need to invoke the exigent circumstances exception to the    warrant    requirement is "particularly compelling in narcotics cases" because narcotics can be so easily and quickly destroyed. *United States v. Young,* 909 F.2d 442, 446 (11th Cir.1990).

Exigency is assumed when the police are faced with the likelihood that a vehicle contains contraband, however, and under the automobile exception, "a search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not been actually obtained." *United States v. Ross*, 456 U.S. 798, 809 (1982).  See also *United States v. Watts,* 329 F.3d 1282, 1285 (11th Cir., 2003).

Moreover, the Court impliedly declared an inherent "exigency" when a vehicle was the subject of the search when it found in *Pennsylvania v. Labron*, 518 U.S. 938 (1996) (per curiam), that the automobile exception does not have a separate exigency requirement: "If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more." *Id.* at 940.

10

The Court of Appeals has specifically affirmed the automobile exception to the requirement of a warrant. In *United States v. Nixon*, 918 F.2d 895, 903 (11th Cir. 1990), the Court specifically rejected a defendant's contention that "law enforcement agents can justify a warrantless search of an automobile only through some showing of exigent circumstances beyond the exigency inherent in the ready mobility of the vehicle." Instead, the court pronounced it "clear that the requirement of exigent circumstances is satisfied by the 'ready mobility' inherent in all automobiles that reasonably appear to be capable of functioning." *Id.*

Thus it is unnecessary for this court to analyze the particulars of whether the circumstances were truly "exigent", as the term has been used . *See, e.g., Maryland v. Dyson*, 527 U.S. 465, 467 (1999) (per curiam) (no special exigency is required beyond a showing of the mobility of the automobile). In that case, the Supreme Court concluded that because the defendant was driving his automobile at the time of his arrest, a finding of probable cause "alone satisfies the automobile exception to the Fourth Amendment's warrant requirement." *Id.*

## III.    CONCLUSION

For the foregoing reasons, it is the RECOMMENDATION of the Magistrate Judge that Woods' Motion to Suppress be DENIED in all respects.                It is further

ORDERED that the parties shall file any objections to this Recommendation on or before 1 April 2005. A party must specifically identify the findings in the Recommendation to which objection is made; frivolous, conclusive, or general objections will not be considered.

11

Failure to file written objections to the Magistrate Judge's proposed findings and recommendations shall bar a party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982).  *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982).  *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*).

DONE this 25th day of March, 2005.

/s/ Vanzetta Penn McPherson
VANZETTA PENN MCPHERSON
UNITED STATES MAGISTRATE JUDGE

12

04.0001
SRR
ŋL

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

UNITED STATES OF AMERICA      )
                              )
v.                            )      CR NO. 1:04cr12-F
                              )
CLAUDE LEE WOODS              )

## ORDER

Upon consideration of the Motion to Withdraw as Counsel (Doc. #26), filed on 6

January 2005, and for good cause, it is

ORDERED that the motion is GRANTED.  The Clerk shall forward all documents

related to this matter to counsel of record, Susan James, Esq.

Done this 30th day of March, 2005.

                              /s/ Vanzetta Penn McPherson
                              VANZETTA PENN MCPHERSON
                              UNITED STATES MAGISTRATE JUDGE



AO986-C
**GOVERNMENT
EXHIBIT**

CASE
NO.

EXHIBIT
NO.  M

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

UNITED STATES OF AMERICA,    )
                             )
v.                           )    CASE NO.  01:04CV12-F
                             )
CLAUDE LEE WOODS             )

## ORDER

The defendant filed a Motion to Suppress on 16 December 2004 (Doc. # 15) and a

Supplement to Motion To Suppress on 25 January 2005 (Doc. # 28). As defendant's counsel

stated in the latter document, she requested permission at the conclusion of the evidentiary

hearing conducted on 18 January 2005 to file supplemental support for the pending motion.

Thus, the substance of the Supplement to Motion To Suppress referenced the same issues and

defenses as the initial motion.  No new issues were addressed in the Supplement.

On 25 March 2005, the Magistrate Judge entered a Recommendation on the motion

to suppress (Doc. # 31).  It is

ORDERED that the Recommendation be construed as applicable to the Motion to

Suppress and the Supplement to Motion to Suppress.

DONE this 31st day of March, 2005.


                    /s/ Vanzetta Penn McPherson
                    VANZETTA PENN MCPHERSON
                    UNITED STATES MAGISTRATE JUDGE




GOVERNMENT
EXHIBIT

CASE
NO.

EXHIBIT
NO.    N

04 0001
SRR
WL

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| PLAINTIFF, | * | |
| | * | |
| v. | * | CASE NO.  1:04CR12-F |
| | * | |
| CLAUDE LEE WOODS, | * | |
| | * | |
| DEFENDANT. | * | |

**MOTION FOR LEAVE OF COURT TO FILE OBJECTIONS TO MAGISTRATE
REPORTS AND RECOMMENDATIONS OUT OF TIME**

Comes now Claude Woods by and through undersigned Counsel and files this motion

requesting that the objections to the Magistrate Reports and Recommendations being filed under

separate cover be accepted out of time and in support thereof states the following:

1.  The undersigned has been extremely ill since February 26, 2005.  She has been under

doctors care and also had to participate in several trials and the preparation of briefs during this

period of illness.

2.  Counsel's most recent doctor's visit was March 28, 2005 at which time she was

administered an injection and antibiotics and began to make some improvement in her condition.

However, she still has not been up to par.

3.  Based on the press of other scheduled matters and the volume of work that has been

unattended in her absence, Counsel only recently had brought to her attention the Magistrate

Reports and Recommendations on Woods (March 25 and 31, 2005) .  What Counsel did not

observe is that the Court had shortened the response time for objections to April 1, 2005 which

was a seven day turn around.  Counsel was under the mistaken and erroneous belief that the



AO88B-C
**GOVERNMENT
EXHIBIT**

CASE
NO.

EXHIBIT
NO.    0

objections would be due within 13 days of the order.

    4. It was not until April 5, 2005 that Counsel, in preparation of the objections to the

Magistrate Reports and Recommendations, realized in the conclusion of the recommendation that

it was directed that the objections be filed on or before April 1, 2005.

    5. Obviously Counsel's illness and the lateness of the filing of these objections were out

of the control of Claude Lee Woods. Counsel accepts full responsibility for the tardiness of these

pleadings, however, Counsel has been extremely ill and is not back 100% at present.

    6. Wherefore it is respectfully submitted and requested that the separate filed objections

to the Magistrate Reports and Recommendations be accepted out of time.

    Respectfully submitted,


            s/Susan G. James

            SUSAN G. JAMES
            Attorney at Law
            600 South McDonough Street
            Montgomery, Alabama 36104
            Phone: (334) 269-3330
            Fax: (334) 834-0353
            E-mail: sgjamesandassoc@aol.com
            Bar No: JAM012


## CERTIFICATE OF SERVICE

    I hereby certify that on April 5, 2005, I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system which will send notification of such filing to the following:

Susan G. Redmond
United States Attorney
P.O. Box 197
Montgomery, Alabama, 36101

Respectfully submitted,

s/Susan G. James
SUSAN G. JAMES
Attorney at Law
600 South McDonough Street
Montgomery, Alabama 36104
Phone: (334) 269-3330
Fax: (334) 834-0353
E-mail: sgjamesandassoc@aol.com
Bar No: JAM012

94 0001
SRR
SR

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | * | |
| | * | |
| **PLAINTIFF,** | * | |
| | * | |
| **v.** | * **CASE NO.   1:04CR12-F** | |
| | * | |
| **CLAUDE LEE WOODS,** | * | |
| | * | |
| **DEFENDANT.** | * | |



GOVERNMENT
EXHIBIT

CASE
NO.

EXHIBIT
NO.  ρ

## WOOD'S OBJECTIONS TO THE MAGISTRATE REPORTS AND RECOMMENDATIONS OF MARCH 25, 2005 AND MARCH 31, 2005

Comes now Claude Lee Woods and files this his formal objection to the Magistrate Reports and Recommendations of March 25 and 31, 2005 regarding his suppression motion and in support thereof states the following:

1. Woods considers his motion and supporting law in conjunction with the facts to be dispositive, and adopts the same by reference as if fully set forth herein. Woods contends that the Magistrate Reports and Recommendations reached the wrong conclusion from the disputed facts.

2. Woods urges this Court to reweigh the arguments, citations to authority, and the evidence at the suppression hearing, and requests the relief sought therein. Woods disagrees in total with the findings of the Magistrate Judge both factually and legally. Woods specifically objects to the Magistrate Judge's findings and recommendation as follows:

3. **The Specific Objections Woods Makes are as follows**:

a. **Factual Errors**

Page 3, Paragraph 2 - "Elkins then asked Woods if he were on parole or probation, and

Wood's replied that he "was on parole out of Georgia for a drug violation." (TR17) 5. Footnote 5, page 3 states: "Elkins acknowledged that, when he learned that Woods was indeed on parole in Georgia for a drug violation, that information "heighten[ed]" his suspicion that he would find marijuana in the vehicle (TR 17-18)."

This is misleading in that the officer asked about the parole status before he was ever suspicious of anything. Obviously this questioning went beyond that authorized for a routine traffic stop. Woods contends this stop was pretextual and this factual scenario is offered in support. The officers statement that this question was routine is highly suspect. The recitation of facts should include that the question was asked to create suspicion.

b. Legal Errors

Woods argues that the Magistrate's conclusions that the officers had probable cause to conduct a warrantless search is in error.

As Woods noted in his supplement to the Motion to Suppress, crossing a fog line is not uncommon for drivers. They are not expected to stay steady on a course given legitimate distractions that may occur when driving, i.e., radio, cell phones, etc.

In this case the officers testimony was in conflict as to how others began noticing and pursuing the vehicle.

The probable cause findings of the Magistrate on page 5 of the Report and Recommendation are not valid. They are addressed as follows:

1. Smell of Marijuana

The windows were open for a period of time and the officers did not find evidence of marijuana being burned. This reason is highly suspect.

2

2. Rolling Papers

These officers had already decided to search before seeing the papers. The officer admitted rolling papers have legal uses.

3. Time to Stop

Woods explanation was not unreasonable that he was looking for a safe place. Further, the officers were not in a marked unit. They admitted Woods would not likely have been familiar with the area.

4. Forward Movement in the Vehicle

It was night and the officers were behind Woods. They could not see well enough to see a forward movement. It is plausible he reached for ownership proof and insurance.

The Courts consideration of the fact Woods was on Georgia parole for a drug crime should not be considered in determining probable cause as it was irrelevant to the search and merely shows the officers were predisposed to believe Woods was engaged in transporting narcotics based on a profile.

## Conclusion

Wherefore based on the above, Wood requests that the Magistrate Reports and Recommendations be overruled and the evidence of the search be suppressed.

Respectfully submitted,

s/Susan G. James

SUSAN G. JAMES
Attorney at Law
600 South McDonough Street
Montgomery, Alabama 36104
Phone: (334) 269-3330

3

Fax: (334) 834-0353
E-mail: sgjamesandassoc@aol.com
Bar No: JAM012

## CERTIFICATE OF SERVICE

I hereby certify that on April 5, 2005, I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system which will send notification of such filing to the following:

Susan G. Redmond
United States Attorney
P.O. Box 197
Montgomery, Alabama, 36101

Respectfully submitted,

s/Susan G. James
SUSAN G. JAMES
Attorney at Law
600 South McDonough Street
Montgomery, Alabama 36104
Phone: (334) 269-3330
Fax: (334) 834-0353
E-mail: sgjamesandassoc@aol.com
Bar No: JAM012

4

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA OF
SOUTHERN DIVISION

UNITED STATES OF AMERICA,          )
                                   )
         Plaintiff,                )
                                   )
v.                                 )          CASE NO. 1:04-cr-12-F
                                   )
CLAUDE LEE WOODS,                  )
                                   )
         Defendant.                )

**O R D E R**

After an independent review of the file, including full consideration of the Defendant's

Objection, it is hereby the ORDER, JUDGMENT and DECREE of the Court that:

(1) Defendant's Objection to the Report and Recommendation (Doc. #36), filed on April 5,

2005, is OVERRULED;

(2) The Recommendation of the Magistrate Judge (Doc. #31) regarding the Defendant's

Motion to Suppress (Doc. #15), which was construed by Order of the Magistrate Judge (Doc. #34)

as also applicable to the Defendant's Supplement to Motion to Suppress (Doc. #28), is ADOPTED;

and

(3) The Defendant's Motion to Suppress Stop, Search and Seizure (Doc. #15) and the

Defendant's Supplement to Motion to Suppress (Doc. #28), which was docketed as a Motion to

Suppress, are DENIED.

DONE this 8th day of April, 2005.

_____
/s/ Mark E. Fuller
CHIEF UNITED STATES DISTRICT JUDGE



AO898-C
**GOVERNMENT
EXHIBIT**

CASE
NO.

EXHIBIT
NO.        Q

04 0001
SRR
7/~

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

UNITED STATES OF AMERICA,      *
                               *
        PLAINTIFF,             *
                               *
v.                             * CASE NO.  1:04CR12
                               *
CLAUDE LEE WOODS,              *
                               *
        DEFENDANT.             *


## MOTION TO EXTEND TIME FOR CHANGE OF PLEA AND PLACEMENT ON NEXT TRIAL TERM

Comes now Claude Lee Woods by and through undersigned counsel and files this Motion to Extend the Change of Plea from April 11, 2005 and the trial of April 18, 2005 to the next term and in support thereof states the following:

1.  Woods is scheduled for change of plea on April 11, 2005 and trial on April 18, 2005. Negotiations have been entered to resolve this matter by way of plea.

2.  However, the Northern District of Florida has an interest in this case as it is inextricably intertwined with a parallel investigation.

3.  It would defeat the interests of justice for both parties to rush settlement in this court without a full understanding of the Florida matter and simultaneous resolution of both.

4.  The undersigned has been in contact with the DEA in Panama City, Florida and AUSA Susan Redmond about resolving this case.  In order to do so further negotiations and a proffer is necessary.  This cannot be accomplished prior to Monday.

5.  Additionally, a firm secretary just lost her son on April 5, 2005 in a tragic and untimely death.  This has been unsettling for all staff and the funeral and visitation will limit counsel's



AO88-C
**GOVERNMENT
EXHIBIT**

CASE
NO.

EXHIBIT
NO.    R

ability to further explore this situation prior to the change of plea date.

 6. Susan Redmond, AUSA, concurs with this request.  Wherefore the undersigned

respectively requests it be moved to the next trial term.  A waiver of speedy trial has been filed

previously.  A new waiver can be executed.   Woods, however, by signing the waiver does not

waive his speedy trial rights relating to the time period before he was actually brought into federal

custody on this case.

 Respectfully submitted,


   s/Susan G. James

   SUSAN G. JAMES
   Attorney at Law
   600 South McDonough Street
   Montgomery, Alabama 36104
   Phone: (334) 269-3330
   Fax: (334) 834-0353
   E-mail: sgjamesandassoc@aol.com
   Bar No: JAM012


## CERTIFICATE OF SERVICE

 I hereby certify that on April 8, 2005, I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system which will send notification of such filing to the following:


 United States Attorney
 P.O. Box 197
 Montgomery, Alabama, 36101

Respectfully submitted,


s/Susan G. James
SUSAN G. JAMES
Attorney at Law
600 South McDonough Street
Montgomery, Alabama 36104
Phone: (334) 269-3330
Fax: (334) 834-0353
E-mail: sgjamesandassoc@aol.com
Bar No: JAM012

04 0001
SRR
SK

# IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE MIDDLE DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | * |
| | * |
| PLAINTIFF, | * |
| | * |
| v. | * CASE NO.  1:04CR12 |
| | * |
| CLAUDE LEE WOODS, | * |
| | * |
| DEFENDANT. | * |

## WAIVER OF SPEEDY TRIAL RIGHTS

The undersigned Defendant, Claude Woods, after being first advised of his right to a

speedy trial as guaranteed him by the Sixth Amendment of the United States Constitution and the

implementation of said right in 18 U.S.C. § 3161, hereby requests trial in this matter be set

sometime after the April trial term and foregoes/waives any speedy trial issues pertaining to the

resetting of this case.

A waiver of speedy trial has been filed previously.  A new waiver is being executed.

Woods, however, by signing the waiver does not waive his speedy trial rights relating to the time

period before he was actually brought into federal custody on this case.


_____
Claude Woods

| GOVERNMENT EXHIBIT |
|---|
| AO988-C |
| CASE NO. |
| EXHIBIT NO.    5 |

04 0001
SRR

GOVERNMENT
EXHIBIT

CASE
NO.

EXHIBIT
NO.         T

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

UNITED STATES OF AMERICA      )
                              )
v.                            )        CASE NO. 1:04-cr-12-F
                              )
CLAUDE LEE WOODS              )

## O R D E R

On April 8, 2005, the defendant filed a Motion to Extend Time for Change of Plea and

Placement on Next Trial Term (Doc. #38). While the granting of a continuance is left to the

sound discretion of the trial judge, *United States v. Warren*, 772 F.2d 827, 837 (11th Cir.

1985), the court is, of course, limited by the requirements of the Speedy Trial Act, 18 U.S.C.

§ 3161. The Speedy Trial Act provides generally that the trial of a defendant in a criminal

case shall commence within 70 days of the latter of the filing date of the indictment or the

date the defendant appeared before a judicial officer in such matter. 18 U.S.C. §3161(c)(1).

*See United States v. Vasser*, 916 F.2d 624 (11th Cir. 1990).

The Act excludes from this 70 day period any continuance that the judge grants "on

the basis of his findings that the ends of justice served by taking such action outweigh the

best interest of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(8)(A).

The motion states that negotiations have been entered in an effort to resolve this case

by way of a plea. The United States District Court for the Northern District of Florida has

an interest in the instant case as it is inextricably intertwined with a parallel investigation.

Counsel for the defendant states that it would defeat the interests of justice for both parties

to rush settlement in this court without a full understanding of the Florida matter and simultaneous resolution of both. Counsel for the government does not oppose a continuance of this case. Consequently, the court concludes that a continuance of this case is warranted and that the ends of justice served by continuing this case outweighs the best interest of the public and the defendant in a speedy trial. See United States v. Davenport, 935 F.2d 1223, 1235 (11th Cir. 1991)(reasonable time necessary for effective preparation is a significant factor for granting a continuance under the Speedy Trial Act).

Accordingly, it is hereby ORDERED:

1. That the defendant's motion filed on April 8, 2005 is GRANTED;

2. That the trial of this defendant is continued from the April 18, 2005 trial term to the May 16, 2005 trial term.

DONE this 12th day of April, 2005.

_____ /s/ Mark E. Fuller _____
CHIEF UNITED STATES DISTRICT JUDGE

TESTIMONY AND  PROCEEDINGS                    May 23, 2005
UNITED STATES OF AMERICA v. CLAUDE LEE WOODS

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


UNITED STATES OF AMERICA,

    vs.                              CR-1:04cr12-H

CLAUDE LEE WOODS,

      Defendant.


\* \* \* \* \* \* \* \* \* \*

TRIAL

\* \* \* \* \* \* \* \* \* \*


    BEFORE THE HONORABLE TRUMAN M. HOBBS, UNITED

STATES DISTRICT JUDGE, and a jury, at Montgomery,

Alabama, on Monday, May 23, 2005, commencing at

9:31      a.m.


FOR THE GOVERNMENT:    Ms. Susan Redmond
                        U.S. Attorney
                        U.S. Attorney's Office
                        One Court Square, Suite 201
                        Montgomery, Alabama  36104

FOR THE DEFENDANT:      Ms. Susan James
                        Ms. Denise Simmons
                        Attorneys at Law
                        600 South McDonough Street
                        Montgomery, Alabama  36104

    Proceedings reported stenographically;

      transcript produced by computer

AO088-C
GOVERNMENT
EXHIBIT

CASE
NO.

EXHIBIT
NO.  U

TESTIMONY AND PROCEEDINGS                          May 23, 2005
UNITED STATES OF AMERICA v. CLAUDE LEE WOODS

2 (Pages 2 to 5)

---

Page 2

1          EXAMINATION INDEX
2    DAVID ELKINS
        DIRECT BY MS. REDMOND          17
3       CROSS BY MS. JAMES             34
4    JOHN RILEY
        DIRECT BY MS. REDMOND          51
5       CROSS BY MS. JAMES             57
6    VICTOR BRAVENEC
        DIRECT BY MS. REDMOND          59
7       CROSS BY MS. JAMES             69
        REDIRECT BY MS. REDMOND        72
8
    DEVIN WHITTLE
9       DIRECT BY MS. REDMOND          73
        CROSS BY MS. JAMES             81
10      REDIRECT BY MS. REDMOND        92
        RECROSS BY MS. JAMES           98
11      REDIRECT BY MS. REDMOND       100
12          * * * * * * * * * * *
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 3

1    (The following proceedings were heard before the
     Honorable Truman M. Hobbs, United States District
2    Judge, and a jury, at Montgomery, Alabama, on Monday,
     May 23, 2005, commencing at 9:31 a.m.:)
3
4        THE COURT: While we're bringing in this
5    juror, does either side desire to have the rule
6    invoked?
7        MS. REDMOND: Yes, sir. The Government does.
8        MS. JAMES: Yes, Your Honor.
9        THE COURT: All right. It will be the
10   responsibility of the lawyers to see that there are no
11   witnesses, other than the defendant and the
12   representative from the Government, who remain in the
13   courtroom if they're expected to testify as witnesses.
14           (The jury was impaneled.)
15       THE COURT: Now that you've been sworn in as
16   jurors to try the case, let me give you a few
17   preliminary instructions about your role as jurors in
18   this case.
19       It will be your duty to find from the
20   evidence what the true facts in the case are. You and
21   you alone are the judges of the facts. You will then
22   apply those facts to the law as I will instruct you as
23   to the law that governs this type of case.
24       In this regard, your role and the judge's
25   role is entirely different. I have no function in

---

Page 4

1    trying to decide what the true facts in the case may
2    be. That is the sole prerogative of the jury in our
3    system of justice. On the other hand, I have to
4    charge you as to the law. And that is my obligation.
5    It's your obligation to follow the law as I instruct
6    you as to what the law is.
7        The evidence from which you will find the
8    facts will come from the testimony of the witnesses as
9    they testify in the case and from any documents that
10   may -- or exhibits that may be entered into in the
11   case.
12       Certain things are not evidence in the case
13   and should not be regarded as evidence. Statements,
14   arguments, questions, and objections by the lawyers
15   are not evidence in the case and shouldn't be regarded
16   by you as evidence in the case.
17       Now, as you know from having been selected to
18   try this case, this is what is known as a criminal
19   case as opposed to a civil case. And there are three
20   basic facts which apply in every criminal case. And
21   you should keep these -- these principles in mind as
22   you discharge your responsibility as jurors.
23       First, the defendant is presumed innocent
24   unless proven guilty. The indictment against the
25   defendant brought by the Government is only an

---

Page 5

1    accusation; it's nothing more. It is not proof of
2    guilt or proof of anything. It's just an accusation.
3    And the defendant, therefore, starts out in a court of
4    law in this country with a clean slate.
5        Second, the burden of proof is on the
6    Government until the very end of the case. The
7    defendant has no burden to prove his innocence or to
8    present any evidence or even to testify if he elects
9    not to testify. Since the defendant has the right to
10   remain silent, the law prohibits a jury in arriving at
11   a verdict considering the fact one way or the other as
12   to whether the defendant has elected not to testify.
13   And I have no idea in any case at this point in the
14   trial whether the defendant is going to testify. I
15   give this charge in every case.
16       Third, the Government must prove the
17   defendant's guilt beyond a reasonable doubt. I'll
18   give you further instructions at the end of the trial
19   concerning exactly what proof beyond a reasonable
20   doubt means, but I will say again that proof beyond a
21   reasonable doubt does not mean proof beyond all
22   possible doubt. It does mean proof beyond a
23   reasonable doubt. And I will explain to you later
24   just in other words what proof beyond a reasonable
25   doubt means.

TESTIMONY AND  PROCEEDINGS                      May 23, 2005
UNITED STATES OF AMERICA v. CLAUDE LEE WOODS

3 (Pages 6 to 9)

Page 6

1      Now, in this case the indictment charges --
2  and I'll read the indictment to you.  And it's United
3  States against Claude Lee Woods.  Mr. Woods is here
4  represented by his attorney.
5      On or about the 14th day of August, 2003, in
6  Dothan, Alabama, in the Middle District of Alabama,
7  Claude Lee Woods, the defendant herein, did knowingly
8  and intentionally possess with intent to distribute 50
9  grams or more of methamphetamine, a Schedule III
10  controlled substance, in violation of Title 21 United
11  States Code, Section 841(a)(1).  That is the
12  indictment; and that is the indictment that is
13  involved, of course, in this case.
14      Now just a few words about your conduct as
15  jurors.  First, I instruct you that during the course
16  of the trial, you're not to discuss the case with
17  anyone or permit anyone to discuss the case with you.
18  Now, that sounds easy, but it -- particularly, in a
19  long case -- and this is not a long -- will not be a
20  long case.  The attorneys have told me that they're
21  hopeful that the case can be completed today.  But the
22  instruction that you not talk with anyone about the
23  case until after all the witnesses have testified,
24  you've heard the closing arguments of the lawyers, and
25  you've had the charge of the court, and have retired

Page 7

1  to the jury room to begin your deliberations, that's
2  the first time you're supposed to discuss the case
3  with anyone, even among yourselves.
4      And I can tell from having sat here for many,
5  many years, that something comes up almost every year,
6  once or twice every year; and somebody says, well, I
7  heard two jurors talking to each other and they were
8  discussing the case.  Well, that could even result to
9  a mistrial.  And I know that's not anything anybody
10  wants.  Usually, whatever they -- when you try to
11  ferret it all out, you find out that it was a totally
12  innocuous conversation that was going on; but just
13  don't discuss it.  It's the most natural thing in the
14  world to be focused on what's going on.  And the
15  natural thing is to say, gee, what did you think about
16  that; but just don't do it.  I tell you it will get us
17  all in trouble.
18      Now, second, in a short trial like this, this
19  charge is probably not even necessary; but don't
20  listen to anything that might be said by anyone from
21  outside.  If anyone should attempt to talk to you, you
22  should promptly report it to the Court.  And I will
23  ask you now, since you've been selected to try this
24  case, has anyone attempted to -- is there anyone here
25  who has been approached by anyone that's attempted to

Page 8

1  talk to you about this case?
2      (No response)
3      THE COURT:  All right.  Now, this last thing
4  is going to be difficult for you, perhaps, even in
5  this short a trial.  Do not form any fixed opinion
6  about whether the defendant is guilty or not guilty
7  until you've heard all the evidence, until you've
8  heard the closing arguments of the attorneys and the
9  charge of the Court.  The trial has to proceed in bits
10  and pieces.  And under our system, the Government has
11  the obligation to proceed first to present the
12  evidence that the Government wants you to consider.
13  And it would be grossly unfair to a defendant if you
14  formed a fixed opinion about the case until the
15  defendant had had a chance to present his evidence.
16      When that is done, the Government has an
17  opportunity where it's appropriate to put on rebuttal
18  evidence once again.  And then wait until the lawyers
19  can argue the case to you and you've heard the
20  instructions as to the applicable law.
21      Now, in just a moment, the trial will begin.
22  It will begin by an opening statement by the
23  Government and then an opening statement by the
24  attorney for the defendant.  And I've just gotten
25  through telling you that their statements are not

Page 9

1  evidence in the case, and I adhere that statement, but
2  listening carefully to their statements will be a
3  benefit to you as they try to give you sort of an
4  overview of what the case is all about.  It will make
5  the evidence more meaningful when it is offered to you
6  from the witness stand.
7      So at this time, the case is with the
8  Government to make an opening statement.
9      MS. REDMOND:  Thank you, Your Honor.
10      May it please Court, counsel.  Ladies and
11  gentlemen, thank you for being here this morning.
12  Last week when we got together and you-all were
13  selected for jury service, one of the things that I
14  think Judge Albritton might have said -- and if he
15  didn't, let me say it now -- part of the reason why
16  you were chosen for jury service is because we want
17  individuals from the community with common sense to
18  come before and hear and weigh evidence to decide a
19  person's innocence or guilt.
20      In this case, you've heard the indictment
21  that on or about August 14th, 2003, Claude Woods,
22  who's seated at the table over there in the blue
23  shirt, was found in possession of methamphetamine.
24  And I don't know how many of you know what
25  methamphetamine is.  Methamphetamine is commonly known

TESTIMONY AND PROCEEDINGS                    May 23, 2005
UNITED STATES OF AMERICA v. CLAUDE LEE WOODS

4 (Pages 10 to 13)

Page 10

1  ice or crank or glass.  It is a mood- and
2  mind-altering drug.
3          And he's charged with possession with intent
4  to distribute it, meaning that he had it with an
5  intent that he would give it away or sell it.
6  Distribution doesn't mean that money has to be
7  exchanged.  It simply means that he has to be willing
8  and have the intent to give that product away for
9  whatever reason.
10         And you will hear from four witnesses for the
11  Government.  And that's all that we will call, four
12  witnesses.  And I proffered them to you Monday when
13  you were being selected.  You will hear, number one --
14  and this is key -- from a Victor Bravenec.  He is a
15  chemist from the DEA lab out of Texas.  Now, what he's
16  going to come in and talk to you about is that the
17  evidence that he received from the agents, the drug
18  evidence, he'll tell you what it is, what the purity
19  of it is, what it means, and the weight of it.  Okay?
20  And that's important because in the indictment,
21  Mr. Woods is charged with having over 50 grams of this
22  methamphetamine.  So it's important that you listen to
23  hear how much the chemist says we actually say he has.
24  He has weighed it.  And he'll tell you this is meth,
25  this is its purity, it is ice, and if he had more than

Page 11

1  50 grams.
2          You will hear from Devin Whittle, who I told
3  you was with DEA.  He was not here last Monday.  This
4  is Devin Whittle.  He is an agent with the DEA.  He is
5  the case agent, which means he's the one that pulls
6  all the facts together and then brings it to the U.S.
7  Attorney's Office seeking an indictment.
8          And Mr. Whittle, Agent Whittle, is going to
9  talk to you a little bit about -- a little bit about
10  the drug trade.  And I expect that that testimony will
11  be relevant to this case because we have in this case
12  what we call circumstantial evidence.  There's direct
13  evidence, and there's circumstantial evidence.  How do
14  you prove that a person -- you can prove that a person
15  possessed it.  He either had it or he didn't have it.
16  But how do you prove that person intended to
17  distribute something unless you see him, you have the
18  drug deals where you actually see somebody handing off
19  the product?
20          This is not our case.  We don't have him
21  handing off the product.  So how do we get to intent
22  to distribute?  Circumstantial evidence is what brings
23  it to us.  And the Judge will tell you that that is
24  still good evidence and is evidence for you to
25  consider.  And Mr. Whittle is going to talk to you

Page 12

1  about that.
2          He will also talk about the things that are
3  found in the car that indicate that this is a person
4  who is intending to sell this product or distribute
5  this product.
6          And that brings me to the other two and last
7  two witnesses for the Government.  They are Dothan
8  police officers.  And they're the ones who actually
9  made the stop of the vehicle Mr. Woods was driving and
10  who found that evidence.
11         I think at the conclusion -- I hope at the
12  conclusion, using your common sense, looking at the
13  direct and the circumstantial evidence, you will
14  return a verdict of guilty of possession with intent
15  to distribute on Mr. Woods.
16         Thank you for your time.
17         MS. JAMES:  May it please the Court, opposing
18  counsel.  Ladies and gentlemen of the jury, my name is
19  Susan James, and I'm one of the lawyers for
20  Mr. Woods.  I was not here, I was out of state on
21  another matter when Ms. Simmons, who's assisting me in
22  the case, was participating in jury selection.  I,
23  too, want to thank you for being here.  This is an
24  opportunity for the lawyers to tell you a little bit
25  about what we expect the evidence to show in this

Page 13

1  case.
2          And this case is somewhat unique.  Because
3  many times Ms. Redmond and I on opposite sides; I'm
4  saying things were one way and she's saying things
5  were another; and it gets quite confusing.  But, quite
6  frankly, the evidence in this case is going to show
7  that Mr. Woods was stopped by the two officers that
8  she told you down in Houston County; in fact, on
9  Highway 231.  Probably some of you have traveled that
10  road before and know that that is a route that is
11  commonly used for people that are heading to and from
12  Florida, either Panama City area, Tallahassee, or
13  whatever.  And that the law enforcement officers in
14  this case observed what they thought was a traffic
15  violation, obviously weaving a little on the road, and
16  that they made a traffic stop; these two Dothan police
17  officers.
18         And the evidence is going to show that when
19  they approached the car, they smelled a faint odor of
20  what they determined to be marijuana.  In their
21  training in law enforcement and all the schools
22  they've been to, they're trained to recognize the
23  smell of these odors.  And that they smelled marijuana
24  emitting from the car.  They subsequently had Mr. Wood
25  exit the vehicle, and they actually -- he had a

TESTIMONY AND PROCEEDINGS                    May 23, 2005
UNITED STATES OF AMERICA v. CLAUDE LEE WOODS

Page 14

1  drink. I think it was like a wine cooler or something
2  of that nature in his lap, open. And they were
3  suspicious that maybe he was involved with drinking
4  and driving. And they actually administered a field
5  sobriety test for -- to determine if he had been
6  drinking.
7      And they're going to tell you that they did
8  administer the test, but they did not determine that
9  he had been drinking. They're also going to tell you
10 as a result of that stop, that they did in fact search
11 the vehicle that Mr. Woods was traveling in.
12     And there's not going to be any dispute.
13 This will be easy up to this point for you because
14 there's not going to be any dispute that certain
15 evidence that we expect the Government is going to
16 offer, which includes methamphetamine, some marijuana,
17 although he's not charged with the possession of the
18 marijuana in this case. That's not before you. But
19 it's our position and we submit that that's relevant
20 to your consideration in this case. And there are
21 various other items of drug paraphernalia that were
22 found in that vehicle.
23     Now, you probably sit there today and you
24 say, well, why -- why are we even here? If you're
25 agreeing that that's what happened, he obviously must

Page 15

1  be guilty. But be reminded of what Judge Hobbs has
2  told you; and that is, don't have a fixed opinion
3  about this case. He's going tell you that you're to
4  wait for the conclusion of the evidence -- that means
5  the direct examination of the witnesses and the
6  cross-examination of the witnesses -- before you make
7  up your mind. Because in this particular case, we
8  expect that the Judge is going to tell you that you
9  not only have to make a finding that he possessed
10 these substances on the particular day of his arrest,
11 but secondly -- and this is where the dispute will
12 lie -- that the Judge is going to tell you that you
13 also have to determine that he possessed those
14 substances on that particular day with the intent to
15 distribute those substances.
16     And the Judge is going to tell you -- he's
17 already told you about reasonable doubt. He's going
18 to tell you certain other things, certain charges that
19 he'll give you at the close of the case. And it's
20 very important. This is an important day for the
21 Government and for you as jurors serving in this
22 capacity. And it's also important for Mr. Woods and
23 his family.
24     And at the end of this case, after listening
25 to the charges that the Court is going to give you, we

Page 16

1  submit to you that the Government will not be able to
2  prove Mr. Woods' guilt beyond a reasonable doubt as to
3  the second element of the charge in this case. So
4  listen carefully. Pay attention. And this is a case
5  that's going to be very, very important for you to
6  listen to the law. It's always important, but this is
7  even particularly important in this case to listen to
8  the law that the Judge gives you at the conclusion of
9  this case.
10     And I submit to you that when you observe the
11 facts and you listen to the law, that the only
12 conclusion that you will be able to reach in this case
13 is not guilty as charged in this indictment.
14     Thank you for your attention.
15     THE COURT: All right. Call your first
16 witness.
17     MS. REDMOND: Thank you, Judge. Government
18 calls Dave Elkins.
19     DAVID ELKINS
20     The witness, having first been sworn to speak
21 the truth, the whole truth and nothing but the truth,
22 testified as follows:
23     DIRECT EXAMINATION
24 BY MS. REDMOND:
25     Q.  Good morning. Would you state your name,

Page 17

1  spelling your last name for the record?
2      A.  David Elkins, E-L-K-I-N-S.
3      Q.  And do you work?
4      A.  Yes, ma'am.
5      Q.  Where do you work?
6      A.  With the City of Dothan Police Department.
7      Q.  What do you do there?
8      A.  I'm a police officer.
9      Q.  How long have you worked as a police officer
10 for Dothan?
11     A.  Just shy of seven years.
12     Q.  Okay. And what are your duties there? As a
13 police officer, what do you do?
14     A.  Right now I'm currently assigned to night
15 shift patrol.
16     Q.  And what do you do on night shift patrol?
17     A.  I answer calls for services when they're
18 called in to dispatch and enforce criminal and traffic
19 laws, serve subpoenas.
20     Q.  How long have you been doing that, or how
21 long have you been so assigned?
22     A.  About the last 18 months.
23     Q.  Okay. Prior to that, what were your duties?
24     A.  I was a vice and intelligence investigator
25 working narcotics.

TESTIMONY AND PROCEEDINGS                          May 23, 2005
UNITED STATES OF AMERICA v. CLAUDE LEE WOODS

6 (Pages 18 to 21)

---

Page 18

1    Q.  And what would that entail?  What would you
2  do as a vice and intelligence officer?
3    A.  We enforced narcotics laws, prostitution,
4  gambling, and alcohol violations.
5    Q.  Are you having trouble hearing me?  Can you
6  hear me?
7    A.  Yes, ma'am.
8    Q.  Okay.  Were you working in your capacity as a
9  vice intelligence officer on or about August 14th,
10  2003?
11    A.  Yes, ma'am, I was.
12    Q.  And did you -- when you were working as a
13  vice and intelligence officer, did you have a partner?
14    A.  Yes.  We partnered.  There was like six of us
15  in the office, so we would partner up with one
16  another.
17    Q.  Who would you have partnered up with?
18    A.  That particular night would have been
19  Investigator Riley.
20    Q.  Okay.  And he's also vice and intelligence?
21    A.  Yes, ma'am.
22    Q.  And what were you-all doing that -- you said
23  that night?
24    A.  We was driving around.
25    Q.  Doing -- just driving around having fun?

---

Page 19

1    A.  Just driving around, yes, ma'am.
2    Q.  Okay.
3    A.  Not anything in particular.
4    Q.  What, if anything, occurred that stands out
5  in your memory?
6    A.  We were going south on 231.
7    Q.  Uh-huh.
8    A.  South of us.  And we seen a vehicle in front
9  of us that was in the opposite lane in front of us
10  weaving.
11    Q.  Okay.  Were -- where were you coming from?
12    A.  We had actually just left the Wal-Mart on the
13  south side of town.
14    Q.  Okay.  You had left the Wal-Mart?
15    A.  Yes, ma'am.
16    Q.  And who -- were you in a vehicle?
17    A.  Yes, ma'am.
18    Q.  Who was driving?
19    A.  I was.
20    Q.  Okay.  And describe that vehicle, please.
21    A.  It was a 2001 maroon, extended-cab Dodge Ram
22  pickup truck.
23    Q.  Was that a service vehicle?  Did it belong to
24  the Dothan Police Department?
25    A.  Yes, ma'am, it did.

---

Page 20

1    Q.  Did it have any special features?  Is Dothan
2  Police Department written on the side of it or --
3    A.  No, ma'am.  It's unmarked with the exception
4  of, you know, a radio and siren; and then it had
5  lights, you know.
6    Q.  Okay.  And those are lights that you could
7  switch on from inside the car -- or the truck?
8    A.  Yes, ma'am.
9    Q.  And you had indicated that you were coming
10  from the Wal-Mart when you saw a car?
11    A.  Yes, ma'am.
12    Q.  Okay.  And can you describe that car?
13    A.  It was a black Cadillac Eldorado.
14    Q.  And what, if anything, caused you to notice
15  that vehicle?
16    A.  Like I said, it had been -- it had crossed
17  the fault line, and we thought he might have been
18  intoxicated.
19    Q.  Okay.  What, if anything, did you do?
20    A.  We turned on our lights and -- our lights and
21  siren.
22    Q.  Okay.  And did the vehicle stop?
23    A.  Not immediately.  It took about -- probably
24  about a quarter mile or so for the vehicle to pull
25  over.

---

Page 21

1    Q.  And where did the vehicle finally stop?
2    A.  On 231 just south of Festival Drive, where
3  they have the peanut festival.
4    Q.  I'm sorry.  I'm missing part of it.
5      THE COURT:  Don't go so -- quite so fast.
6      THE WITNESS:  Yes, Your Honor.
7    Q.  Did you get behind the vehicle?
8    A.  Yes, ma'am.
9    Q.  Did you in any way indicate your desire to
10  have that vehicle stop?
11    A.  Yes, ma'am.
12    Q.  How did you do that?
13    A.  We turned on our lights and siren.
14    Q.  Okay.  And it was after that point that the
15  vehicle still continued on about a half mile?
16    A.  About a quarter mile.
17    Q.  And it stopped where, please?
18    A.  Just south of the Festival Drive
19  intersection.
20    Q.  Okay.  And describe the area where the
21  vehicle stopped.
22    A.  Just south of Festival Drive.  It's, you
23  know, a four-lane highway.
24    Q.  Is there a lot of traffic?
25    A.  Yes, ma'am.  There's a fair amount of traffic

TESTIMONY AND PROCEEDINGS                      May 23, 2005
UNITED STATES OF AMERICA v. CLAUDE LEE WOODS

Page 22

1   on 231.
2      Q.  Are there other -- were there other places
3   for this vehicle to stop?
4      A.  Yes, ma'am.
5      Q.  Okay.  Where it stopped, I thought I heard
6   you say something about peanuts.  I might have
7   misunderstood.
8      A.  Yeah.  Festival Drive leads up to where we
9   have the peanut festival, the national peanut
10  festival.
11     Q.  Is it an open area?
12     A.  Yes, ma'am.  It goes up into a rather large
13  parking lot where they have the fair and whatnot.
14     Q.  Did the car go up into that parking lot?
15     A.  No.  It passed that.
16     Q.  Okay.
17     A.  And then pulled over.
18     Q.  And then pulled over.
19     A.  Yes, ma'am.
20     Q.  Did it pull over on the side of the road,
21  then?
22     A.  Yes, ma'am.  On the right-hand side of the
23  road.
24     Q.  Okay.  What, if anything, did you do once the
25  vehicle stopped?

Page 23

1      A.  I went on the driver's side after
2   Investigator Riley called out the traffic stop.
3      Q.  When you say called out the traffic stop,
4   tell us what that means.
5      A.  He used the police radio to inform dispatch
6   that we conducted a traffic stop and gave the tag
7   number and requested a uniformed officer meet us.
8      Q.  For what reason?
9      A.  If he was intoxicated, to take him; because
10  we can't transport in our vehicle.
11     Q.  Okay.  Is that something that you-all would
12  normally do working in narcotics and intelligence,
13  stop a vehicle on the side of the road?
14     A.  Yes, ma'am.
15     Q.  Okay.  When you stopped the vehicle, you said
16  you approached the driver's side.  What, if anything,
17  did you see?
18     A.  Seen a white male.  The window was down.  He
19  had an open beer, bottled beer, in his lap, in between
20  his legs.  There was rolling papers -- cigarette
21  rolling papers on the armrest of the vehicle, of the
22  door.
23     Q.  Okay.  Did you see anything else?
24     A.  No, ma'am.
25     Q.  Did you smell anything?

Page 24

1      A.  Yes, ma'am.
2      Q.  What, if anything, did you smell?
3      A.  The faint odor of marijuana.
4      Q.  What, if anything, did you do with the person
5   that you encountered that you saw in the driver's
6   seat?
7      A.  After he gave me his driver's license and
8   showed me his insurance, I asked him to get out of the
9   vehicle.
10     Q.  Did he comply?
11     A.  Oh, yes, ma'am.
12     Q.  And what, if anything, was your purpose in
13  getting him out of the vehicle?
14     A.  So we could conduct a field sobriety with a
15  uniformed officer there.
16     Q.  Was the uniformed officer there by that time?
17     A.  Yes, ma'am.  He wasn't too far up the road
18  when they dispatched him.
19     Q.  And did you conduct the field sobriety test?
20     A.  No, I did not.
21     Q.  Okay.  What did you -- was it conducted?
22     A.  Yes, ma'am.
23     Q.  Okay.  What, if anything, did you do while
24  that test was going on?
25     A.  I searched the vehicle.

Page 25

1      Q.  What did you find in the vehicle?  Actually,
2   let me stop right there.  You described the vehicle
3   as -- did you say it was an Eldorado?
4      A.  Yes, ma'am.
5      Q.  Describe that vehicle a little bit more.
6   Tell me about the interior of the vehicle.
7      A.  It was a -- I believe it was a two-door
8   sedan.  A sedan, front seats and the back seat.
9      Q.  All right.  And did you -- did you indicate
10  that it was a two-door vehicle?
11     A.  I'm double checking here.  I believe it was a
12  two-door.  Yes, ma'am, it was a two-door.
13     Q.  Okay.  And where did you start your search of
14  the vehicle?
15     A.  At the driver's seat.
16     Q.  What, if anything, did you see?
17     A.  Underneath the driver's seat was a black,
18  like a zippered nylon type case that was laying up
19  under the seat.  And the zipper was broken, but facing
20  out towards the front of the vehicle.
21     Q.  Okay.  And this is on the driver's side?
22     A.  Yes, ma'am.
23     Q.  Are those -- is it one seat, or are there
24  like bucket seats?
25     A.  It's two -- two different seats for --

TESTIMONY AND PROCEEDINGS                          May 23, 2005
UNITED STATES OF AMERICA v. CLAUDE LEE WOODS

8 (Pages 26 to 29)

Page 26

1    Q. Okay. And this is directly under the
2  driver's seat. Is it under the seat, or is it in
3  the -- the little floorboard well?
4    A. It was under the seat, but not all the way
5  back.
6    Q. Okay. And what, if anything, did you do once
7  you saw this nylon bag?
8    A. Like I said, the zipper wasn't shut. I seen
9  what I believed to be ice or methamphetamine, pulled
10  the bag out and found what I believed to be meth or
11  ice.
12    Q. Are you familiar with meth?
13    A. Yes, ma'am.
14    Q. How are you familiar with meth, or how did
15  you become familiar with it?
16    A. I've been to several schools and been on
17  several search warrants in cases where we would come
18  across it.
19    Q. Okay. And what did you do once you found the
20  nylon bag with the suspected methamphetamine?
21    A. Looked next to it where there was a Crown
22  Royal bag.
23    Q. Uh-huh.
24    A. Which contained a bunch of empty sandwich
25  baggies. And then I looked near the center console

Page 27

1  area, where I found a littler silver metal box like
2  you would put a package of cigarettes in.
3    Q. Okay.
4    A. And I opened it up, and it contained a little
5  baggy of marijuana and some more methamphetamine.
6    Q. Okay. And let me go back. You find -- are
7  you finding all of this under the driver's side seat?
8    A. No. The silver box was in between the
9  driver's seat in like the center console area.
10    Q. And tell me about that console. Is this a --
11  is this a stick shift? Is it a manual?
12    A. It's just an automatic car.
13    Q. Okay. And talk -- talk to us about the
14  console, because we know that now there are two seats
15  like bucket seats.
16    A. Uh-huh.
17    Q. Talk to us kind of about the -- the console.
18  Is it -- is there an armrest there? Do you remember?
19    A. I believe the console itself would be an
20  armrest --
21    Q. Okay.
22    A. -- that I can recall, ma'am.
23    Q. Okay. Was it in plain sight, or did you have
24  to open up something to find the metal box?
25    A. No. It was in between the console area and

Page 28

1  the driver's seat.
2    Q. So it's between the seat and this armrest?
3    A. Correct.
4    Q. Okay. What did you do next?
5    A. Went back and asked the driver about it.
6    Q. Okay. Did you find anything else in the
7  vehicle?
8    A. Yes, ma'am.
9    Q. Okay.
10    A. Further searching found another little bag,
11  like a zipper type, maybe a makeup type bag --
12    Q. Okay.
13    A. -- in the back seat that had one or two sets
14  of scales, digital scales in it. There was a -- like
15  a metal lock box, like a fireproof, waterproof lock
16  box that you store like personal documents or whatnot
17  in, like a little safe --
18    Q. All right.
19    A. -- on the floorboard on the passenger side of
20  the vehicle. And --
21    Q. When you're saying in the floorboard, are you
22  talking about the front or the back?
23    A. Front, yes. The front. Which contained some
24  money, roughly about $2,000.
25    Q. How was that -- was it loose?

Page 29

1    A. No, ma'am. It was rolled up, $100 bills, I
2  believe. You know, rolled $100 bills that were
3  rubber-banded together.
4    Q. Okay. So it's in a roll?
5    A. It was rolled or folded and rubber-banded,
6  rubber-banded together.
7    Q. And this is in a -- you said a green bag?
8    A. No. That was actually in a safe, like a
9  little -- one of those personal fireproof safes.
10    Q. Okay. Did you find anything else?
11    A. Yes, ma'am. On the passenger floorboard as
12  well, we found an ink pen body where the actual tip
13  and ink had been taken out that contained what we
14  thought might be more residue, methamphetamine
15  residue. Also found some marijuana seeds in the
16  floorboard on the driver's side of the vehicle, front
17  driver's side, and then the rolling papers that were
18  on the door.
19    Q. What, if anything, did you do with the items
20  that you collected from the vehicle?
21    A. I field tested it with a little drug reagent.
22    Q. Stop right there. Hold on. Tell me what it
23  means, the field tested.
24    A. It's a little glass tube, and it has a couple
25  of other little tubes with chemicals in it.

TESTIMONY AND PROCEEDINGS                           May 23, 2005
UNITED STATES OF AMERICA v. CLAUDE LEE WOODS

9 (Pages 30 to 33)

---

Page 30

1    Q.  Uh-huh.
2    A.  I don't know exactly what they are.  You put
3  the sample of drugs in there and you break the vials
4  and shake it.  And if it turns certain colors, it
5  tells you what drug is present.
6    Q.  Did you have some kind of training for that?
7    A.  Yes, ma'am.
8    Q.  Do you usually carry those vials with the
9  chemicals in them?
10   A.  Yes, ma'am.
11   Q.  Okay.  Is that sort of standard procedure
12 when you're working in narcotics?
13   A.  Yes, ma'am.
14   Q.  What, if anything, did you do -- or what, if
15 anything, did that vial tell you?
16   A.  It indicated a presence of methamphetamine
17 from one of the baggies that came from under the seat
18 of the -- under the seat.
19   Q.  Okay.  What did you do at that point?
20   A.  Put Mr. Woods in the patrol car and took him
21 up to the office.
22   Q.  Was he under arrest at that point?
23   A.  At that point, no, he was not.
24   Q.  Okay.
25      MS. REDMOND:  Judge, if I may approach the

---

Page 31

1  witness.
2      THE COURT:  Yes, ma'am.
3    Q.  Officer, I've placed before you what has been
4  marked as Government's Exhibit #3.  I ask you if you
5  recognize that.
6    A.  Yes, ma'am.
7    Q.  What is that?
8    A.  It looks like a bag that I did recover from
9  under the seat.
10   Q.  Okay.  And is -- that's the bag that had a
11 quantity of what you thought was methamphetamine?
12   A.  Yes, ma'am.
13   Q.  Is it from that quantity of meth that you
14 took out of that bag that you tested?
15   A.  Yes, ma'am.
16      MS. REDMOND:  May I approach again, Your
17 Honor?
18      THE COURT:  Yes.
19   Q.  Officer, I've put in front of you what has
20 been marked as Government's Exhibit #4 and ask you if
21 you recognize that.
22   A.  Yes, ma'am.
23   Q.  And can you tell us what that is?
24   A.  This is the box that I recovered from between
25 the driver's seat and the console area of the vehicle.

---

Page 32

1    Q.  Is there anything else in that package along
2  with that box?
3    A.  There's a green baggy and a white baggy that
4  contains methamphetamine.
5    Q.  Is that consistent with what you saw when you
6  opened that container?
7    A.  Yes, ma'am.
8    Q.  Did you do any field test from the substance
9  out of that silver container?
10   A.  No, ma'am, I did not.
11      MS. REDMOND:  May I approach again, Your
12 Honor?
13      THE COURT:  Yes, ma'am.
14   Q.  Officer, I've put in front of you a package
15 that's been marked as Government's Exhibit #5 and ask
16 you if you recognize that exhibit.
17   A.  It's a Crown Royal bag, ma'am.
18   Q.  Is it familiar to you?
19   A.  Yes, ma'am.  It was laying under the driver's
20 seat.
21      MS. REDMOND:  May I approach again, Your
22 Honor?
23      THE COURT:  All right.
24      MS. REDMOND:  Thank you.
25   Q.  Officer, I've laid in front of you an exhibit

---

Page 33

1  that's been marked as Government's Exhibit #6, ask you
2  if you can recognize that.
3    A.  Yes, ma'am.  This is the ink pen that came
4  from the front of the -- front passenger floorboard
5  area of the vehicle.
6      MS. REDMOND:  May I approach once more?
7      THE COURT:  Certainly.
8      MS. REDMOND:  Thank you.
9    Q.  I've placed in front of you an exhibit that's
10 been marked as Government's Exhibit #7.  I ask you if
11 you can recognize that.
12   A.  Yes, ma'am.  This is the bag that was
13 recovered from the back seat that had -- or back seat
14 area that contained scales.
15   Q.  Was Mr. Woods arrested?
16   A.  Yes, he was.
17   Q.  What were the charges under which he was
18 arrested?
19   A.  Possession of marijuana in the second degree.
20   Q.  And that's for the amount that you saw when
21 you walked up to the car?
22   A.  It was from what was recovered from the
23 silver box, yes, ma'am..
24   Q.  Along with the methamphetamine?  You said the
25 silver box.  What was -- what was found in the box?

TESTIMONY AND PROCEEDINGS                          May 23, 2005
UNITED STATES OF AMERICA v. CLAUDE LEE WOODS

10 (Pages 34 to 37)

---

Page 34

1    A.  Oh, the marijuana and the meth.  Yes, ma'am.
2    Q.  Okay.  What did you do with these objects
3  that you have identified?  What did you do with these
4  objects?
5    A.  I turned them over to Agent Whittle from the
6  DEA office in Montgomery.
7    Q.  After handing those items over to Detective
8  Whittle, did you have any further dealings with those
9  items at all?
10    A.  No, ma'am.
11    MS. REDMOND:  Nothing further.  Thank you.
12            CROSS-EXAMINATION
13  BY MS. JAMES:
14    Q.  Is it Officer Elkins?
15    A.  Yes, ma'am.
16    Q.  My name is Susan James, and I represent
17  Mr. Woods.  I just have a couple of questions for you.
18  Ms. Redmond asked you several times about your role
19  back at the time of this traffic stop in August of
20  2003.  You said you were with vice and narcotics; is
21  that correct?
22    A.  Vice and intelligence and in narcotics.
23    Q.  And your partner that night of the night the
24  stop of Mr. Woods, he was also in vice and
25  intelligence.  Would that be correct?

---

Page 35

1    A.  Yes, ma'am.
2    Q.  And that would be with the Dothan Police
3  Department?
4    A.  Yes, ma'am.
5    Q.  All right.  The fact that you and your
6  partner were members of the vice and intelligence unit
7  of the Dothan Police Department had absolutely nothing
8  to do with the fact that you stopped Mr. Woods on
9  August 14th, 2003, correct?
10    A.  Correct.
11    Q.  In fact, you and your partner were just out
12  driving around, saw a vehicle that you thought had
13  violated a traffic law or might -- that the driver
14  might be impaired?
15    A.  Correct.
16    Q.  And at some point, you say that you were --
17  you were in an unmarked vehicle, right?
18    A.  Yes, ma'am.
19    Q.  And so unless you turned on your siren and
20  activated your light, your vehicle looked pretty much
21  like any other vehicle on the road?
22    A.  Yes, ma'am.
23    Q.  And so when you began following the subject
24  vehicle, the vehicle that Mr. Woods was riding in, you
25  had initially kind of gotten behind him without

---

Page 36

1  activating your lights, correct?
2    A.  Correct.
3    Q.  All right.  And you drove for a period of
4  time.  While he was driving, did you notice that the
5  tag on the vehicle was an out-of-state tag?
6    A.  Yes, ma'am.
7    Q.  It was a Georgia tag, wasn't it?
8    A.  Yes, ma'am, it was.
9    Q.  And you said that he stopped eventually
10  slightly past, I think you said, the -- was it
11  Festival?
12    A.  Drive, yeah.
13    Q.  Festival Drive.  And Festival Driver, if I'm
14  correct from my trips through Dothan and Panama City,
15  is actually going away from Dothan on 231.  Would that
16  be correct?
17    A.  Yes, ma'am.  South of Dothan.
18    Q.  And that -- probably on that night that you
19  made this stop, that provided a little more of a --
20  probably a more lighted area.  Would you agree?
21    A.  Yes, ma'am.
22    Q.  Okay.  So you get behind Mr. Woods.  And you
23  say you stopped him because you saw him weave over the
24  fog line, I believe, a couple of times, correct?  Two
25  or three?

---

Page 37

1    A.  Three times.
2    Q.  Three times.  And it was your concern, based
3  on your training as a law enforcement officer, that
4  someone that weaves over the fog line might be under
5  the influence of either drugs or alcohol, correct?
6    A.  Yes, ma'am.
7    Q.  And in response to that concern, you
8  activated the siren, service lights, and did in fact
9  stop Mr. Woods, right?
10    A.  Yes, ma'am.
11    Q.  Okay.  When you stopped him and he -- I guess
12  he rolled down his window; is that --
13    A.  It was already down, I believe, when we got
14  there.
15    Q.  Okay.  Window's already down.  But it was at
16  that point that you smelled a faint odor of marijuana
17  emitting from inside the vehicle, correct?
18    A.  Yes.  While I was talking to him, yes, ma'am.
19    Q.  And that made you believe that marijuana had
20  been smoked in the vehicle, right?
21    A.  Correct.
22    Q.  And then during the course of that traffic
23  stop and your asking him for his identification, you
24  actually observed some rolling papers in the vehicle,
25  right?

TESTIMONY AND PROCEEDINGS                          May 23, 2005
UNITED STATES OF AMERICA v. CLAUDE LEE WOODS

Page 38

1    A.  Yes, ma'am.
2    Q.  And that was consistent with your belief that
3  marijuana might have been smoked in the vehicle?
4    A.  Correct.
5    Q.  Because the rolling papers that you found and
6  took into evidence, which have been shown to you
7  today, are consistent with what some people who smoke
8  marijuana use to roll it, correct?
9    A.  Yes, ma'am.
10   Q.  All right.  So at this point, you believe
11 that there's been marijuana smoked in the vehicle,
12 there's an open container -- actually, a Smirnoff
13 Ice -- sitting between Mr. Woods' legs as he was
14 driving -- or as he was parked?
15   A.  Yes, ma'am.
16   Q.  And you made an inquiry of Mr. Woods as to
17 had he had anything to drink, because at that point
18 you were concerned that he might be driving under the
19 influence --
20   A.  Correct.
21   Q.  -- correct?  And he told you that he had just
22 opened that one and he had had one more, correct?
23   A.  Yes, ma'am.
24   Q.  And at that point, even in front of you in
25 your presence, he actually poured the Smirnoff Ice out

Page 39

1  onto the ground, right?
2    A.  He actually opened the door and poured it
3  out, yeah.
4    Q.  Actually poured it on the ground.  But still
5  you were concerned, so you summoned another regular
6  patrol unit in the event he was DUI so that they could
7  take him into custody if he was DUI, right?
8    A.  We call for a patrol unit as we initiate our
9  traffic stop.
10   Q.  Okay.  But the purpose being if he was DUI,
11 you made an arrest, they can take him in, right?
12   A.  Turn it over to patrol, yes, ma'am.
13   Q.  Because they have like a cage in their car
14 where they can transport prisoners?
15   A.  Correct.
16   Q.  Okay.  So after the field sobriety was
17 administered, it was determined that he was not
18 impaired and that didn't -- didn't warrant a DUI,
19 correct?
20   A.  Correct.
21   Q.  Okay.  Now, you -- you made an inquiry of
22 Mr. Woods with regard to -- or you told him that you
23 stopped him because of his crossing the fog line,
24 correct?
25   A.  Yes, ma'am.

Page 40

1    Q.  And Mr. Woods told you that that happened
2  because he was on his cellular telephone, didn't he?
3    A.  Yes, ma'am, he did.
4    Q.  He told you he was en route to the beach at
5  Panama City and another -- a female was following him
6  and had gotten lost, right?
7    A.  That is correct.
8    Q.  And that she was wanting him actually to come
9  back up to Columbus or that area and lead her back
10 down to the route that they could take to the beach?
11   A.  Correct.
12   Q.  Now, you did in fact seize a cellular
13 telephone as part and incident to the arrest in this
14 case, correct?
15   A.  Yes, ma'am, I do believe.  Yes, ma'am.
16   Q.  Okay.  Now, you've testified you've been
17 involved -- would this be the phone?  Can you see it
18 from here?
19     MS. JAMES:  May I approach, Your Honor?
20     THE COURT:  Yes.
21   Q.  Showing you what's marked for identification
22 purposes -- it's not marked.  Okay.  I'm sorry.  It's
23 not marked, but let me show you.  Does that appear to
24 be the phone?
25   A.  Yes, ma'am, it does.

Page 41

1    Q.  Okay.  And I'm sure with your training as
2  a -- I know you were effecting a traffic stop; but I'm
3  sure with your training that you testified you've had
4  as a vice and narcotics officer, that his telephone
5  was a pretty important piece of evidence.  Would you
6  agree?
7    A.  Yes, ma'am.
8    Q.  Because that phone would lead you -- as a
9  vice and narcotics guy, possibly lead you with phone
10 records to the people that Mr. Woods had communicated
11 with in a relatively close proximity to the time that
12 the stop was made, right?
13   A.  You mean, like logs as far as who had been --
14 numbers talking to?  Yes, ma'am.
15   Q.  Okay.  Because in the course of your work,
16 you have the capability of subpoenaing phone records
17 and things like that that go with a particular phone
18 to see who has been calling and who has -- the phone
19 records, who they've been talking to?
20   A.  I've never done that, but, yes, ma'am.
21   Q.  But you can do that, right?
22   A.  Yes, ma'am.
23   Q.  Okay.  Now, I guess after you observed the
24 rolling papers and you smelled what you thought was
25 marijuana and as things transpired that you described

TESTIMONY AND PROCEEDINGS                           May 23, 2005
UNITED STATES OF AMERICA v. CLAUDE LEE WOODS

12 (Pages 42 to 45)

| Page 42 | Page 44 |
|---|---|

Page 42

1  here today, you did have Mr. Woods exit the vehicle;
2  is that correct?
3      A.  Yes, ma'am.
4      Q.  And you did ultimately conduct a search of
5  the vehicle and found these items that you've
6  identified here today?
7      A.  Yes, ma'am.
8      Q.  Now, did you have occasion to do an inventory
9  of the contents of the vehicle?
10     A.  We -- I don't recall if we did a tow slip or
11 not, ma'am, because we took the vehicle up to the
12 police department.
13     Q.  Okay.  Well, let me ask you this.  Isn't it
14 normal and customary that if a vehicle is taken into
15 custody, say incident to an arrest such as this, that
16 there is an inventory done of the vehicle at least at
17 the police station?
18     A.  Yes, ma'am.
19     Q.  All right.  Would you have in your records
20 there or would you be able to tell us of your own
21 personal knowledge if such an inventory was done in
22 this particular case?
23     A.  No, ma'am.  I can't tell you that for sure.
24     Q.  So you don't know if there was or not,
25 correct?

Page 44

1  a city court ordinance violation, right?
2      A.  Well, it's a state traffic.
3      Q.  Okay.  State.  Excuse me.
4      A.  Just a traffic offense, yes, ma'am.
5      Q.  All right.  And he was also charged with
6  possession of marijuana second degree?
7      A.  Correct.
8      Q.  All right.  Now, you know from your training
9  and your experience as a law enforcement officer in
10 the state of Alabama that there's possession of
11 marijuana second and possession of marijuana first
12 degree, correct?
13     A.  Yes, ma'am.
14     Q.  And possession of marijuana second, the same
15 that he was charged with, meant that the quantity of
16 marijuana was for personal -- or arguably for personal
17 use, correct?
18     A.  Yes, ma'am.
19     Q.  All right.  Now, you also will agree with me,
20 will you not, that in Alabama we don't have a -- for
21 any substance other than marijuana, there is no
22 personal use quantity?  Do you understand what I'm
23 saying?
24     A.  Yes, ma'am, I think I do.
25     Q.  Okay.  In other words, you couldn't -- you

Page 43

1      A.  Correct.
2      Q.  Okay.  So if there were other items of
3  personal property in that vehicle, do you have idea
4  what -- what may have happened to them?
5      A.  They would have stayed in the vehicle.
6      Q.  Okay.  Did you observe in the vehicle that --
7  when you were doing this search and you were looking
8  around, I mean, you were actually looking around
9  inside the vehicle, right?
10     A.  Correct.
11     Q.  Did you observe that there were clothes in
12 the vehicle?
13     A.  I cannot for 100 percent say yes or no,
14 ma'am.  I'm assuming there were, but --
15     Q.  Okay.  And how about any other items,
16 cameras, video recorders, anything of that nature?  Do
17 you remember seeing one of those?
18     A.  I remember a big stereo speaker in a box, I
19 believe, in the trunk area.
20     Q.  Okay.  Now, the rolling papers that you took
21 into evidence, you took into evidence because you
22 thought that would support your case that he was
23 possessing marijuana for his personal use, correct?
24     A.  Correct.
25     Q.  In fact, he was charged with open container,

Page 45

1  couldn't charge personal use of methamphetamine.
2      A.  No, ma'am.
3      Q.  Okay.  Now, the -- what's been shown to you,
4  I believe, as --
5         MS. JAMES:  May I approach again, Your
6  Honor?
7         THE COURT:  Yes, ma'am.
8      Q.  What's now been marked as Government's
9  Exhibit #6 and shown to you for identification
10 purposes, this being the pen --
11     A.  Yes.
12     Q.  -- you seized that out of the vehicle also,
13 right?
14     A.  That's correct.
15     Q.  And this was what appeared to be a -- just a
16 regular BIC ballpoint pen, right?
17     A.  Correct.
18     Q.  Just from your first glance, right?
19     A.  Yes, ma'am.
20     Q.  But you as a trained law enforcement officer
21 always want to check things like that in a vehicle so
22 that you can see if they've been modified for purposes
23 of use -- some illicit purpose, correct?
24     A.  Correct.
25     Q.  And in this case, your suspicion proved

TESTIMONY AND PROCEEDINGS                          May 23, 2005
UNITED STATES OF AMERICA v. CLAUDE LEE WOODS

Page 46

1  correct because you found that the inner workings of
2  this pen had been removed, right?
3      A.  Correct.
4      Q.  And upon further review, you revealed or
5  you -- you found that there was a white residue in
6  here that made you think it was a presence of
7  methamphetamine, correct?
8      A.  Yes, ma'am.
9      Q.  Now, based on your experience as a law
10 enforcement officer, how does one use this, a user?
11 How do they use that to ingest drugs?
12     A.  They would snort a substance, much like using
13 a straw.
14     Q.  Okay.  So would that mean the cap would
15 probably be removed?
16     A.  Yes, ma'am.
17     Q.  And if the cap is removed, then they take it;
18 and I guess the substance is down on a surface and
19 they actually put it up and suck it up into their
20 nose?
21     A.  Yes, ma'am.
22     Q.  Okay.  And so you thought this was consistent
23 with -- with someone using drugs, correct?
24     A.  Correct.
25     Q.  Now, you did a report incident to arrest in

Page 47

1  this case, correct?
2      A.  Correct.
3      Q.  And that's customary because you never know
4  when you might be called to court in a case such as
5  this to testify about what happened a year or more
6  ago, right?
7      A.  Correct.
8      Q.  And in this case, you filled out pertinent
9  biographical information about Mr. Woods, correct?
10     A.  Yes.
11     Q.  And what you learned or what you put on your
12 form, anyway, was that he was from somewhere in
13 Georgia, correct?
14     A.  Yes, ma'am.  Riverdale, Georgia.
15     Q.  And he indicated to you at the time that he
16 worked as a laborer, correct?
17     A.  Yes, ma'am.
18     Q.  Now, those were things that he self-reported
19 to you, right?
20     A.  Correct.
21     Q.  You didn't have occasion and on that night to
22 go out and independently investigate that, right?
23     A.  No, ma'am.
24     Q.  And I'm assuming that you didn't take any
25 action to investigate or follow up on the female that

Page 48

1  he said he had spoken to by using this telephone,
2  correct?
3      A.  No, ma'am, I did not.
4      Q.  Okay.  Now, you indicated on your form, your
5  report that you did relating and memorializing what
6  happened at the time of Mr. Woods' arrest in August of
7  2003, that he was a drug user.  Do you remember that?
8      A.  Yes, ma'am.
9      Q.  Okay.  Now, how did you formulate that
10 opinion?
11     A.  From the drugs in the vehicle.
12     Q.  Okay.  And would that also be consistent with
13 the straw and the rolling papers?
14     A.  Yes, ma'am.
15     Q.  And that was pertinent information for you to
16 put on that particular form because you want to make
17 sure that everybody's mindful if someone's using
18 drugs, they might react differently.  And it has to do
19 with the information you need as well as officer
20 safety?
21     A.  Correct.  It goes into our computer, yes,
22 ma'am.
23     Q.  Okay.  And I believe also you said that upon
24 further looking in this vehicle, you actually found
25 seeds of marijuana on both the passenger and the

Page 49

1  driver's floor; is that correct?
2      A.  l think it was just the driver's side, ma'am,
3  but we did find marijuana seeds.
4      Q.  Okay.  Okay.  And if you find seeds in a
5  vehicle like that, does that sometimes indicate to you
6  that somebody has used the drug in the vehicle?
7      A.  Correct.  Yes, ma'am.
8      Q.  And I'm assuming that the -- the quantity of
9  the methamphetamine and the purity gave you cause to
10 think it was a pretty big amount?
11     A.  Yes, ma'am.
12     Q.  And to the extent that you contacted the Drug
13 Enforcement Administration in Montgomery and got
14 Mr. Whittle and his people involved, right?
15     A.  Yes, ma'am.
16     Q.  But based on your knowledge and your stop
17 that night, other than what Mr. Woods told you and his
18 Georgia plates, you really didn't have reason to know
19 where he had come from, correct?
20     A.  Correct.
21     Q.  And other than what Mr. Woods told you that
22 night and actually the route that he was taking,
23 231 -- I guess it would be south, toward Panama City,
24 right?
25     A.  Yes, ma'am.

TESTIMONY AND PROCEEDINGS                    May 23, 2005
UNITED STATES OF AMERICA v. CLAUDE LEE WOODS

14 (Pages 50 to 53)

Page 50

1    Q. -- with clothes in his vehicle, that's the
2  only thing that you really knew about where he was
3  going?
4    A. Correct.
5    Q. And other than his reference to having spoken
6  with a female that was following him or going to
7  accompany him to the beach, you don't have any
8  knowledge about what his plans were, correct?
9    A. That's correct.
10   Q. Wouldn't know where he was going to stay or
11 how long he was going to stay?
12   A. No, ma'am.
13     MS. JAMES: May I have one moment, Judge?
14     THE COURT: All right.
15     (Brief pause)
16     MS. JAMES: That's all. Thank you.
17     THE COURT: All right. Anything further from
18 the Government?
19     MS. REDMOND: Nothing for this witness, Your
20 Honor.
21     THE COURT: All right. Thank you, sir.
22     MS. REDMOND: May he be excused, Your Honor?
23     THE COURT: Excuse me?
24     MS. REDMOND: I'm sorry. May he be excused?
25     THE COURT: Yes. All witnesses are going to

Page 51

1  be excused unless someone requests otherwise.
2      MS. REDMOND: Thank you, Your Honor.
3      THE COURT: Call your next witness.
4      MS. REDMOND: John Riley.
5          JOHN RILEY
6      The witness, having first been sworn to speak
7  the truth, the whole truth, and nothing but the truth,
8  testified as follows:
9          DIRECT EXAMINATION
10 BY MS. REDMOND:
11   Q. Good morning. Would you state your name and
12 spell your last name for the record.
13   A. John Riley, R-I-L-E-Y.
14   Q. And are you employed?
15   A. Yes, ma'am. Dothan Police Department.
16   Q. And how long have you worked for the Dothan
17 Police Department?
18   A. A total of seven years.
19   Q. What do you do for them?
20   A. Narcotics investigations.
21   Q. How long have you been doing that?
22   A. Two years.
23   Q. Okay. Back August 14th of 2003, were you in
24 narcotics at that time?
25   A. Yes, ma'am.

Page 52

1    Q. Okay. And on August 14th, 2003, were you on
2  duty?
3    A. Yes, ma'am.
4    Q. Were you riding with anyone?
5    A. Investigator Dave Elkins.
6    Q. And did -- is there anything that happened
7  that evening or that day that stands out in your
8  memory?
9    A. We pulled out of the Wal-Mart parking lot
10 southbound and made contact with Mr. Woods' Cadillac
11 swerving on the roadway.
12   Q. And what, if anything, did you do upon making
13 contact?
14   A. After I believe it was the third time he
15 swerved, we initiated or -- we initiated a traffic
16 stop.
17   Q. How did you do that?
18   A. We were in an unmarked vehicle, but it does
19 have -- it's a Dodge Ram pickup used mostly for
20 surveillance, but it does have lights and sirens and a
21 corner strobe. It's marked as a police vehicle when
22 you light it up. And we used the vehicle to pull him
23 over.
24   Q. Did you use the lights?
25   A. Yes, ma'am.

Page 53

1    Q. Okay. Did you use the siren?
2    A. Eventually, we had to.
3    Q. At some point, did the vehicle being driven
4  by Mr. Woods stop?
5    A. Yes, ma'am.
6    Q. Okay. And what happened or what did you do
7  once that vehicle stopped?
8    A. Well, Investigator Elkins approached the
9  vehicle on the driver's side, and I approached on the
10 passenger side and basically listened as he asked
11 Mr. Woods for his driver's license.
12   Q. Okay. And did you in any way, shape, or
13 form -- you -- engage Mr. Woods in conversation?
14   A. Not at that point.
15   Q. Okay. Did you observe anything in the
16 vehicle? Could you see into the vehicle?
17   A. Well, actually, he -- I guess he saw me walk
18 up because he -- when he let down the driver's window,
19 he also let down the passenger's window.
20   Q. Did you look into the car?
21   A. Yes, ma'am.
22   Q. Did you see anything?
23   A. He had a Smirnoff beer bottle in between his
24 legs. And as soon as he rolled the window down, I
25 mean, you could smell a little bit of marijuana,

TESTIMONY AND PROCEEDINGS
UNITED STATES OF AMERICA v. CLAUDE LEE WOODS

May 23, 2005

Page 54

1 nothing real strong, but a faint odor of marijuana.
2    Q. What, if anything, did you do?
3    A. Eventually during the contact with Mr. Woods,
4 Investigator Elkins asked him to step outside. And I
5 was on the radio calling for a patrol car to come
6 because we thought he might be DUI.
7    Q. Did you administer any tests?
8    A. No, ma'am. I stood there and talked to him
9 and tried to get just a gauge on him to see if he was
10 in fact drunk.
11    Q. Did he appear drunk?
12    A. No, ma'am, he didn't.
13    Q. Okay. What, if anything, did you do after
14 having this conversation with Mr. Woods?
15    A. I stood there and we used what's called a
16 contact technique after Investigator Elkins --
17    Q. I'm sorry. I missed that. A contact and --
18    A. I stayed with Mr. Woods to make sure one
19 police officer stayed with him. And while the other
20 officer runs a driver's license check, looks through a
21 vehicle, anything he does, one person stays with
22 whoever is under investigation at all times. And
23 that's pretty much what I did.
24    Q. What's the purpose of that?
25    A. Safety.

Page 55

1    Q. Okay. And the person that you were standing
2 with and whom you had pulled over, is that person in
3 the courtroom today?
4    A. Yes, ma'am.
5    Q. Can you identify him?
6    A. Yes, ma'am. It's Mr. Woods sitting there in
7 the blue shirt.
8    Q. Right here in between the two ladies at
9 counsel table?
10    A. That is correct.
11    Q. Did you have any problems with Mr. Woods at
12 all?
13    A. He -- other than just not wanting to really
14 answer any -- he would answer his questions, but you
15 could tell that he didn't really -- he was annoyed by
16 the fact that we had pulled him over, but no major
17 problems.
18    Q. Well, it's not unusual for people to be
19 annoyed that police officers have pulled them over, is
20 it?
21    A. Absolutely not.
22    Q. All right. Did you have -- other than
23 standing with him and engaging him in conversation,
24 did you have any contact with the vehicle at all?
25    A. Not at that point.

Page 56

1    Q. At some point, did you?
2    A. After Investigator Elkins brought back
3 several items that he thought might be of evidentiary
4 value and placed them on the hood of our truck and
5 showed them to me and after a patrol officer -- John
6 Gibbons, I believe, is the patrol officer that came;
7 and he was able to stand with Mr. Woods. And after we
8 further searched the vehicle, I had it at that point,
9 but not initially.
10    Q. Did you find anything in the vehicle of note?
11    A. The only thing I actually put my hands on and
12 brought out of the vehicle was a Century lock box that
13 was open.
14    Q. A Century lock box?
15    A. Yes, ma'am.
16    Q. What, if anything, is the significance of
17 that lock box?
18    A. Other than it being fireproof and it can be a
19 safe to hold valuables in. It contained, I think, a
20 total of $2,000. I counted it and Investigator Elkins
21 counted it. We both counted $2,000 in rolled up $100
22 bills.
23    Q. Did you -- and let me go back for just a
24 second. Did you have occasion to pat Mr. Woods down?
25    A. I believe Investigator Elkins did that.

Page 57

1    Q. Do you know if anything was removed from his
2 person?
3    A. No, ma'am.
4    Q. Okay. Other than you having that contact
5 initially with Mr. Woods and then removing the lock
6 box from the vehicle and counting the money you found
7 in that box, did you have any other duties or
8 responsibilities involving either Mr. Woods or that
9 vehicle?
10    A. No, ma'am. I -- after everything was done
11 and said and all the items of evidentiary value were
12 taken from the vehicle, I did drive it back to the
13 police department for possible civil seizure.
14    Q. Okay.
15    MS. REDMOND: Thank you. Nothing further.
16    CROSS-EXAMINATION
17 BY MS. JAMES:
18    Q. Good morning, Officer Riley. My name is
19 Susan James. I represent Mr. Woods. You mentioned
20 that after everything of evidentiary value was seized
21 from the vehicle that it was actually, I guess, taken
22 down to the station?
23    A. Yes, ma'am.
24    Q. There were other personal items in the
25 vehicle, though, weren't there, that were not taken as

TESTIMONY AND PROCEEDINGS                                    May 23, 2005
UNITED STATES OF AMERICA v. CLAUDE LEE WOODS

16 (Pages 58 to 61)

Page 58

1    evidentiary matters -- or evidence?
2    A.  If I remember correctly, there were a lot of
3    clothes in there.
4    Q.  Okay.
5    A.  Would be the biggest thing I remember.  It
6    was almost to the point you couldn't sit down.  Maybe
7    in the back seat.  Not in the front, but in the back.
8    Q.  Okay.  Do you remember the stereo equipment
9    in the trunk?
10   A.  Not specifically, but --
11   Q.  Any kind of camcorder, camera, anything like
12   that?
13   A.  No, ma'am.
14   Q.  Okay.  And there were no weapons found in the
15   vehicle, were there?
16   A.  No.
17        MS. JAMES:  That's all the questions I have.
18   Thank you.
19        THE COURT:  All right.
20        MS. REDMOND:  Nothing further of this
21   witness.
22        THE COURT:  All right.  Thank you, sir.  You
23   may be excused.
24        MS. REDMOND:  Victor Bravenec.
25        THE COURT:  Let's give the jury a 10-minute

Page 59

1    break before we call the next witness and --
2        MS. REDMOND:  Yes, sir.
3        THE COURT:  You're excused now for 15
4    minutes.
5        (Brief recess)
6        (Jury present)
7             VICTOR BRAVENEC
8        The witness, having first been sworn to speak
9    the truth, the whole truth and nothing but the truth,
10   testified as follows:
11        DIRECT EXAMINATION
12   BY MS. REDMOND:
13   Q.    Would you tell us your name, spelling your
14   last name for the record.
15   A.  Victor Bravenec, B-R-A-V, as in Victor,
16   E-N-E-C.
17   Q.  And, Mr. Bravenec, do you work?
18   A.  I work for the Drug Enforcement
19   Administration.
20   Q.  What do you do?
21   A.  I'm a senior forensic chemist.
22   Q.  What does that mean?
23   A.  My primary duties is to analyze evidence for
24   the presence of controlled substances and write a
25   report to my findings.

Page 60

1    Q.  So people will send you various substances,
2    and you do a lab test on those substances and then
3    write up your findings?
4    A.  Yes, I do.
5    Q.  Okay.  Do you -- what is your training and
6    education?
7    A.  I have a Bachelor of Science degree in
8    chemistry from Charleston State University.  I went
9    through the Drug Enforcement Administration internship
10   program while in college, went through the basic
11   training for the forensic chemist to the DEA, and then
12   have worked in the Northeast Laboratory in New York
13   City for approximately four years.
14   Q.  Okay.  Where did you do your basic training
15   for DEA?
16   A.  Quantico, Virginia.
17   Q.  And you said that you had worked at the
18   Northeast Laboratory for how long?
19   A.  I believe three years.
20   Q.  Okay.  And is that where you work now?
21   A.  No.  I work in the Dallas laboratory, in the
22   South Central Laboratory in Dallas, Texas.
23   Q.  And how long have you worked there?
24   A.  Since I transferred in November of '96.
25   Q.  Okay.  Have you had any additional training

Page 61

1    since your basic training?
2    A.  I've had numerous training courses and
3    various instrumentation at -- that I use to analyze
4    controlled substances throughout my career.
5    Q.  Are you familiar with a drug methamphetamine?
6    A.  Yes, I am.
7    Q.  Have you had training in forensically
8    evaluating methamphetamine?
9    A.  Yes, I have.
10   Q.  Can you tell us a little bit about those
11   tests?  And if you could -- I know that you're a
12   chemist and you're used to working with certain
13   language.  Could you make it so that I can understand
14   some of the tests that you do?
15   A.  The training I've received through the normal
16   course of the training program on methamphetamine is
17   how to analyze it.  Some of the training I have
18   received is the manufacturing of methamphetamine, how
19   that is done, clandestine laboratory safety in regards
20   to methamphetamine laboratories.
21   Q.  Is methamphetamine the kind of drug that you
22   know it when you see it?
23   A.  Yes.
24   Q.  Okay.  How will you know it?  Can you
25   describe some of the physical properties of

TESTIMONY AND PROCEEDINGS                    May 23, 2005
UNITED STATES OF AMERICA v. CLAUDE LEE WOODS

17 (Pages 62 to 65)

Page 62

1   methamphetamine?
2      A.  It would generally be either a white powder
3   or a white crystal.  It can be tan in nature as well.
4   It usually has some kind of odor, it's -- whether it's
5   a solvent odor.  Sometimes it's hard to describe.
6      Q.  I'm sorry for just a minute.  What do you
7   mean a solvent odor?
8      A.  A solvent like acetone, which is in
9   fingernail polish remover.
10     Q.  You're saying that's the kind of smell it
11  has?
12     A.  Sometimes it has, not all the time, but
13  sometimes has that odor.  Other solvents can be like
14  Coleman fuel.  Sometimes it will have that kind of
15  odor to it.
16     Q.  Okay.  You know that we are here in trial on
17  an individual named Claude Lee Woods; is that correct?
18     A.  That's correct.
19     Q.  And what, if any, is your involvement in that
20  case?
21     A.  My involvement is in regards to analyzing
22  three exhibits that came into our laboratory.
23     MS. REDMOND:  Your Honor, may I approach the
24  witness?
25     THE COURT:  Yes, ma'am.

Page 63

1      Q.  I have placed in front of you an exhibit
2   that's been marked as Government's Exhibit #3.  I ask
3   you if you recognize that.
4      A.  Yes, I do.
5      Q.  What is that?
6      A.  That's the evidence that I received on
7   September 19th, 2003, to be analyzed.
8      Q.  Is that the way that it came to you?
9      A.  Not the way it came to me.  At the bottom of
10  it, it was sealed from -- the candle seal from the
11  factory was intact, and the bag had not been initialed
12  by me or anything like that.
13     Q.  Did it come with the substance as well as the
14  bag that's in there?
15     A.  Yes, it did.
16     Q.  Okay.  And did you do an analysis of the
17  substance?
18     A.  Yes, I did.
19     Q.  And what, if anything, did you determine?
20     A.  I determined that this exhibit -- may I refer
21  to my notes?
22     MS. REDMOND:  Your Honor?
23     THE COURT:  Yes.
24     MS. REDMOND:  Thank you.
25     A.  That this exhibit contained dimethamphetamine

Page 64

1   hydrochloride with a purity of 93 percent and a net
2   weight of 149.1 grams.
3      Q.  Let me go back just a minute.  You had
4   indicated -- did you indicate some percentage?
5      A.  Yes.
6      Q.  And tell me that percentage indicates to
7   you.
8      A.  93 percent.
9      Q.  And what does that mean?
10     A.  That means the amount of pure methamphetamine
11  in the exhibit.
12     Q.  So there is in that exhibit, Exhibit #3, the
13  drug or the substance that you analyzed was 93 percent
14  pure?
15     A.  Yes.
16     Q.  Okay.  Is that unusual to have that high
17  percentage of pure methamphetamine?
18     A.  At this current time, no; but in 2003, it was
19  a little unusual.
20     Q.  Why is that?
21     A.  With the amount of what's known as ice out on
22  the streets, we see a lot of methamphetamine exhibits
23  that are in the high 80s to high 90s, is not uncommon
24  anymore.
25     Q.  And you used the term "ice."  What -- is ice

Page 65

1   different than methamphetamine?
2      A.  Ice is usually a high purity form of
3   methamphetamine.  Legally, it's usually above 80
4   percent; and it's usually in a crystal type form,
5   although, it can be in a white powder.  And that's
6   where the term "ice" comes from because it looks like
7   ice, shards of ice.
8      Q.  So in Exhibit #3, you had more than 50 grams
9   of ice?
10     A.  Yes.
11     Q.  Okay.
12     MS. REDMOND:  Your Honor, may I approach once
13  more?
14     THE COURT:  I didn't follow what he -- how
15  many grams did -- was -- did you have of --
16     THE WITNESS:  149.1 grams.
17     THE COURT:  Okay.
18     Q.  I've handed you what's been marked as
19  Government's Exhibit #4.  I ask you if you recognize
20  that exhibit.
21     A.  Yes, I do.
22     Q.  And what is that?
23     A.  It's exhibit -- my exhibit two that I
24  received in the case that had two bags of -- actually,
25  a plastic bag and a Ziploc bag, one containing a tan

TESTIMONY AND PROCEEDINGS                    May 23, 2005
UNITED STATES OF AMERICA v. CLAUDE LEE WOODS

18 (Pages 66 to 69)

Page 66

1  powder and one containing a white crystalline type
2  powder.
3      Q. Two different packaged substances in your
4  exhibit two, my Exhibit #3; is that correct?
5      A. Yes.
6      Q. And did you do an analysis of those
7  substances?
8      A. Yes, I did.
9      Q. And let me go back. Is that the way the
10 exhibit came to you or the evidence came to you? Is
11 it substantially similar?
12     A. Except, again, for the candle seal where mine
13 is now was intact and the methamphetamine was in this
14 plastic bag. And I put it into a -- what we call a
15 substitute bag or a Ziploc bag that we have in our
16 laboratory.
17     Q. What, if anything, did your analysis of those
18 two packages show?
19     A. My analysis showed, with respect to the
20 green -- the substance that was found in the green
21 bag, to contain dimethamphetamine hydrochloride with a
22 purity of 97 percent and a net weight of .45 grams or
23 450 milligrams.
24     Q. Is that for both of the -- is that for the
25 combined substances or --

Page 67

1      A. No. No. For the substance that is on here,
2  the substance that was found in the green bag.
3      Q. And is there another bag in there as well?
4      A. Yes, there is another bag.
5      Q. What did your analysis show of the second
6  bag?
7      A. The second bag, the substance was contained
8  in a plastic bag was found to be to dimethamphetamine
9  hydrochloride with a purity of 88 percent and a net
10 weight of 1.9 grams.
11     Q. So we have in the green bag a purity of 97
12 percent meth; is that correct?
13     A. Correct.
14     Q. And is it accurate to refer to that as ice?
15     A. Yes.
16     Q. And in the second bag, we have a substance
17 that is 88 percent pure; is that correct?
18     A. Correct.
19     Q. Is it correct to identify that substance as
20 ice?
21     A. Yes.
22     Q. Did you -- did you -- and if you did, how --
23 indicate or memorialize your findings?
24     A. I wrote a report, and that report was typed,
25 and I signed that report to reflect my analysis.

Page 68

1      MS. REDMOND: May I approach, Your Honor?
2      THE COURT: Yes, ma'am.
3      Q. I've handed you what's been marked as
4  Government's Exhibit #1 and ask you if you recognize
5  that.
6      A. Yes, I do.
7      Q. What is that, please?
8      A. This is the laboratory analysis report for
9  this case.
10     Q. That's the report that you generated; is that
11 correct?
12     A. Correct.
13     Q. And did you submit the to the department as a
14 final report?
15     A. Yes, I did.
16     Q. And here today while testifying, have you in
17 any way, shape, or form changed or modified any of the
18 facts or findings indicated by that report?
19     A. No.
20     MS. REDMOND: Your Honor, at this time, the
21 Government would move to have admitted into evidence
22 Government's Exhibits #3, #4, and #1.
23     THE COURT: All right.
24     MS. JAMES: No objection, Your Honor.
25     THE COURT: Excuse me?

Page 69

1      MS. JAMES: No objection.
2      THE COURT: All right. Thank you. Be
3  admitted.
4      MS. REDMOND: One moment please, Your Honor.
5      THE COURT: All right.
6      MS. REDMOND: Nothing further of this witness.
7      THE COURT: All right.
8          CROSS-EXAMINATION
9  BY MS. JAMES:
10     Q. Is it Mr. Bravenec?
11     A. Bravenec.
12     Q. Bravenec. My name is Susan James; I
13 represent Mr. Woods. Just a couple of quick
14 questions. You said that in 19 -- I mean 2003, you
15 weren't seeing as much methamphetamine of this
16 quality, correct?
17     A. Correct.
18     Q. But now you say that it's more common, what,
19 two years later that there's more ice or high purity
20 methamphetamine out there, right?
21     A. Correct.
22     Q. And would it be correct that the higher --
23 the higher quality, probably the more desirable; would
24 you --
25     A. Yes.

TESTIMONY AND PROCEEDINGS                        May 23, 2005
UNITED STATES OF AMERICA v. CLAUDE LEE WOODS

Page 70

1    Q. And would it be safe to say if it's a higher
2    quality, the effect is probably more substantial than
3    if it were a lower quality?
4    A. Yes.
5    Q. And what I'm saying, in fact, I'm saying the
6    actual user would -- would probably get a bigger kick
7    out of a 93 percent than a -- than a 50 percent
8    purity.
9    A. Correct.
10   Q. Or it would take less maybe is a better --
11   better term, correct?
12   A. Yes.
13   Q. And have you seen anything during the course
14   of your work -- and let me back up a minute. You said
15   you're at the Dallas lab, correct?
16   A. Correct.
17   Q. But the Dallas lab receives samples, just as
18   you did in this case, from all over the country,
19   right?
20   A. We service the lower seven states. Texas, of
21   course, Oklahoma, New Mexico, Mississippi, Louisiana,
22   Arkansas, and Alabama.
23   Q. Okay. And based on your observations -- and
24   I'm taking you back to 2003 up until today -- is there
25   any correlation between the quantity -- not the

Page 71

1    quantity, but the purity and the, I guess for lack of
2    a better term, source cities? Do you know what I'm
3    referring to? Like certain cities, the metropolitan
4    areas, perhaps, you see more -- higher purity coming
5    out of those areas?
6    A. Back in 2003, I can't recall if that was, you
7    know, seeing larger quantities coming out of the
8    larger cities. I really can't say.
9    Q. Okay. Or the same with regard to purity.
10   You really couldn't say?
11   A. Yes.
12   Q. Okay. When you examined the -- what's now in
13   evidence as Government's Exhibit #3, which you've
14   identified as being the methamphetamine and the
15   quantity of, what, a hundred and --
16   A. 149.1 grams.
17   Q. Okay. Now, this appears to be in a granular
18   type form. Is that the condition it was in when you
19   found it?
20   A. No. It was more in a crystalline form; but
21   to obtain a homogeneous mixture for the quantitation
22   and identification, we grind it up into a powder.
23   Q. So if it -- if it had -- at that time when it
24   came to you, if it were in shards or the little
25   crystal looking things, that would have -- they were

Page 72

1    destroyed by the process?
2    A. Correct.
3    Q. Okay.
4    MS. JAMES: That's all I have. Thank you.
5    THE COURT: All right.
6    MS. REDMOND: I just have one follow-up
7    question.
8    REDIRECT EXAMINATION
9    BY MS. REDMOND:
10   Q. Ms. James asked you if the physicality or the
11   physical appearance of the drug was changed by your
12   testing, and you replied yes; is that correct?
13   A. Yes.
14   Q. Does it change the quality of the drug, the
15   testing that you do?
16   A. No.
17   Q. Does it change the fact that it's ice?
18   A. No.
19   MS. REDMOND: Nothing further. Thank you.
20   THE COURT: All right. Thank you, sir.
21   MS. REDMOND: The Government calls Devin
22   Whittle.
23   DEVIN WHITTLE
24   The witness, having first been sworn to speak
25   the truth, the whole truth and nothing but the truth,

Page 73

1    testified as follows:
2    DIRECT EXAMINATION
3    BY MS. REDMOND:
4    Q. State your name and spell your last name for
5    the record.
6    A. Devin Whittle, D-E-V-I-N, W-H-I-T-T-L-E.
7    Q. And do you work?
8    A. Yes.
9    Q. Where do you work?
10   A. I'm a special agent with the Department of
11   Justice, the Drug Enforcement Administration.
12   Q. What do you do there?
13   A. In a nutshell, we identify and investigate
14   individuals and organizations that are responsible for
15   distribution and manufacture of controlled substance.
16   Q. Are you familiar with a drug methamphetamine?
17   A. Yes.
18   Q. How are you familiar with methamphetamine?
19   A. Through my experience and through my
20   training.
21   Q. What kinds of training?
22   A. Well, I've -- I've had -- I've trained at
23   Quantico at the FBI DEA Academy regarding the
24   identification of drugs.
25   Q. How long have you been working with drugs as

TESTIMONY AND PROCEEDINGS                              May 23, 2005
UNITED STATES OF AMERICA v. CLAUDE LEE WOODS

20 (Pages 74 to 77)

| Page 74 |
|---|

1    a police officer?
2        A. I was a Montgomery police officer for eight
3    years. I spent six of those years in narcotics. And
4    I've been with the DEA now for approximately nine
5    years.
6        Q. Is it fair to say that you have a passing
7    acquaintance with drugs, drug usage, and drug users?
8        A. Yes, that's correct.
9        Q. Is it also fair to say that you have some
10   understanding of the drug trade in general?
11       A. Yes.
12       Q. You are the case agent in a case involving as
13   defendant Claude Woods; is that correct?
14       A. Yes, that's correct.
15       Q. How did you become involved in this case?
16       A. I received a call from Officer Elkins
17   regarding the traffic stop with the amount of drugs
18   that were involved. Officer Elkins was interested in
19   the federal government pursuing charges against the
20   defendant.
21       Q. I apologize. I'm having some trouble hearing
22   you. Can you pull that mike towards you?
23       THE COURT: You tend to sort of drop your
24   voice. You need to get a little closer to the mike or
25   either raise your voice.

| Page 75 |
|---|

1        A. Okay. I'm sorry. Officer Elkins called me
2    as a result of the traffic stop he and Officer Riley
3    made on the defendant. Because of the amount of drugs
4    that were involved in this case, these officers were
5    interested in pursuing federal charges against the
6    defendant.
7        Q. And these are the two officers who have
8    testified from the Dothan Police Department?
9        A. Yes, that's correct.
10       Q. And did you in fact bring charges against
11   Mr. Woods?
12       A. Yes, I did.
13       Q. And those charges are what bring us here
14   today?
15       A. That's correct.
16       Q. You have heard the opening statement of the
17   defense; is that correct?
18       A. Yes.
19       Q. Okay. The evidence that has been seized and
20   that we've been discussing here today, did you take
21   possession of this evidence that's here on the table
22   and that's been placed into evidence?
23       A. Yes, I did.
24       Q. Was it in anybody else's care, custody, or
25   control other than yourself or the chemist to whom you

| Page 76 |
|---|

1    sent it?
2        A. No.
3        MS. REDMOND: Judge, if I may approach for
4    just a moment.
5        THE COURT: All right.
6        Q. Agent Whittle, I have placed Government's
7    Exhibits #6 and #7 before you; is that correct?
8        A. Yes.
9        Q. Can you tell us what #6 is?
10       A. #6 is a white looks like a ballpoint ink pen
11   with a red cap on it.
12       Q. Is that evidence that was given to you by
13   agent -- excuse me -- Officer Elkins in this case?
14       A. Yes, it was.
15       Q. And is it in substantially similar shape as
16   it was when it was given to you?
17       A. Yes.
18       Q. And have you maintained custody and control
19   of that until today?
20       A. Yes.
21       MS. REDMOND: Judge, at this time, we'd ask
22   to have admitted into evidence Government's Exhibit
23   #6.
24       MS. JAMES: No objection.
25       THE COURT: All right. Admitted.

| Page 77 |
|---|

1        Q. Can you tell us what Exhibit #7 is?
2        A. Exhibit #7 is a green zipper pouch that
3    contains two sets of digital scales.
4        Q. And is that evidence that was put into your
5    custody or given to you by the Dothan Police
6    Department?
7        A. Yes.
8        Q. Is it in substantially similar shape as when
9    you received it from the Dothan Police Department?
10       A. It is.
11       Q. And has it been out of your care, custody or
12   control other than possibly for examination until this
13   morning?
14       A. No. I've maintained custody of it.
15       MS. REDMOND: Judge, the Government would ask
16   to have admitted into evidence Government's Exhibit
17   #7.
18       THE COURT: All right. Be admitted.
19       Q. You heard the testimony from the chemist,
20   Mr. Bravenec, as to the amount of drug that he
21   analyzed; is that correct?
22       A. Yes.
23       Q. Okay. And what, if anything, is indicated by
24   the amount of drugs that he analyzed in this case?
25   What does it mean to you as a -- as a trained

TESTIMONY AND PROCEEDINGS                    May 23, 2005
UNITED STATES OF AMERICA v. CLAUDE LEE WOODS

Page 78

1    narcotics officer?
2        A.  Well, the chemist talked about two particular
3    pieces of evidence.  One evidence bag contained two
4    small bags that contained small amounts of
5    methamphetamine, very likely user amounts of
6    methamphetamine.  The other exhibit the chemist talked
7    about contained a large amount of methamphetamine.  I
8    believe it was 149 grams, clearly a distribution
9    amount of methamphetamine.
10       Q.  What makes it a distribution amount to your
11   way of thinking?
12       A.  Well, it was -- according to the chemist's
13   testimony, it was 149 grams.  If you took and rounded
14   it down to 140 grams of methamphetamine at $200 a
15   gram, which is conservative for the purchase of a gram
16   of methamphetamine, that would be $28,000 worth of
17   methamphetamine.
18       Q.  Wait a minute.  You're telling me that that
19   one -- separate and apart from the smaller amounts,
20   the larger amount of meth, this (indicating), is worth
21   how much?
22       A.  $28,000.  And that's a conservative figure
23   because a gram of ice -- and there's a difference
24   between ice and methamphetamine that you've heard.  A
25   gram of ice goes from between $200 to $450 a gram.  So

Page 79

1    $200 is conservative.  $28,000 worth -- worth of
2    meth -- of ice is a conservative figure.
3        Q.  Is it unusual for a user to have that much
4    meth or that much ice?
5        A.  Absolutely.
6        Q.  Is there anything else of the facts or the
7    evidence gathered by the Dothan Police Department or
8    your own agency that would suggest that this is more
9    than a user in possession, but is in fact a
10   distribution case?
11       A.  One, the fact that he has scales, electronic
12   scales.  Users very rarely carry around scales to
13   measure the amounts of meth -- meth they are getting
14   or any other drug because usually it's of small
15   quantities and they purchase it so frequently that
16   they recognize it by sight.  If you're using scales,
17   you're weighing it out for customers.  In addition to
18   that, there were some -- there was some sandwich bags
19   found that are used to break the existing ice down and
20   break it in to separate units that would be measured
21   here with the scales.  And in addition to that, the
22   $2,000 that was found in a safe.  A user would not be
23   in possession of that kind of money, generally.
24       Q.  Why?
25       A.  Well, usually, users -- and it's not an

Page 80

1    absolute; but I would say 98 percent of the time users
2    have spent everything they've got, they're down to
3    nothing, they don't have any money, they've spent it
4    on the drugs they've used.  So for him to be in
5    possession of $2,000 in cash would be unusual.  That
6    would be something you would expect to see from
7    someone who's selling as opposed to someone who's
8    using.
9        Q.  And let me go back for a moment and talk
10   about this cash that's found.  Is there anything
11   that's important or indicative of distribution in the
12   way that the money is found or in where it's found?
13       A.  The fact that it was found in hundred-dollar
14   increments is an indication that -- that he's selling
15   drugs in that increment, which generally could be an
16   ounce at a time that he's selling it.  The fact that
17   it's secured in a safe is an indication that he --
18       Q.  Is an indication -- I'm sorry.
19       A.  Is an indication that he -- he's protecting
20   something that -- that's of value to him.
21       Q.  You did a -- or generated a report based on
22   the facts and the evidence that you were -- that was
23   obtained in this case; is that correct?
24       A.  That's correct.
25       Q.  Let me ask you this.  The $2,000 that's been

Page 81

1    referenced, that's found in a lock box, correct?
2        A.  That's correct.
3        Q.  Are there other moneys that are located or
4    taken in this case?
5        A.  Yes.  I believe there was 300 -- I believe it
6    was $303 found in the defendant's pockets.
7        Q.  So he's got money in his pocket and then
8    separate bound money in a lock box?
9        A.  That's correct.
10       MS. REDMOND:  I don't have anything further
11   at this time.  Thank you.
12           CROSS-EXAMINATION
13   BY MS. JAMES:
14       Q.  Good morning, Mr. Whittle.
15       A.  Good morning.
16       Q.  Basically, your testimony today has been --
17   you've given your opinion about what you think these
18   substances were going to be used for, correct?
19       A.  Based on my experience and training, yes,
20   ma'am.
21       Q.  But it is your opinion?
22       A.  That's correct.
23       Q.  And kind of in your business, sometimes you
24   just have a hunch, don't you, when you see certain
25   things or people react certain ways, right?

TESTIMONY AND PROCEEDINGS                                          May 23, 2005
UNITED STATES OF AMERICA v. CLAUDE LEE WOODS

22 (Pages 82 to 85)

Page 82

1    A.  Sure.
2    Q.  And the best way to confirm a hunch is to do
3  further investigation.  Would you agree?
4    A.  Yes, ma'am.
5    Q.  Okay.  So as this thing sets up, we know that
6  Mr. Woods was stopped in Dothan, 231 going south,
7  right?
8    A.  That's correct.
9    Q.  You know from what Mr. Elkins, Officer
10  Elkins, told you, Mr. Woods said he was going to the
11  beach; a girl was going to be following him and she
12  had gotten lost, correct?
13    A.  That's correct.
14    Q.  Now, you've heard these law enforcement
15  officers testify that the car was weaving, correct?
16    A.  Yes, ma'am.
17    Q.  And that it was apparent to them that
18  marijuana had been used in that vehicle some time
19  recent enough for them to smell it when they
20  approached the car?
21    A.  That's correct.
22    Q.  And it's your understanding that these --
23  these drugs and this evidence that was seized that you
24  took into your possession, that some of it was just
25  sitting there just in plain view?

Page 83

1    A.  Yes.
2    Q.  Okay.  And you would agree with me that folks
3  that are hauling drugs try to be careful enough to
4  avoid law enforcement detection most of the time?
5    A.  Most of the time, yes.
6    Q.  Okay.  Now, you've testified that there was a
7  quantity of methamphetamine that was consistent --
8  that was found in vehicle consistent with personal
9  use?
10    A.  Yes.
11    Q.  Okay.  The larger quantity, however, you said
12  says to you this must have been for sale?
13    A.  Yes, ma'am.
14    Q.  Okay.  And that's based on your experience
15  and what users and sellers normally do?
16    A.  That's correct.
17    Q.  But the evidence in this case, you'll agree,
18  certainly confirms the fact that Mr. Woods was a user,
19  right?
20    A.  Yes, I believe that Mr. Woods was a user.
21    Q.  Okay.  Because we have rolling papers, we've
22  got marijuana seeds, and we've got a little tube that
23  meth folks sometimes uses to snort up the drug, right?
24    A.  Assuming that there's -- that paraphernalia
25  belongs to Mr. Woods, yes, that would be indication.

Page 84

1    Q.  All right.  Well, there's no indication that
2  anyone else on that night of the arrest had any
3  connection to that vehicle or was in the vehicle,
4  right?
5    A.  At least since Columbus, Georgia, yes, ma'am.
6    Q.  Okay.  And the officer -- and, of course,
7  you've been present in the courtroom; so we know that
8  he thought -- Mr. Elkins even memorialized on the
9  report that he thought that Mr. Woods was a drug user,
10  correct?
11    A.  Yes.
12    Q.  Now, to your knowledge, was there any sort of
13  test done on Mr. Woods that night that would have
14  confirmed whether or not he had ingested any sort of
15  controlled substance?
16    A.  No, ma'am, not to my knowledge.
17    Q.  All right.  Now, you've talked about scales.
18  And you say these scales are consistent with folks
19  that sell drugs, not use drugs, right?
20    A.  That's correct.
21    Q.  Would you agree with me that folks that are
22  sophisticated drug users are in fact concerned
23  oftentimes with drug quantities if they're going to be
24  using them to -- to shoot up, to shoot their veins?
25    A.  That's possible, yes, ma'am.

Page 85

1    Q.  I mean, because that could cause -- sometimes
2  that could cause somebody to die if they inject more
3  than they should?
4    A.  Yes, ma'am.
5    Q.  All right.  Now, so that we can kind of break
6  this down, you've talked about all of your experience
7  as a trained drug enforcement agent.  How much is the
8  most you've ever seen someone, a drug -- a heavy
9  drug -- meth user use in a day?  Not that you've
10  actually seen them, but I'm just saying based on your
11  knowledge that you would know.
12    A.  Well, generally, a high from ice will last
13  from 8 to 16 hours; so you're not going to have to use
14  a lot.  And I -- a gram of meth, you can get from 10
15  to 25 hits out of one gram.
16    Q.  All right.  What's an eight ball?
17    A.  An eight ball is an eighth of an ounce.
18    Q.  Okay.  Would that be about 3.5 grams?
19    A.  Yes, ma'am.
20    Q.  Okay.  And someone that has built up quite a
21  tolerance from a long history of meth abuse could
22  tolerate an eight ball a day, couldn't they?
23    A.  An eight ball a day, that would be a lot.
24    Certainly, in your -- certainly, in your --
25  in your travels as a drug enforcement agent debriefing

TESTIMONY AND PROCEEDINGS                          May 23, 2005
UNITED STATES OF AMERICA v. CLAUDE LEE WOODS

23 (Pages 86 to 89)

---

Page 86

1  addicts and sellers, that's certainly not beyond the
2  realm of possibility? It's a lot, but someone could
3  do that, right?
4      A.  I agree. However, I believe that if you had
5  somebody who had built up that tolerance level of
6  methamphetamine, they would be a bag of bones standing
7  beside the road. That's how wasted they would be at
8  that point in their years.
9      Q.  Okay. Well, this was two years ago. Do you
10 know how big Mr. Woods was two years ago?
11     A.  I saw Mr. Woods a few days after his arrest.
12 I would say that he's roughly the same size now he was
13 at the time he was arrested.
14     Q.  Okay. Now, work with me on this for a
15 minute. If a person were using 3.5 grams of
16 methamphetamine per day, 149 grams -- and I'm saying
17 if they used it that much every day, 3.5 grams with
18 its quantity of 149 -- that that could be used up in a
19 period of about 40 days?
20     A.  If you do the math, that's right.
21     Q.  I know you're -- I know you don't want to
22 accept that; but if you do the math, you'll agree with
23 me that that could work?
24     A.  That's right, if you do the math.
25     Q.  All right. And in this particular case, we

---

Page 87

1  know from what Mr. Woods told Officer Elkins he was
2  heading to Panama City down there with -- with a
3  female that was going to travel with him, correct?
4      A.  That's correct.
5      Q.  And you didn't do anything, obviously, in the
6  of your investigation to run the numbers on his phone,
7  did you?
8      A.  Yes, I did. I did not subpoena the numbers
9  specifically, but what I did do is list the numbers.
10 Since there was a lot of Panama City numbers in the
11 cell phone, I faxed them to our Panama City office to
12 agents down there.
13     Q.  Do you have any knowledge as to why that list
14 would not have been provided to me?
15     A.  No. No.
16     Q.  Is that something you've got in your file
17 here today?
18     A.  No, ma'am, I don't. It's just something I
19 wrote down, because it had 850 numbers on it. I sent
20 it to our office. I didn't further that investigation
21 other than that.
22     Q.  Okay. So you're saying that it wasn't even
23 important enough for you to make it part of your
24 official file that you were going to use here in
25 court?

---

Page 88

1      A.  Not as part of my investigation, it wasn't.
2  I thought it was important to the Panama City people.
3  That's why I sent it to them.
4      Q.  All right. Did you -- did you make an
5  inquiry as to -- to whom the numbers belonged?
6      A.  I have since made an inquiry.
7      Q.  No. I'm saying then.
8      A.  No. No, I didn't.
9      Q.  All right. The -- you've testified here
10 today that the value -- or that if a person were
11 buying this purity of methamphetamine, that it would
12 cost, you said, between 200 to $450 an ounce?
13     A.  That's correct. Ice. And there's a
14 difference between methamphetamine and ice.
15     Q.  Okay. But there are some folks that you come
16 in contact with that have really good connections to
17 obtain drugs, don't they?
18     A.  Yes.
19     Q.  And some of these folks that use drugs, I
20 mean, you would agree with me it's just human nature,
21 whether you're a drug addict or you're a shopper at
22 Sam's buying detergent, you want to get the most
23 product for the least amount of money, right?
24     A.  That's true.
25     Q.  So if a person were to have -- an addict have

---

Page 89

1  a source that had good quality drugs and would sell
2  them to them at a cheaper price, that would certainly
3  be something most drug users or drug sellers would
4  want, correct?
5      A.  That's correct.
6      Q.  And in this particular case, given the fact
7  that you're not -- you weren't there and didn't
8  observe where Mr. Woods obtained this controlled
9  substance that was in his vehicle, you wouldn't know
10 how much was paid for it, would you?
11     A.  No, ma'am. I don't know how much Mr. Woods
12 paid for that.
13     Q.  Okay. So, basically, I mean, what you're
14 telling us is based on your training and experience,
15 this is what normally happens, right?
16     A.  That's correct.
17     Q.  And you have been candid enough with us to
18 even use the word, in some reference here, it's not
19 absolute, right?
20     A.  That's right.
21     Q.  In other words, there's some times in life
22 and there are just some times things that don't go
23 according to plan or aren't like they always were,
24 correct?
25     A.  Sure.

TESTIMONY AND   PROCEEDINGS                          May 23, 2005
UNITED STATES OF AMERICA v. CLAUDE LEE WOODS

24 (Pages 90 to 93)

Page 90

1    Q.  Now, methamphetamine, would you agree, is
2  highly addictive?
3    A.  Yes, ma'am, absolutely.
4    Q.  And you've had occasion to investigate
5  clandestine meth labs, correct?
6    A.  Yes.
7    Q.  Now, what we have here that's now in evidence
8  as Government's Exhibit #3, that's not necessarily the
9  type product that you would find somebody out in the
10  woods making in a clandestine lab, is it?
11    A.  That's correct.
12    Q.  But you will agree with me that what -- if
13  folks that are -- are having methamphetamine, those
14  people that possess it that want to use it, they
15  typically want to get their hands on as much as they
16  possibly can, don't they?
17    A.  Yes.
18    Q.  In other words, most of them are consumed --
19  most of the ones you've been associated, the meth
20  users, are pretty consumed with being able to get it
21  and have it when they want it rather than have to go
22  look for it.
23    A.  Depending on their ability to afford it, yes.
24    Q.  Right.  And you made reference to Officer
25  Elkins' desire that the federal government take this

Page 91

1  case because of the quantity.  Do you remember that?
2    A.  Yes, ma'am.
3    Q.  And quantity alone does not determine whether
4  the federal government gets involved in a case, does
5  it?
6    A.  That's correct.
7    Q.  In fact, this methamphetamine could have been
8  a much smaller quantity.  Even if it had been what you
9  say was personal use and the feds -- you could have
10  still brought charges in this case just as if you --
11  similar to what you've done, right?
12    A.  Yes, but that's not generally the case.  We
13  usually like to take bigger cases and deal with people
14  who are trafficking as opposed to users.
15    Q.  Okay.  And in this particular case, you're --
16  well, let me withdraw that.  But you -- you are
17  agreeing, though, that you can -- you've got the
18  jurisdiction and the authority to make a case on a
19  smaller quantity than what happened here?
20    A.  Yes, ma'am.
21    Q.  And you talked about the money that was --
22  was confiscated in this case, and you say that's not
23  typically something that a -- a drug user would have
24  on them.  Is that what you said?
25    A.  Yes, ma'am.

Page 92

1    Q.  And, again, that would be what you routinely
2  see, not what might occur, correct?
3    A.  That's correct.
4    Q.  All right.  And you said that this money
5  being in a safe was also suspicious to you.  Remember
6  that?
7    A.  Yes, ma'am.
8    Q.  Do you remember during the course of the
9  investigation that this was actually referred to as a
10  lock box?  I mean, it wasn't a safe where you had to
11  do a combination, was it?
12    A.  That's right.
13    Q.  And based on the knowledge that you have of
14  the investigation, that was not locked, was it?
15    A.  That's right.
16        MS. JAMES:  May I have a moment, Judge?
17        THE COURT:  Yes, ma'am.
18        (Brief pause)
19        MS. JAMES:  That's all the questions I have
20  of Agent Whittle.
21        THE COURT:  All right.
22        MS. REDMOND:  I just have a few.
23            REDIRECT EXAMINATION
24  BY MS. REDMOND:
25    Q.  Agent Whittle, the 149 grams of ice that are

Page 93

1  bound, they are not bound with the separated, smaller
2  amount; is that correct?
3    A.  That's correct.  The user's amount of
4  methamphetamine was found in a different location than
5  the amount that's being reported as the distribution
6  amount.
7    Q.  The user amount is under the driver's seat
8  and within his immediate sphere; is that correct?
9    A.  Yes.
10    Q.  And he's got the, what, $800 on his person;
11  is that correct?
12    A.  Is it 800 or 300?
13    Q.  And if I'm wrong, I'm sorry.
14    A.  I think it was 300 that was in his pocket.
15    Q.  Okay.  And the 2,000 -- is it 2,000 -- that's
16  found bound together with a rubber band in the lock
17  box is separate even from the user amounts of meth
18  that are found around his area; is that correct?
19    A.  That's correct.
20    Q.  And the -- do you know where in relation to
21  the 149 grams, these baggies -- the Crown Royal bag
22  and the baggies are found?
23    A.  I believe they were both -- all of it was
24  found up under the seat.
25    Q.  The same with the scales?

TESTIMONY AND   PROCEEDINGS                    May 23, 2005
UNITED STATES OF AMERICA v. CLAUDE LEE WOODS

25 (Pages 94 to 97)

Page 94

1    A.  That's correct.
2    Q.  So we've got a separated amount of user, and
3  then we have a 149 grams for distribution?
4    A.  That's correct.
5    Q.  Along with the scales and the baggies?
6    A.  Yes.
7    Q.  Okay.  Are you familiar -- and if you aren't
8  that's fine -- with how a person acts, what their
9  demeanor is, who's a meth user?
10    A.  Yes.
11    Q.  Okay.  Can you tell us what that would be?
12    A.  Hyper, agitated, intoxicated.
13    Q.  Now, you heard the testimony from the
14  officers about when they got him out of the car and
15  initiated the field sobriety test; is that correct?
16    A.  Yes.
17    Q.  And was there anything that they indicated,
18  either then or here today, that suggested that he was
19  in fact inebriated?
20    A.  Yes.  Well, first, the traffic violation,
21  when he -- when he ran off the road, was an indication
22  that he was possibly intoxicated; his behavior, his
23  agitated behavior, once the officers had contact with
24  him.
25    Q.  But, now, let me understand something.  He's

Page 95

1  got an open beer and he's talking on his cell phone
2  while he's weaving; is that correct?
3    A.  That's -- that's correct.
4    Q.  So there's nothing in that, with the
5  knowledge they now have, per se, that suggests that
6  he's drunk, right?
7    A.  Yes, ma'am.
8    Q.  And they do the field sobriety test and it's
9  negative; he's not drunk.
10    A.  Yes, ma'am.
11    Q.  He's ticked off because he's gotten stopped
12  by the police, but that's about it?
13    MS. JAMES:  Objection to the leading, Judge.
14    THE COURT:  That question was leading.
15    MS. REDMOND:  Thank you, Judge.
16    Q.  Is there anything in his demeanor when he's
17  talking to the police that suggests that he's high on
18  meth?
19    A.  It could been either intoxicated on the
20  beverage or the -- on the meth.
21    Q.  Well, let me understand something.
22    A.  Not to the point that he couldn't operate a
23  motor vehicle.
24    Q.  I'm trying to understand, what evidence has
25  been presented here today that says he's a meth user?

Page 96

1    MS. JAMES:  Objection to the -- it's asked
2  and answered about two or three times.
3    THE COURT:  I'll overrule.  This a different
4  witness, as I understand.
5    Q.  What evidence has been presented or what
6  evidence do you have that says he himself is a meth
7  user?  We know he's doing the marijuana, but what
8  about the meth?
9    A.  Well, none specifically.  We have the
10  paraphernalia; but, again, there's no -- there's no
11  solid proof that it actually belongs to -- to the
12  defendant.
13    Q.  When you say paraphernalia, you're talking
14  about that pen?
15    A.  That's right.
16    Q.  That has the sort of substance or residue of
17  meth?
18    A.  That's correct.
19    Q.  And that's found on the passenger side?
20    A.  In the floorboard, yes.
21    Q.  And is there anything at all that puts --
22  other than it being there, that puts that pen up to
23  his lips?
24    A.  No.
25    Q.  Okay.  Now, you had indicated earlier that --

Page 97

1  something about a gram of meth will keep you up for
2  how long?
3    A.  8 to 16 hours.
4    Q.  And a gram -- from a gram -- I keep doing
5  this, but it's really a gram -- you can get how many
6  hits?
7    A.  You can get 10 to 25 hits from a single gram,
8  and that's of ice.
9    Q.  And help me understand something.  You heard
10  the chemist, Mr. Bravenec, describe how the drugs came
11  to him.  And they were in a crystal fashion; is that
12  correct?
13    A.  Yes.
14    Q.  Okay.  How would you use that pen to snort a
15  crystal?  You just suck it up whole?  Is it just
16  something that lodges?
17    A.  Well, it can be ground up, but the thing that
18  you -- you probably should understand about ingesting
19  ice through a pen is obviously it's being snorted
20  through a pen that's being used similar to a straw to
21  snort it.  It's -- it's very damaging to the nasal
22  cavity.  So if you've used -- most people who start
23  out using ice afterwards have to go to starting to
24  shoot it up and do things of this nature because it's
25  so rough on your nose.  It actually eats the tissue

TESTIMONY AND PROCEEDINGS                          May 23, 2005
UNITED STATES OF AMERICA v. CLAUDE LEE WOODS

26 (Pages 98 to 101)

Page 98

1    out of the inside or your nose.  You have frequent --
2    you have frequent nosebleeds and things like that.
3        Q.  So if there was a person who had been using
4    by use of snorting meth for a while, the -- however
5    many -- that Ms. James gave as an example, however
6    many days or hours or amounts, you would expect to be
7    able to physically, looking at that person, tell that
8    they were a user because something would be wrong with
9    their nose area --
10       A.  Absolutely.
11       Q.  -- is that accurate?
12       A.  Yes.  It would eat your nose up, literally.
13       Q.  You said that you saw Mr. Woods roughly two
14   days after his arrest?
15       A.  Yes.
16       Q.  Was there anything about his person that
17   indicated that he was a meth user by way of snorting?
18       A.  No.
19           MS. REDMOND: Nothing further.  Thank you.
20           MS. JAMES: Judge, may I have a follow-up?
21           THE COURT: Sure.  Yes, ma'am.
22               RECROSS-EXAMINATION
23   BY MS. JAMES:
24       Q.  Agent Whittle, there are other ways that meth
25   addicts use and ingest methamphetamine, aren't there?

Page 99

1        A.  Yes, ma'am.
2        Q.  In fact, one common way is they smoke it,
3    right?
4        A.  Yes, it's smoked as well.
5        Q.  They heat it, correct?
6        A.  That's correct.
7        Q.  And in those cases where they heat it,
8    sometimes they have a good bit of waste, don't they?
9        A.  Yes.
10       Q.  In other words, they're burning up some of
11   it.  Some of it's evaporating as opposed to if they're
12   injecting it or snorting it in their nose, correct?
13       A.  That's correct.
14       Q.  And would you agree with me that sometimes
15   people use tubular or cylinder like objects, pens and
16   little glass vases, to actually smoke it?
17       A.  Yes, they do.
18       Q.  And you will agree with me -- you're not a
19   chemist; I know you're a drug -- you're a drug
20   enforcement agent.  But there are in fact -- there are
21   some evidence that people's metabolism and body makeup
22   may impact the reaction they get to drug use?
23       A.  Yes.  Just like with alcohol, your body size
24   determines the effect that it has on you.
25       Q.  So without actually doing a blood test or

Page 100

1    something sophisticated like that, we're speculating
2    as to how much one body could use or need in a day?
3        A.  Yes.
4            MS. JAMES: That's all.  Thank you.
5            MS. REDMOND: I'm sorry.  I just have a
6    couple of follow-ups.
7                REDIRECT EXAMINATION
8    BY MS. REDMOND:
9        Q.  Do have you the pen in front of you?
10       A.  Yes.
11       Q.  Now, you were just asked about smoking the
12   substance; is that correct?
13       A.  Yes.
14       Q.  And you would have to heat the substance; is
15   that correct?
16       A.  That's correct.
17       Q.  Typically, what would you find with a person
18   who was heating a drug to ingest it?
19       A.  When you -- when you have paraphernalia, when
20   drugs are being smoked through tubular things like
21   this, it's usually some kind of metal because,
22   obviously, this plastic is going to melt if you stick
23   a torch to it.  And that the residue inside the tube
24   indicates that it was used for snorting as opposed to
25   smoking.  And, also, inside these tubular-shaped

Page 101

1    objects that they use as pipes, you usually see
2    something consistent with a piece of a brillo pad,
3    which is what they rest the rock on, in this case
4    maybe a shard of ice, so they can smoke it without it
5    going all the way down the tube and up against their
6    lips.
7        Those things are not present here.  That's how
8    you can tell it was not used for smoking.
9        Q.  Okay.  So that's not something that would
10   have been heated and ingested that way?
11       A.  That's correct.
12       Q.  So we have snorting.  We have smoking.  What
13   other ways are there to ingest methamphetamine or ice?
14       A.  Vascular, in the veins.
15       Q.  Which means that you would shoot it up?
16       A.  That's correct.
17       Q.  With a needle?
18       A.  That's right.
19       Q.  And would you expect to see physical evidence
20   of shooting up --
21       A.  Yes.
22       Q.  -- a drug?  What would that be?
23       A.  Well, you would have a syringe.  You would
24   have -- in most cases, it's a spoon, something that
25   they -- some kind of -- something similar to a spoon

TESTIMONY AND PROCEEDINGS
UNITED STATES OF AMERICA v. CLAUDE LEE WOODS

May 23, 2005

Page 102

1    that they melt the drugs down in. They mix it with
2    liquid, heat -- heat source that melt it down so they
3    can pour it in the syringe and shoot it up. And then
4    often you see a band associated with that that's used
5    to tie off the artery, so that when they stick
6    themselves, they don't have mass bleeding.
7    Q.  Any kind of that evidence -- any of that
8    located anywhere in this vehicle?
9    A.  No.
10    Q.  And one last question. Is it possible to use
11    a drug that you're also engaged in distributing or
12    selling?
13    A.  Absolutely.
14        MS. REDMOND: Nothing further.
15        THE COURT: All right.
16        All right. Thank you, sir. You may be
17    excused.
18        MS. REDMOND: Your Honor, at this time, the
19    Government rests.
20        THE COURT: All right. I'm going to excuse
21    the jury now for lunch and ask that you come back,
22    we'll say one o'clock. And at that time, the
23    defendant will have an opportunity to put on any
24    evidence the defense wants to put on. So you're
25    excused now until one o'clock.

Page 103

1            (Jury not present)
2        THE COURT: Anything further?
3        MS. JAMES: Yes, Your Honor. At this time,
4    Your Honor, we would move to judgment of acquittal as
5    to the indictment. And our contention is the
6    Government has failed to prove a prima facie case of
7    distribution. Possession, they've proven, but not
8    distribution.
9        THE COURT: All right. I'll rule on this
10    before -- before one o'clock if I can; but if either
11    of you have any cases on this, what it takes to
12    surmount the issue that is, as you said at the
13    beginning, the only issue in the case, whether this is
14    for distribution or his use, I'll be glad to look at
15    those over the --
16        MS. JAMES: Well, Judge, I don't want to
17    mislead the Court. I mean, I think that -- quite
18    frankly, I mean, I think that the Government can infer
19    from the quantity that there is an intent to
20    distribute. On the other hand, I think -- and we'll
21    deal with it, I guess, in the charge conference; but
22    at the very least, I think that we would be asking for
23    a lesser included of simple possession under 21 U.S.C
24    844 and 844(a).
25        THE COURT: All right. I'll look at -- look

Page 104

1    at any cases you-all have on that over the break.
2        MS. REDMOND: And, Judge, I will submit those
3    to your clerk; but for the record, the Government
4    would put forward that quantity, purity, and value of
5    the substance alone may be sufficient to establish the
6    requisite intent to distribute. That's in United
7    States versus Sanchez, 990 F2d 11 --
8        THE COURT: Wait. Wait. Sanchez and what's
9    the --
10        MS. REDMOND: It is 990 F2d 1169. That's a
11    Fifth Circuit Case. United -- I'm sorry.
12        THE COURT: Uh-huh.
13        MS. REDMOND: United States v. -- and I'll
14    spell this for the Court -- R-E-I-O, hyphen,
15    T-R-E-J-O. That's at 45 F3d 907. That's a Fifth
16    Circuit Court -- Fifth Circuit case, 1995.
17        Additionally, the Government would argue that
18    case law has established that the presence of
19    distribution paraphernalia, such as the scales, pagers
20    or cellular phones, and packaging materials may
21    establish intent to distribute. I will give several
22    sites for that. Unites States versus Tebha,
23    T-E-B-H-A. That's 770 F2d 1454. That's a Ninth
24    Circuit case. There is United States versus Schubel,
25    S-C-H-U-B-E-L, 912 F2d 952; and United States versus

Page 105

1    Bingham, 81 F3d 617.
2        THE COURT: Give me that cite again.
3        MS. REDMOND: United States versus Bingham.
4        THE COURT: No. Just the -- just the number.
5        MS. REDMOND: 81 F3d 617.
6        THE COURT: Thank you.
7        MS. REDMOND: Thank you, Judge.
8        THE COURT: All right. See you back just a
9    few minutes before one, if we can get this done.
10        MS. REDMOND: Yes, sir. Thank you.
11        THE COURT: Thank you. We'll be in recess.
12            (Lunch recess)
13            (Proceedings held in chambers as
14            follows:)
15        THE COURT: The case that we have had time to
16    look over over this break that seems most relevant to
17    your situation, I belive, is the Schubel case. And
18    I'm going to deny the motion at this time. And you
19    can -- of course, I know you will and if you think
20    it's a viable conclusion of all the evidence, you can
21    raise it again. And -- but the Schubel case is
22    very -- on very close facts. It says there is enough
23    on intent to distribute. But I just haven't had time
24    over this one-hour break to read it all that you cited
25    to me. So let's go back in and --

TESTIMONY AND PROCEEDINGS                    May 23, 2005
UNITED STATES OF AMERICA v. CLAUDE LEE WOODS

28 (Pages 106 to 109)

Page 106

1        MS. JAMES:  Judge, just so that you know,
2   we're prepared to rest.
3        THE COURT:  All right.
4        MS. JAMES:  And --
5        THE COURT:  Then we'll take a break, and I'll
6   go over the charge with you.
7        MS. JAMES:  Okay.  And I always ask -- it's
8   been a long time since I've tried a case with you, but
9   I always ask that you get him on the record saying
10  that it's --
11       THE COURT:  Okay.
12       MS. JAMES:  -- knowing and voluntary waiver.
13  Do you want me to do that now?
14       THE COURT:  It might be a good time.
15       MS. JAMES:  Do you want me to question him?
16       THE COURT:  Sure.
17       MS. JAMES:  Would you state your name,
18  please?
19       MR. WOODS:  Claude Woods.
20       MS. JAMES:  Are you the defendant in this
21  case?
22       MR. WOODS:  Yes, ma'am.
23       MS. JAMES:  Have you and I had an opportunity
24  to discuss your opportunity to testify or not to
25  testify if that was your choice?

Page 107

1        MR. WOODS:  Yes, ma'am.
2        MS. JAMES:  And have we discussed the pluses
3   and minuses of doing that?
4        MR. WOODS:  Yes, ma'am.
5        MS. JAMES:  Including the fact that if you
6   testified, your prior record would probably be exposed
7   to the jury?
8        MR. WOODS:  Yes, ma'am.
9        MS. JAMES:  And having considered all of
10  those factors and my advice as well as your own
11  independent decision, what is your decision with
12  regard to whether or not you want to testify?
13       MR. WOODS:  I'm not going to.
14       MS. JAMES:  And is that a decision that
15  you've made freely and voluntarily?
16       MR. WOODS:  Yes, ma'am.
17       MS. JAMES:  Okay.
18       THE COURT:  All right.
19       MS. JAMES:  Do you want me to renew my motion
20  now to save time?
21       THE COURT:  Okay.  Well, I don't know that --
22       MS. JAMES:  Well, I've got to rest on the
23  record.
24       THE COURT:  If that's all of it, it's
25  already --

Page 108

1        MS. JAMES:  That's it.
2        THE COURT:  It's already on the record, I
3   think.
4        MS. JAMES:  Well, I don't know.  I don't want
5   the 11th Circuit to get me -- after I rest, I'll just
6   say I renew my motion, and then we'll know.
7        THE COURT:  All right.  That's fine.
8        MS. JAMES:  Is that good?
9        THE COURT:  That's fine.
10       MS. JAMES:  And then we're going to do charge
11  conference?
12       THE COURT:  Yeah.
13       MS. JAMES:  Okay.
14       THE COURT:  So we'll go in just to excuse the
15  jury and tell them that there won't be any more
16  testimony in this case and -- and that we're going to
17  have a brief conference.
18       MS. JAMES:  Okay.
19       THE COURT:  I hope it's brief.
20            (Proceedings in open court, jury
21            present, as follows:)
22       THE COURT:  At this part of the trial, as you
23  know, they've cross-examined witnesses put on by the
24  Government but they don't have any witnesses of theirs
25  to put on.  So the testimony in the case has now been

Page 109

1   concluded.  The -- I need to meet with the attorneys
2   to go over the applicable law that will apply in this
3   case, and I'm going to hazard a guess that that may
4   take as much as 45 minutes or an hour.  So I'm going
5   to excuse you until two o'clock, at which time we'll
6   come back in here and the lawyers will argue the case
7   to you.  And I will then charge you as to the
8   applicable law, and the case will be submitted to you
9   for your determination determination.
10       So you're excused now until two o'clock.
11  Thank you.
12            (Jury not present)
13       THE COURT:  Why don't we wait about five or
14  ten minutes for her to get the copies of the charge
15  ready, and I'll just bring those out to you.  And
16  you-all read them and then come in and put it on.  And
17  any objections you have to any of it, we'll consider
18  any objections you might have.
19       MS. JAMES:  Judge, I mentioned to you that we
20  were going to have a request for a lesser included of
21  simple possession pursuant to I believe it's 21 U.S.C.
22  844(a).  And if the Court -- I don't want to waste the
23  Court's time.  Is that something you want me to
24  address now so we don't back after --
25       THE COURT:  I'd like -- I'd like to look at

TESTIMONY AND PROCEEDINGS                              May 23, 2005
UNITED STATES OF AMERICA v. CLAUDE LEE WOODS

Page 110

1    whatever law they've got on it and whatever position
2    the Government takes with the respect to it.  I --
3         MS. JAMES:  I have two cases, Judge.
4         THE COURT:  All right.
5         MS. JAMES:  I did not bring the Government a
6    copy.  I usually keep these with me.  The first being
7    Keeble, K-E-E-B-L-E, versus United States.
8         THE COURT:  How do you spell that again?
9         MS. JAMES:  K-E-E-B-L-E.
10        THE COURT:  K-E-E-B-L-E?
11        MS. JAMES:  Yes, sir.  Versus United States.
12        THE COURT:  All right.
13        MS. JAMES:  And that's a Supreme Court case
14   412 U.S. 205, '93, Sup. Ct. 1993.  36 --
15        THE COURT:  Wait a minute.  Wait a minute.
16   412 U.S. 205.  Then you said '93?
17        MS. JAMES:  Right.  I mean, it's got all the
18   cites here.  I mean, we've got the U.S. cite, and
19   we've got those.
20        THE COURT:  Well, just give me the -- the --
21   just give me the U.S.
22        MS. JAMES:  That's 412 U.S. 205, Judge.
23        THE COURT:  All right.
24        MS. JAMES:  And then that case in particular
25   held that the defendant is entitled to an instruction

Page 111

1    on a lesser included offense if the evidence would
2    permit a jury rationally to find him guilty of the
3    lesser offense and acquit him of the greater.
4         And then, Judge, the other case that I would
5    rely on is Schmuck, S-C-H-M-U-C-K, versus United
6    States.  And that's found at 489 U.S. 705.
7         THE COURT:  705.  All right.
8         MS. JAMES:  Yes, sir.  And they -- in the
9    Schmuck case, it's -- they pretty much define what is
10   required to find a lesser included.  And they say to
11   be necessarily included in the greater offense, the
12   lesser must be such that if it is impossible to commit
13   the greater without first having committed the
14   lesser.  And it's pretty clear in this case that the
15   first element that they've got to prove is that he
16   possessed it.  And so I think it does meet the Schmuck
17   test.  And I think that there is ample evidence in
18   this case from which the jury could conclude that it
19   is a simple possession case.  Although the Government
20   is going to argue.  And it's a question for the jury,
21   quite frankly.  And the Government will argue
22   quantity, and we'll argue all the evidence that's
23   supported our position.
24        THE COURT:  What is the position of the
25   Government with respect to the lesser included

Page 112

1    offense?
2         MS. REDMOND:  Judge, I think -- and so that
3    the record is clear, this is the first that the
4    Government has been made aware of the fact that a
5    lesser included was going to be requested.  844 -- and
6    it's 21-844 -- does not contemplate a possession of
7    methamphetamine as a simple possession.  I believe
8    that it specifically references crack cocaine, and it
9    is I believe less than five grams.  So in this case,
10   the amount would not allow it to be a lesser included
11   as well the drug itself, that being methamphetamine.
12   And that's without having 844 in front of me, Judge;
13   but I think in reading that statute, it is not
14   applicable in this case.  And we --
15        THE COURT:  Tell me what -- you mentioned
16   844.  What are you talking about?  Title -- is that
17   the title?
18        MS. REDMOND:  Title 21, Section 844, is the
19   simple possession that I believe Ms. James is using
20   for the -- for the lesser included charge.
21        THE COURT:  All right.
22        MS. JAMES:  Judge, my position on that,
23   number one, I have precedent.  I had Judge Varner give
24   me a charge on this once before.  I had Judge Granade
25   down in Mobile gave me this charge.  I had it with a

Page 113

1    judge in Chattanooga.  And it does not -- my reading
2    of the statute simply does not preclude consideration
3    in a meth case.
4         Now, there is reference to -- and she and I
5    argued this before Judge Thompson in the Reese case.
6    There is some carving out about crack and certain
7    elements that have to be met.  In other words, if they
8    have a prior and things like that.  But there's no
9    reading here that would suggest that it would be
10   inappropriate in a meth case; but probably the Court
11   needs to read it since we're disputing it.
12        THE COURT:  All right.  You're talking about
13   the Schmuck case primarily?
14        MS. JAMES:  Well, and the Keeble case, which
15   says that we're entitled to it if there is any
16   evidence that the jury could find.
17        THE COURT:  Okay.  All right.
18        MS. JAMES:  And if you want me to rehash the
19   evidence, I will.  I know you listened.
20        THE COURT:  No.  I think I got the -- that
21   aspect of it all right.  So thank you.  And I'll let
22   you know on it.
23        (Brief recess)
24        (Jury present)
25        MS. JAMES:  Your Honor, at this time, the

TESTIMONY AND    PROCEEDINGS                    May 23, 2005
UNITED STATES OF AMERICA v. CLAUDE LEE WOODS

30 (Pages 114 to 117)

Page 114

1    defendant will rest.
2        THE COURT: All right. Thank you.
3        Now the case is with the attorneys to argue
4    the case. The Government will proceed first.
5        MS. REDMOND: Thank you, Judge, counsel.
6        Thank you for staying with us today. Thank
7    you for listening intently. And I noticed that all of
8    you were. Although, you-all have switched on me, so
9    now I'm messed up.
10       We are here today on a case. One element is
11   already satisfied. We know he possessed that
12   methamphetamine. So the question for you-all to
13   decide is why did he have that huge amount of meth.
14   They're going to argue that it was for personal use.
15       Let me just say this. A laborer has in
16   excess of $28,000 worth of methamphetamine separated
17   out from a use amount. With that $28,000, he also has
18   $2,000 separated out from the money that's on his
19   person.
20       Remember I told you the evidence comes two
21   ways. One is direct, which is I saw it, I know what
22   I saw, or I have it on tape; and circumstantial: I
23   use my common sense; and from everything that is
24   taking place, I can pretty much determine what's
25   happening.

Page 115

1        Here's an example of circumstantial. You
2    have a little kid who has crumbs and chocolate all
3    over his face. There's a cookie jar, and the lid is
4    off of it. Did you see him eat the cookie? No. But
5    you can guess, you can assume, you can make that leap
6    of logic that that little kid ate the cookie from the
7    cookie jar. You look at everything there is in the
8    circumstance, and it tells you.
9        And what I'm saying to you is the amount of
10   meth, the purity of meth -- let me just go here for
11   just a second. The use amounts of meth that he had on
12   the driver's side cannot come from that separate 140
13   plus grams. And here's how you know this. If in fact
14   they were all from the same batch, they would all be
15   the same purity. And remember that we have three
16   different purities. And that's in this report, which
17   you'll have back there with you. We have 93 percent
18   strength, 97 percent strength, and 88 percent
19   strength. So it can't all come from the same batch
20   because it would have the same purity.
21       So the question is, why does he have it? And
22   why does he have scales? And why does he separately
23   bound money? And why does he have the individual
24   baggies? And it's all of those things that the expert
25   will tell you that's what shows you that he's going

Page 116

1    down, wherever he's going, and he's going to
2    distribute that product.
3        Now, I'm going to come back after defense
4    counsel, Ms. James, speaks with you. And I'm going to
5    do a further summation; but while she's talking, I
6    want you to remember and think and use your common
7    sense about everything you heard from that stand, from
8    the four people who testified.
9        Thanks for your time.
10       MS. JAMES: May it please the Court, opposing
11   counsel, again, ladies and gentlemen, this is my last
12   opportunity to speak with you. And if some of you are
13   like me, you always want to have the last word.
14   Unfortunately, the rules don't provide for that.
15       So she's going to get up and say things that
16   I would certainly love to respond to. So you'll
17   just -- in the short time you've known me, you'll just
18   have to guess what I would have said; but rest assured
19   that I would have a comment.
20       Again, it's been a short trial. And that's
21   good for you because you get to go home to your
22   families; but it's, nevertheless, very, very
23   important. And it's important for all parties as I
24   told you earlier.
25       Now, I told you earlier this morning that

Page 117

1    there would be no dispute that Claude Woods was in a
2    vehicle, Highway 231, heading south towards Panama
3    City in August of 2003; and that when he was stopped
4    on a routine traffic stop, weaving, talking on his
5    cell phone, with a Smirnoff Ice between his legs and
6    the smell of marijuana in his car, that he was asked
7    to step out of the car; a search was done of the car;
8    and in that car was close to 150 grams of very, very
9    good quality methamphetamine. There's no dispute
10   about that. There's no point in us arguing and
11   wasting your time and the Court's time on something
12   that is just clearly a fact.
13       But let's look -- and so the Government is
14   going to meet element number one that you would have
15   to find to establish guilt beyond a reasonable doubt
16   as to the charge in the indictment. Here's where the
17   problem lies. The rub comes here. The Government has
18   to prove to you beyond a reasonable doubt -- the Court
19   is going to tell you in its charge that a reasonable
20   doubt is information, let's say, that you wouldn't
21   hesitate to rely on in the most important of your
22   affairs. In other words, you're that sure about what
23   you're hearing that you could make a decision based on
24   what you've heard.
25       Now, this is my opportunity to tell you

TESTIMONY AND PROCEEDINGS                    May 23, 2005
UNITED STATES OF AMERICA v. CLAUDE LEE WOODS

Page 118

1  pretty much what I think the evidence has shown. Now,
2  it's up to you folks when you go back there to decide
3  collectively what you think the evidence has shown.
4  The Judge is going to tell you it doesn't matter what
5  the lawyers say, but this is a chance for us to give
6  you that roadmap.
7      What the Government has not proven is that
8  there was an intent to distribute those drugs beyond a
9  reasonable doubt. Now, we know for certain we have
10  evidence of drug use. And you could tell through my
11  cross-examination of the officers, the people that
12  were there. Be reminded Devin Whittle with the DEA
13  was not there; but the two officers that were there,
14  Officer Elkins and Officer Riley, Officer Elkins faced
15  with the recovery of this bag of methamphetamine --
16  even faced with that, what did he say? And remember
17  his exact words. He said -- I said, you put on your
18  form drug user. Why did you do that? And he goes,
19  based on what I found in the car. Well, he found just
20  what they say, and this is their speculation that what
21  was beside the seat was personal use and what was in
22  the back was for distribution. He said drug user.
23      We have in evidence the straw that they use
24  to snort the stuff. We've got seeds of marijuana on
25  the floor, and we've got recently burned marijuana in

Page 119

1  the vehicle.
2      Now, the Court is going to tell you in its
3  instructions that Claude Woods has no obligation to
4  put on a witness, to put himself on the stand or
5  anything else. And I submit to you the Court is going
6  to tell you the fact that he didn't testify is
7  something that you should not consider, but I'll take
8  it a step further and submit to you he didn't need to
9  testify. Because by his plea of not guilty, he has
10  said to you, I am not guilty of the charges in this
11  indictment.
12      What the evidence in this case is going to
13  show, however, is that he is guilty of something. He
14  is guilty of something. And the Judge is going to
15  give you another option. He's going to allow you in
16  your verdict form and in your deliberations to
17  consider another charge, another offense for which we
18  concede he is guilty. And that is simple possession
19  of methamphetamine.
20      Now, that, we contend, is what the evidence
21  in this case has shown you beyond a reasonable doubt.
22  And that is that he was in the vehicle with these
23  controlled substances and that he was deemed by law
24  enforcement a drug user.
25      Now, when Ms. Redmond -- she and I, this

Page 120

1  isn't our first rodeo. We've been in courtrooms like
2  this before together. And we anticipate what each
3  other is going to say. And again she gets -- she gets
4  the last say. So I'm going to anticipate some of the
5  things she's going to say. And she's going to say,
6  well, we've got the scales; be reminded we found the
7  baggies, the sandwich baggies. She's already told you
8  we found the money, we found that in a lock box.
9  Well, we know that it wasn't a locked safe; it was a
10  box that was open.
11      But you know what else? We don't know what
12  else was in the car. Be reminded that Officer Riley
13  said there were so many clothes in the car that you
14  couldn't -- couldn't hardly see in there. He said
15  something to that effect. They've got no inventory,
16  so we don't know what was in there. But what we do
17  know, uncontroverted, undisputed, was that on August
18  the 13th of 2003, Claude Woods was in a car on his way
19  to Panama City talking on the cell phone to a girl
20  that was going to go with him or meet him there, who
21  had gotten lost on her way, lost, and wanted him to
22  come back to Columbus to get her.
23      Mr. Whittle says, well, you know, 3.5 grams
24  is a lot for somebody to do, an eight ball; but we
25  don't know what his metabolism is. We don't know how

Page 121

1  long he's been using drugs. We don't know how he was
2  ingesting the drugs. Could he have been smoking these
3  drugs when he got down there? There's waste with
4  that.
5      And if you do the math -- Agent Whittle
6  agreed with me. If you do the math, it could have
7  lasted for about a month. Now, we know this. It's
8  just like all of us, whether you're buying detergent
9  as I asked them, you're buying detergent, you're
10  buying shoes, you're buying groceries, you want to get
11  the best for your buck. And they all -- even Agent
12  Whittle said he didn't know where he got the money to
13  get the drugs. He doesn't know how much the drugs
14  cost.
15      Now, he's estimated to you that this is some
16  $28,000 worth of drugs for a common laborer. I submit
17  to you we don't know that. But what we do know is
18  that if he were using an eight ball a day and he was
19  going to Panama City with all those clothes, including
20  a stereo system in his trunk, we don't know how long
21  he was going to be in Panama City. Any of you that
22  have been down that way recently knows it wouldn't
23  take you too long, if you were going to stay in Panama
24  City or one those beach areas, to spend $2,000.
25      Let me tell you what the Government's

TESTIMONY AND PROCEEDINGS                    May 23, 2005
UNITED STATES OF AMERICA v. CLAUDE LEE WOODS

32 (Pages 122 to 125)

Page 122

1  evidence is in this case. Oh, and by the way, the
2  scales, even Agent Whittle admitted that those could
3  be used by a user, particularly someone that was going
4  to use it intravenously because of the possibility of
5  an overdose.
6        Now, what we have here is we have the agents
7  telling us what happened on the stop, uncontroverted.
8  That would be Riley and that would be Elkins. What we
9  have here is a forensic scientist who came in from
10 Dallas, and he says this is high quality
11 methamphetamine. The better the quality, the more
12 kick you get. And Ms. Redmond is going to say that's
13 true, the more kick you get, the less you've got to
14 use. And I submit to you we have nothing before you
15 that says how much a person has to use depending on
16 their size other than people have certain tolerances,
17 certain weight can affect how it affects them.
18       But what we have here, to corroborate the
19 Government's case wherein they ask you to find him
20 guilty beyond a reasonable doubt as to the charge in
21 the indictment that they made, that he possessed it
22 and that he possessed with intent to distribute -- we
23 have no sales. We don't have sales. We don't have
24 anything that happened before it got in the car. We
25 don't have anything after it got in the car. All we

Page 123

1  have is the possession.
2        What the Government uses as their evidence to
3  tell you that it is more, that he possessed with the
4  intent to distribute it, is Agent Whittle. And I credit
5  frankly, he's a trained law enforcement officer; and
6  he did exactly what you would expect any case agent
7  for the Government to do. We know he's not going to
8  get on the stand and say, you know, send him home. I
9  mean, that's -- that's not -- that's not what his job
10 is. But what he did do was give you his opinion. And
11 I submit to you that's all it was, was his opinion,
12 based on his experience and based on his training.
13       But notice the words he used. And I credit
14 him for this because he knew he couldn't get up there
15 and say 100 percent I know; because, quite frankly, he
16 doesn't know. He's speculating as to what this was
17 used for based on the quantity, based on the scales,
18 and based on the baggies. But he continued to use
19 words such as "usually", "rarely", "not absolute."
20 Those are words that he used. And I submit to you
21 therein is your reasonable doubt.
22       This isn't a case where I'm saying to you
23 give him a clean slate, let him go. I'm asking you
24 to -- if you're going to convict him, convict him of
25 what he's guilty of. And that is possession of

Page 124

1  methamphetamine, simple possession by a user.
2        Now, Ms. Redmond -- my last thing I'm going
3  to suggest is Ms. Redmond is probably going to stand
4  up and say, well, naturally, she wants you to convict
5  him of something less than what he's charged with.
6  You know, that's why she's up there conceding that. I
7  submit to you I'm asking you to convict him.
8        This is a drug case. It's an important
9  case. And I know that that's something everybody is
10 concerned with. But it's no different than any other
11 case that you might be called upon to decide as
12 jurors. And it's that important. And if the evidence
13 isn't here, you can't convict him of what he's charged
14 with. So I'm saying to you, do what's right, do
15 what's fair, consider the evidence, consider the lack
16 of evidence in this case. And I submit to you if you
17 do that, when the Court gives you the instruction of
18 the lesser included offense, that's where you'll end
19 up; because in this case, the Government has the
20 burden of proof, and it's beyond a reasonable doubt.
21       And I told you a few hours ago and I'm
22 telling you again and I'm asking you. I'm asking you
23 to follow the Court's -- follow the law. When you
24 compare them with the facts, that is the only just
25 verdict in this case. And I appreciate your time.

Page 125

1        MS. REDMOND. Okay. We know he has
2  methamphetamine. The question is why does he have
3  it? And, quite honestly, we've all made some
4  assumptions. We have assumed that he's a drug user.
5  We've assumed -- and let me go back. Because he is a
6  drug user. But we've assumed that he's a user of
7  meth. There is nothing from what you heard that says
8  he is a meth user. There's a smell of burned
9  marijuana in the car, so he smokes marijuana. But are
10 there crystals? Is there powder spread out in the
11 car? The one thing that we have that suggest maybe
12 that he's a drug user is that hollowed-out pen that
13 has the trace amounts of methamphetamine.
14       But here's the problem. If you're a meth
15 user, everyone will know you're a meth user. The
16 smell, the physical deterioration of your body tells
17 people you are a meth head. That's what you are.
18 You're a drug user. Because meth destroys the body
19 and the mind. And to be able to use that amount that
20 has been suggested, not from the stand but from
21 Ms. James throwing that out, the eight ball, the
22 3.5 -- and I hate saying this because I'm standing
23 here talking to you. What attorneys say is not
24 evidence. It's argument.
25       There is no evidence he's a meth user. There

TESTIMONY AND PROCEEDINGS                    May 23, 2005
UNITED STATES OF AMERICA v. CLAUDE LEE WOODS

33 (Pages 126 to 129)

Page 126

1  is evidence that he distributes meth. Okay? And,
2  yeah, I want you to convict him of what he's guilty
3  of. And what he's guilty of is distributing. Now, we
4  didn't say he's selling. We said he's distributing.
5  Although, the $2,000 that's separated out and the
6  baggies and the scales tells you, yeah, it's money;
7  that's what he's selling the product for. It's money.
8         And he's going down to Panama maybe. We
9  don't know. Because the only information, how that
10  comes to them, is that what he tells the cops. We
11  don't know where he's going. We don't know if he's
12  stopping off in Dothan. We don't know any of that.
13  We don't know that he is in fact talking to some girl
14  who's lost in Columbus, who's following him down to
15  the beach. That's what he tells the cops, but nobody
16  can verify that. But he's talking on the phone,
17  drinking a beer, driving down the road; and when they
18  pulled him over -- or I should say when he finally
19  stops, he's not talking to anybody on the phone. And
20  then the beer is poured out.
21         And the seeds -- the marijuana seeds are on
22  the floor. That's how we know he's using because
23  that's the only indication of drug use. Everything
24  else is pushed to the side and tucked down.
25         They want you to buy into this, I'm a drug

Page 127

1  user. I'm a drug user, but I don't ever give the drug
2  away. I don't ever get anybody else involved in it.
3         Don't buy into it. Please don't buy into it.
4  There is no reason to doubt that that man is a drug
5  dealer. There isn't. Convict him of what he's guilty
6  of. Take away his money and take away his drugs. Use
7  your common sense. He's not a drug user; he's a drug
8  dealer. And everything that's in that car and
9  everything that's not in that car -- because you
10  better believe it. If they had found the heating
11  element, if they had seen the tracks, if they had
12  found the hypodermic needles, it would have all been
13  right here. It's not here because he's not a user.
14  He's not a user. He sells drugs.
15         Please convict him of possession with intent
16  to distribute. Thank you.
17         THE COURT: Ladies and gentlemen, now that
18  you've heard the closing arguments of the attorneys,
19  it's my job to instruct you as to the applicable law.
20  And when I am finished, you'll be excused to go to the
21  jury room to begin your deliberations.
22         It will be your duty to decide whether the
23  Government has proved beyond a reasonable doubt the
24  specific facts necessary to find the defendant guilty
25  of the crimes charged in the indictment. You must

Page 128

1  make your decision only on the basis of the testimony
2  and the other evidence presented during the trial.
3  And you must not be influenced in any way by either
4  sympathy or prejudice for or against the defendant or
5  for or against the Government.
6         You must follow the law as I explain it to
7  you whether you agree with the law or not and follow
8  all of my instructions as a whole. Don't single out
9  or disregard any of the Court's instructions on the
10  law.
11         Now, the indictment or formal charge against
12  any defendant, as I mentioned to you just a few hours
13  ago in the preliminary instructions, is not evidence
14  of guilt or evidence of anything. Every defendant is
15  presumed by the law to be innocent. The law doesn't
16  require a defendant to prove his innocence or to
17  produce any evidence. And if a defendant elects not
18  testify, you cannot consider that in any way during
19  your deliberations.
20         The Government has the burden of proving a
21  defendant guilty beyond a reasonable doubt. And if it
22  fails to do so, you must find the defendant not
23  guilty. Now, that's why the Government's burden of
24  proof is a strict or heavy burden. It is not
25  necessary that a defendant's guilt be proved beyond

Page 129

1  all possible doubt. It is only required that the
2  Government's proof exclude any reasonable doubt
3  concerning a defendant's guilt.
4         What is a reasonable doubt? It's a real
5  doubt based upon your reason and common sense after
6  careful and impartial consideration of all the
7  evidence in the case. Proof beyond a reasonable doubt
8  has been defined as proof of such a convincing
9  character that you would be willing to rely and act
10  upon it without hesitation in the most important of
11  your own affairs. If you're convinced that the
12  defendant has been proven guilty beyond a reasonable
13  doubt, by your verdict say so. If you are not so
14  convinced, by your verdict say so.
15         Now, as I said earlier, you must consider
16  only the evidence that's been admitted into the case.
17  Evidence, of course, includes the testimony of the
18  witnesses and the exhibits admitted in the record.
19         Remember once again that anything the lawyers
20  say is not evidence. It is your own recollection and
21  interpretation of the evidence that is controlling.
22  What the lawyers say is in no way binding upon you.
23         Also you should not assume from anything that
24  I have said during the course of this trial that I am
25  giving you any opinion. My opinion concerning the

TESTIMONY AND PROCEEDINGS                    May 23, 2005
UNITED STATES OF AMERICA v. CLAUDE LEE WOODS

34 (Pages 130 to 133)

Page 130

1   issues in the case -- as I told you, I'm hearing this
2   evidence for the first time the same way you're
3   hearing it for the first time.  But I don't have the
4   job you have of deciding what the true facts of the
5   case are.
6          Now, in considering the evidence you can make
7   deductions and reach conclusions which your reason and
8   common sense lead you to make.  And you should not be
9   concerned about whether the evidence is direct or
10  circumstantial.  Direct evidence is the testimony of
11  one who asserts actual knowledge of the facts, such as
12  an eyewitness.  Circumstantial evidence is proof of a
13  chain of facts and circumstances tending to prove or
14  disprove a fact in dispute.  The law makes no
15  distinction between the weight you should give to
16  direct or circumstantial evidence.
17         Now, in saying that you must consider all of
18  the evidence, I don't mean that you must accept all
19  the evidence as true or accurate.  You should decide
20  whether you believe what each witness had to say and
21  how important that witness's testimony was.  In making
22  that decision, you may believe any witness in whole or
23  in part.  Also, the number of witnesses testifying
24  concerning any particular dispute is not controlling.
25         In deciding whether you believe or do not

Page 131

1   believe a witness, I ask -- I suggest that you may
2   wish to ask yourself a few questions.  Did the witness
3   impress you as one who was telling the truth?  Did the
4   witness have any particular reason not to tell the
5   truth?  Did the witness have a personal interest in
6   the outcome of the case?  Did the witness seem to have
7   a good memory?  Did he have the opportunity and
8   ability to observe accurately things about which he
9   testified?  Did the witness appear to understand the
10  questions clearly and answer them directly?  Did the
11  witness's testimony differ from other testimony or
12  from other evidence?
13         Now, in this case, certain persons were
14  qualified as an expert to give their opinion about
15  certain things, like the -- what type of drug was
16  found and so forth.  Where knowledge of a technical
17  subject matter might be helpful to the jury, a person
18  having special training or experience in that
19  technical field is permitted to state an opinion
20  concerning those technical matters; but merely because
21  a witness has expressed an opinion does not mean that
22  you must accept that opinion.  The same as with any
23  other witness.  It's up to you to decide whether to
24  rely on it.
25         Now, up to this point, I have given you

Page 132

1   substantially the charges I give in every criminal
2   case.  There may be some variance because of the
3   nature of the offense that's been charged, but this is
4   what we call the boilerplate instructions in a
5   criminal case in federal court.  Now let me talk to
6   you for a just a few minutes about the charges in this
7   case.
8          The indictment charges one offense called a
9   count.  Count one of the indictment charges -- and it
10  will go into the jury room with you -- that on or
11  about the 14th day of August, 2003, in Dothan,
12  Alabama, in the Middle District of Alabama, Claude Lee
13  Woods, defendant herein, did knowingly and
14  intentionally possess with intent to distribute 50
15  grams or more of methamphetamine, a Schedule III
16  controlled substance in violation of Title 21 United
17  States Code Section 841(a)(1).  Title 21, Section
18  841(a)(1), makes it a federal crime or offense for
19  anyone to possess a controlled substance with intent
20  to distribute it.  Methamphetamine is a controlled
21  substance within the meaning of the law.
22         The defendant can be found guilty of that
23  offense only if all the following three things are
24  proven: one, that the defendant knowingly and
25  willfully possessed methamphetamine as charged; and,

Page 133

1   two, that the defendant possessed the substance with
2   the intent to distribute it; and, three, that the
3   weight of the methamphetamine possessed by the
4   defendant was in excess of 50 grams as charged.
5          To possess with intent to distribute simply
6   means to possess with intent to deliver or transfer
7   possession of a controlled substance to other persons
8   or person with or without any financial interest in
9   the transaction.
10         The law recognizes several kinds of
11  possession.  A person may have actual possession or
12  constructive possession; he may have sole possession
13  or joint possession.  But a person who knowingly has
14  direct physical control of something is then in actual
15  possession of it.  The person who is not in actual
16  possession but who has no -- the power or intention to
17  later take control over something either alone or
18  together with someone else is deemed to be in
19  constructive possession.  If one person alone has
20  possession of something, that possession is known as
21  sole possession.  If two or more persons share
22  possession, such possession is joint.
23         You will note that the indictment charges
24  that the offense was committed on or about a certain
25  date.  The Government doesn't have to prove the

TESTIMONY AND PROCEEDINGS                    May 23, 2005
UNITED STATES OF AMERICA v. CLAUDE LEE WOODS

Page 134

1    certain, exact date of the alleged offense. It's
2    sufficient that the Government prove beyond a
3    reasonable doubt that the offense was committed on a
4    date reasonably near the date alleged in the
5    indictment.
6        The word "knowingly" as that term is used in
7    the indictment or in these instructions means the act
8    was done voluntarily and intentionally and not because
9    of mistake or accident. "Willfully" as that term is
10   used in the indictment or in these instructions means
11   the act was committed voluntarily and purposely with
12   the specific intent to do something the law forbids;
13   that is, with a bad purpose, either to disobey or
14   disregard the law.
15       In some cases, the law which a defendant is
16   charged with breaking actually covers two separate
17   crimes. One is more serious than the second, and the
18   second crime is generally called a lesser included
19   offense. So in this case, with regard to the offense
20   charged in count one, if you should find the defendant
21   not guilty of that crime as defined in these
22   instructions, you should then proceed to decide
23   whether the defendant is guilty or not guilty of the
24   lesser included offense of simple possession of a
25   controlled substance.

Page 135

1        The lesser included offense would consist of
2    proof beyond a reasonable doubt of all of the facts
3    stated before as necessary to a conviction under count
4    one except the element of intent to distribute. If
5    you found the defendant was guilty under count one,
6    then you wouldn't need to consider the lesser included
7    offense; but if you -- if it's the other way around,
8    you would need to consider the lesser included
9    offense. That's a little bit confusing. I'm trying
10   to state it twice.
11       I caution you, members of the jury, you're
12   here to determine from the evidence whether the
13   defendant is guilty or not guilty. Also, the question
14   of punishment should never be considered by the jury
15   in any way in deciding the case. If the defendant is
16   convicted, the matter of punishment is for the Court
17   to determine after studying a presentence report.
18       Now, some final instructions. Any verdict
19   you've reached in the jury room, either guilty or not
20   guilty, must be unanimous. In other words, to return
21   a verdict, you must all agree to it. Your
22   deliberations will be secret. You will never have to
23   explain your verdict. It is your duty as jurors to
24   discuss the case with one another in an effort to
25   reach an agreement if you can do so. Each of you must

Page 136

1    decide for yourself, but only after full consideration
2    of the evidence with the other members of the jury.
3    While you're discussing the case, do not hesitate to
4    reexamine your opinion and change your mind if you
5    become convinced that you were wrong; but do not -- do
6    not give up your honest beliefs solely because others
7    may think differently or merely to get the case
8    concluded.
9        Remember, in a very real sense, you are the
10   judges. You are the judges of the facts. Your only
11   interest is to seek the truth from the evidence in
12   this case. When you faithfully discharge this
13   obligation, you move us closer to our ideal, to make
14   the courtroom a temple of justice.
15       When you go into the jury room, you should
16   first select one of your members to act as your
17   foreperson who will preside over your deliberations
18   and will speak for you in any communications you find
19   it necessary to have with the Court.
20       Forms of the verdict have been prepared for
21   your convenience. You will take the verdict form to
22   the jury room. And when you've reached a unanimous
23   agreement, have your foreperson fill in the verdict
24   form, date, and sign it and then return to the
25   courtroom. If you should desire to communicate with

Page 137

1    the Court at any time, please write down your message
2    or question and pass the note to the marshal, who will
3    bring it promptly to my attention. I will respond as
4    promptly as possible, either in writing or by having
5    you return to the courtroom so that I can speak with
6    you directly.
7        I caution you, however, with regard to any
8    message or question you might send in, you should not
9    tell me if there's any numerical division on the jury
10   or what that might be. I say that because the first
11   case I ever tried 25 years ago, that's what happened.
12   So I've been giving that instruction ever since.
13       These written instructions will be provided
14   for you during your deliberations, but they do not add
15   anything to the oral charge. They're just there
16   because I know the language that lawyers and judges
17   sometimes talk in is not the everyday language of the
18   jurors, and they're here in case you want to make some
19   reference to these written instructions.
20       So I'm now going to ask you to step out of
21   the courtroom just long enough for me to give the
22   lawyers an opportunity to make any objection to the
23   charges I have given. So you're excused now for just
24   a moment.
25                (Jury not present)

TESTIMONY AND PROCEEDINGS                          May 23, 2005
UNITED STATES OF AMERICA v. CLAUDE LEE WOODS

36 (Pages 138 to 141)

Page 138

1    THE COURT: Anything from the Government or
2    the defendant?
3        MS. REDMOND: Judge, the same objection to
4    the lesser included offense charge being given.
5        THE COURT: All right.
6        MS. JAMES: Judge, if I heard the Court
7    correctly, in these -- our pages are not numbered; but
8    in the section where you have substantive offense and
9    you gave them the elements for Title 21 United States
10   Code 841(a), right before you listed those three, I
11   think the Court omitted beyond a reasonable doubt.
12   What I heard the Court say was the defendant can be
13   found guilty of that offense only if the following
14   facts are proven, and the Court did not say beyond a
15   reasonable doubt. And then you went into those three
16   elements.
17       THE COURT: Can you go back and find that for
18   me?
19           (Brief pause)
20           (Jury present)
21       THE COURT: In giving the charge, I stated to
22   you that the defendant could be found guilty of the
23   offense only if the following facts are proved, and I
24   stated what the three facts were. That is, the
25   defendant knowingly and willfully possessed

Page 139

1    methamphetamine as charged; that the defendant
2    possessed a substance with the intent to distribute
3    it; that the weight of methamphetamine possessed by
4    the defendant was in excess of 50 grams as charged.
5    But in the written instructions, I added -- I had also
6    said they had to be proved beyond a reasonable doubt.
7    I don't think I said it verbally. It is in the
8    written instructions that way, and that's the proper
9    way that it should have been given. So I want to make
10   that correction.
11       So you can return now to the jury room.
12           (Jury not present)
13       MS. JAMES: Judge, I'm satisfied.
14       THE COURT: All right.
15       MS. REDMOND: And I have a housekeeping
16   matter. As it pertains to the drugs, I don't know
17   what the Court's policy is. Everything is sealed;
18   they are not open. As long as they don't open it, I
19   don't have an objection to any of the evidence going
20   back.
21       THE COURT: Okay. Okay.
22       MS. JAMES: And, Judge, I had, in chambers,
23   renewed my motion for judgment of acquittal after the
24   close of our evidence; and the Court indicated out of
25   the presence of the jury and off the record that it

Page 140

1    would deny it. So I just want to memorialize that for
2    the record.
3        THE COURT: All right. Thank you.
4        MS. REDMOND: And just one more. We hadn't
5    seen the verdict form. I did not see the verdict
6    form. I was just wondering if we could view it.
7        THE COURT: Yeah. It's right here. And
8    we're going to send it to the jury room unless
9    somebody else has got --
10       MS. REDMOND: I'm satisfied.
11       THE COURT: All right. And as I understand
12   it, your objection to the lesser included offense is
13   that you don't think the lesser included offense
14   should be submitted to the jury at all. It's not the
15   wording of it, is it?
16       MS. REDMOND: That's absolutely correct, Your
17   Honor.
18       THE COURT: Okay. Thank you.
19       MS. REDMOND: Judge, can we approach for a
20   moment?
21       THE COURT: Sure.
22           (Off-the-record discussion)
23       THE COURT: We'll be in recess.
24       MS. REDMOND: Thank you, Judge.
25           (Jury commences deliberation)

Page 141

1            (Jury present)
2        THE COURT: Have you reached a verdict?
3        THE FOREPERSON: Yes, Your Honor, we have.
4        THE COURT: All right. Would you hand it to
5    me? Well, I guess I have it.
6        We find the defendant, Charles Lee Woods,
7    guilty of the offense charged in count one of the
8    indictment. Signed by the foreman, Bennett Jones,
9    this 23rd day of May 2005.
10       Anything from the defendant or anything from
11   the plaintiff?
12       MS. JAMES: Just to poll the jury, Your
13   Honor.
14       THE COURT: All right. Would you poll the
15   jury, please?
16       COURTROOM DEPUTY: Mary Elkins, is this your
17   verdict?
18       MS. ELKINS: Yes, it is.
19       COURTROOM DEPUTY: Victoria Tapley, is this
20   your verdict?
21       MS. TAPLEY: Yes, it is.
22       COURTROOM DEPUTY: Bennett Jones, is this
23   your verdict?
24       MR. JONES: Yes, it is.
25       COURTROOM DEPUTY: J.M. McGhee, is this your

TESTIMONY AND PROCEEDINGS                        May 23, 2005
UNITED STATES OF AMERICA v. CLAUDE LEE WOODS

| Page 142 | Page 144 |
|---|---|

**Page 142**

1  verdict?
2      MR. McGHEE: Yes, it is.
3      COURTROOM DEPUTY: Angela Calhoun, is this
4  your verdict?
5      MS. CALHOUN: Yes, it is.
6      COURTROOM DEPUTY: Jackie Henderson, is this
7  your verdict?
8      MS. HENDERSON: Yes, it is.
9      COURTROOM DEPUTY: Cheryl Kelley, is this
10  your verdict?
11      MS. KELLEY: Yes, it is.
12      COURTROOM DEPUTY: Gussie McGill, is this
13  your verdict?
14      MS. McGILL: Yes, it is.
15      COURTROOM DEPUTY: Sarah Moss, is this your
16  verdict?
17      MS. MOSS: Yes, it is.
18      COURTROOM DEPUTY: Walter Davis, is this your
19  verdict?
20      MR. DAVIS: Yes, it is.
21      COURTROOM DEPUTY: Manervia Washington, is
22  this your verdict?
23      MS. WASHINGTON: Yes, it is.
24      COURTROOM DEPUTY: Angela Whitten, is this
25  your verdict?

**Page 144**

1      REPORTER'S CERTIFICATE
2  STATE OF ALABAMA
3  AUTAUGA COUNTY
4      I, Heather Barnett, Court Reporter and
5  Commissioner for the State of Alabama at Large, hereby
6  certify that on May 23, 2005, I reported the TRIAL
7  PROCEEDINGS in the matter of the foregoing cause, and
8  that pages 3 through 143 contain a true and accurate
9  transcription of said proceedings.
10      I further certify that I am neither kin nor
11  of counsel to the parties to said cause, nor in any
12  manner interested in the results thereof.
13      This 26th day of July, 2005.
14
15
16
17
                                _____
                                HEATHER BARNETT, Court Reporter
18                              and Commissioner for the
                                State of Alabama at Large
19
                                MY COMMISSION EXPIRES: 3/24/07
20
21
22
23
24
25

**Page 143**

1      MS. WHITTEN: Yes, it is.
2      THE COURT: All right. Anything further?
3  Thank you very much for your attention to the case.
4  You know, I read the other day in the newspaper where
5  somewhere jurors weren't coming to court when they
6  were subpoenaed, but we don't have that problem in
7  this part of the thing. And you-all certainly make
8  the system work. It couldn't work without you. Thank
9  you.
10      (Jury dismissed)
11      THE COURT: All right. Is Mr. Woods in
12  custody at the present time?
13      MS. REDMOND: He is, Your Honor.
14      THE COURT: Well, I understand it takes at
15  least 30 days to get a presentence report these days.
16  We'll get some word about when the sentencing will
17  take place. If there's not anything else, we will be
18  in recess.
19      MS. REDMOND: Thank you, Your Honor.
20      (The proceedings concluded at
21          3:08 p.m.)
22      * * * * * * * * * * *
23      END OF PROCEEDINGS
24      * * * * * * * * * * *
25

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

UNITED STATES OF AMERICA,    *
                             *
    PLAINTIFF,               *
                             *
v.                           * CASE NO.  1:04CR12
                             *
CLAUDE LEE WOODS,            *
                             *
    DEFENDANT.               *

### SENTENCING MEMORANDUM

Comes now Claude Lee Woods by and through undersigned counsel and files this Sentencing Memorandum and in support thereof states the following:

1. Woods was charged with and convicted of 21 U.S.C. §841(a)(1). The offense conduct involved Woods being found in possession of 140.09 grams of methamphetamine during a routine (arguendo) traffic stop in Dothan, Alabama. He pled not guilty and proceeded to a jury trial. There are mitigating factors this court should and may now consider pursuant to 18 U.S.C. §3553(a) and 18 U. S.C. §3661.

2. The mandatory guideline system created by the Sentencing Reform Act of 1984 has been rendered advisory by the United States Supreme Courts decision in *Booker*, 543 U.S. 125, S.Ct. 738, 160 L.Ed 2d 621 (2005). The Court in *Booker* directed that sentences must now be fashioned by considering and consulting the Sentencing Guidelines and then considering the factors set forth in 18 U.S.C. §3553(a).

3. Title 18 Untied States Code §3553(a) states in pertinent part:

(a) Factors to be considered in imposing a sentence.



AO000-C
GOVERNMENT
EXHIBIT

CASE
NO.

EXHIBIT
NO.    V

The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider - (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed - (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing ranges established for.

4. 18 U.S.C. §3661 states in pertinent part:

"no limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court...may receive and consider for the purpose of imposing an appropriate sentence."

5. In keeping with the above it should be noted that Woods defense at trial was simple possession. He successfully obtained a jury charge and verdict form on the lesser included offense. The jury rejected the defense. Nevertheless Woods admitted the possession given the contraband was found in his car. There were no sales and clear evidence that he was a drug user. There was clothing and other personal items located in his vehicle indicative of a move or relocation. The evidence was that Woods was traveling from Georgia to Florida.

6. Woods contends that he accepted responsibility for the drugs and did not testify. This is a mitigating factor that would have or could have resulted in a three level downward adjustment

2

from the guidelines pursuant to U.S.S.G. §3E1.1.

7. Further Woods was attempting to give a proffer to the government which was thwarted by intervening circumstances beyond his control. Woods and counsel were under the impression that agents from the Northern District of Florida Drug Enforcement Administration were traveling to Montgomery early in the week prior to the beginning of the trial term. The initial meeting fell through and was scheduled the Friday before the trial term. Woods was transported to the U. S. Attorney's Office for a meeting with the agents. He and counsel were advised the agents could not make it. Without the proffer and based on the limited time left in the day, Woods was desirous of passing his case to the next trial term.

8. Counsel had understood this court to leave open this possibility if the proffer could not be accomplished within the required time frame. The Honorable Truman Hobbs had a different interpretation and was concerned that the plea had been left open for so long. He was unsympathetic to the logistical problems associated with coordinating the proffer session with agents from Florida. As a result, Woods felt he was compelled to try the case and the trial followed. Woods argues given more time he would have worked out a more favorable plea agreement (based on cooperation) that simply could not be resolved before the close of business on the eve before the trial. Counsel recognizes the Government and this Court may believe this could have been done earlier, it simply was not and it was not Woods fault.

9. Pretrial the undersigned was successful in having the case continued due to the need to resolve issues regarding Woods criminal history. This, in part, caused some of the delay in disposition of this case as did the unavailability of the out of town interviewing agents. These factors should also add to Woods position he actually accepted responsibility for his criminal

conduct.

10. Woods mother is also disabled and very much needs her son home to assist her. A sentence even at the bottom of the suggested guideline range of 260 months is excessive and not necessary to protect the public, send a message, or for punishment and accountability purposes.

11. The court should also take into consideration that as a result of this arrest, Woods Georgia parole was revoked. Woods has served 10 months in a Georgia penitentiary as a result of the instant conduct. At the least the court could consider the ten months against any final sentence the court seeks to impose.

12. Woods is not particularly in need of education or vocational training while incarcerated as he has already obtained a trade while in Georgia prisons. Therefore, his sentence need not be longer for this purpose.

13. Woods does desire a court recommendation for the intensive substance abuse program while incarcerated. Counsel submits that the minimum ten year term for an individual who merely possessed controlled substances without any evidence of sales is sufficient to meet all the purposes of punishment.

Respectfully submitted,

s/Susan G. James

SUSAN G. JAMES
Attorney at Law
600 South McDonough Street
Montgomery, Alabama 36104
Phone: (334) 269-3330
Fax: (334) 834-0353
E-mail: sgjamesandassoc@aol.com
Bar No: JAM012

4

**CERTIFICATE OF SERVICE**

I hereby certify that on October 11, 2005, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system which will send notification of such filing to the

following:

Susan Redmon
Assistant United States Attorney
P.O. Box 197
Montgomery, Alabama, 36101

Respectfully submitted,

s/Susan G. James
SUSAN G. JAMES
Attorney at Law
600 South McDonough Street
Montgomery, Alabama 36104
Phone: (334) 269-3330
Fax: (334) 834-0353
E-mail: sgjamesandassoc@aol.com
Bar No: JAM012

Page 3

IN THE UNITED STATES DISTRICT COURT FOR

THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

GOVERNMENT
EXHIBIT

CASE
NO.

EXHIBIT    W
NO.

UNITED STATES OF AMERICA

Vs.          CR. NO. 04-12-F

CLAUDE LEE WOODS

*  *  *  *  *  *  *

SENTENCE HEARING

*  *  *  *  *  *  *  *

Before Hon. Mark E. Fuller, Judge,

at Montgomery, Alabama, Commencing

on October 13, 2005

*  *  *  *  *  *  *  *

APPEARANCES: For the Government: Susan B. Redmond

Assistant U.S. Attorney

For the Defendant:  Susan G. James,

Attorney at Law

---

**Page 3**

1  the Court, Mr. Woods has been very involved in researching
2  the issues in this case and he has some opinions about some
3  things he wants me to bring to the Court's attention. And
4  one thing that he did bring to my attention was the fact
5  that -- and it's obviously self-evident -- but the fact that
6  the case was heard by Judge Hobbs, and I believe it
7  originally started with Judge Albritton; am I correct in
8  that?
9       THE COURT: I am not sure.
10      MS. JAMES: For some reason I thought he entertained
11  a motion to continue, but maybe that was another case. But
12  never the less, maybe Judge Hobbs just heard the trial for
13  you because of a crowded docket. Mr. Woods believes that
14  given that Judge Hobbs did hear the evidence in the case that
15  he should be sentenced by Judge Hobbs. Now, I haven't been
16  able to locate any legal authority to support that position
17  but that is his position and I do want to preserve that for
18  purposes of appeal should the case be appealed.
19      THE COURT: Are you making that as a motion?
20      MS. JAMES: Yes, sir.
21      THE COURT: The motion is denied.
22      MS. JAMES: May I proceed with -- I may be able to
23  kind of shortcut this whole objection process.
24      THE COURT: You may.
25      MS. JAMES: In this particular case as to objection

---

**Page 2**

1       (The above case coming on for hearing at Montgomery,
2  Alabama, October 13, 2005, before Honorable Mark E. Fuller,
3  Judge, the following proceedings were had commencing at 11:30
4  a.m.:)
5       THE COURT: Call the case of United States of
6  America versus Claude Lee Woods. Is the government prepared
7  to go forward with the sentencing?
8       MS. REDMOND: Yes, Your Honor.
9       THE COURT: Is the defense prepared to go forward
10  with the sentencing?
11      MS. JAMES: Yes, sir.
12      THE COURT: I note that there are some objections
13  that have been filed. Do you persist on your objections in
14  this case --
15      MS. JAMES: Yes, Your Honor.
16      THE COURT: -- Ms. James? I will allow your client
17  to stand so we can cover the first portion of the colloquy
18  with him from counsel table.
19      MS. JAMES: Judge, before -- you want to just leave
20  him there?
21      THE COURT: If you are going to have argument or
22  evidence about the objections you don't have to bring him up
23  and have him walk back so he can sit down. We can cover this from
24  counsel table and then you can get into your objections.
25      MS. JAMES: Judge, at the outset let me share with

---

**Page 4**

1  one, we did -- let me back up and I think I need to set the
2  stage here. I am kind of starting from the back going
3  forward but I think it's important. We spoke with the
4  government, or at least I spoke with Susan Redmond on a
5  number of occasions about Mr. Woods possibly cooperating with
6  the government. There was at some point during the trial --
7  well, we had a motion to suppress the evidence and we lost on
8  that.
9       At some point during the litigation Ms. Redmond
10  and/or Mr. Whittle made me aware that there might be some
11  interest in Mr. Woods in Pensacola -- not in Pensacola, but
12  in Panama City, the Northern District of Florida area. In
13  consideration of that information Mr. Woods and I, of course,
14  wanted to know as much as we could about what was going on in
15  Florida, the possibility of a proffer, the possibility of
16  maybe -- if we entered a plea maybe making that part of this
17  situation here.
18       And the Court may recall we had a telephone
19  conference I believe with regard to the status of this case
20  and at that point Ms. Redmond and I both -- and she can
21  correct me if I am wrong, I can't remember everything -- but
22  I think we both made the Court aware of the situation in
23  Florida and the fact that we were trying to meet with the
24  agents from Florida and do a proffer. My recollection of what
25  the Court said was I am going to leave it on this trial term.

**Page 5**

1  If you can't get that worked out get back with the Court. I
2  took that to mean if we couldn't get it done that the Court,
3  Your Honor specifically, might be inclined to put us over to
4  the next term because we were dealing with things beyond Ms.
5  Redmond's control because they were agents from Florida.
6      Well, and she thought that we can get it done
7  quickly, and I did too, so she had it set I believe on a
8  Tuesday, like a week before the trial was to commence. For
9  some reason that fell through and we reset it for Friday.
10  This would be Friday, the eve of the -- Friday right before
11  the trial to begin on Monday. We went over for this proffer
12  session, expecting the agents to be there, and they couldn't
13  come. And that was about 12:00 o'clock noon. Well, sometime
14  during the course of I think that very day Judge Hobbs had,
15  of course, been assigned the case and once he realized that
16  the plea had not been accomplished and things had kind of
17  been left open Judge Hobbs was not pleased with that at all
18  and basically said you are either going to plead today or we
19  are going to trial Monday.
20      And in fairness to Mr. Woods I want the Court to
21  know that I think that put him really at somewhat of a
22  disadvantage. And I am not saying it was the Court's fault
23  or Ms. Redmond's fault or my fault, it was just a combination
24  of factors that happened there, because quite frankly I
25  believe that if we could have proffered with those agents and

**Page 6**

1  known where we stood with regard to the totality that Mr.
2  Woods would have entered a guilty plea. So Friday afternoon
3  we told the government that we had no choice but to go to
4  trial. We told Judge Hobbs. Well, in fact, we tried to
5  reach Judge Hobbs to tell him our dilemma that the agents
6  didn't come and he had already left and as I understand had
7  told Stan or somebody, I don't remember, that he was going to
8  be out I guess doing something and not to call him unless we
9  had a plea. So given that warning, I did not attempt to reach
10  him because we didn't have a plea, we just had a problem.
11      So I want you to know from the outset we have never
12  denied that he possessed the hundred and 40.09 grams of
13  methamphetamine that was found in his vehicle. Our defense --
14  given the fact that we lost the suppression hearing, our
15  defense was that it was for his own possession. And I do
16  expect if the Court will indulge us to hear briefly from him
17  with regard to the extent of his substance abuse problem.
18      So the objection, number one, says we don't dispute
19  the facts but we did contend in our motion to suppress, which
20  would be an issue on appeal, that it was a pretextual stop
21  and that the substances found in the vehicle were for his
22  personnel use. That theory was rejected by the jury. We were
23  successful in requesting and being approved an instruction as
24  well as a verdict form as to simple possession which was a
25  misdemeanor. So, I don't think the Court really has to make

**Page 7**

1  any finding there because this is not something that really
2  impacts the guidelines. So I am prepared to move on from
3  that, if that's acceptable.
4      THE COURT: Why don't we -- if you wish to take up
5  the objections now, I think we are kind of getting the cart
6  before the horse. Let's give you an opportunity to do that. I
7  believe that I understand what you are saying, and the line
8  of argument that you are trying to make. But let's get
9  ourselves to the point where we can find out if there are any
10  other facts contained within the presentence report that --
11  other than the three areas that you have addressed as a
12  possible source of an objection and take them up at that
13  point.
14      MS. JAMES: I guess what I am saying, Judge, is
15  although I list number one as an objection it really is not
16  an objection that impacts the guidelines, so I am prepared to
17  move to number two if you would like.
18      THE COURT: Let's get down to that point first. Let
19  me start the colloquy with your client so that he can
20  entertain any other objections other than the three that you
21  have listed and make sure that we have at least got them
22  narrowed down and then we will take the objections up. Mr.
23  Woods, today the Court will determine a reasonable sentence
24  in your case by considering the United States Sentencing
25  Guidelines which were promulgated pursuant to the Sentencing

**Page 8**

1  Reform Act of 1984, and which are now advisory, and by
2  considering the factors set forth in 18 United States Code
3  Section 3553(a).
4      Having talked with your attorney about some of the
5  objections she has listed, I know that she has reviewed the
6  presentence report, but have you, Mr. Woods, had an
7  opportunity to review the presentence report before today's
8  date and have you had an opportunity to discuss the same with
9  your attorney?
10      THE DEFENDANT: Yes, sir.
11      THE COURT: Do you have any objections to any of the
12  content of the presentence report?
13      THE DEFENDANT: Only what she said.
14      THE COURT: All right. Let's take those up now at
15  this time. And as we start with your first objection as to
16  paragraph seven and eight, I do agree that -- I looked at the
17  motion that you had made pretrial as well as the jury verdict
18  form, there was an opportunity for the jury to have found a
19  lesser included offense of possession as opposed to
20  possession with intent to distribute, so I don't see that as
21  an objection that would cause a factual dispute for this
22  Court to resolve at sentencing. I do think you would have it
23  preserved for appeal your issue on the motion to suppress to
24  the extent that you have that reserved. But as to your
25  objection number one as to paragraphs seven and eight whether

Page 9

1 the stop was pretextual, the Court has already ruled on that
2 motion prior to trial, and following the jury's verdict on
3 the evidence in this case, that objection is overruled.
4        Objection number two deals with paragraph 34 and the
5 computation of the criminal history points.
6        MS. JAMES: Judge, subsequent to my having filed the
7 objections, the probation department I think obtained
8 additional information that actually increased the criminal
9 history score, and it is reflected in the addendum that we
10 now object to the present criminal history score. I don't
11 have any argument or evidence in that regard, I do want to
12 preserve that, however, our contention being that additional
13 criminal history points were added for consolidated offenses
14 and we just would maintain that objection.
15       THE COURT: Well, as I have reviewed his criminal
16 history, Mr. Woods' criminal history, it appears as though he
17 may have consummated guilty pleas on June 30th, 1999 to
18 multiple offenses but those offenses were separated by
19 intervening arrests, which I don't think qualifies those
20 offenses as being consolidated for the purposes of a criminal
21 history score. Mr. Marshall, am I correct in that?
22       PROBATION OFFICER: Yes, you are, Judge, because
23 they were intervening arrests they were not considered
24 related so therefore they were counted separate.
25       THE COURT: So as to your objection based upon the

Page 10

1 computation as stated, that objection is overruled and you
2 will have your error preserved if it is, in fact, error.
3        MS. JAMES: Yes, sir. Judge, I think -- my numbers
4 in my objections I don't think are corresponding exactly now
5 with the revised presentence report, but I believe that my
6 objection number three was simply the objection to the
7 computation of the points as opposed to a new specific
8 objection.
9        THE COURT: Based upon your previous objection?
10       MS. JAMES: Right. Like when they subtotaled, I just
11 generally object to the additional points, so I don't think
12 that that's a separate and distinct objection.
13       THE COURT: Same ruling as to objection number
14 three.
15       MS. JAMES: And the last thing that I put in the
16 objection, it's not an objection, it's just a comment, it's
17 our argument that the criminal history score of six over-
18 represented the seriousness of his past criminal conduct.
19 However, that is not an objection, that's probably more
20 appropriate I guess in mitigation.
21       THE COURT: Mr. Woods, having made findings as to
22 the objections to the presentence report, the Court adopts
23 the factual statements contained in the presentence report
24 with specific findings under the guidelines that the offense
25 level is 32, the criminal history category is VI, the

Page 11

1 guideline range is from two hundred and ten months to two
2 hundred and 62 months, and the fine range is from 17 thousand
3 five hundred dollars to four million dollars. Ms. James, do
4 either you or your client have anything to say in mitigation
5 or otherwise before the Court pronounces sentence in this
6 case?
7        MS. JAMES: Yes, Judge. A couple of things. This is
8 kind of an overlapping argument and with regard to your new-
9 found discretion I guess under Booker, given that you are
10 still making a guideline computation, I guess I will make the
11 argument now with regard to the guidelines. I would have the
12 same argument pursuant to 3553(a).
13       THE COURT: Okay.
14       MS. JAMES: But I won't make it twice as long as we
15 have the understanding that it's for both. And that would be
16 that I believe in the Court's guideline calculation which is
17 now only advisory that the Court should consider a 3E1.1
18 downward adjustment for acceptance of responsibility. And I
19 say that and support that in part based on the argument that
20 I made at the onset with regard to Mr. Woods' I think good
21 faith effort to enter plea negotiations and with another week
22 behind us I think that we could have. But through no fault of
23 his we ended up, I think, pressed for trial. So he didn't
24 avail himself of the three levels although given a bit more
25 time to have proffered with the agents I think that would

Page 12

1 have happened.
2        Secondly, I think the fact that Mr. Woods never
3 denied that he possessed the drugs, and simply exercised his
4 right to not only file a suppression motion but exercised his
5 right to trial, that that is not a bar for the Court's
6 consideration and application of the 3E1.1 adjustment for
7 downward departure. If the Court -- in the alternative, if
8 the Court elects not to consider that, then I would use that
9 same argument in mitigation as a factor that the Court should
10 consider under 18 U.S.C. 3553(a), or 18 U.S.C. Section 3661.
11       THE COURT: You can make your arguments or interpose
12 your arguments in each of those bases if you would like.
13 Anything else?
14       MS. JAMES: No, not with regard to -- well, I would
15 say -- since we are still on the guidelines section I would
16 say that to reiterate the argument that the criminal history
17 score in my opinion overrepresents the seriousness of his
18 criminal conduct. And I say that in part -- I know probation
19 says just the opposite, they pretty much say it under-
20 represents with a recommendation with regard of the guidelines
21 decision. But there is a well-documented history of Mr.
22 Woods' substance abuse, and I believe that almost all of the
23 cases that he has, and I concede that there are quite a few
24 of them, they have all been drug-related and resulting from
25 his substance abuse. If the Court would hear him now because

| Page 13 | Page 15 |
|---|---|

**Page 13**

1  you are making a finding as to whether it does over-
2  represent, again, an overlapping argument, if you would hear
3  from him now the same testimony could be considered by the
4  Court under 3553. You want him sworn?
5      THE COURT: Yes.
6      THE CLERK: Raise your right hand. You do solemnly
7  swear or affirm that the testimony you give in this cause to
8  be the truth, the whole truth, and nothing but the truth, so
9  help you God?
10     THE DEFENDANT: Yes, ma'am.
11     MS. JAMES: Judge, may he just speak to the Court
12  without my questioning him? I think it might speed it up.
13     THE COURT: That would be fine.
14     THE DEFENDANT: I would just say, Your Honor, that I
15  probably started using drugs around the time I was 17, 18
16  years old. First I started out kind of small, then it kind of
17  escalated. And a lot of people may say that you can only use
18  a certain amount of drugs a day or whatever, but until they
19  have done methamphetamine they can't really say that.
20  Methamphetamine is a drug that just keeps going and going,
21  and once you get started on it I don't think there's any
22  stopping. There may be, and I would have to say now that I
23  have been incarcerated for a while that I feel better about
24  myself now that I'm off of it. But to be honest with you it's
25  the type of drug that just escalates, you do more and more

**Page 14**

1  and more. You may do a quarter gram today whenever you first
2  start out, tomorrow you may be doing a half ounce.
3      Some people say it's not possible but I believe it
4  is. I have seen -- I mean at the time of my arrest I know for
5  a fact that I was using a lot more than a gram a day. I could
6  smoke a gram in 20 minutes with no problem. May not be
7  believable but it does happen. And I can't explain it to you
8  how the feeling is, it's just the more you do the more you
9  want.
10     Like she was saying to me just then, a lot of the
11  times, a lot of my cases -- I have used drugs all my life
12  basically, since I was old enough to really be out on my own.
13  I moved out on my own when I was 15 years old. But like I
14  told her, and I will tell y'all, a lot of these cases if I
15  would not have been involved in drugs I probably would not
16  have them. That's pretty evident by my PSI. I am not happy
17  about my criminal history at all. I know I have made a lot of
18  mistakes. A lot of it was due to drugs and I know that.
19     MS. JAMES: Judge, that's all we have on that point.
20     THE COURT: Well, I will add here, and I don't know
21  that this is the appropriate time to be informing you of
22  this, Mr. Woods. I will say as sympathetic as it may be about
23  your criminal history and involvement that you have had in
24  the use of illegal drugs, I am not aware of that being a
25  basis in and of itself for diminished capacity, a departure

**Page 15**

1  as a specific example. I will say that if you have
2  information that could be used by law enforcement that you
3  were not able to provide in time to negotiate an acceptable
4  plea agreement, should you have retained the desire to plead
5  guilty without having to go to trial in this case, that is
6  always available to you through a Rule 35 departure after you
7  are sentenced today, the information that you have would
8  still be beneficial to the government. So I just remind you
9  of that. I am sure you are aware of that, but I will remind
10  you of that, that if you do provide information to the
11  government that is helpful to them and aids them in their
12  investigation of anyone else involved in other criminal
13  activity, be it in the Middle District of Alabama or
14  elsewhere, that would be something that I could certainly
15  look favorably upon if it were filed in the form of a Rule 35
16  motion to affect your sentence.
17     THE DEFENDANT: Thank you, Your Honor.
18     THE COURT: Mr. Woods, the sentence will now be
19  stated but you will have a final chance to make legal
20  objections before the sentence is imposed.
21     MS. JAMES: Your Honor, excuse me, I don't think I
22  have had a sentencing with you since we have been post-
23  Booker.
24     THE COURT: Okay.
25     MS. JAMES: But could we still make our 3553

**Page 16**

1  arguments? Because it sounds like you are about to sentence
2  him.
3      THE COURT: You can, yes. I thought that I had told
4  you that unless there was some other evidence --
5      MS. JAMES: I apologize.
6      THE COURT: -- or some other argument that I was
7  going to allow you to preserve that as an argument both under
8  3553 and under the guidelines.
9      MS. JAMES: Thank you. I just had a couple that I
10  didn't, if I may proceed.
11     THE COURT: You may.
12     MS. JAMES: If I might be heard on those. I had
13  asked the Court -- in a separate sentencing memorandum that I
14  filed had asked the Court to consider pursuant to 18 U.S.C.
15  Section 3553(a), that he has -- he served ten months in
16  custody in Georgia on a Georgia state parole violation as a
17  result of this criminal conduct for which he was convicted.
18  And I realize that the Court is not bound to consider that,
19  but -- and obviously the State of Georgia may deal with him
20  when he gets out of federal custody or sometime in between,
21  but I ask the Court to consider those ten months in
22  determining whatever sentence the Court would impose.
23      Additionally, I know the Court can consider
24  educational and vocational training as a factor when
25  considering the appropriate sentence. And in this case I have

Page 17

1   pointed out that during one of his stints in the state prison
2   system in Georgia he did attend school and he got a trade so
3   I don't think that that's a necessary consideration for the
4   Court at this time. But I would point out to the Court that
5   with regard to this particular offense, the evidence that
6   Your Honor didn't hear, and I know you know what the case is
7   about, but Mr. Woods was traveling from Georgia to Florida
8   and was stopped in Dothan on a purported routine traffic stop
9   and this quantity of drugs was found in the vehicle.
10      There was evidence that he was moving or going to be
11  gone for a while because the officer, one of them testified I
12  think at the suppression hearing or the trial that the trunk
13  was full of stuff, not just clothes, but clothes and
14  everything else, you could hardly see in it. Mr. Woods was
15  also -- it was noted in some of the law enforcement reports
16  that he was, quote, a drug user. There was evidence of drug
17  use within the vehicle. And although rejected by the jury
18  that this was a simple possession case, there was no evidence
19  that came before the Court that he had actually made a drug
20  sale or was en route.
21      And I know Ms. Redmond is going to say we believe
22  that he was and that's why Florida is looking at him. We have
23  not -- other than what they have reported to me, that's all
24  we know about that. So I think that even though the quantity
25  was a substantial amount, and obviously the jury felt that

Page 18

1   way, for one person, I don't think that it's improbable that
2   someone with a history and an addiction to the extent that
3   Mr. Woods had could have had that for his own personal use.
4       We don't have codefendants, we don't have a
5   historical case here where they were working this and they
6   just happened to apprehend him in Dothan. So the case is I
7   guess what it is, and that is that he was possessing a
8   substantial amount of -- and he tells me it really wasn't a
9   substantial amount, he told me that today, given his
10  addiction. I know it's -- it may have been for someone else
11  that didn't have the long history but not for him.
12      I guess the last couple of things that I would point
13  out to the Court and ask the Court to consider, and really
14  for purposes of an appellate record if necessary, and that is
15  that it appears to me that the probation department on the
16  recommendation that we were provided today where they
17  suggested a top of the guidelines decision at two hundred and
18  62 months, I think would -- is inappropriate because the
19  basis of the recommendation, Your Honor, is his criminal
20  history score, basically. The fact that he has been in
21  trouble. And I would argue to the Court that that criminal
22  history score of six puts him in the worse possible category
23  but it does recognize the fact and penalize him for the fact
24  of having been in and out of trouble, not only with prior
25  crimes but his inability to successfully complete some of his

Page 19

1   probationary and parole periods. So I think that factor alone
2   doesn't justify a top of the guidelines decision in this case
3   because it has been considered.
4       The last argument I would make, and I learned in the
5   Reese case to make them even if it's not the law. You know,
6   I am probably the only lawyer -- researching those cases I
7   think not only was I the only lawyer in the 11th Circuit to
8   preserve the error but I think in the entire country, because
9   it was post-Apprendi but pre-Blakely, but I would make an
10  objection to the Court's enhancing his punishment. And, of
11  course, in this particular case we don't have sentencing
12  enhancers as we do in typical cases like with a role
13  enhancement or obstruction of justice or something of that
14  nature. But I think that the Supreme Court's remedy in Booker
15  part two wherein the guidelines are now advisory and the
16  Court then needs to look through the lens of 3553, I disagree
17  with that remedy. I think the remedy is more appropriate,
18  the remedy in Blakely which the majority in Booker part one
19  suggested was the appropriate remedy. And there are
20  petitions for cert going up all the while on this particular
21  issue, I am about to file one Monday, and I would not want
22  the Supreme Court to agree with me and not have made that
23  argument for Mr. Woods and others.
24      I do have two other matters, Judge, and I don't --
25  and these are two that Mr. Woods has urged me to make, and I

Page 20

1   do want to make them. They don't really -- it's a motion for
2   speedy trial issue and motion to dismiss the indictment on a
3   double-jeopardy issue, and they don't really have anything to
4   do with the sentence, so maybe -- and I don't want to belabor
5   those, but I can explain why I do want to make them part of
6   the record. So as far as sentencing mitigation we are done
7   and then if you will just simply indulge me to make a record
8   on that when you are done with the sentence.
9          THE COURT: Anything further, Ms. James?
10         MS. JAMES: No, sir. Do you have anything else?
11         THE COURT: Anything that you would like to add, Mr.
12  Woods?
13         THE DEFENDANT: No, sir.
14         THE COURT: As I stated, the sentence will now be
15  imposed but you will have a final chance to make legal
16  objections before the sentence is imposed. It will now be
17  stated but you will have a chance to make legal objections
18  before it is imposed, I should say. Based upon the advisory
19  guideline range and the applicable statutory factors it is
20  the judgement of this Court that you, Mr. Woods, be committed
21  to the custody of the Federal Bureau of Prisons to be
22  imprisoned for a total term of two hundred and 62 months. The
23  Court recommends that you be designated to a facility where
24  intensive residential substance abuse treatment is available.
25  Based upon your inability to pay the Court waives the

Page 21

1  imposition of a fine. However, you shall pay to the United
2  States District Court Clerk a special assessment fee of one
3  hundred dollars, which is due immediately. The Court finds
4  that there is no identifiable victim who incurred a financial
5  loss as a result of this offense.
6       Upon release from imprisonment you shall be placed
7  on supervised release for a term of five years. Within 72
8  hours of release from custody you shall report to the
9  probation office in the District to which you are released.
10  While on supervised release you shall comply with the
11  mandatory and standard conditions of supervised release on
12  file with this Court.
13       The Court also orders the following special
14  conditions: You shall participate in drug testing and/or
15  treatment. You shall contribute to the cost of any treatment
16  based upon your ability to pay and the availability of
17  third-party payments. You shall submit to a search of your
18  person, residence, office or vehicle pursuant to the search
19  policy of this Court. You shall cooperate in the collection
20  of DNA as directed by the probation officer.
21       The Court finds that the sentence that has been
22  stated in this case is a reasonable sentence because of the
23  factors set forth in Section 3553(a) of Title 18 United
24  States Code, particularly for the need for the sentence
25  imposed to reflect the seriousness of the offense, to promote

Page 22

1  respect for the law and to provide a just punishment for the
2  offense, to afford adequate deterrence to criminal conduct,
3  to protect the public from further crimes of you, Mr. Woods,
4  and finally, to provide you with the vocational and
5  educational as well as medical treatment in a most efficient
6  manner. The Court further finds that any lesser sentence
7  would be insufficient to accomplish the purposes set forth in
8  18 United States Code Section 3553(a)(2).
9       Are there any objections to the sentence or to the
10  manner in which the Court pronounced it? For example, do you
11  have any objections to the Court's ultimate findings of fact
12  or conclusions of law?
13       MS. JAMES: Judge, I would readopt the objections
14  that I have previously made with regard to the presentence
15  report as well as the Blakely 6th Amendment objection. I
16  would also object, and my basis would be that the sentence is
17  not a reasonable sentence when you weigh the facts of the
18  case against the factors that the Court is now required to
19  consider pursuant to 18 U.S.C. Section 3553(a).
20       THE COURT: And in response, I will just say that
21  the Court's sentence is as a result of the findings of fact
22  as reached by the jury in this case and that is possession
23  with intent to distribute as opposed to simple possession.
24       MS. JAMES: Judge, one other objection, and I argued
25  a minute ago that I felt it was inappropriate to sentence at

Page 23

1  the top of the guideline range in this case given the Court's
2  findings based on the fact that the prior -- the top of the
3  guidelines decision as recommended by probation was based on
4  his prior criminal conduct which is already taken into
5  consideration in the criminal history score of VI. Once I saw
6  the probation recommendation I immediately called my office
7  because I had just found a case, I don't have a copy for the
8  Court, but I would add this to my argument, and it's U.S.
9  versus Castro-Juarez, J-U-A-R-E-Z, and it's a 7th Circuit
10  case. It's only been released October the 3rd of '05 so I
11  only have the docket number, it's 05-1195.
12       THE COURT: Which Circuit?
13       MS. JAMES: 7th Circuit. And I realize that's not
14  binding in this Circuit but given all of the newness of
15  reasonableness and those type things I am pulling any
16  reasonableness decision I can find. And quite frankly I have
17  just researched every Circuit and there's really not a
18  definition for reasonableness. There is -- the Second Circuit
19  in fact declines to set forth any -- in Crosby to set forth
20  any specific criteria for reasonableness because they didn't
21  want it to just become kind of a mechanical thing.
22       But in this particular case, in the Juarez case, the
23  7th Circuit determined that the Casper-Juarez sentence was
24  not reasonable. In that case the Judge did go outside the
25  guidelines, where in this case you have only gone to the top,

Page 24

1  but the similarity in the two cases was the only basis that
2  was articulated by the Court for going outside the
3  guidelines, a sentence that was double what was recommended
4  by the guidelines, was the prior offense conduct that was
5  already considered within the criminal history score. And
6  while I don't have an exact on-point situation here I do
7  believe that the Court's using the guidelines, first of all,
8  as determined, as well as going to the top of the guidelines
9  is not a reasonable sentence, and I would offer that case in
10  support of that position.
11       THE COURT: And for the record certainly the Court
12  is aware that the guidelines as has been amended by the
13  recent Supreme Court decisions in Booker and Fanfan make them
14  advisory to this Court and the Court used them only in an
15  advisory capacity.
16       MS. JAMES: Thank you.
17       THE COURT: Which is a reasonable sentence as
18  articulated for the record.
19       MS. JAMES: Judge, I don't have anything else. I
20  guess with regard to sentence you made a recommendation that
21  he be in the drug program. I would ask the Court, his mother
22  is in poor health, and she lives over in -- what is it,
23  Clayton County? Near Atlanta. I know it's up to the Bureau of
24  Prisons but if the Court would make a recommendation the
25  Bureau of Prisons would at least consider it, that he be

Page 25

1   placed in a facility closest to home. I am not sure he wants
2   to go to the penitentiary in Atlanta but with this sentence
3   he might very well end up there.
4          THE DEFENDANT: That would be fine with me, I would
5   be close to my mom.
6          MS. JAMES: His mother was here for the trial, she
7   is just really not in good enough shape to come. And she is
8   disabled and it's very hard for her to travel. So, if nothing
9   else that will relieve a burden on the family.
10         THE COURT: I will add to the conditions that you be
11  placed in a facility as near your mother's residence as can
12  accomplish the purposes as set forth in the Court's other
13  requirements that you participate in drug counseling and
14  treatment while in custody.
15         THE DEFENDANT: Thank you very much.
16         MS. JAMES: Judge, now if I may be just briefly
17  heard on two other issues. Kevin Butler had this case -- let
18  me back up. When Mr. Woods was arrested he was arrested in
19  Dothan and he actually was prosecuted by the City of Dothan
20  for the possession of a small amount of marijuana. There was
21  some dispute that he was charged with having an open
22  container because he had an open bottle of beer in there. We
23  never had any -- I don't think that case has ever been
24  prosecuted. But in addition to that there was a three
25  thousand dollar forfeiture proceeding. He had three thousand

Page 26

1   dollars that was forfeited in exchange for getting his
2   mother's vehicle back.
3          The case was referred to the feds for prosecution
4   and he was indicted in January of '04, and not -- then he was
5   taken into custody by Georgia because of his parole violation
6   and then he ultimately was brought here for trial in
7   November. For purposes of the record I do want him to just
8   articulate very quickly that chronology. But here's the
9   dilemma. When I got the case Mr. Woods was being represented
10  by Kevin Butler of the Federal Public Defender's office, and,
11  of course, at that point pretrial motion deadlines had
12  passed.
13         Kevin had filed a motion to suppress. I
14  supplemented the motion to suppress. We had a hearing. I
15  didn't file any speedy trial motion, I didn't file any
16  double-jeopardy motion. Mr. Woods and I have had many
17  occasions to speak during my representation and he has always
18  been very convinced that his speedy trial rights have been
19  violated and that his conviction should have been barred
20  based on double-jeopardy because of the separate civil
21  forfeiture.
22         Mr. Butler and I in filing waivers of speedy trial
23  subsequent to his being brought to federal custody, we both
24  styled them -- and quite frankly I picked up the language
25  from Mr. Butler -- that we are waiving speedy trial rights

Page 27

1   but not any that preceded. In other words, that window of
2   possible speedy trial violation, we both protected. Now, I am
3   not sure if that was based on Mr. Woods' insistence, just a
4   precautionary thing, but Mr. Butler did it and I followed
5   suit.
6          In speaking with Mr. Woods I have repeatedly told
7   him that if Mr. Butler or I missed a speedy trial issue or if
8   we missed a double-jeopardy issue that he would have a clear
9   claim against both of us for ineffective assistance of
10  counsel which would probably more appropriately be raised in
11  a post- conviction 28 U.S.C. Section 2255. We visited again
12  this morning and I told him that I would bring this to the
13  Court's attention, not so much that I am asking the Court to
14  rule because I realize we are far past that deadline, but in
15  the event that he decides to go pro se, hire a different
16  lawyer or whatever, I did want to make it a part of the
17  record.
18         I will deal with the double-jeopardy real quickly at
19  first and then if he could give you a couple of facts then I
20  think the record will be clear. And if we did make such a
21  grave error it might be one of those rare occasions that the
22  11th Circuit would look at and make a merit determination of
23  ineffective assistance of counsel on the face of the record
24  when it goes up on direct appeal. They rarely do that but
25  there are some cases they would do that.

Page 28

1          With regard to the double-jeopardy, the case law for
2   years, the way -- this was way before Your Honor was on the
3   bench and you may not have had to deal with it because the
4   government has kind of corrected it, but what typically
5   happened in the old days was there would be a separate civil
6   proceeding, let's just say here in federal court, they take
7   your car, take your money and prosecute you in a separate
8   indictment. And back in the early '90s, because I had a
9   number of cases that had this issue back in the early '90s,
10  the U.S. Supreme Court came out with the Halper case and the
11  Department of Revenue of Montana versus Kirk Ranch.
12         And basically what fell out of those cases was that
13  it was a double punishment for you to be prosecuted in a
14  civil proceeding because taking your money, taking your car,
15  taking your house and punishment and then prosecuting you in
16  the criminal end was punishment as well and that you couldn't
17  be punished two times for the same crime. And that the
18  prosecution that was barred naturally would have been the
19  second prosecution, that being in most instances the trial.
20  There was a Fifth Circuit case that came out, the Tilley
21  case.
22         Well, Mr. Woods, his argument would be that the
23  civil proceeding in Dothan, the forfeiture of the three
24  thousand dollars, was premised on the meth. There's
25  paperwork apparently in existence that says we are taking

Page 29

1  this because of your possession of methamphetamine. And it's
2  his contention that that -- let me back up a minute. The
3  government solved this problem, Judge, in most cases. You
4  will note now probably every indictment that has a forfeiture
5  comes in with the criminal indictment as opposed to the way
6  it used to be done separately. So we rarely ever have these
7  type double-jeopardy issues any more because the government
8  kind of fixed that problem. But in this case because Dothan
9  took the three thousand dollars on the basis of the same
10  conduct for which he was prosecuted, Mr. Woods' position is
11  that was a civil punishment, but never the less a punishment
12  for the same conduct for which he was tried and convicted by
13  the jury. Have I pretty much said that?
14      THE DEFENDANT: That's the way I feel.
15      MS. JAMES: So having said that if I might move on
16  simply to the speedy trial.
17      THE COURT: Let me give you a ruling so you will
18  have something to preserve. Your oral motion for -- I guess
19  would be --
20      MS. JAMES: Judge, let me say this to you, I am in a
21  quandary because I am not sure I want to -- and here's why.
22  My advice as a lawyer to him is I think that this is more
23  appropriately raised in a 2255.
24      THE COURT: I agree.
25      MS. JAMES: But I am trying to accommodate his

Page 30

1  wishes in the event that he decides to do something
2  differently. My concern is if you give me a ruling -- it's a
3  catch-22 -- but if you give me a ruling and he doesn't take
4  it up, then he is going to be procedurally barred under 2255.
5  If you give me a ruling on an inadequate record, that I
6  believe is inadequate at this point, then --
7      THE COURT: I am prepared to rule on your motion.
8  If you are making it in the form of a judgment -- motion for
9  judgment of acquittal based upon double-jeopardy, if that is
10  the nature of your --
11      (At which time an off-the-record discussion was had
12  between the Defendant and counsel.)
13      MS. JAMES: Yes, Judge, we'd like a ruling.
14      THE COURT: Any response from the government?
15      MS. REDMOND: First, Judge, I don't think that --
16      THE COURT: I am not waiving timeliness, I am not
17  waiving -- I am not saying it's due to be granted for out of
18  time. I am not asking you to raise all of those obvious
19  objections, and I certainly won't use that in ruling on the
20  motion.
21      MS. REDMOND: I am not quite sure where to go now.
22  And I apologize, I don't think, number one, it's properly
23  raised here. If it's, in fact, a motion for new trial or to
24  set aside the judgment of the jury, then I would obviously
25  still suggest that it's not properly raised at this point in

Page 31

1  the proceedings. So that would be my response at this time
2  for the record.
3      THE COURT: And my ruling would be to the extent
4  that it is a proper motion at this time for judgment of
5  acquittal based upon the issue of double-jeopardy, the motion
6  is denied.
7      MS. JAMES: Judge, I think for the record because we
8  did have an off-record consultation here, and because it
9  could be an issue, I do believe that if -- given the Court's
10  rulings here that he would be able to raise the claims on his
11  direct appeal, he would still possibly have an opening for
12  ineffective assistance claim against Mr. Butler and me
13  because of whatever. So I think when I spoke and said he
14  couldn't raise it there may be a way he could raise it.
15      THE COURT: I'm not saying it's a timely raised
16  motion, there are other hurdles to get through --
17      MS. JAMES: Which may support his ineffective
18  assistance --
19      THE COURT: -- which may be other grounds for other
20  motions. But to the extent that it is raised timely with the
21  information before the Court, that's the Court's ruling.
22      MS. JAMES: And the last thing, Judge, very quickly,
23  was his speedy trial. Again, without going into all the
24  details of what Kevin and I did or didn't do, tell the Court
25  real briefly why you think -- so you have got your record --

Page 32

1  why you think the speedy trial rights were violated. With
2  permission, Judge, may he?
3      THE COURT: He may.
4      THE DEFENDANT: It's my understanding, Judge, they
5  had 70 days after they indict me to get me to trial. It's
6  very apparent by my indictment that it took them ten months
7  to get me to arraignment, not even counting trial. Whenever I
8  got arrested, Your Honor, they placed a hold on me that I
9  could not get out. And that's way before my parole or
10  anything like that was violated. That's while I was in Dothan
11  they placed a hold on me that I could not get out. From that
12  time, I am not sure, but I believe they had 30 days to indict
13  me after my arrest, and it took them five months to indict
14  me, and then another ten months to get me to arraignment
15  after that. So it's 15 months from the time of my arrest to
16  my arraignment, not the hundred and 80 days maximum, which I
17  believe, Your Honor, is far and above the speedy trial. So I
18  believe I was denied due process on the speedy trial law. I
19  may be wrong.
20      THE COURT: How were you prejudiced, Mr. Woods,
21  other than the delay? Was there evidence that was lost or
22  witnesses that were not available at the trial because of the
23  delay?
24      THE DEFENDANT: Well, there may have been some
25  witnesses in my case that I could not have got in touch with

Page 29 - Page 32

Page 33

1  because I had lost contact with them.
2      THE COURT: Are you aware of any witnesses that
3  weren't available because of the 15 month delay?
4      THE DEFENDANT: There was a girl that was in the car
5  with me -- well, not actually in the car with me, that was
6  following me to Georgia, that I couldn't reach after that,
7  that was following me down to Florida.
8      THE COURT: Isn't she the one that got lost in
9  Columbus, from my reading your presentence report?
10     THE DEFENDANT: Yes, sir.
11     THE COURT: That's a long way from Columbus to
12 Dothan. So she didn't see what went on in Dothan, did she?
13     THE DEFENDANT: Sir?
14     THE COURT: It's a long way from Columbus, Georgia
15 to Dothan so she wasn't present in Dothan when you were
16 arrested and she did not see what took place in Dothan, did
17 she?
18     THE DEFENDANT: No, sir. But she was well aware of
19 what was going on. Whether I was in Columbus or Dothan
20 doesn't matter, she was still aware of what was going on, and
21 why I had the drugs and all that. But I could no longer get
22 in touch with her and I still don't know how to get in touch
23 with her. I have got it wrote down -- Ruth, I don't know her
24 last name but I have it written down. Ruby, I know her first
25 name but I don't know her last name, but I have all that in

Page 34

1  my paperwork at the jail.
2      THE COURT: Any response from the government?
3      MS. REDMOND: Judge, again, I don't believe this is
4  properly brought at this time, in addition to which the
5  Defendant has actually stated no actual prejudice which would
6  give grounds possibly to form the basis for the motion.
7      MS. JAMES: Judge, the only thing I would say --
8  it's his motion -- the only thing I would add to that is
9  there were some -- there was discussion about trying to
10 locate this woman as a witness, and given that he was in
11 Dothan and she was lost in Columbus, it would have been part
12 of our defense if we had been able to get her and assuming
13 that she would have confirmed what he told the police when he
14 was arrested that they were following each other, that he
15 was, in fact, moving to Florida, that that's why his car was
16 loaded, the extent of his substance abuse problem, and the
17 fact that the drugs were for their joint use because they
18 were going down there to party. That's why he had the three
19 thousand dollars, he was going to lay up in a motel room and
20 do all that meth. So I think it would have at the least
21 lended further support to our simple possession defense.
22     MS. REDMOND: Judge?
23     THE COURT: Any response?
24     MS. REDMOND: I apologize because I just need to
25 make this clear. If, in fact, that's what the Defendant is

Page 35

1  putting on as a -- on the record as a defense, I would note
2  for the record that that, in fact, then would give grounds to
3  a cause for the State of Georgia as he was on parole at that
4  time and was not authorized to leave the State of Georgia,
5  let alone remove himself to the State of Florida.
6      MS. JAMES: He was already -- I think the record,
7  maybe not before the Court, but he was already in trouble
8  with Georgia when he took off, weren't you?
9      THE DEFENDANT: Well, I would have been, but not
10 that day.
11     THE COURT: Without saying that your motion for a
12 violation of the Speedy Trial Act is timely, to the extent
13 that it is germane to any issue before me at sentencing,
14 motion denied.
15     MS. JAMES: Anything else?
16     THE DEFENDANT: No.
17     MS. JAMES: That's all we have, Your Honor.
18     THE COURT: One question of probation. If, in fact,
19 Mr. Woods was detained for ten months in Georgia on a
20 probation violation, would he be entitled to credit on this
21 sentence that I have just imposed for this case?
22     PROBATION OFFICER: Judge, based on the information
23 I got, we got him on a writ in November, 2004. We got him on
24 a writ. He was go already serving time for his probation
25 parole violation in Georgia. We got him on a writ, so we have

Page 36

1  had him on a writ at least about ten months -- I think it's
2  about ten months. And I think that may be the only time that
3  would be credited to him.
4      THE COURT: I would ask the Bureau of Prisons to
5  investigate the time that he spent in custody in Georgia
6  while awaiting transport to Alabama for these charges, and if
7  he is entitled to credit against the two hundred 62 months
8  for any time spent in Georgia on a probation revocation, I
9  would ask that he be given the time that he's legally
10 eligible to receive. I certainly understand the time that
11 he's been here since trial and before trial on the writ, he
12 would be due to be credited that time, but any time that he
13 was in Georgia on a probation violation I don't think that I
14 believe that he is entitled to that, but I don't want my
15 ignorance to prejudice him on any time that he would be
16 eligible for in custody. Anything else that we need to take
17 up before I inform Mr. Woods of his appeal rights?
18     MS. JAMES: No, sir.
19     MS. REDMOND: No, sir.
20     THE COURT: Mr. Woods, the sentence is ordered
21 imposed as stated. I will now address your right of appeal.
22 You have a right to appeal. In order for your appeal to be
23 timely you may need to file a notice of appeal as soon as ten
24 days after the Court enters its written judgment in this
25 case. If you can not afford the cost of an appeal you may

Page 37

1  petition the Court for leave to appeal in forma pauperis. I
2  am not encouraging you to appeal or discouraging you from
3  appealing, I am merely informing you of your rights. Do you
4  understand those rights?
5      THE DEFENDANT: Yes, sir, I do.
6      THE COURT: Do you have any questions about your
7  appeal rights?
8      THE DEFENDANT: No, sir, I don't.
9      THE COURT: Mr. Woods, I wish you the best of luck.
10  You will remain in the custody of the marshal.
11      THE DEFENDANT: All right.
12      MS. JAMES: Judge, for purposes of appeal, and you
13  may want me to do this in a written motion, but obviously I
14  am retained and responsible for pursuing the appeal. However,
15  my fee was paid by his family and I mean they simply don't
16  have funds to obtain the transcripts.
17      THE COURT: If you will file a motion with an
18  affidavit I will take a look at it.
19      MS. JAMES: Thank you, Your Honor. May I be excused?
20      THE COURT: You may.
21      MS. REDMOND: May I be excused?
22      THE COURT: Anything else we need to take up?
23      MS. REDMOND: No, sir.
24      THE COURT: Court will be in recess.
25      (At which time, 12:22 p.m., the hearing was

Page 38

1  adjourned.)
2          *   *   *   *   *
3      I certify that the foregoing is a correct transcript
4  from the record of proceedings in the above-entitled matter.
5  This the 16th day of February, 2006.
6
7              Official Court Reporter
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

AO 245B    (Rev. 06/05) Judgment in a Criminal C
Sheet 1

# UNITED STATES DISTRICT COURT

__MIDDLE__ District of __ALABAMA__

UNITED STATES OF AMERICA
V.
CLAUDE LEE WOODS

## JUDGMENT IN A CRIMINAL CASE

Case Number:    **1:04CR12-F**

USM Number:    **11560-002**

__Susan G. James__
Defendant's Attorney

## THE DEFENDANT:

☐ pleaded guilty to count(s)

☐ pleaded nolo contendere to count(s)
which was accepted by the court.

X was found guilty on count(s)    1 of the Indictment by a Jury on 5/23/2005
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 21:841(a)(1) | Possession with Intent to Distribute Methamphetamine | 8/14/03 | 1 |

     The defendant is sentenced as provided in pages 2 through    6    of this judgment. The sentence is imposed pursuant to
the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s)    ☐ is    ☐ are dismissed on the motion of the United States.

     It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence,
or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution,
the defendant must notify the court and United States attorney of material changes in economic circumstances.

__October 13, 2005__
Date of Imposition of Judgment

Signature of Judge

__MARK E. FULLER, CHIEF U.S. DISTRICT JUDGE__
Name and Title of Judge

17 OCTOBER 2005
Date

ATTEST: A True Copy.
Certified to
Clerk, U.S. District Court,
Middle District of Alabama

BY
Deputy Clerk

AO88-C
GOVERNMENT
EXHIBIT

CASE
NO.

EXHIBIT
NO.    X

AO 245B    (Rev. 06/05) Judgment in Criminal Case
Sheet 2 — Imprisonment

DEFENDANT:       **CLAUDE LEE WOODS**
CASE NUMBER:     **1:04CR12-F**

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

**Two hundred sixty two (262) months.**

X The court makes the following recommendations to the Bureau of Prisons:

**The Court recommends that defendant be designated to a facility where Intensive Residential Substance Abuse Treatment is available.**

**The Court further recommends that defendant be placed in a facility close to his families residence in Georgia.**

X The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

☐    at _____ ☐ a.m. ☐ p.m.    on _____ .

☐    as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐    before 2 p.m. on _____ .

☐    as notified by the United States Marshal.

☐    as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____    to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B    (Rev. 06/05) Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page    3    of    6

DEFENDANT:     **CLAUDE LEE WOODS**
CASE NUMBER:     **1:04CR12-F**

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :

**Five (5) years.**

    The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐  The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of

    future substance abuse. (Check, if applicable.)

X  The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.

X  The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if

☐  The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a

    student, as directed by the probation officer. (Check, if applicable.)

☐  The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

    If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

    The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1)  the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)  the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3)  the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)  the defendant shall support his or her dependents and meet other family responsibilities;

5)  the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)  the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)  the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)  the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)  the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)  the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)  the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)  the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13)  as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

DEFENDANT:    **CLAUDE LEE WOODS**
CASE NUMBER:    **1:04CR12-F**

## SPECIAL CONDITIONS OF SUPERVISION

Defendant shall participate in drug testing and/or treatment.  Defendant shall contribute to the cost of any treatment based on ability to pay and availability of third party payments.

Defendant shall submit to a search of his person, residence, office or vehicle pursuant to the search policy of this Court.

Judgment — Page  5  of  6

| DEFENDANT: | **CLAUDE LEE WOODS** |
| CASE NUMBER: | **1:04CR12-F** |

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | **$  100.00** | **$  0** | **$  0** |

☐  The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss\*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | | | |

| **TOTALS** | $ _____ 0 | $ _____ 0 | |

☐  Restitution amount ordered pursuant to plea agreement  $  _____

☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐  The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐  the interest requirement is waived for the    ☐  fine    ☐  restitution.

☐  the interest requirement for the    ☐  fine    ☐  restitution is modified as follows:

\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

Judgment — Page __6__ of __6__

DEFENDANT:     **CLAUDE LEE WOODS**
CASE NUMBER:   **1:04CR12-F**

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

**A**   X   Lump sum payment of $ ___100.00___ due immediately, balance due

      ☐   not later than _____ , or
      X   in accordance   ☐ C,   ☐ D,   ☐ E, or   X   F below; or

**B**   ☐   Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ☐ F below); or

**C**   ☐   Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
_____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

**D**   ☐   Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
_____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
term of supervision; or

**E**   ☐   Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**   X   Special instructions regarding the payment of criminal monetary penalties:

      **Criminal monetary payments shall be made payable to the Clerk, U.S. District Court, Middle District of Alabama, P.O.
Box 711, Montgomery, AL 36101.**

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐   Joint and Several

      Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount,
and corresponding payee, if appropriate.

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☐   The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA,    *
                             *
    Plaintiff/Appellee,      *
                             *
V.                           *    **Case No. 05-15999-BB**
                             *
CLAUDE LEE WOODS,            *
                             *
    Defendant/Appellant.     *

---

## OPENING BRIEF OF APPELLANT CLAUDE LEE WOODS

---

## ON APPEAL FROM
## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## CASE NO: 04-12-S

SUSAN GRAHAM JAMES
COUNSEL FOR APPELLANT
LAW OFFICE OF
SUSAN G. JAMES & ASSOCIATES
600 SOUTH McDONOUGH ST.
MONTGOMERY, AL 36104
(334) 269-3330
EMAIL: SGJAMESANDASSOC@AOL.COM
ALABAMA BAR. NO. ASB-7956-J64S



AO998-C
**GOVERNMENT
EXHIBIT**

CASE
NO.

EXHIBIT
NO.    Y

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA,          *
                                   *
        Plaintiff/Appellee,        *
                                   *
V.                                 *        Case No. 05-15999-BB
                                   *
CLAUDE LEE WOODS,                  *
                                   *
        Defendant/Appellant.       *

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Circuit Rule 26.1 Appellant Claude Lee Woods files this

Certificate of Interested Persons and Corporate Disclosure Statement.

1. Kevin Butler, Former Counsel

2. Honorable Truman Hobbs - United States District Judge

3. Susan G. James - Woods' Counsel

4. Honorable Vanzetta McPherson - U. S. Magistrate Judge

5. Susan Redmond - AUSA

6. Denise Simmons - Woods' Counsel

7. Claude Woods - Defendant/Appellant

Of Counsel

C1

## STATEMENT REGARDING ORAL ARGUMENT

Appellant believes that oral argument would assist this Court in determining the issues raised herein.

## CERTIFICATE OF TYPE SIZE AND STYLE

Times New Roman 14-point-type - Wordperfect 12

## CERTIFICATE OF COMPLIANCE

I, Susan G. James, certify that I am filing this principal brief pursuant to Rule 32(a)(7)(B) and certify that it contains 9,648 words.

_____
Susan G. James

i

## TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND

CORPORATE DISCLOSURE ........................................ ...C1

STATEMENT REGARDING ORAL ARGUMENT .......................... i

CERTIFICATE OF TYPE SIZE AND STYLE ............................. i

TABLE OF CONTENTS .............................................. ii

TABLE OF AUTHORITIES ........................................... iii

STATEMENT OF JURISDICTION ..................................... 1

STATEMENT OF THE ISSUES ....................................... 1

STATEMENT OF THE CASE ......................................... 1

    A. Course of Proceedings Below .................................... 1

    B. Statement of Facts ........................................... 2

    C. Standard of Review .......................................... 26

SUMMARY OF THE ARGUMENT .................................... 27

ARGUMENT ..................................................... 28

CONCLUSION ................................................... 39

CERTIFICATE OF SERVICE ....................................... 40

# TABLE OF AUTHORITIES

**Page No.**

*Blakely v. Washington*, 542 U.S. _, 124 S.Ct. 2531, 159 L.Ed. 2d 403 (2004) . . 36

*Brinegar v. United States*, 388 U.S. 160, 175 (1949) . . . . . . . . . . . . . . . . . . . . . . 34

*Bumper v. North Carolina*, 391 U.S. 543, 548 (1968) . . . . . . . . . . . . . . . . . . . . . 34

*Collins  v. State*, 65 So.2d 61, 63 (Fla. 1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Nardone v. United States*, 308 U.S. 338, 341 60 S. Ct. 266,268,84 L. Ed.2d 307

(1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Nix v. Williams*, 467 U.S. 431, 444,104 S. Ct. 2501, 2508, 81 L Ed. 2d

377 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Pennsylvania v. Mimms*, 434 U.S. 106 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Smith at 799 F.2d 704; *United States v. Miller*, 821 Fd 546 (11th Cir. 1987) . . . 37

Whren v. United States, 517 U.S. 806 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3*1*

*Wong  v. United States*, 371 U. S. 471, 83 S. Ct. 407, 9 L Ed. 2d 441 (1963) . . . 32

*United States v. Arvizu*, 122 S.Ct. 744 (220) . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Battle,* 892 F.2d 992, 998 (11th Cir. 1990*)* . . . . . . . . . . . . . . . . 29

*United States v. Calderone*, 127 F.3d at 1324 . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Calandra*, 414 U.S. 338, 347, 94 S. Ct. 613, 38 L Ed. 2d 561, 94

(1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *32*

United States v. Castro-Juarez, 425 F.3d 430 (7th Cir. 2005) . . . . . . . . . . . . 25,37

*United States v. Cruz*, 581 F.2d 535 (5th Cir. 1978) (en banc) . . . . . . . . . . . . . . 34

*United States v. Garcia*, 890 F.2d 355 (11th Cir. 1989) . . . . . . . . . . . . . . . . . . . . 31

*United States v. Hardy*, 855 F.2d 753, 756 (1988) . . . . . . . . . . . . . . . . . . . . . .  31

*United States v. Jeffers*, 342 U.S. 48, 51, 72 S. Ct. 93,96 L Ed. 59 (1951) . . . . . 33

*United States v. Leon*, 468 U.S. 897,906, 104 S. Ct. 3405, 82 L Ed. 2d

677 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *33*

*United States v. Mendenhall*, 446 U.S. 544, 557 (1980) . . . . . . . . . . . . . . . . . . *34*

*United States v. Mykytiuk*, F.3d (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United State v. Pantoja-Sota,* 739 F.2d 1520, 1525 (11th Cir. 1984) . . . . . . . . . *29*

*United States v. Purcell*, 236 F. 3d 1274, 1277 (11 th Cir. 2001) . . . . . . . . . . . . 33

*United States v. Rodriguez-Suazo*, 346 F. 3d 637, 644 (6th Cir. 2003) . . . . . . . . 33

*United States v. Saunders*, 318 F.3d 1257 (11th Cir.) . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Scroggins*, 880 F.2d 1204, 1209 (11th Cir. 1989) . . . . . . . . . . . 37

*United States v. Smith*, 799 F.2d 704, (11th Cir. 1986) . . . . . . . . . . . . . . . . . . . . 34

*United States v. Tapia*, 912 F.2d 1367 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Taylor*, 2006 U.S. App. LEXIS 15107 (11th Cir. June 2006) . . . *27*

*United States v. Tokars*, 95 F.3d 1520 (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . 26

*United States v. Witek,* 61 F.3d 819 (11th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . 29

iv

## STATEMENT OF JURISDICTION

The District Court had jurisdiction of this case pursuant to 18 U.S.C. §3231.

This Court has jurisdiction pursuant to 28 U.S.C. §1291 and 18 U.S.C. §3742.

## STATEMENT OF THE ISSUES

## I. WHETHER THE EVIDENCE WAS SUFFICIENT TO SUSTAIN A CONVICTION.

## II.  WHETHER THE COURT ERRED IN DENYING THE MOTION TO SUPPRESS.

## III.  WHETHER THE COURT ERRED IN SENTENCING WOODS

## IV.  WHETHER THE COURT ERRED IN DENYING WOODS MOTIONS TO DISMISS FOR SPEEDY TRIAL AND DOUBLE JEOPARDY.

## STATEMENT OF CASE[1]

### Course of Proceedings

Claude Woods was arrested on August 14, 2003.  He was indicted in a one

count federal indictment on January 21, 2004.  (D-1)  He was charged with

---

[1]The docket entry sheet will be cited as (D-___) indicating document number. The transcript containing three volumes will be cited (TR-___) indicating volume and page number.  The suppression hearing will be cited (SH-___) indicating suppression hearing and page number.  The sentencing transcript will be cited as (ST-___) indicating sentencing transcript and page number.

1

knowing and intentionally possessing with the intent to distribute approximately 50 grams of methamphetamine in violation of 21 U.S.C. §841(a)(1).

On November 5, 2004 the United States Government issued a writ of habeas corpus ad prosequendum and Woods was brought from custody in the State of Georgia to the Middle District of Alabama. (D-5)

A warrant was received and executed.  On November 17 Woods appeared before a Magistrate Judge and entered a plea of not guilty. (D-11)

A suppression hearing was conducted January 18, 2005.  The motion to suppress was denied.

His trial occurred on May 23, 2005.  The jury found him guilty the same day on the one count indictment.  (D-56)

Woods was sentenced on October 13, 2005.  His sentence was 262 months. (D-64) Woods filed a timely notice of appeal and this appeal follows. (D-65)   He is presently in custody in Florida after having been prosecuted in the Northern District of Florida on related conduct.

## STATEMENT OF FACTS

### SUPPRESSION HEARING

### DAVID ELKINS

He is a police officer with the City of Dothan.  He has worked in that

2

capacity since July 1998. He was at the time of the hearing assigned to the Patrol

Division. Prior to that he was assigned to Vice and Intelligence. He is directed to

August 14, 2003. He was working Vice at that time. His partner was Jon Riley.

They were charged with the assignment of enforcing narcotics, prostitution,

alcohol, follow up on informant information, and patrol division cases. (SH-2-4)

On August 14, 2003 they encountered Claude Woods. They stopped him on

a traffic stop at the 5700 block of South Oates. Prior to stopping him they were

coming from Wal Mart. He was driving. He observed a Cadillac going south

bound on South Oates. That is Highway 231 South. (SH-5) They saw him

crossing the fog line and weaving. It was 10:00 p.m. when they stopped him. (SH-

6)

They observed him cross the fog line three times. They were behind him on

Oates. After they saw him cross the fog line several times they turned on their

lights to stop him. The fog line is a solid line on the shoulder of the road. (SH-7)

They were driving a 2001 Dodge Ram pick-up truck with an extended cab. It did

not have police decals on it. They initiated blue visor lights. He did not

immediately pull over, so they had to turn on their siren. It took him a quarter of a

mile to stop. (SH-8)

Once they pulled the vehicle over they made a traffic stop and requested a

3

marked unit meet them. He was suspected of DUI. (SH-9)

The only thing he was wearing to indicate he was a police officer was a badge. It was located on his hip next to his firearm. His partner also had a badge. (SH-10)

He approached the driver to gather information. He told him he stopped him because he was weaving. The driver told him he was sorry but he had been speaking on the phone with a girl in Georgia. They could see the cell phone. He presented his driver's license and proof of insurance. (SH-10-11)

He noticed an open bottle of beer in his lap and asked him how much he had been drinking. He stated he had just opened the beer and had one prior to that. He asked him to get out of the vehicle for a field sobriety test. Prior to approaching the vehicle he notified the police department by radio of the stop. (SH-11)

Even though they are vice and narcotics they still enforce the traffic laws including DUI's. They requested a marked unit because if he had been DUI they would need the marked unit to transport him. (SH-12)

In approaching the car the officer smelled a faint odor of marijuana coming from the vehicle. On the driver's arm rest on the door was a package of rolling papers. He had a suspicion that the rolling papers were used to roll marijuana

4

cigarettes. They requested the driver exit the car for a field sobriety test. The patrol unit was on the scene at that time. (SH-13-14)

They asked Woods if anything illegal was in his vehicle and he responded no. He asked him if he could search his car and Woods responded that he wasn't searching his fucking car. He still searched the vehicle. (SH-14)

He believed that there was marijuana in the vehicle. This was based on the smell and the rolling papers. After initiating the lights they observed Woods moving around in the vehicle acting as if he was trying to hide something in the seat area. (SH-15)

Other than asking for his license, registration, and insurance, he asked Woods if he was on probation or parole. He said that is something he normally asks at traffic stops. If someone is on parole or probation, they have to do a field contact card. That has all their personal information and a brief narrative of how they came in contact with them. (SH-16)

Woods responded that he was on parole in Georgia for a drug violation. This information he obtained after smelling marijuana. The information about him being on probation for a drug offense added to his belief that he would find marijuana. (SH-17)

While the patrol officer was conducting the field sobriety test he was looking

5

around in the vehicle. He found a zippered bag with a zipper broken underneath the driver's seat. It was a plastic bag. He could not see through it. (SH-18)

After he recovered the bag he opened it all the way. He found methamphetamine or what he believed to be methamphetamine inside the bag. (SH-19)

He continued to look around and found a silver colored metal cigarette box in between the driver's seat and center console. He found a bag of marijuana inside and two other little ziplock baggies containing what he believed to be methamphetamine. (SH-20)

They placed Woods in handcuffs and field tested the substance as positive for methamphetamine. They issued him a citation for an open alcoholic beverage and charged him with possession of marijuana second degree. (SH-21)

Woods entered a plea of guilty to possession of marijuana second degree in Municipal Court, City of Dothan. (SH-22) They also found scales. (SH-22)

### CROSS EXAMINATION

The night of Woods stop he was driving a Cadillac Eldorado. The car was a nice car. (SH-25) Woods did not go off the road but he did go over the line. There are possible explanations for crossing the line which could include someone fiddling with the radio or a cell phone. (SH-27)

6

His car was undercover enough that it was not recognizable as a patrol unit until the lights were activated. (SH-28) They were coming out of Wal-Mart and sitting there when he passed in front of them. They turned out of Wal-Mart, southbound, behind him. (SH-29)

Rather than turn out of Wal-Mart left back to the police station they turned southbound, as if they were going towards Panama City. (SH-30) They followed him close to a mile before they activated their lights. They observed that he had a Georgia tag and was driving a nice vehicle. (SH-31)

Defendant's Exhibit 2 was admitted into evidence. This was a report dealing with the arrest. It indicated that the offense happened at 6500 South Oates. The complaint was for possession of marijuana. However, in the report he indicates that it occurred at the 5700 block. He acknowledges that this was a mistake. (SH-34-35) Despite his having seen the open bottle of Smirnoff Ice he did not smell a strong odor of alcohol, his eyes did not appear to be bloodshot, and his speech did not appear to be slurred. (SH-37)

After you receive the drivers license and insurance you run a check to make sure who you are dealing with. He acknowledged that he was not sure at what point or who actually made a check. (SH-38)

He did not see any marijuana roaches in the ashtray. (SH-38) The rolling

7

papers that he saw are consistent with rolling papers that one could use to roll tobacco. (SH-40) After obtaining the registration it was only a couple of minutes before he asked him to exit the vehicle. The officer in the patrol unit was Officer Givens. (SH-40)

He told Givens that they thought he might be DUI. Woods was asked to go to the back of the vehicle with the Patrol Officer and Riley and he stayed with the vehicle. (SH-41) He searched the vehicle entirely and did not find one thing that indicated evidence of marijuana being smoked. (SH-42)

The bag that was located containing the methamphetamine actually looked like a shaving kit and was concealed under the front seat of the driver's side of the vehicle. He actually had to get down and shine a light underneath the seat to find it. It was zipped almost completely shut. The bag was laying on its side and part of it was zipped and facing the front of the vehicle. Before touching the bag he observed what he believed to be methamphetamine. (SH-43-44) He could see what was in the bag before he picked it up. (SH-45)

Probably ninety percent (90%) of the time when he makes stops he asks people if they are on probation or parole. He does this so that he can get a jump on the paperwork if they are. He admits that at this point he was actually in the business of looking for people who were involved in the drug trade. (SH-48)

8

He denied learning of his Georgia parole status after he ran the license. (SH-48) He did not fill out a field contact report because he ended up arresting him. (SH-49)

He did not place Woods under arrest until he located the controlled substances. He says, however, he stopped him for a field sobriety test and that he patted him down. He did not include field sobriety test information in his report. He was not arrested for DUI. (SH-51)

Without him entering the car and looking under the seat with a flashlight he would never have seen the bag containing the methamphetamine. (SH-53)

He could not see in plain view the metal container between the console and the driver's seat. (SH-53) Woods did not want the vehicle searched but he told him he was searching it anyway. He did not need his consent to search but he asked anyway. (SH-54)

When he made the stop he was more interested in finding drugs than making a traffic stop. (SH-57) There is no record available as to the field sobriety test. (SH-57)

He did not know about the parole warrant until the next day. In the presence of Devin Whittle he made a comment to Woods that he could not believe that he wasn't nervous when he stopped him because of the warrant. (SH-59)

9

**REDIRECT**

In response to the Court's inquiry he indicated that he had five reasons for the search. These were his belief that he had the authority, the smell of marijuana, observation of rolling papers, the time it took Woods to stop, and his movement within the vehicle. (SH-62)

Woods told him that he was looking for a safe place to stop and that is why he did not pull over. He rejected that as an explanation for his refusal to stop. The reason because there was movement in the vehicle, the smell, and the rolling papers. He thought he was hiding some weed. (SH-62-63) The movement he saw in the car was not the normal reaching for the glove compartment to get a wallet. His suspicion was aroused because once they turned the lights on they saw him moving around. He automatically thought he was trying to hide a gun, dope, or something. (SH-63)

The government argued that there were exigent circumstances that caused the highway stop and reasonable suspicion.

The Government's argument in response to the Court's question as to Woods' exception to the warrantless search argument was that the search was reasonable based on the fact that the defendant's car was weaving. The AUSA said the officers action for soliciting personal information was reasonable. The officer

10

smelled marijuana and saw rolling papers. The odor was emitting from the vehicle. The car was mobile. The Government believed it gave rise to the exigent circumstances that were necessary for the officer at that point to search the vehicle. (SH-64) He had no reason to believe that Woods' could have jumped in his vehicle and left. (SH-67) It would not have been unreasonable for him to wait for the results of the field sobriety test to see if they were going to arrest him before he began to conduct his search. If he had been arrested he could have searched the vehicle incident to a lawful arrest. He did not issue a citation for unlawful crossing the lane. He could have. (SH-68)

### JON RILEY

He is presently employed with the Dothan Police Department. He was working as a Narcotics Investigator on August 14, 2003. His partner was Dave Elkins. (SH-72) He was sitting at the light at WalMart actually looking down at what he had just bought. He said that Elkins mentioned to him, look at that car that is driving off the road a little bit, and that is when he looked up. He admits that he was sitting stationary at WalMart. They just looked at the car, saw how he was driving, and turned behind him to follow him. (SH-73)

In following the vehicle he noticed that he was on a cell phone and not staying within the line of travel, mostly going to the right and clipping the grass on

11

the right hand side of the road. He observed this three times. (SH-74) The vehicle

that he was driving had nice rims and was "tricked out". (SH-74-75) The vehicle

was a little flashier than most. They probably followed him three or four miles

before he stopped. They activated the service lights approximately one mile down

the road. He was driving the speed limit. He followed him and he just kept hitting

the fog line on the right hand side of the road, just not paying attention, and talking

on the cell phone. (SH-76)

It was fairly well lit as they followed him up to the point they got to Festival

Drive. They could see in the vehicle pretty well. (SH-76) He agreed that someone

talking on the cell phone would have paid less attention than someone who was

not. (SH-76) Elkins observed an open container of alcohol and indicated that he

might be DUI. They called for assistance in giving a field sobriety test. (SH-78)

Officer Givens came on the scene and began to give him a field sobriety test. (SH-

79)

Givens gave him the horizontal Gaze Nystagmus eye test and the quick one

legged stand. They determined that he was not under the influence of alcohol.

(SH-80) At this point and time Elkins was probably searching the Cadillac. He had

smelled the odor of marijuana. When he was trying to pull him over it took a while

to stop and it looked like he was shoving something under the driver's seat. He

12

also smelled marijuana. He did not do a report. (SH-80)

Burned marijuana smells differently than non-burned marijuana. He found no evidence in the car to indicate burned marijuana. (SH-81-82)

While Woods was at the back of the vehicle he was not free to leave. They were conducting a field sobriety test. There was not any chance of him getting in the car and driving off. (SH-82)

He does not remember at what point the driver's license was run. (SH-82) As a result of the running the license they learned that Woods' was on probation. (SH-83) It came back with a hit indicating probation out of Georgia. (SH-83)

He said that Elkins found what he believed to be methamphetamine under the driver's seat. He believed that it was packaged in a Crown Royal bag. He saw it when he put it on the trunk. (SH- 86)

It is not his practice to ask people that he stops if they are on probation or parole. (SH-87) When he was at the passenger window incident to this stop he did not see any controlled substances in plain view. (SH-87)

The Court makes an inquiry about what he based the search on as to probable cause. He said that he did base it on the odor of marijuana emitting from the vehicle. He said that he was concerned about Woods' reaching under the seat as it

13

was obvious he was trying to hide something. He was concerned about officer safety. He was also concerned as to why Woods did not stop at the Peanut Festival entrance because it was a safe place to stop. (SH-89) He was also concerned that he did not turn in Festival Drive but kept going after they had initiated their sirens. He also indicated that he saw rolling papers in the car. (SH-90)

He admitted that with Woods' being from out of town he would not have necessarily have known that the Festival entrance was a safe place. (SH-91-92)

**TRIAL**

**DAVID ELKINS (TR1-16-34)**

**DIRECT EXAMINATION**

During the time of this trial, Elkins was employed with the City of Dothan Police Department as a police officer. At that time he was a Vice and Intelligence Investigator working narcotics. (TR1-17) Elkins stated that he was working on August 14, 2003 and was partnered with Investigator Riley. (TR1-18)

He stated that on that night he was driving south bound on 231 when he saw a vehicle in the opposite lane in front of him weaving. (TR1-19) He described the weaving car to be a black Cadillac Eldorado that crossed the fog line. This caused him to believe the driver might have been intoxicated. (TR1-20) He stated that after turning on his police lights and siren the vehicle did not immediately stop.

14

(TR1-21) He stated that the vehicle continued to drive approximately a quarter mile, and only stopped on 231 just south of Festival Drive. (TR1-21)

Elkins testified that he approached the driver's side after Investigator Riley had called out the traffic stop. Upon approaching the driver's side window Elkins observed a white male with an opened bottle of beer in his lap and cigarette rolling papers on the arm rest of the vehicle. (TR1-23)

He smelled the faint odor of marijuana. After the driver showed Elkins his drivers license and insurance, he was asked to step out of the vehicle so that a field sobriety test with a uniformed officer could be conducted. Elkins stated that he did not conduct the field sobriety test himself, and instead searched the vehicle. (TR1-24) Elkins started the search of the two-door sedan vehicle at the driver's seat. He stated that underneath the driver's seat he found a black nylon type case with a broken zipper. (TR1-25) Elkins stated the zipper on the bag was not shut and he observed what was inside the bag was what he believed to be methamphetamine. He also stated that next to the nylon bag was a Crown Royal bag. (TR1-26)

Inside the Crown Royal bag was a number of empty sandwich baggies. He then looked near the center console area and found a small silver metal box that contained a small bag of marijuana and what he believed was more methamphetamine. (TR1-27) He stated that he found the silver box in between the

15

seat and the arm rest. He also found another small bag in the back seat that contained a set of digital scales and a metal lock box containing around $2,000. (TR1-28)

Elkins also stated that on the passenger side floorboard he located an ink pen body where the actual pen and ink had been taken out that contained what he thought might be methamphetamine residue. He also stated that he found some marijuana seeds in the floorboard on the drivers side of the vehicle. (TR1-29)

Elkins stated that he field tested the items that he collected from the vehicle. (TR1-29) He stated that the field test indicated the presence of methamphetamine from one of the bags that had come from under the seat. Elkins stated that he then put Woods in the patrol car and took him to the office. (TR1-30)

He then identified Government's Exhibits, 3, 4, 5, 6, and 7 and agreed that they were all objects that were found in the vehicle. (TR1-31-33)

Elkins stated that Woods was arrested on the charge of possession of marijuana in the second degree. This charge was for the amount that was recovered from the silver box. (TR1-33)

Elkins stated that he turned the objects that were found in the silver box over to the Agent Whittle with the DEA in Montgomery. After handing the items over Elkins stated that he had no further dealings with the items. (TR1-34)

16

## CROSS EXAMINATION

Officer Elkins stated that the fact that he and his partner were members of the Vice and Intelligence Unit of the Dothan Police Department had nothing to do with the fact that they stopped Woods on August 14, 2003. Elkins stated he did follow Woods' vehicle in an unmarked car before activating his police lights. He also stated that while he was following Woods' vehicle that he did notice that Woods' vehicle had an out of state tag. (TR1-36)

Elkins stated that Woods told him the reason he had crossed the fog line was because he was on his cellular phone. Woods also told Elkins that a female was following him to the beach and had gotten lost. (TR1-40) Elkins then identified the cell phone that had been seized from Woods. (TR1-41)

Elkins was not sure that there had been an inventory done of the vehicle in this particular case. (TR1-42)

Elkins agreed that Woods voluntarily indicated that he was from the State of Georgia, and also was working as a laborer. (TR1-47) Elkins stated that he formulated the opinion that Woods was a drug user from the drugs found in the vehicle. (TR1-48)

## JON RILEY

## DIRECT EXAMINATION (TR1-51-57)

17

At the time of the trial Riley was employed with the Dothan Police Department as a Narcotics Investigator. (TR1-51)

Officer Riley indicated that on August 14, 2003 he was riding with Investigator David Elkins. Officer Riley stated that after observing Woods Cadillac crossing the fog line the third time they initiated a traffic stop.

Riley testified that he approached the vehicle on the passenger side and basically listened as Elkins asked Woods for his drivers license. Riley stated at that point he did not engage in any conversation with Woods. (TR1-53) Riley said that he observed a Smirnoff beer bottle in between Woods legs as well as the smell of marijuana. Officer Riley did not administer any sobriety test. He only stood and talked to him to see if he appeared to be drunk. Riley testified that Woods did not appear to be drunk. Riley stayed with Woods while Elkins went through the procedures of running the drivers license and checking the vehicle. (TR1-54)

Riley stated that Woods seemed annoyed by the fact that he had been pulled over but that caused no major problems. Riley stated that the only thing he recovered from the vehicle was a century lock box which contained a total of $2,000 rolled in $100 bills. (TR1-56)

**CROSS EXAMINATION (TR1-57-58)**

At this time Riley simply stated that there were other items in the vehicle that

18

were not taken into evidence. These items included clothes, possibly a camera. No weapons were found in the vehicle. (TR1-58)

### VICTOR BRAZENEC (TR1-59-69)

Mr. Brazenec is a Senior Forensic Chemist for the Drug Enforcement Administration. His primary duties include analyzing evidence for the presence of controlled substances and reporting his findings. (TR1-59)

Mr. Brazenec stated that he is familiar with the drug methamphetamine and had been through proper training in forensically evaluating methamphetamine. (TR1-61) Mr. Brazenec indicated that his involvement was analyzing the three exhibits. (TR1-62) Mr. Brazenec identified Government's Exhibit 3 and said that he received this evidence on September 19, 2003. (TR1-63) Mr. Brazenec determined that Exhibit 3 contained dimethamthetaphine hydrochloride with a purity of 93% and had a net weight of 149.1 grams. (TR1-63-64)

Brazenec then identified Government's Exhibit 4 which contained one plastic bag and one ziplock bag. (TR1-65-66) Mr. Brazenec stated that in the green bag was a substance that contained dimethamphetamine hydrochloride with a purity of 97% and a net weight of .45 grams, and in the second bag was a substance that was found to be dimethamphetamine hydrochloride with a purity of 88% and a net weight of 9.1 grams. (TR1-66-67)

19

Mr. Brazenec read a report on these findings and found the report to reflect his analysis. (TR1-67) Mr. Brazenec then identified Government's Exhibit 1, which was a laboratory analysis report for the case. He stated that he did submit this as his final report to the Department. (TR1-68)

**CROSS EXAMINATION (TR1-69-72)**

Mr. Brazenec agreed that in 2003 seeing this amount of methamphetamine with this much quality was not as common. However, the purity level of methamphetamine was commonly higher. (TR1-69) Mr. Brazenec stated that Government's Exhibit 3 appeared to be a granular type form. However, when he received it was in more of a crystalline form. For him to obtain a homogeneous mixture for the identification his lab must grind it into a powder. (TR1-71)

**REDIRECT (TR1-72)**

Mr. Brazenec stated that the physical appearance of the drug was changed by his testing. That did not change the quality of the drug. (TR1-72)

**DEVIN WHITTLE (TR1-72-81)**

At the time of the trial Agent Whittle was employed as a Special Agent with the Department of Justice and the Drug Enforcement Administration. Agent Whittle testified that he was familiar with the drug methamphetamine through his

experience and training. (TR1-73) Agent Whittle stated that he became involved in the case involving Defendant Claude Woods when he received a call from Officer Elkins regarding the traffic stop. Agent Whittle stated that Elkins was interested in the federal government pursuing charges against the defendant. (TR1-74) Agent Whittle testified that he took possession of the evidence that had been seized during the search of Woods' vehicle. (TR1-75)

Agent Whittle then identified Government's Exhibits 6 and 7. He described Exhibit 6 to be a ball point ink pen with a red cap and Exhibit 7 to be a green zipper pouch that contained two sets of digital scales. (TR1-76-77)

Agent Whittle confirmed that he had maintained custody of these two exhibits from the time he received them from the Dothan Police Department. (TR1-77)

Agent Whittle stated that based on the findings and testimony of Brazenec he believed that the two small bags contained small amounts of methamphetamine that were likely user amounts of methamphetamine. However, Agent Whittle believed that the other exhibit, which was the large amount of methamphetamine, was clearly a distribution amount of methamphetamine. (TR1-78) Agent Whittle stated that he believed that the 149 grams of methamphetamine would be worth approximately $28,000. (TR1-78)

21

Agent Whittle believed that there were several other factors that caused him to believe that this amount was intended for distribution. One factor included the electronic scales that were found and the other factor was the sandwich bags that were found that could have possibly been used to break the existing ice down into separate units. The $2,000 that was found in the safe was a factor that caused him to believe this methamphetamine was to be distributed. (TR1-79)

Agent Whittle also believed that the $2,000 found in hundred dollar increments was an indication that he had been selling drugs. (TR1-80)

### CROSS EXAMINATION (TR1-81-92)

Agent Whittle agreed that the testimony that he gave during the trial in relation to what he thought the substances were going to be used for was strictly his opinion. (TR1-81)

Agent Whittle also agreed that the small amount of methamphetamine found in the vehicle was consistent with that for personal use and that Woods was a user. (TR1-83)

Agent Whittle stated that he did believe that scales were consistent with people who sold drugs not used them. (TR1-84)

Agent Whittle testified that he faxed the numbers obtained from Woods' cell phone to the Panama City office to have agents look at them. However, he did not

22

subpoena the records.  (TR1-87)

Agent Whittle stated that at that time he did not make an inquiry to whom the numbers belonged.  He agreed that all of the information he gave regarding distribution of methamphetamine was strictly based on his opinion.  (TR1-89)

### REDIRECT (TR1-92-98)

Agent Whittle stated that the user amount of methamphetamine was found in a different location than the amount that was being reported as the distribution amount.  (TR1-93)

Agent Whittle stated that there was no specific evidence that showed Woods' was a meth user.  (TR1-96) Agent Whittle believed that a person that had been using methamphetamine for many days or hours would have something noticeably wrong with their nose area if they had been snorting methamphetamine.  (TR1-98) Agent Whittle stated that he saw Woods' roughly two days after his arrest and nothing indicated that Woods was a meth user by way of snorting.  (TR1-98)

### RECROSS

Agent Whittle agreed that there were many other ways to ingest methamphetamine, including smoking.  He also agreed that an individual might use a tubular or cylinder object such as a pen to actually smoke the meth.  (TR1-99)

### REDIRECT

At this time Agent Whittle stated that usually when someone is using a tubular object to smoke methamphetamine the tubular object would be some kind of metal. This is because the plastic could possibly melt. (TR1-100)

**GOVERNMENT RESTS**

Out of the presence of the jury the defense moved for judgment of acquittal as to the indictment arguing that the Government has failed to prove a case of distribution. They have proved possession but not distribution. (TR1-103) The motion was denied.

**GOVERNMENT'S CLOSING ARGUMENT (TR1-114-116)**

**DEFENDANT'S CLOSING ARGUMENT (TR1-116-124)**

**GOVERNMENT REBUTTAL (TR1-125-127)**

**SENTENCING**

Woods' made a Sixth Amendment objection to any sentencing enhancements based on the facts found by the Judge and not by the jury. (ST-19)

Woods also objected to the Court's failure to modify the Criminal History Score of VI based on several prior convictions being consolidated offenses. (ST-9) Further Woods argued that the Criminal History Score over-represented the seriousness of his criminal conduct. (ST-10)

The Court denied the objections to the presentence report, adopted the facts

24

and statements contained in the presentence report, and determined the Base

Offense Level at 32 and the Criminal History Score of VI. The guideline range

was 210-262 months. The Court imposed a sentence of 262 months. (ST-11)

Woods argued that he should receive acceptance of responsibility given the

fact that he did not dispute the possession and ownership of the drugs in the

vehicle. (ST-11)

Woods testified as to a substantial substance abuse problem. (ST-13-16)

Woods urged Counsel to make a motion that his case should be dismissed for

failure to comply with speedy trial and to dismiss based on double jeopardy

because of a civil forfeiture related to his arrest and detention in Dothan.

Woods objected to the sentence as unreasonable because he was penalized in

his Criminal History Score with a maximum of VI while he was given a top of the

guideline sentence at 262 months based on the same factor. He relied on the case

of *United States v. Castro-Juarez,* 425 F.3d 430 (7th Cir. 2005). (ST-23)

Woods asked for a ruling on these two motions. Counsel was concerned that

there was an inadequate record but raised the issues at Woods' insistence. Counsel

explained that if the Court made a merits ruling on the motions that he might be

procedurally barred from raising the issues in a 2255. (ST-29-30) After an off the

record discussion with defendant and counsel Woods requested that the Court

25

make a ruling. The Court indicated it was not waiving timeliness.

The Court made its determination that if the motion had been timely made as a motion for judgement of acquittal based on the double jeopardy that it would be denied. (ST-31)

Woods **personally** argued his speedy trial motion indicated that they had 70 days to indict him and get him to trial. He said after the indictment it took 10 months for his arraignment. When he was arrested he was placed on hold with his Georgia parole. He was in Dothan. He said they had 30 days to indict him after his arrest and it took five months for them to indict him and 10 months for arraignment.

In response to the Court's question about how he was prejudiced by the delay he said that there were witnesses that could have been brought in his case that were not. There was a girl in a car actually following him from Georgia and she was not to be found as a result of the delay. (ST-33)

Counsel confirmed that there was discussion about bringing this woman to trial but that she was unavailable based on the length of time it took to get him to Court. (ST-34) The motion for speedy trial is denied. (ST-35)

The court asked the Bureau of Prisons to investigate whether or not the time spent in custody in Georgia could be credited toward his 262 month sentence. (ST-

26

35-36)

## STANDARD OF REVIEW

I. Whether the evidence is sufficient to sustain a defendant's conviction is a question of law which the appellate court reviews de novo. *United States v. Saunders*, 318 F.3d 1257 (11th Cir.)

II. Findings of fact are reviewed for clear error. The district court's application of law to those facts is subject to de novo review. *United States v. Tokars*, 95 F.3d 1520 (11th Cir. 1996)

III. Sentencing post *Booker* is reviewed under a reasonableness standard. *United States v. Taylor*, 2006 U.S. App. LEXIS 15107 (11th Cir. June 2006).

IV. The Court reviews application of law to facts de novo, yet defers to the trial judge's finding of fact unless clearly erroneous. *United States v. Garcia*, 890 F.2d 355 (11th Cir. 1989).

## SUMMARY OF THE ARGUMENT

ISSUE I - Woods' contends that the uncontradicted evidence was that he possessed the drugs found in his vehicle the night of his August 14, 2003 arrest. There was no evidence of distribution or intent. The only distribution evidence was provided by DEA Agent Devin Whittle which he admitted was his opinion and speculation.

ISSUE II - The stop of Woods was pretextual. The officers gave conflicting testimony. Evidence through Government witnesses supports Woods' claim that the evidence should have been suppressed. There was no probable cause for the search.

ISSUE III - Woods argues the Court should have modified the Criminal History Score based on consolidated cases, determined his Criminal History Score over-represents the seriousness of his past criminal conduct, that he should have received a 3E1.1 downward departure for acceptance of responsibility, and that all sentencing factors should have been determined by the jury beyond a reasonable doubt.

ISSUE IV - Woods argues that the District Court abused its discretion denying his motion for dismissal based on a speedy trial violation and double jeopardy violation.

## ARGUMENT

## I. WHETHER THE EVIDENCE WAS SUFFICIENT TO SUSTAIN A CONVICTION.

Woods' was guilty of simple possession of methamphetamine under 21 U.S.C. §844. This was not disputed. There was no evidence presented involving any drug sales but only speculation by DEA Agent Devin Whittle that the larger quantity of methamphetamine was a distribution amount. (TR1-78, 81, 85) There

28

was evidence of Woods' use of drugs and drug using paraphernalia in the vehicle. (TR1-83) Woods had personal property within his vehicle as if he was moving. He was in route to Panama City, Florida from Georgia.

The evidence supported nothing more than simple possession and the conviction should be overturned.

Although the appellate court conducts its review without special deference to the district court, the evidence is viewed in the light most favorable to the Government, with all reasonable inferences and credibility choices made in the Government's favor. *United States v. Calderone*, 127 F.3d at 1324. The verdict must stand if there is substantial evidence to support it; that is, unless no trier of the fact could have found guilt beyond a reasonable doubt. *United States v. Witek*, 61 F.3d 819 (11th Cir. 1995); *United States v. Battle*, 892 F.2d 992, 998 (11th Cir. 1990). If, however, the record reveals a lack of substantial evidence from which a fact finder could find guilt beyond a reasonable doubt, the appellate court must reverse the defendant's conviction. *United State v. Pantoja-Sota*, 739 F.2d 1520, 1525 (11th Cir. 1984). Such is the case at bar.

## II. WHETHER THE COURT ERRED IN DENYING THE MOTION TO SUPPRESS.

Woods was arrested in Dothan, Alabama en route from Georgia to Panama

29

City, Florida.  He was purportedly stopped on a routine traffic stop.  The vice

officers testified they smelled marijuana and saw rolling papers in plain view.

These facts coupled with Woods failure to stop after the police lights were

activated purportedly gave the officers probable cause to search the vehicle.

Interestingly, Elkins testified he routinely questions people as to whether

they are on probation or parole.  He said he did so in the instant case.

Riley admitted the vehicle was "tricked out" and acknowledged that there

were innocent reasons for Woods' failure to immediately stop upon initiation of the

police lights.

Woods failure to stop at Festival Parkway could also be explained by his

being from out of state and not knowing the area.

Woods contends the traffic stop was pretextual and that the officers lacked

probable cause to search.  The officers never established that marijuana had been

smoked in the vehicle and rolling papers in plain view could just have easily been

for tobacco.

Woods submits the following testimony supports his request that the

evidence should have been suppressed.

### DAVID ELKINS

Elkins was not sure at what point or who actually made a check to verify the

drivers license and insurance. (SH-38) No evidence of marijuana being smoked. (SH-42) Elkins denied learning of Woods Georgia parole status after he ran the license. He did not fill out a field contact report because he ended up arresting him. (SH-49)

It would not have been unreasonable for him to wait for the results of the field sobriety test to see if they were going to arrest him before he began to conduct his search. (SH-68) Elkins did not issue a citation for unlawfully crossing the line. (SH-68)

### JON RILEY

He found no evidence in the car to indicate burned marijuana. (SH-81-82) There was not any chance of him getting in the car and driving off. (SH-82) He does not remember at what point the drivers license was run. (SH-82) As a result of running the license they learned Woods' was on probation. It came back with a hit indicating probation out of Georgia. (SH-83)

It is not his practice to ask people that he stops if they are on probation or parole. (SH-87) When he was at the passenger window incident to the stop he did not see any controlled substances in plain view. (SH-87)

Police may only stop a vehicle if the totality of circumstances show that there is probable cause to believe occupant(s) have violated the law (i.e., committed a

31

traffic violation or some other offense.) *United States v. Arvizu*, 122 S.Ct. 744

(220). And though a police officer may order an individual out of the vehicle once

it is stopped, there must be some legitimate basis (i.e., traffic violation) for the stop

of the vehicle. *Whren v. United States*, 517 U.S. 806 (1996); *Pennsylvania v.*

*Mimms*, 434 U.S. 106 (1977).

The Eleventh Circuit in *United States v. Hardy*, 855 F.2d 753, 756 (1988)

cert denied, 489 U. S. 1019, 109 S.Ct. 1137, 103 L.Ed.2d 198 (1989) held that the

proper inquiry for determining whether a stop is pretextual is "whether a reasonable

officer would have made the seizure in the absence of illegitimate motivation."

Georgia  license plates and a "tricked out" car  would certainly not be

enough to provide reasonable suspicion of drug activity.  As noted by the Eleventh

Circuit in *United States v. Tapia*, 912 F.2d 1367 (1990) traveling on the interstate

with Texas license plates (not yet a crime in Alabama) does not provide a minimal,

particularized basis for a conclusion of reasonable suspicion on the part of the

officer.  The allegations of erratic driving to the point of warranting a stop is

negated by the fact that Woods passed the field sobriety test.  The officers admitted

there was no strong smell of alcohol, nor slurred speech, or bloodshot eyes.

The exclusionary rule bars the admission of evidence obtained in violation of

the Constitution, it extends beyond the direct products of police misconduct to

32

evidence derived from the illegal conduct, or "fruit of the poisonous tree." *Nardone v. United States*, 308 U.S. 338, 341 60 S. Ct. 266,268,84 L. Ed.2d 307 (1939). The rule applies not only to illegally obtained evidence itself, but also other incriminating evidence derived from the primary evidence. *Nix v. Williams*, 467 U.S. 431, 444,104 S. Ct. 2501, 2508, 81 L Ed. 2d 377 (1984), *Wong v. United States*, 371 U. S. 471, 83 S. Ct. 407, 9 L Ed. 2d 441 (1963). The purpose behind the exclusion is not to remedy the harm suffered by the victim of the illegal search, but rather to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures. *United States v. Calandra*, 414 U.S. 338, 347, 94 S. Ct. 613, 38 L Ed. 2d 561, 94 (1974). Evidence procured through an illegal search or seizure is not automatically suppressed, but rather the applicability of certain exceptions to the exclusion are considered first. *United States v. Rodriguez-Suazo*, 346 F. 3d 637, 644 (6th Cir. 2003) quoting *United States v. Leon*, 468 U.S. 897,906, 104 S. Ct. 3405, 82 L Ed. 2d 677 (1984). The burden of proof is upon the government to establish an exemption to the Fourth Amendment requirement. See *United States v. Jeffers*, 342 U.S. 48, 51, 72 S. Ct. 93,96 L Ed. 59 (1951).

In *United States v. Purcell*, 236 F. 3d 1274, 1277 (11 th Cir. 2001) the following standard applicable to vehicle stop and searches was stated:

33

The Fourth Amendment protects individuals from unreasonable search and seizure. A traffic stop is a seizure within the meaning of the Fourth Amendment ... Because a routine traffic stop is only a limited form of seizure, it is more analogous to an investigative detention than a custodial arrest ... Therefore, we analyze the legality of these stops under the standard articulated in *Terry v. Ohio* ... Under *Terry*, an officer's actions during a traffic stop must be 'reasonably related in scope to the circumstances which justified the interference in the first place'... Furthermore, the duration of the traffic stop must be limited to the time necessary to effectuate the purpose of the stop... The traffic stop may not last 'any longer than necessary to process the traffic violation' unless there is articulable suspicion of other illegal activity....

It was stated in *Brinegar v. United States*, 388 U.S. 160, 175 (1949)   that:

[Probable cause] mean[s] more than bare  suspicion:

Probable cause exists where the facts and circumstances within their [the Officers] knowledge and of which they had reasonable trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.

This question should be determined by a totality of the circumstances. *United States v. Mendenhall*, 446 U.S. 544, 557 (1980). The burden is on the prosecution to prove such facts. *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968).

Based upon the facts of this case there was no sufficient cause to justify the search.

In the case at bar, as in *United States v. Smith*, 799 F.2d 704, (11th Cir. 1986), no

traffic violation occurred nor was a citation issued. In Smith, the Court noted that in determining when an investigatory stop is unreasonably pretextual, the proper inquiry, again, is not whether the officer could validly have made the stop but whether under the same circumstances a reasonable officer would have made the stop in the absence of the invalid purpose. In this case it appears analogous to the improper type motive rejected by the Fifth Circuit in *United States v. Cruz*, 581 F.2d 535 (5th Cir. 1978) (en banc).

The Fifth Circuit held the stop was an unreasonable seizure under the Fourth Amendment because its purported rationale was merely a pretext for an invalid purpose. Finding the testimony of the deputy inherently unbelievable, the court concluded that the deputy did not stop the car because of a possible traffic violation but instead was "hunting for illegal aliens and stopped [the] automobile to inspect its occupants." 581 F.2d at 542.

As the Court noted in Smith, supra, were we to abandon the rule of Cruz - - which, of course, this panel cannot do - - police officers could easily make the random, arbitrary stops denounced in Terry. With little more than an inarticulate "hunch" of illegal activity an officer could begin following a vehicle and then stop it for the slightest deviation from a completely steady course. This possibility was denounced more than 30 years ago by the Florida Supreme Court in a case remarkably similar to

the present one holding

    ... " that such a feeble reason would justify a halting and searching would mean that all travelers on the highway would hazard such treatment, for who among them would not be guilty of crossing the center line so much as a foot from time to time. All could, therefore, be subjected to inconvenience, ignominy and embarrassment. *Collins v. State*, 65 So.2d 61, 63 (Fla. 1953). Like the Supreme Court of Florida, we believe that such a result would run counter to our Constitution's promise against unreasonable searches and seizures by law enforcement officials."

    This is precisely what happened in the case at bar.

    As the Eleventh Circuit noted in *United States v. Smith*, supra. [D]rug trafficking is a serious menace to this nation, and law enforcement agencies should use every available means toward its eradication - provided that the methods do not offend the protections of the Constitution.  Here a single six-inch deviation from a drivers course did not give reasonable grounds for a stop.  Accordingly, the stop was an unreasonable seizure under the Fourth Amendment."  The same is true in this case and the evidence should have been  suppressed.

    The District Court ignored this Courts precedent cited in  Smith at 799 F.2d 704; *United States v. Miller*, 821 Fd 546 (11th Cir. 1987).  The real question is whether a reasonable officer would have made the seizure in the absence of illegitimate motivation.

    Probable cause simply did not exist.  The officers attempt to manufacture probable cause in hindsight is nonpersuasive.

### III. WHETHER THE COURT ERRED IN SENTENCING WOODS.

At sentencing Woods objected to all of the sentencing enhancements that were not found by the jury beyond a reasonable doubt pursuant to the United States Supreme Court's holding in *Blakely v. Washington*, 542 U.S. _, 124 S.Ct. 2531, 159 L.Ed. 2d 403 (2004).

Woods' argued that his Criminal History Score was wrongly increased because ✓ several prior convictions were consolidated for sentencing. The District Court disagreed.

The offender's total offense level reflects the seriousness of the offense of conviction adjusted for relevant conduct. *United States v. Scroggins*, 880 F.2d 1204, 1209 (11th Cir. 1989). An offender's Criminal History Score "evaluates the need to increase his sentence incrementally to deter him from further criminal activity." *Scroggins*, 880 F.2d at 1210.

Woods objected to the District Court's failure to grant a three level 3E1.1 ✓ departure.

Woods was sentenced to 262 months.

At sentencing Woods objected to the Court imposing a top of the guidelines ✓ decision based on his criminal background when the same was used in determining his Criminal History Score of VI.

37

In support of his argument Woods relied on *United States v. Castro-Juarez*, 425

F.3d 430 (7th Cir. 2005). In *Castro-Juarez* the Seventh Circuit determined his above

the guidelines sentence to be unreasonable because it could not conclude the District

Court's explanation was sufficiently compelling to uphold the District Court's exercise

of discretion. In *Castro-Juarez*, the District Court relied on his criminal history in

making the decision.

In Castro the Court noted:

"Having identified the relevant factors, however, the judge did not single out
any aspect except criminal history. The Court was understandably troubled by Castro-
Juarez's history of several times entering the United States illegally, committing
crimes once in the country, being deported, and then beginning the cycle again. The
judge also expressed dismay over Castro-Juarez's history of violence, especially that
directed against his girlfriend. **These are significant concerns, but they overlap
and, as far as we can tell on this record, are encompassed by the district court's
explicit reference to the text of §4A1.3.** We understand that reference to mean that
the district court was itself drawing an analogy to §4A1.3, yet we have seen that the
analogy does not fully explain the 48-month sentence. And because that sentence is
more than double the high end of the guideline range, we cannot conclude that the
court's explanation is sufficiently compelling. See *Dean*, 414 F.3d at 729."

### SENTENCE UNREASONABLE

An appellant may rebut the presumption of reasonableness if he can demonstrate

that his sentence would be unreasonable when measured against the factors set forth

in 18 U.S.C. 3553(a), *United States v. Mykytiuk*, F.3d (7th Cir. 2005).

Because "reasonableness" is inherently a concept of flexible meaning, generally

lacking precise boundaries, the Second Circuit in *Crosby*, 397 F.3d 103 (2005) declined to fashion any per se rules as to the reasonableness of every sentence within an applicable guideline or the unreasonableness of every sentence outside an applicable guideline. The Second Circuit went further to state that "such per se rules would risk being invalidated as contrary to the Supreme Court's holding in *Booker, FanFan*, because they would effectively re-institute mandatory adherence to the guidelines. (See *Booker/FanFan*, 125 S.Ct. at 794 (Scalia, J. Dissenting in part).

It is clear that the vague and subjective reasonableness standard of review returns federal sentencing to its state pre 1984.

## IV. WHETHER THE COURT ERRED IN DENYING THE MOTION TO SUPPRESS.

Woods insisted that counsel file motions for dismissal of the indictment based on violation of the Speedy Trial Act and double jeopardy. Woods explained at sentencing his version of the speedy trial violation. (ST-33-36) He also urged counsel and she so argued that his indictment should be dismissed because a civil forfeiture created a double jeopardy issue barring criminal prosecution.

The District Court did not decide the timeliness issue but did in fact rule that the motions should be denied. (ST-33-36)

Woods contends that the Court abused its discretion in making these rulings.

39

*United States v. Garcia*, 890 F.2d 355 (11th Cir. 1989)

## CONCLUSION

Wherefore, for the foregoing arguments and citations to authority Woods prays

that this Court vacate his conviction and/or at the very least order a re-sentencing.

Respectfully submitted this 5 day of July 2006.

Susan G. James (ASB7956J64S)

Address of Counsel:
Law Offices of
Susan G. James & Associates
600 S. McDonough St.
Montgomery, AL  36104
(334) 269-3330

## CERTIFICATE OF SERVICE

I hereby certify that a true and complete copy of the foregoing was served upon
Susan Redmond, Assistant United States Attorney, P. O. Box 197, Montgomery,
Alabama, this 5 day of July  2006.

the above instrument was served via:
( )  personal service
(✓) first class mail
( )  certified mail, return receipt requested
( )  facsimile
( )  overnight courier

of Counsel

40

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

NO. 05-15999-BB

CLAUDE WOODS,
Appellant

versus

UNITED STATES OF AMERICA,
Appellee

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

BRIEF OF APPELLEE

LEURA GARRETT CANARY
UNITED STATES ATTORNEY

SUSAN R. REDMOND
Assistant U. S. Attorney
Post Office Box 197
Montgomery, Alabama 36101

ATTORNEYS FOR APPELLEE

AO886-C
**GOVERNMENT
EXHIBIT**

CASE
NO.

EXHIBIT
NO.    2

## United States of America v. Claude Woods

### Appeal No. 05-15999-BB

### CERTIFICATE OF INTERESTED PERSONS
### AND CORPORATE DISCLOSURE STATEMENT

The following persons have an interest in the outcome of this case:

Kevin Butler, Former Attorney for Appellant

Leura Garrett Canary, United States Attorney

Mark E. Fuller, Chief United States District Judge

John T. Harmon, Assistant United States Attorney

Truman Hobbs, United States District Judge

Susan G. James, Attorney for Appellant

Vanzetta Penn McPherson, United States Magistrate Judge

Susan R. Redmond, Assistant United States Attorney

Denise Simmons, Attorney for Appellant

Claude Lee Woods, Appellant/Defendant

C-1 of 1

## STATEMENT REGARDING ORAL ARGUMENT

The United States does not request oral argument.   The facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument. <u>See</u> Fed. R. App. P. 34(a)(2)(C).

## CERTIFICATE OF TYPE SIZE AND STYLE

The size and style of type utilized throughout Appellee's Brief is Times New Roman, 14pt 10 pitch (Legal).

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

Appellee's brief is in compliance with Federal Rule of Appellate Procedure 32(a)(7)(B)(I) in that it contains less than 14,000 words.

# TABLE OF CONTENTS

**PAGE**

Certificate of Interested Persons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-1 of 1

Statement Regarding Oral Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Certificate of Type Size and Style . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Certificate of Compliance with Type-Volume Limitation. . . . . . . . . . . . . . . . . . ii

Authorities Cited . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

Statement of Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    (I)     Course of Proceedings and Disposition in the Court Below . . . . . . . 1

    (ii)    Statement of the Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    (iii)   Standards of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Summary of the Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Argument and Citations of Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    ISSUE I.    WHETHER THE DISTRICT COURT ERRED IN FINDING
               THAT SUFFICIENT EVIDENCE EXISTED TO SUSTAIN
               THE JURY'S VERDICT OF GUILTY . . . . . . . . . . . . . . . . . 16

    ISSUE II    WHETHER THE DISTRICT COURT ERRED IN DENYING
               WOODS' MOTION TO SUPPRESS . . . . . . . . . . . . . . . . . . . 19

ISSUE III    WHETHER THE DISTRICT COURT ERRED IN
SENTENCING WOODS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

ISSUE IV    WHETHER THE DISTRICT COURT ERRED IN DENYING
WOODS' MOTIONS TO DISMISS . . . . . . . . . . . . . . . . . . 27

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

# AUTHORITIES CITED

Barker v. Wingo,

    407 U.S. 514 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32

Carroll v. United States,

    267 U.S. 132, (1925) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Doggett v. United States,

    505 U.S. 647 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Glasser v. United States,

    315 U.S. 60 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Illinois v. Gates,

    462 U.S. 213, 230, (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Jackson v. Virginia,

    443 U.S. 307 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

United States v. Abbell,

    271 F.3d 1286 (11th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

United States v. 817 N.E. 29th Dr., Wilton Manors, Fla.,

    175 F.3d 1304 (11th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

United States v. Baggett,

     901 F.2d 1546, 1548 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

United States v. Booker,

     125 S.Ct. 738 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 24

United States v. Booker,

     543 U.S. 220, 263,125 S. Ct. 738, 766 (2005) . . . . . . . . . . . . . . . . . 24, 25

United States v. Brenson,

     104 F.3d 1267 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

United States v. Chau,

     426 F.3d 1318 (11th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

United States v. Clark,

     83 F.3d 1350 (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 31

United States v. Cooper,

     203 F.3d 1279 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

United States v. Crawford,

     407 F.3d 1174 (11th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

United States v. Gonzalez,

     70 F.3d 1236 (11th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

United States v. Gonzalez,

     71 F.3d 819 (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

United States v. Grisby,

     11 F.3d 806 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

United States v. Hayes,

     40 F.3d 362 (11th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

United States v. Hermanski,

     861 F.2d 1240 (11th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

United States v. James

     No. 05-00009, slip op. at 5 (11th Cir. June 28, 2006) . . . . . . . . . . . . . . . . . 32

United States v. Knowles,

     66 F.3d 1146 (11th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

United States v. Martinez,

     434 F.3d 1318 (11th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

United States v. Nash,

     910 F.2d 749, 752 (11th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

United States v. Petho,

     409 F.3d 1277, 1280 (n.1) (11th Cir.2005) . . . . . . . . . . . . . . . . . . . . . . . . 22

United States v. Poole,

     1878 F.2d 1389 (11th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

United States v. Register,

     182 F.3d 820 (11th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

United States v. Robinson,

     870 F.2d 612  (11th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

United States v. Shelton,

     400 F.3d 1325, 1330 (11th Cir.2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

United States v. Skanes,

     17 F.3d 1352 (11th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

United States v. Starke,

     62 F.3d 1374 (11th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

United States v. Talley,

     108 F.3d 277 (11th Cir., 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

United States v. Talley,

     431 F.3d 784, 788 (11th Cir, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

United States v. To,

     144 F.3d 737 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 16

United States v. Twitty,

 107 F.3d 1482 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 31

United States v. Ursery,

 518 U.S. 267 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

United States v. Ward,

 197 F.3d 1076 (11th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

United States v. Wilks,

 No. 05-14262, slip op. at 5 (11th Cir. Sept. 13, 2006). . . . . . . . . . . . . . . . . 13

United States v. Williams,

 340 F.3d 1239 (11th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

United States v. Williams,

 169 Fed.Appx. 548 (11th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

Whren v. United States,

 517 U.S. 806 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*FEDERAL STATUTES AND RULES*

18 U.S.C. § 3161 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28, 30

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 23, 24, 25

21 U.S.C. § 841(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

Federal Rule of Appellate Procedure 32(a)(7)(B)(I) . . . . . . . . . . . . . . . . . . . . . . . ii

## STATEMENT OF JURISDICTION

The instant case is an appeal from a final judgment in the United States

District Court for the Middle District of Alabama, after the finding of guilt by a

jury. The jurisdiction of this Court rests upon Title 28, United States Code,

Section 1291.

## STATEMENT OF THE ISSUES

**ISSUE I.**    **WHETHER THE DISTRICT COURT ERRED IN FINDING THAT SUFFICIENT EVIDENCE EXISTED TO SUSTAIN THE JURY'S VERDICT OF GUILTY**

**ISSUE II.**   **WHETHER THE DISTRICT COURT ERRED IN DENYING WOODS' MOTION TO SUPPRESS**

**ISSUE III.**  **WHETHER THE DISTRICT COURT ERRED IN SENTENCING WOODS**

**ISSUE IV.**   **WHETHER THE DISTRICT COURT ERRED IN DENYING WOODS' MOTIONS TO DISMISS**

## STATEMENT OF THE CASE

**(I)**    **Course of Proceedings and Disposition in the Court Below**.

On January 21, 2004, a grand jury sitting in the Middle District of Alabama

issued a one-count indictment against Claude Woods (Woods). (R1-1.) Count 1

charged that on or about August 14, 2003, in Dothan, Alabama, within the Middle

District of Alabama, the defendant did knowingly and intentionally possess with

1

intent to distribute 50 grams or more of methamphetamine, a Schedule III Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).(R1-1.)

Woods was arraigned before United States Magistrate Judge Vanzetta Penn McPherson on November 17, 2004, entering a plea of not guilty. (R1- 10.)

On December 16, 2004, Woods filed a <u>Motion to Suppress Stop, Search and Seizure and Citations of Authority.</u>(R1-15.)

On December 28, 2004, the government filed its response to Woods' <u>Motion to Suppress.</u>(R1-21.)

On January 18, 2005, an evidentiary hearing was held before Magistrate Judge Vanzetta Penn McPherson on Woods' <u>Motion to Suppress.</u>(R1-27.)

On January 25, 2005, Woods filed a <u>Supplement to the Motion to Suppress.</u>(R1-28.)

On March 25, 2005, the *Recommendation of the Magistrate Judge* was filed.(R1-31.)

On April 5, 2005, Woods filed an <u>Objection to the Recommendation.</u>(R1-36.)

On April 8, 2005, Woods' motions to suppress were denied by the District Court.(R1-39.)

On April 8, 2005, Woods filed a <u>Motion for Placement on Next Trial Term.</u>(R1-38.)

2

On April 12, 2005, the District Court granted Woods' Motion for Placement and set trial on the May 16, 2005 trial term.(R1- 42.)

On May 23, 2005, a jury trial in the case was held before the Honorable Truman M. Hobbs, United States District Judge for the Middle District of Alabama.(R1- 57.)

On May 23, 2005, the jury found Woods guilty of the violation of Title 21, United States Code, Section 841(a)(1), alleged in the Indictment.(R1- 56.)

On October 13, 2005, a sentencing hearing was held before Chief United States District Judge Mark E. Fuller, at which Woods orally moved for judgment of acquittal pursuant to double jeopardy, speedy trial and denial of due process claims.(R1- 63.)

On October 13, 2005, Judge Fuller denied oral motions for acquittal by Woods and sentenced Woods to 262 months imprisonment, 5 years supervised release, and a special assessment fee of $100 on count 1.(R1-63,64.)

On October 24, 2005, Woods filed a timely Notice of Appeal.(R1- 65.) Woods is currently incarcerated by the Bureau of Prisons.

### (ii)  **Statement of the Facts**

## I. FACTS

SUPPRESSION[1]

At approximately 10:00 p.m. on 14 August 2003, David Elkins ["Elkins"], a

vice and intelligence officer with the Dothan, Alabama police department[2], and his

partner, Jon Riley ["Riley"], were leaving a store parking lot when they saw

Woods proceeding south on Alabama highway 231 in Dothan. (TR.3-5). They

exited the parking lot and turned in a southward direction when they noticed

Woods "crossing the fog line" (TR.6).[3] After he crossed the line "at least three

times", Elkins turned on his emergency lights, signaling Woods to stop (TR.7).

Woods, who was driving a black Cadillac Eldorado, stopped approximately a

---

[1] The facts are taken from the Recommendation of the Magistrate Judge, adopted by the District Court.(R1-31 at 1-5, R1-39.) References made to "TR" are to the transcript of the evidentiary hearing cited elsewhere in this brief as "R3."

Woods had one objection to the facts as adopted by the Court, that being that the recitation of facts should indicate that the question asked of Woods by the officer as to Woods' parole or probation status was asked, "...before the officer had any suspicion" and "...was asked to create suspicion."(R1-36 at 1-2.)

[2] Elkins had been employed as a Dothan police officer since July 1998(TR.3). At the time of the evidentiary hearing, he had been a patrol officer for approximately one year (TR.4). As vice officers, they enforced laws related to "narcotics, prostitution, and alcohol" and followed up on informant information and patrol division cases.(TR.4)

[3] The fog line is the solid white line on the extreme right and left sides of the highway (TR.26). Woods was driving within the posted speed limit (TR.75).

4

quarter of a mile down the highway (TR.7-8, 25). After Woods stopped, Riley notified the police department of the stop and requested a "marked unit" at the scene (TR.11)[4].

According to Elkins, he and Riley suspected that Woods may have been driving under the influence of alcohol (TR.9). When they stopped him, Elkins approached the driver's side, while Riley approached the passenger side; Woods was alone in the vehicle (TR.9-10). Neither man drew a weapon (TR.10, 36). When Elkins advised Woods that he was stopped because of the "weaving", Woods apologized and said that "he was on the phone speaking with a girl in Georgia" (Id.) Elkins saw the telephone (Id.). There is some evidence that the officers knew that he was talking on his cell phone. Riley said that as they pursued Woods, he was "just not paying attention, talking on the cell phone, that type thing" (TR.76).

After Elkins examined Woods' drivers license and his proof of insurance, he "noticed an open bottle of beer" in Woods' lap; when he asked Woods how much he'd had to drink, and Woods replied that he "had just opened that beer and he had

---

[4]Elkins testified that they stopped Woods in the 5700 block of South Oates in Dothan (the same as Highway 231). His written report dated 14 August 2003, and admitted as Defendant's Exh. 1, stated that the stop was made in the 5700 block of South Oates, but his sworn complaint stated that it was made in the 6500 block. Elkins testified that he "made a mistake on the one for that complaint" (TR.34-35).

had one prior to that" (TR.11)[5] Elkins also stated that there was "a faint odor of marijuana coming from the vehicle, and on the driver's armrest of the door was a package of [cigarette] rolling papers" (TR.12-13). Riley also smelled marijuana (TR.80) and saw the cigarette papers, which he said were in "plain view" (TR. 90-91).

Elkins said that he didn't smell alcohol (either on Woods' person or from the open bottle), and he also said that he did not notice anything about the appearance of Woods' eyes or his speech (TR.37, 61-62). Riley, however, testified that he and a third officer, John Givens, smelled alcohol on Woods' person (TR.81). Elkins then asked Woods if he was on parole or probation, and Woods replied that he "was on parole out of Georgia . . . for a drug violation" (TR.17).[6] Elkins then asked Woods to exit the car so that the patrol officers on the scene could conduct a field sobriety test (TR.14).

They asked Woods "if there was anything illegal in his vehicle", and Woods replied "there was not" (TR.14). Elkins then asked Woods for permission to search the vehicle, but Woods declined to consent (TR.14). Nevertheless, Elkins searched

---

[5] Woods later dumped the open beer on the ground (TR.23).

[6] Elkins acknowledged that, when he learned that Woods was indeed on parole in Georgia for a drug violation, that information "heighten[ed]" his suspicion that he would find marijuana in the vehicle (TR. 17-18).

6

the vehicle because he believed that he would find marijuana "[b]ased on the smell and the rolling papers, the time it took [Woods] to stop and him [sic] moving around as we were stopping him" (TR.15).[7]

As Elkins searched Woods' vehicle, he found "a [plastic] zippered bag with a zipper broken underneath the driver's seat" (TR.18). Because the bag was partially opened, Elkins could see its contents before he touched it (TR. 45-46). Elkins opened the bag and found methamphetamine inside (TR.19).[8] He also found a "little silver colored metal cigarette box in between the driver's seat and the center console" containing "a bag of marijuana" and "more methamphetamine" (TR. 20). They found no indication that marijuana had been smoked or burned in the vehicle, but they did find marijuana seeds on the floor (TR. 42). Thereafter, the officers placed Woods in handcuffs (TR. 21).

After the field sobriety test was conducted, officers learned that Woods "was not too impaired to drive" (TR. 50). They continued to search the vehicle, ultimately removing two sets of electronic scales (located in the back seat in a bag)

---

[7]Elkins testified that as they approached Woods' vehicle from behind, he "looked as if he was trying to hide something or bending [sic] around the seat area" (TR. 15).

[8]Elkins recognized the substance as methamphetamine because of his "training and experience (TR. 19). He said that the substance was "not quite like sugar, it's a little coarser and almost like a clear rock salt maybe, small particles of it" (TR. 20). Significantly, however, Elkins "field-tested" the substance "and it did show the presence of methamphetamine" (TR. 21).

(TR. 22). When they searched Woods' person (Id.), he had "some money on him" but no contraband was found (Id.).[9] Woods was arrested for possession of marijuana second degree (Id.). The entire search of the vehicle took approximately "four or five minutes" (TR. 50). Officers also issued him a citation for having an open alcoholic beverage (Id.).

The officers removed from Woods' vehicle the bag of marijuana and the methamphetamine. Woods later entered a guilty plea to the marijuana charge in Dothan municipal court (TR. 21-22).

TRIAL

Testimony at trial established that on August 14, 2003, Woods was the sole driver of a black Cadillac Eldorado.(R2-18, 20.) Woods was seen by Dothan Vice and Narcotics officers, Elkins and Riley, to be driving erratically and weaving across the fog line.(R2-19, 20, 36, 37, 52.) Riley and Elkins effected a stop of the Cadillac.(R2-20-21.) Elkins and Riley approached the Cadillac and saw Woods in the driver's seat with an open bottle of alcohol in his lap, cigarette rolling papers on the door armrest, and smelled marijuana.(R2-23-24, 53.) The officers then searched the vehicle and found: a black zippered case containing

---

[9]Woods had $303.00 in his "pants pocket and another [$500.00] inside his wallet" (TR. 53).

8

methamphetamine under the driver's seat; a Crown Royal bag containing

numerous empty sandwich bags; a silver metal box containing a small amount of

marijuana and methamphetamine between the drivers seat and the center console;

two sets of digital scales; a metal lockbox on the floorboard on the front passenger

side containing a roll of $100 bills totaling $2000.00; and scattered marijuana

seeds on the driver's side floorboard.(R2-25-29, 56.)

Victor Bravenec, a chemist with the Drug Enforcement Administration

(DEA), testified that he tested three exhibits which he found were respectively:

149.1 grams of methamphetamine of 93% purity; .45 grams of methamphetamine

of 97% purity; and 1.9 grams of methamphetamine of 88% purity.(R2-59,62-69.)

Devin Whittle, an agent with DEA for nine years, testified that the three

exhibits, identified by the chemist as methamphetamine, were taken from the

vehicle driven by Woods by the Dothan Police Department and placed in his

custody.(R2-74-75.) Whittle further testified that in his experience, first as a

narcotics officer with the Montgomery Police Department and later as a DEA

agent, the amount of the drugs recovered, the plastic sandwich bags, the digital

scales, and the manner of packaging and amount of money recovered, indicated

that Woods was involved as a distributor of illegal narcotics.(R2-74, 77-80.)

Specifically, Whittle detailed that the purchase price for a gram of

methamphetamine is, conservatively, $200/gram; that it is unusual for a user to have large amounts of methamphetamine; that users rarely carry scales because they typically buy in smaller amounts; that the sandwich bags found are typically used to separate methamphetamine units for distribution; that it is unusual for a user to have a large amount of cash; that the $2000, made up of $100 bills, indicates that he is selling drugs in $100 increments; and that the fact that the $2000 is separated from his other monies and secured in a safe, indicates Woods' desire to protect something of value to him.(R2-79-81.)

SENTENCING

On October 13, 2005, sentencing was held before Chief United States District Judge Mark Fuller.(R4-2.) Woods filed a sentencing memorandum on October 11, 2005, in which he set out the following as mitigating factors to be considered by the court: that the fact that he did not testify at trial is evidence of his acceptance of responsibility and should allow the court to grant him a downward departure pursuant to § 3E1.1; that he was willing to work out a favorable plea agreement; that his mother is disabled and requires his assistance; that his Georgia parole was revoked and he was required to serve a term of imprisonment of ten months as a result; that he is not in need of education or vocational training, that he desires intensive substance abuse counseling; that a

10

sentence of 260 months (the bottom of the suggested guideline range) is excessive;
and, that a ten year term of imprisonment (the statutory minimum) is excessive for
a person who merely possessed controlled substances.(R62- 1-5.)

At sentencing, Woods lodged three objections to the PreSentence Report
(PSR): (1) that, although he does not object to the factual basis outlined in the
PSR, he maintains that the stop was pretextual and that the controlled substances
found within the vehicle were for his personal use; (2) that he should not receive
24 criminal history points as the offenses noted in paragraphs 26, 28, 30 and 31 of
the PSR, which result in the 24 criminal history points, were consolidated for
sentencing and disposed of by way of guilty pleas on June 30, 1999; and (3) that
his suggested criminal history score of IV and guideline range of 210 to 262
months over represents the seriousness of his prior criminal history and his offense
conduct, specifically that all of his prior offense conduct is directly related to his
addiction to methamphetamine.(R4-2, 6, 9, 10.)

The court overruled Woods' objections, adopted the factual statements
contained in the PSR and made specific findings under the guidelines that the
offense level was 32, that the criminal category was VI, that the guideline range
was from 210 - 262 months and the fine range was from $17,500 to
$4,000,000.(R4-10-11.)

11

Woods argued that, pursuant to <u>Booker,</u> 18 U.S.C. § 3553(a) and § 3661, the court should consider a downward adjustment for or as a mitigating factor of, acceptance of responsibility. (R4-11-12.)

Woods reiterated his earlier argument that the criminal history score over represented the seriousness of his criminal conduct and that he was a drug user.(R4- 12-14.)

Woods reiterated the arguments made in his sentencing memorandum.(R4-16-19.)

Finally, Woods objects to the court's enhancing of his punishment and motions for dismissal based on speedy trial violations and double jeopardy.(R4-19-20.)

**(iii)  Standards of Review.**

ISSUE I

Whether evidence is sufficient to sustain a defendant's conviction is a question of law reviewed *de novo.*  <u>United States v. To,</u> 144 F.3d 737 (11th Cir. 1998); <u>United States v. Grisby,</u> 11 F.3d 806 (11th Cir. 1997); <u>United States v. Gonzalez,</u> 71 F.3d 819 (11th Cir. 1996); <u>United States v. Starke,</u> 62 F.3d 1374 (11th Cir. 1995).

ISSUE II

In the context of a motion to suppress, the district court's findings of fact will be upheld unless they were clearly erroneous, but the application of the law to those facts is subject to *de novo* review. United States v. Nash, 910 F.2d 749, 752 (11th Cir. 1990).

ISSUE III

The court reviews for clear error a factual finding that prior convictions are unrelated under § 4A1.2. See United States v. Wilks, No. 05-14262, slip op. at 5 (11th Cir. Sept. 13, 2006).

A district court's decision whether to grant a reduction for acceptance of responsibility under United States Sentencing Guidelines §3E1.1 is reviewed for clear error. United States v. Gonzalez, 70 F.3d 1236 (11th Cir. 1995); United States v. Williams, 340 F.3d 1231(11th Cir. 2003).

This court reviews a sentencing court's determination of sentences under the standard of reasonableness determined with reference to the standards set forth in Title 18, U.S.C. § 3553(a). United States v. Booker, 125 S.Ct. 738 (2005).

ISSUE IV

The appellate court reviews claims under the Speedy Trial Act *de novo*. United States v. Twitty, 107 F.3d 1482 (11th Cir. 1997).

The determination of whether a defendant's constitutional right to a speedy

trial has been violated is a mixed question of law and fact. Questions of law are

reviewed *de novo*, and findings of fact are reviewed under the clearly erroneous

standard. United States v. Clark, 83 F.3d 1350 (11th Cir. 1996).

A district court's double jeopardy ruling is subject to *de novo* review by the

appellate court. United States v. Baggett, 901 F.2d 1546, 1548 (11th Cir. 1990).

## SUMMARY OF THE ARGUMENT

Sufficient evidence was presented at trial to allow the jury to make a finding

that Woods was guilty of possession with intent to distribute more than 50 grams of

methamphetamine and reject Woods' contention that he was guilty of possession of

methamphetamine for personal use only. The evidence showed that Woods was in

possession of 151.45 grams of methamphetamine of at least 88% purity, digital

scales, empty plastic sandwich bags, and $2000.00 cash, in $100 bills rolled together,

found in a metal lockbox separate from the $300.00 found on his person.

The district court properly denied Woods' motion to suppress based on its

finding that the police initiated their stop of Woods because he was driving

erratically, crossing the fog line, weaving, and using his cell phone while driving.

Further, the district court was correct in finding that, once the car was stopped, the

officers had probable cause to search Woods' vehicle for contraband because the

14

officers smelled the odor of marijuana emitting from the vehicle, saw cigarette rolling papers, and saw that Woods had an open container of alcohol in the vehicle (an act which constitutes an offense under Alabama law).

The district court did not err in sentencing Woods because the district court correctly calculated the criminal history score, properly determined that the criminal history score was representative of Woods' criminal history, correctly denied Woods' request for a downward departure for acceptance of responsibility, correctly determined and applied all relevant sentencing factors as set out in Title 18, United States Code, § 3353(a), and reasonably sentenced Woods pursuant to those factors.

The district court did not err in denying Woods' motion for dismissal based on the Speedy Trial Act and double jeopardy, because Woods waived the issues by not timely raising them. In addition, Woods' argument that a speedy trial violation existed, whether pursuant to the Act or to the Clause, is factually and legally incorrect and Woods' argument that a double jeopardy violation existed is incorrect because civil forfeitures do not amount to punishments.

Because Woods' arguments are meritless, the conviction and sentence should be affirmed.

15

## ARGUMENT AND CITATIONS OF AUTHORITY

## ISSUE I.    THE EVIDENCE WAS SUFFICIENT TO SUSTAIN
THE CONVICTION

When making a determination as to the sufficiency of the evidence, the court

must view the evidence in the light most favorable to the government. Glasser v.

United States, 315 U.S. 60 (1942); United States v. Cooper, 203 F.3d 1279,(11th Cir.

2000); United States v. To, 144 F.3d 737 (11th Cir. 1998) .

The appellate court is required to affirm the defendant's conviction unless no

jury reasonably construing the evidence, could have found the defendant guilty

beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307 (1979); United States

v. Ward, 197 F.3d 1076 (11th Cir. 1999); United States v. Brenson, 104 F.3d 1267

(11th Cir. 1997).

For sufficiency purposes the evidence need not exclude every reasonable

hypothesis of innocence; rather, the question is whether a reasonable trier of fact ,

when choosing among reasonable constructions of the evidence, could have found the

defendant guilty beyond a reasonable doubt. United States v. Knowles, 66 F.3d 1146

(11th Cir. 1995.)

The jury is free to choose among reasonable constructions of the evidence.

United States v. Abbell, 271 F.3d 1286 (11th Cir. 2001.)

16

In order to convict a defendant of possession with intent to distribute drugs, the government must prove beyond a reasonable doubt that the defendant knowingly possessed with intent to distribute. United States v. Poole, 878 F.2d 1389 (11th Cir. 1989).

Whether the quantity of drugs possessed is sufficient to support the "intent to distribute" element of the offense is a jury question. The government may offer expert testimony on this issue. United States v. Robinson, 870 F.2d 612 (11th Cir. 1989).

Woods concedes the sufficiency of the evidence concerning drug possession, type (methamphetamine), quantity (more than 150 grams), and quality (ice). Therefore, the only claim he presents is that the evidence was insufficient to support the jury's verdict of possession with intent to distribute.

The record is clear that the facts adduced at trial and found by the jury are: that Woods was the sole driver of a black Cadillac Eldorado on August 14, 2003(R2-18,20.); that a search of the vehicle uncovered, a black zippered case containing methamphetamine under the drivers seat, a Crown Royal bag containing numerous empty sandwich bags, a silver metal box containing a small amount of marijuana as well as methamphetamine between the drivers seat and the center console, two sets of digital scales, and a metal lockbox on the floorboard on the front passenger side containing a roll of $100 bills totaling $2000.00.(R2-25-29, 56.)

17

Further evidence was presented that established that the substances tested were respectively: 149.1 grams of methamphetamine of 93% purity; .45 grams of methamphetamine of 97% purity; and 1.9 grams of methamphetamine of 88% purity.(R2-59, 62-69.)

Finally, DEA agent Whittle testified that in his experience as a DEA agent, the amount of the drugs recovered, the plastic bags, the digital scales, and the manner of packaging and amount of money recovered indicated that Woods was involved as a distributor of illegal narcotics.(R2-78-80.) Specifically, Whittle detailed that the purchase price for a gram of methamphetamine is, conservatively, $200/gram; that it is unusual for a user to have large amounts of methamphetamine; that users rarely carry scales because they typically buy in smaller amounts; that the sandwich bags found are typically used to separate methamphetamine units for distribution; that it is unusual for a user to have a large amount of cash; that the $2000, made up of $100 bills, indicates that he is selling drugs in $100 increments; and that the fact that the $2000 is separated from his other monies and secured in a safe, indicates Woods' desire to protect something of value to him.(R2-79-81.)

Woods asked for and received a jury charge as to Title 18, United States Code, Section 844(a), simple possession of methamphetamine.(R2-134-135.) It is clear that the jury considered the fact that Woods had over 150 grams of pure

18

methamphetamine, plastic sandwich bags, scales, and a large amount of distinctive

currency in reaching its conclusion. The jury freely chose to reject Woods' argument

that he was a drug user in possession of a user amount of pure methamphetamine and

found him guilty as charged to possession with intent to distribute

methamphetamine.(R1-56.)

The jury properly found and the district court properly upheld the finding that

Woods had possessed more than 50 grams of methamphetamine with the intent to

distribute. The evidence was sufficient to sustain the finding of guilt.

## ISSUE II.   THE   DISTRICT   COURT   DID   NOT   ERR IN DENYING WOODS' MOTION TO SUPPRESS

Whren v. United States, 517 U.S. 806 (1996), established that the detention of

a motorist is reasonable where probable cause exists to believe that a traffic violation

has occurred. The fact that the police may be motivated to stop the vehicle which has

committed a violation because of a  suspicion that the occupants committed some

other offense, is not a basis for invalidating the initial stop.

In the present case, the undisputed facts are that the officers initiated their stop

of Woods because he was driving erratically, "crossing the fog line", "weaving", and

using his cell phone while driving.(R1-31, at 6-7.)

The district court correctly found that the stop of the vehicle, therefore, was

proper because officers had probable cause to believe that a traffic violation had occurred, i.e. driving under the influence.

The fact that Woods was not cited for being inebriated while driving his vehicle does not negate the probable cause which warranted the stop.

Because the stop of the vehicle was lawful, the district court was correct in determining that officers had probable cause to conduct a search of the vehicle.

When there is probable cause to believe that contraband is in a vehicle, the vehicle may be searched without a warrant. Carroll v. United States, 267 U.S. 132 (1925).

Probable cause exists when there is, "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983); United States v. Talley, 108 F.3d 277, 281 (11th Cir.1997).

In the present case the facts are undisputed that upon stopping Woods, both officers smelled the odor of marijuana emitting from the vehicle, both officers observed cigarette rolling papers in plain view on the driver's armrest, and both officers saw an open container of alcohol in Woods' lap. (R1-31 at 7.) Thus, the officers had reason to believe that the vehicle contained contraband which established probable cause for the search of the vehicle.

Because the district court correctly applied the facts to the law in determining

that Woods' suppression motion be denied, the court did not err in reaching its' conclusion.

## ISSUE III.  WHETHER THE DISTRICT COURT ERRED IN SENTENCING WOODS

### A.    <u>Criminal History Calculation</u>

Woods argues that the district court erred in sentencing him by incorrectly computing his criminal history score by improperly treating consolidated offenses as separate convictions.

U.S.S.G. § 4A1.2(a)(2) states, in part, that prior sentences imposed in unrelated cases are to be counted separately. Application Note 3 of that same section says, in part, that prior sentences are not considered related if they were for offenses that were separated by an intervening arrest.

Woods did not object to the factual representations of his many arrests recounted in the Pre-Sentence Report and the court accepted and adopted those facts at sentencing. The record is clear that Woods did in fact consummate guilty pleas to numerous offenses separated by intervening arrests, on June 30, 1999.

The Court has held, "...failure to dispute the facts contained in the PSI operates as an admission of those facts and, since he admitted the facts underlying the upward departure, there is no Sixth Amendment violation." <u>United States v.</u>

21

Williams, 169 Fed. Appx. 548, 551 (11th Cir. 2006); United States v. Shelton, 400

F.3d 1325, 1330 (11th Cir. 2005) (factual statements in PSI were deemed admitted

as true because defendant raised no objections to them); United States v. Petho,

409 F.3d 1277, 1280 n. 1 (11th Cir. 2005) ("Because Petho admitted to the facts

underlying these enhancements, there is no Sixth Amendment error.").

Based on the undisputed facts and the correct application of law and legal

principle, the district court did not err in overruling Woods' objections to the

computation of his criminal history score.

## B.    Denial of Acceptance of Responsibility

Woods objected to the denial by the district court of his request for a

downward departure pursuant to U.S.S.G. § 3E1.1 Acceptance of Responsibility.

Application Note 2 states, in part, that the adjustment is not intended to apply to a

defendant who puts the government to its burden of proof at trial by denying the

essential factual elements of guilt, and is convicted.

That is exactly what happened here. Woods was charged in a one count

indictment with possession with intent to distribute.(R1-1.) Intent to distribute is

one of the elements the government must establish beyond a reasonable

doubt.(R2-133.) Woods mounted a defense at trial and maintained throughout

sentencing that he did not intend to distribute the illegal narcotics found in his

22

possession but instead, was in possession of the substances for his personal use.(R2- 15, R4-11-14.)

The district court did not err in denying Woods' request for a downward departure for acceptance of responsibility given the facts, the law, and the legal principles taken into consideration.

## C.    Sentencing at Top End of Guideline Range

Woods objected to the recommendation of the United States Probation Office that he receive a sentence at the top of the proposed advisory sentencing guidelines.(R4-12.) The district court did adopt the proposed advisory sentencing guidelines and did sentence Woods to the top of the determined guideline range.(R4-10-11,20.) Woods objected and argued that the basis of the recommendation was Woods' criminal history score of VI.(R4-22-24.)

There is no factual record that supports Woods' contention that the district court sentenced him to the top of the determined advisory guideline range because of his criminal history. Indeed, the record is clear that the district court properly took the determined advisory sentencing guideline range into consideration as well as the factors set out in Title 18, United States Code, § 3553(a). The court did not err in imposing a sentence at the top of the determined guideline range.

23

The Court has held that,"...a post-Booker appeal based on the 'unreasonableness' of a sentence, whether within or outside the advisory guidelines range, is an appeal asserting that the sentence was imposed in violation of law pursuant to § 3742(a)(1)." United States v. Martinez, 434 F.3d 1318, 1322 (11th Cir. 2006) (per curiam).

Following Booker, the Court stated, "the district court must calculate the Guidelines range accurately... After it has made this calculation, the district court may impose a more severe or more lenient sentence as long as the sentence is reasonable, see [United States v. Booker, 543 U.S. 220, 263,125 S. Ct. 738, 766 (2005)]." First, correctly calculate the defendant's Guidelines range, then, using the 18 U.S.C. § 3553(a) sentencing factors, the court "may impose a more severe or more lenient sentence as long as it is reasonable." United States v. Crawford, 407 F.3d 1174, 1179 (11th Cir. 2005).

The § 3553(a) factors include the available sentences, the applicable Guidelines range and policy statements, the nature and circumstances of the offense, and the need for the sentence to (1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense, (2) afford adequate deterrence to criminal conduct, (3) protect the public from further

24

crimes of the defendant, and (4) provide the defendant with needed correctional treatment. 18 U.S.C. § 3553(a).

The Court held in United States v. Talley that,"[T]he party who challenges the sentence bears the burden of establishing that the sentence is unreasonable in the light of both th[e] record and the factors in section 3553(a)." United States v. Talley, 431 F.3d 784, 788 (11th Cir, 2005).

The district court clearly reviewed the uncontested facts of this case, correctly computed and applied the correct advisory sentencing guideline range and considered the factors set out in § 3553(a) in reaching the sentence.(R4-20-22.)

The district court correctly sentenced Woods to a sentence that would reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public and provide Woods with the needed vocational, educational and medical treatment in the most effective manner.(R4-21-22.)

Woods fails in his attempt to establish that his sentence is unreasonable in light of the record and the factors in § 3553(a).

25

## **D.    Guideline Enhancements Not Based on Jury Verdict**

Woods' final argument is that at sentencing he objected to all sentencing enhancements that were not found by the jury beyond a reasonable doubt.

While it is true that at sentencing Woods objected to, "...the Court's enhancing his punishment."(R4-19.) However, Woods never stated what enhancement the objection referenced. It is equally clear that Woods' appeal does not specify what alleged enhancement is being referenced. The government presumes that the objection was to the district court's finding that Woods possessed with intent to distribute at least 50 grams but not more than 150 grams of "ice".

Under Booker, sentencing based on judicial fact-finding is permissible, as long as the district court treats the sentencing guidelines as advisory. *See* United States v. Chau, 426 F.3d 1318, 1324 (11th Cir. 2005).

The record clearly establishes that the 140.00 plus grams of the substance possessed by Woods is "ice".(R2-59,62-69.)

The record also clearly establishes that the district court did treat the sentencing guidelines as advisory.(R4-7-8, 20.)

Because the district court correctly applied the facts to the law in determining the correct sentence, the court did not err in reaching its conclusion

26

## ISSUE IV.  THE DISTRICT COURT DID NOT ERR IN DENYING WOODS' MOTIONS TO DISMISS

Woods argues that the district court abused its discretion in denying his motion to dismiss based on violations of speedy trial. The record is clear that Woods first raised this issue at sentencing.(R4-25-27.)

Although it appears that Woods' claim of speedy trial violation is raised pursuant to Title 18 U.S.C. § 3161, et seq., the government is unsure whether Woods' claim is based on statutory or constitutional protections. The government offers the following analysis of Woods' claim as to both the Speedy Trial Act and the Speedy Trial Clause of the Sixth Amendment Clause, under which, in either case, Woods' claim is without merit.

### A.        Speedy Trial Act

The Speedy Trial Act requires that an indictment be returned within 30 days from the date of arrest. 18 U.S.C. § 3161(b); United States v. Williams, 314 F.3d 552 (11th Cir. 2002). The first day of the 30-day period is the day after arrest. United States v. Skanes, 17 F.3d 1352 (11th Cir. 1994).

The Act also provides a mandatory 30-day period between the return of the indictment and the beginning of trial to enable the defense to prepare. 18 U.S.C. § 3161(c)(2).

27

The Act further states that trial must commence within seventy days of the return of the indictment, or from the date the defendant appeared before a judicial officer of the court in which the charge is pending, whichever date last occurs. 18 U.S.C. § 3161(c)(1); United States v. Hermanski, 861 F.2d 1240 (11th Cir. 1988).

The Act also presents and provides for many periods of "excludable time". 18 U.S.C. § 3161(h).

Finally, a defendant must file a motion to dismiss, pursuant to the Speedy Trial Act, prior to trial, or any violation of the Act is deemed waived. 18 U.S.C. § 3162(a)(2). Here, Woods did not file his motion until sentencing, and therefore he has waived this claim.

Even absent waiver, Woods' claim would fail. Woods argues: (1.) that the government had 30 days from the date of arrest to indict him and that the time from arrest to indictment was 5 months; (2.) that the government had 70 days to bring him to trial after indictment and that because the time from indictment to arraignment was 10 months, the time from indictment to trial exceeded the 70 day requirement; (3.) that he was prejudiced because, "there may have been some witnesses in [his] case that [he] could not have got in touch with because [he] had lost contact with them."; and, that as a result of the aforementioned, his rights were violated.(R4-31-33.)

28

Woods was arrested by the State of Alabama on August 14, 2003, for

Possession of Marijuana in the Second Degree and for having an open container of

alcohol.(R2-33, 43-44.) The State of Alabama (City of Dothan) prosecuted him on

those charges.(R2-25.) At the time of his arrest in Alabama, Woods was on parole

from the State of Georgia . Woods' parole was revoked by Georgia and he served

10 months as a result.(R1-62 at 11.) The United States indicted Woods on  January

21, 2004.(R1-1.) An arrest warrant was issued in the federal case on January 22,

2004.(R1-2.) Woods was taken into federal custody on or about November 17,

2004.(R1-11.) Woods' first Motion to Suppress was filed on December 17,

2004.(R1-15.) On December 12, 2004, Woods filed a Motion to Continue

Trial.(R1-18.) On January 1, 2005, Woods filed a Motion to Continue Suppression

Hearing.(R1-22.) On January 18, 2005, an evidentiary hearing was held on the

Motion to Suppress.(R1-27.) On January 25, 2005, Woods filed a Supplemental

Motion to Suppress.(R1-28.) On March 25, 2005, the *Recommendation of the*

*Magistrate Judge* was filed as to the Motion to Suppress.(R1-31.) On April 5,

2005, Woods filed a Motion for Extension of Time to File Objections to the

*Magistrate Report and Recommendations*.(R1-35.) On April 5, 2005, Woods filed

his Objections to the *Magistrate Report and Recommendations*.(R1-36.) On April

8, 2005, Woods filed a Notice to Extend Time for Change of Plea and Placement

29

on Next Trial Calendar.(R1-38.) On April 8, 2005, the district court denied the Motion to Suppress.(R1-39.) On May 23, 2005, trial in United States v. Woods was held.(R1-57.)

The record establishes that Woods was arrested by the federal government pursuant only to indictment in the instant case, therefore his argument that his speedy trial rights were violated, pursuant to § 3161(b) because 5 months had elapsed between arrest and indictment on federal charges, fails.(R1-1,11.)

Title 18, United States Code, § 3161(c)(1) says, in part, that in any case in which a plea of not guilty is entered, the trial of a defendant charged in an indictment with the commission of an offense shall commence within seventy days from the filing date (and making public) of the indictment, or from the date the defendant has appeared before a judicial officer of the court in which the federal charge was pending, whichever date last occurs.

The record establishes that the time, post-indictment, from the date Woods appeared before a judicial officer of the court in which the federal charge was pending to trial was well over 70 days.(R1-1, 57.) However, Title 18, United States Code, § 3161(h)(1)(F) and (h)(8)(A) state, respectively, in part, the following periods of delay shall be excluded in computing the time within which the trial of any such offense must commence: any period of delay resulting from

30

other proceedings concerning the defendant, including but not limited to- delay

resulting from any pretrial motion, from the filing of the motion to the conclusion

of the hearing on, or prompt disposition of, such motion; and any period of delay

resulting from a continuance granted by any judge at the request of the defendant

or his counsel, if the judge granted the continuance on the basis of his findings

that the ends of justice served by taking such action outweigh the best interest of

the public and the defendant in a speedy trial.

Therefore, the time from indictment to trial was actually 36 days and

Woods' argument  that his speedy trial rights were violated because more than 10

months had elapsed between indictment and trial, fails.

### B.        **Speedy Trial Clause**

Speedy trial challenges in the context of post-indictment delays are subject

to a four-factor test established by the United States Supreme Court in Barker v.

Wingo, 407 U.S. 514 (1972). The factors are (1) length of the delay; (2) reason for

the delay; (3) defendant's assertion of the speedy trial right; and (4) prejudice to

the defendant. United States v. Twitty, 107 F.3d 1482 (11th Cir. 1997); United

States v. Clark, 83 F.3d 1350 (11th Cir. 1996); United States v. Hayes, 40 F.3d 362

(11th Cir. 1994). To trigger a speedy trial analysis, a defendant must first show that

the length of the delay between indictment and arrest was "presumptively

31

prejudicial." Doggett v. United States, 505 U.S. 647 (1992). Only if the threshold

point is satisfied may the court proceed with the final three factors in the Barker

analysis. Delays exceeding one year are generally found to be presumptively

prejudicial. United States v. Register, 182 F.3d 820 (11th Cir. 1999). Although, the

appellate court has held that a ten-year delay in bringing a defendant to trial did

not violate a defendant's Sixth Amendment's protections. United States v. James,

No. 05-00009, slip op. at 5 (11th Cir. June 28, 2006).

Woods argues: (1.) that the government had 30 days from the date of arrest

to indict him and that the time from arrest to indictment was 5 months; (2.) that the

government had 70 days to bring him to trial after indictment and that because the

time from indictment to arraignment was 10 months, the time from indictment to

trial exceeded the 70 day requirement; (3.) that he was prejudiced because, "there

may have been some witnesses in [his] case that [he] could not have got in touch

with because [he] had lost contact with them."; and, that as a result of the

aforementioned, his rights were violated.(R4-31-33.)

Woods was arrested by the State of Alabama on August 14, 2003, for

Possession of Marijuana in the Second Degree and for having an open container of

alcohol.(R2-33, 43-44.) The State of Alabama (City of Dothan) prosecuted him on

those charges.(R2-25.) At the time of his arrest in Alabama, Woods was on parole

from the State of Georgia . Woods' parole was revoked by Georgia and he served 10 months as a result.(R1-62 at 11.) The United States indicted Woods on January 21, 2004.(R1-1.) An arrest warrant issued in the federal case on January 22, 2004.(R1-2.) Woods was taken into federal custody on or about November 17, 2004.(R1-11.) Woods' first Motion to Suppress was filed on December 17, 2004.(R1-15.) On December 12, 2004, Woods filed a Motion to Continue Trial.(R1-18.) On January 1, 2005, Woods filed a Motion to Continue Suppression Hearing.(R1-22.) On January 18, 2005, an evidentiary hearing was held on the Motion to Suppress.(R1-27.) On January 25, 2005, Woods filed a Supplemental Motion to Suppress.(R1-28.) On March 25, 2005, the *Recommendation of the Magistrate Judge* was filed as to the Motion to Suppress.(R1-31.) On April 5, 2005, Woods filed a Motion for Extension of Time to File Objections to the *Magistrate Report and Recommendations*.(R1-35.) On April 5, 2005, Woods filed his Objections to the *Magistrate Report and Recommendations*.(R1-36.) On April 8, 2005, Woods filed a Notice to Extend Time for Change of Plea and Placement on Next Trial Calendar.(R1-38.) On April 8, 2005, the district court denied the Motion to Suppress.(R1-39.) On May 23, 2005, trial in United States v. Woods was held.(R1-57.)

33

Woods argues that his speedy trial rights were violated because 10 months elapsed between his indictment and arrest and that, as a result of the delay he was prejudiced because, "there may have been some witnesses in [his] case that [he] could not have got in touch with because [he] had lost contact with them."; and, that as a result of the aforementioned, his rights were violated.(R4-31-33.). Woods has failed to establish that the length of the delay was presumptively prejudicial, therefore, because Woods has not satisfied the threshold point, this Court need not proceed further with a Barker analysis.

Presuming, arguendo, that Woods had established the first factor of Barker, his argument fails,  as the United States could in no way be seen to have caused the delay between indictment and arrest. The record clearly establishes that Woods was in the custody of a sovereign state, Georgia, serving a sentence.(R1-1-8.) Because the delay was not caused by the United States, Woods' argument would, again, fail.

### C.        Double Jeopardy

Woods argues that the district court abused its discretion in denying his motion to dismiss based on violations of double jeopardy. The record is clear that Woods first raised this issue at sentencing.(R4-25-31.)

34

Woods argues that the civil forfeiture of his property, by the State of Alabama, and the criminal prosecution by the United States of America are based on the same conduct and therefore, he is being doubly punished for the same offense.

However, civil forfeitures do not amount to punishment for purposes of the Double Jeopardy Clause of the Fifth Amendment. <u>United States v. Ursery</u>, 518 U.S. 267 (1996); <u>United States v. 817 N.E. 29th Dr., Wilton Manors, Fla.</u>, 175 F.3d 1304 (11th Cir. 1999).

Moreover, even if Alabama had imposed a criminal punishment, as a separate sovereign, the federal government could impose a separate punishment. <u>See</u> <u>Heath v. Alabama</u>, 474 U.S. 82 (1985).

## CONCLUSION

Because sufficient evidence was presented to the jury to establish the elements of the charged offense, because the district court correctly denied the suppression motion, because the district court correctly calculated and applied the advisory sentencing guidelines and correctly evaluated the facts of the case and the factors of § 3553(a), and because the district court correctly denied motions to dismiss based on speedy trial and double jeopardy, Woods' conviction and sentence should be AFFIRMED.

Respectfully submitted this 14th day of September, 2006.

> LEURA GARRETT CANARY
> UNITED STATES ATTORNEY
>
> Susan R. Redmond
> Assistant United States Attorney

## CERTIFICATE OF SERVICE

I, Susan R. Redmond, Assistant United States Attorney, hereby certify that I

have served a copy of the foregoing by depositing a copy of same in the United States

mail, first class, postage prepaid and properly addressed on this the 14th day of

September, 2006, on the following:

Ms. Susan G. James
Susan G. James and Associates
600 South McDonough Street
Montgomery, Alabama 36104


Susan R. Redmond
Assistant United States Attorney

37

[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

| FILED |
| U.S. COURT OF APPEALS |
| ELEVENTH CIRCUIT |
| FEB 9, 2007 |
| THOMAS K. KAHN |
| CLERK |

No. 05-15999
Non-Argument Calendar

D. C. Docket No. 04-00012-CR-F-S

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CLAUDE LEE WOODS,

Defendant-Appellant.

Appeal from the United States District Court
for the Middle District of Alabama

(February 9, 2007)

Before ANDERSON, DUBINA and BARKETT, Circuit Judges.

PER CURIAM:

Appellant Claude Lee Woods appeals the district court's order denying his

motion to suppress evidence discovered during a search of his car. He also appeals
his conviction and 262-month sentence, imposed after a jury found him guilty of
possession with intent to distribute 50 grams or more of methamphetamine, in
violation of 21 U.S.C. § 841(a)(1). Finally, Woods appeals the district court's
order denying his motion to dismiss for violation of his speedy trial and double
jeopardy rights.

This case involved a warrantless search of Woods's car, during which police
officers found more than 149 grams of methamphetamine and other drug
paraphernalia. Woods argues that there was no probable cause for the police
officers to stop him or to perform a search of his car. Woods also argues that there
is insufficient evidence to support a finding that he intended to distribute
methamphetamine. Further, he contends that the district court erred in calculating
his guideline sentence range and imposed an unreasonable sentence. Finally,
Woods alleges that the district court erred in denying his motion to dismiss for
violation of his speedy trial rights because too much time passed between his
indictment and trial, and for violation of his double jeopardy rights because, he
alleges, the state civil forfeiture of his property should have barred the federal
prosecution.

2

## I. Motion to Suppress

In reviewing a district court's denial of a motion to suppress, we employ a mixed standard of review. *United States v. Simms*, 385 F.3d 1347, 1356 (11th Cir. 2004). We review the district court's findings of fact for clear error, and the district court's application of the law to those facts *de novo*. *Id.* "[W]hen considering a ruling on a motion to suppress, all facts are construed in the light most favorable to the party prevailing in the district court," which is the government in this case. *United States v. Hromada*, 49 F.3d 685, 688 (11th Cir. 1995).

The Fourth Amendment guarantees that individuals will be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." *Whren v. United States*, 517 U.S. 806, 809-10, 116 S. Ct. 1769, 1772 (1996). Therefore, an automobile stop is "subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Id.* at 810, 116 S. Ct. at 1772. The "decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id.* Alabama law prohibits

3

individuals from operating motor vehicles if they are under the influence of alcohol. ALA. CODE § 32-5A-191(a).

Regarding the scope of a law enforcement officer's ability to search a suspect, his possessions, or his residence, "[t]he Fourth Amendment generally requires police to secure a warrant before conducting a search." *Maryland v. Dyson*, 527 U.S. 465, 466, 119 S. Ct. 2013, 2014 (1999). Searches of vehicles, however, are an established exception to the requirement for a warrant. *Id.* The automobile exception allows officers to search any item or compartment in the car that might contain the object of the search without a warrant, as long as they have probable cause to believe that it holds evidence of a crime. *United States v. Strickland*, 902 F.2d 937, 942 (11th Cir. 1990). The automobile exception does not contain a separate exigency requirement. *Dyson*, 527 U.S. at 466-67, 119 S. Ct. at 2014. "If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment permits police to search the vehicle without more." *Id.* at 467, 119 S. Ct. at 2014 (quotation omitted). "[T]he requirement of exigent circumstances is satisfied by the 'ready mobility' *inherent* in all automobiles that reasonably appear to be capable of functioning." *United States v. Nixon*, 918 F.2d 895, 903 (11th Cir. 1990).

We decide probable cause issues on an objective basis, without regard to the

4

law enforcement officers' subjective beliefs. *Craig v. Singletary*, 127 F.3d 1030, 1042 (11th Cir. 1997). "Probable cause for a search exists when under the totality of the circumstances there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Magluta,* 418 F.3d 1166, 1182 (11th Cir. 2005) (quotations omitted), *cert. denied*, 126 S. Ct. 2966 (2006).

Here, we conclude from the record that the district court correctly denied Woods's motion to suppress because there was probable cause for the traffic stop and probable cause for the search of Woods's car. First, construing the evidence in the light most favorable to the government, the traffic stop was not pretextual because the officers observed Woods weave over the fog line at least three times. This weaving was sufficient to establish probable cause that a traffic violation occurred because weaving indicates that the driver may be under the influence of alcohol, which is a traffic violation in Alabama. *See Strickland*, 902 F.2d at 939-41; ALA. CODE § 32-5A-191(a).

Second, the officers had probable cause to search Woods's car, making the search lawful. *See Magluta*, 418 F.3d at 1182. Both police officers observed that Woods had an opened alcoholic beverage in his lap while driving. They also observed rolling papers in the driver's side door that are commonly used to make

5

marijuana cigarettes. Both officers smelled the faint odor of burnt marijuana. Given all of these observations, the officers had probable cause to believe that contraband would be found in the car. We conclude that the district court properly denied Woods's motion to suppress because the warrantless search was legal under the automobile exception.

## II. Sufficiency of the Evidence

We review "challenges to the sufficiency of the evidence *de novo*, viewing the evidence in the light most favorable to the government." *United States v. Futrell*, 209 F.3d 1286, 1288 (11th Cir. 2000). "A conviction must be upheld unless the jury could not have found the defendant guilty under any reasonable construction of the evidence." *United States v. Chastain*, 198 F.3d 1338, 1351 (11th Cir. 1999). We do not consider the sufficiency of the evidence to prove elements that are not challenged on appeal. *See United States v. Starrett*, 55 F.3d 1525, 1541-42 (11th Cir. 1995).

Section 841(a)(1) of Title 21of the U.S. Code defines the offense of which Woods was convicted and states that "it shall be unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1). In order to convict a defendant of possession with the intent to

6

distribute methamphetamine, the government must establish three elements: "(1) knowledge; (2) possession; and (3) intent to distribute." *United States v. Gamboa*, 166 F.3d 1327, 1331 (11th Cir.1999) (quotation omitted). The intent to distribute may be inferred from the amount of drugs involved. *United States v. Hernandez*, 433 F.3d 1328, 1333 (11th Cir. 2005), *cert. denied*, 126 S. Ct. 1635 (2006).

In the present case, Woods only challenges whether the evidence is sufficient to show that he intended to distribute the methamphetamine and does not dispute any other element of the offense. Woods's argument that insufficient evidence supports the conviction because the government did not show evidence of drug sales, but only of possession of a large amount of drugs, fails. Viewing the evidence in the light most favorable to the government, the large amount of methamphetamine in Woods's possession, over 149 grams, and Woods's possession of materials related to drug distribution, including electronic scales, sandwich bags, and a large number of rolled $ 100 bills, support a finding that Woods intended to distribute the methamphetamine. Therefore, we affirm Woods's conviction.

### III. Sentencing Guidelines

### A.    Calculation of Guidelines Range

Although the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005), rendered the Guidelines advisory and established a reasonableness standard for reviewing the ultimate sentence imposed on a defendant, the district court still is obligated to consult the Guidelines and "calculate *correctly* the sentencing range prescribed by the Guidelines." *United States v. Crawford,* 407 F.3d 1174, 1178 (11th Cir. 2005). In this appeal, Woods challenges whether the district court correctly calculated his guidelines range because he argues the court made factual findings in violation of the Sixth Amendment, based its calculation on prior convictions that had been consolidated for sentencing, and failed to give a two-level decrease for acceptance of responsibility.

### 1. *Enhancements Not Found By the Jury*

Woods argues that his Sixth Amendment right to a trial by jury was violated by judicial fact-finding at the sentencing hearing. The Sixth Amendment right to trial by jury is violated where, under a mandatory guidelines system, a sentence is increased because of an enhancement based on facts found by the judge that were neither admitted by the defendant nor found by the jury. *See Booker*, 543 U.S. at 249-53, 125 S. Ct. at 759-61. However, a constitutional error only occurs where the sentencing judge applies the Guidelines as if they are mandatory after using

8

extra-verdict enhancements to reach a guidelines range. *See United States v. Rodriguez*, 398 F.3d 1291, 1301 (11th Cir.), *cert. denied*, 545 U.S. 1127 (2005).

Here, Woods's argument presumably refers to the enhancement for the drug quantity involved in the offense. Although the district court had to determine the amount of drugs involved in order to set the base offense level, it did not consider the Guidelines mandatory when imposing the sentence. *See Rodriguez*, 398 F.3d at 1301. Therefore, Woods's argument that his Sixth Amendment rights were violated by judicial fact-finding fails.

## 2. *Criminal History*

Woods argues that several of his prior convictions should not have been counted separately when determining his criminal history score because the convictions had been consolidated for sentencing purposes. Section 4A1.2 of the Guidelines provides, "Prior sentences imposed in unrelated cases are to be counted separately." U.S.S.G. § 4A1.2(a)(2). Unrelated cases are those where an intervening arrest occurred between offenses. *Id.*, comment. (n.3). If there was no intervening arrest and the offenses were consolidated for sentencing purposes, the cases are considered related. *Id.*

After reviewing the record, we conclude that Woods's prior convictions were properly counted separately when determining his criminal history score

9

because they were separated by intervening arrests. Therefore, Woods's criminal history score was calculated correctly.

### 3. *U.S.S.G. § 3E1.1*

Woods argues that the district court should have given him a downward adjustment for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1. We review the district court's decision whether to adjust a sentence for acceptance of responsibility only for clear error. *United States v. Brenson*, 104 F.3d 1267, 1288 (11th Cir. 1997). Section 3E1.1(a) of the Guidelines states, "If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels." U.S.S.G. § 3E1.1(a). The commentary to § 3E1.1 provides,

> This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse. Conviction by trial, however, does not automatically preclude a defendant from consideration for [the acceptance of responsibility] reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur . . . where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt . . . . [H]owever, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

*Id.*, comment. (n.2). Applying this commentary, we have held that where a defendant denied an essential element of the crime at trial and where the decision

10

to proceed to trial was not to challenge the applicability or constitutionality of the statute, the trial court's decision to deny an acceptance of responsibility reduction was not clear error. *See Brenson*, 104 F.3d at 1289.

The record demonstrates that Woods went to trial and denied that he intended to distribute the methamphetamine. Intent to distribute was an element of the crime for which he was indicted. *See Gamboa*, 166 F.3d at 1331. Because Woods disputed an element of the crime at trial, we conclude that the district court did not clearly err in finding that he failed to qualify for an acceptance of responsibility reduction. *See* U.S.S.G. § 3E1.1, comment. (n.2).

**B.   Reasonableness of Sentence**

We review final sentences for reasonableness, and the defendant has the burden of establishing that the sentence is unreasonable. *United States v. Talley*, 431 F.3d 784, 788 (11th Cir. 2005). "Review for reasonableness is deferential." *Id.* Following *Booker*, we held that, in imposing a sentence, the district court must first accurately calculate the defendant's guideline range and, second, consider the factors set forth in 18 U.S.C. § 3553(a) to determine a reasonable sentence. *Id.* at 786. The § 3553(a) factors include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to

11

> protect the public; (5) the need to provide the defendant with needed
> educational or vocational training or medical care; (6) the kinds of
> sentences available; (7) the Sentencing Guidelines range; (8) pertinent
> policy statements of the Sentencing Commission; (9) the need to
> avoid unwanted sentencing disparities; and (10) the need to provide
> restitution to victims.

*Id.* (citing 18 U.S.C. § 3553(a)). However, "nothing in *Booker* or elsewhere

requires the district court to state on the record that it has explicitly considered

each of the 3553(a) factors or to discuss each of the 3553(a) factors." *United*

*States v. Scott*, 426 F.3d 1324, 1329 (11th Cir. 2005). Rather it is sufficient, under

*Booker*, for the district court to acknowledge that "it has considered the

defendant's arguments and the factors in section 3553(a)." *Talley*, 431 F.3d at 786.

In addition, while a sentence within the guidelines range is not *per se* reasonable, it

is expected to be reasonable. *Id.* at 788.

Woods's sentence is reasonable. First, as discussed above, the district court

properly calculated Woods's guideline range. Second, the district court not only

stated that it had considered the 18 U.S.C. § 3553(a) factors, but specifically listed

the ones it found most important in Woods's case. Third, the district court stated

that a lower sentence would have been insufficient to accomplish the goals of the

§ 3553(a) factors. Fourth, the district court sentenced Woods within the guideline

range. Because the district court properly calculated the guidelines range and

imposed a reasonable sentence, we affirm Woods's sentence.

## IV. Motion to Dismiss

### A.    Speedy Trial

Woods does not indicate whether his motion to dismiss for violation of his speedy trial rights relies on the Speedy Trial Act or the Speedy Trial Clause of the Constitution.  However, Woods's arguments before the sentencing court concerning a specific number of days allowed between phases of a criminal prosecution indicates that he relied on the Speedy Trial Act.[1]  We review a claim under the Speedy Trial Act *de novo*.  *United States v. Dunn*, 345 F.3d 1285, 1288 (11th Cir. 2003).  The Speedy Trial Act provides, in pertinent part, that "[f]ailure of the defendant to move for dismissal prior to trial or entry of a plea of guilty or nolo contendere shall constitute a waiver of the right to dismissal under this section."  18 U.S.C. § 3162(a)(2); *United States v. Miles*, 290 F.3d 1341, 1349 n.5 (11th Cir. 2002).

The record demonstrates that Woods did not move for dismissal until the sentencing hearing, after his trial and conviction.  Therefore, Woods waived any right to have the case dismissed for violation of the Speedy Trial Act, *see* 18

---

[1] Although we address Woods's argument under the Speedy Trial Act, Woods's argument would also fail under the Speedy Trial Clause because he caused any delay that existed between his indictment and trial, given that he was in state prison after the indictment and filed two written and signed speedy trial waivers before his trial commenced. *See United States v. Clark*, 83 F.3d 1350, 1353 (11th Cir. 1996); *United States v. Twitty*, 107 F.3d 1482, 1490 (11th Cir. 1997).

13

U.S.C. § 3162(a)(2); *Miles*, 290 F.3d at 1349 n.5, and we affirm the district court's

denial of his motion to dismiss for violation of speedy trial rights.

### B.    Double Jeopardy

We review *de novo* a district court's ruling on double jeopardy. *United*

*States v. Baptista-Rodriguez*, 17 F.3d 1354, 1360 (11th Cir. 1994). The Double

Jeopardy Clause provides that "[n]o person shall . . . be subject for the same

offence to be twice put in jeopardy of life or limb." U.S. CONST. amend. V. This

constitutional safeguard is founded on the principle that

> the State with all its resources and power should not be allowed to
> make repeated attempts to convict an individual for an alleged
> offense, thereby subjecting him to embarrassment, expense and ordeal
> and compelling him to live in a continuing state of anxiety and
> insecurity, as well as enhancing the possibility that even though
> innocent he may be found guilty.

*Green v. United States*, 355 U.S. 184, 187-88, 78 S. Ct. 221, 223 (1957). The

Double Jeopardy Clause protects defendants in three situations: a second

prosecution for the same offense after acquittal; a second prosecution for the same

offense after conviction; and multiple punishments for the same offense. *Jones v.*

*Thomas*, 491 U.S. 376, 380-81, 109 S. Ct. 2522, 2525 (1989).

The Double Jeopardy Clause applies to proceedings that are "essentially

criminal," as well as to criminal proceedings. *See Helvering v. Mitchell*, 303 U.S.

391, 398-99, 58 S. Ct. 630, 633 (1938). The Double Jeopardy Clause does not

apply in several contexts. For example, because they are *in rem* proceedings in which the government proceeds against property, civil forfeiture proceedings are not criminal proceedings against the defendant. *Waterloo Distilling Corp. v. United States*, 282 U.S. 577, 581, 51 S. Ct. 282, 284 (1931).

Double Jeopardy issues also may arise when more than one sovereign prosecutes the defendant. Convictions on identical offenses with identical elements do not violate the Double Jeopardy Clause when the charges arose in two separate sovereigns. *United States v. 817 N.E. 29th Drive, Wilton Manors, Fla.*, 175 F.3d 1304, 1311 (11th Cir. 1999). This is based upon the common law concept that a crime is an offense against the sovereignty of a government. *Heath v. Alabama*, 474 U.S. 82, 88, 106 S. Ct. 433, 437 (1985). Thus, the Double Jeopardy Clause does not bar successive prosecutions by a state and the federal government. *817 N.E. 29th Drive*, 175 F.3d at 1311.

Woods argues that the federal prosecution violated his double jeopardy rights because the state had already civilly forfeited his property, and the two proceedings constituted two punishments for the same crime. Woods's arguments are without merit. First, civil forfeitures are not punishment under the Double Jeopardy Clause and, therefore, the federal prosecution and punishment was not a second jeopardy. *See Waterloo Distilling Corp.*, 282 U.S. at 581, 51 S. Ct. at 284.

Second, the civil forfeiture was done by the City of Dothan in the State of Alabama, whereas this case was prosecuted by the federal government. The State of Alabama and the federal government are separate sovereigns, and each may prosecute Woods for his violation of each sovereign's laws. *See 817 N.E. 29th Drive*, 175 F.3d at 1311. Therefore, we conclude that the district court did not violate Woods's double jeopardy rights, and we affirm the district court's denial of Woods's motion to dismiss.

## V. Conclusion

For the above-stated reasons, we affirm the district court's orders denying Woods's motion to suppress and his motion to dismiss. We also affirm Woods's conviction and sentence.

**AFFIRMED.**

AFFIDAVIT OF SUSAN R. REDMOND

I, Susan R. Redmond, am an attorney licensed by the State of Alabama. I have served as an Assistant United States Attorney since August 2002. I am the assigned prosecutor in the case of United States v. Claude Lee Woods, 1:04-CR-12-MEF.

It is my recollection that when Ms. James appeared on behalf of Woods, prior to the evidentiary hearing held on January 18, 2005, I approached her, as I did former counsel Kevin Butler, about the possibility of entering plea negotiations. Woods, through counsel, rejected the notion.

On April 5, 2005 Woods filed objections to the Magistrate Judge's recommendations. On April 8, 2005, the Court overruled Woods' objection and denied the motions to suppress. On the same day, Woods filed a Motion to continue trial set for April 18, 2005 and to have the trial set on the next trial term. On April 12, 2005 Woods' Motion for Placement on Next Trial Term was granted and trial set for May 16, 2005.

On April 25, 2005, Woods, through counsel, stated his intention to assert his right to trial at a pretrial conference. The government filed a motion to have the trial specially set due to conflicts. On May 6, 2005, counsel for the parties met with District Court Judge Mark Fuller for a pretrial conference at which trial was set by agreement for May 23, 2005, and Woods, for the first time, suggested that he might be amenable to plea negotiations.

It is my recollection that the parties agreed to a proffer session set for May 10, 2005, which was subsequently cancelled. The proffer session was set a second time for May 13, 2005. I recall that Woods wanted to coordinate the proffer session with agents from Florida, and an unsuccessful attempt was made to do so. I further recall that it was made clear to Woods that the federal prosecutor in Florida was willing to enter into plea negotiations and would receive a copy of statements made by Woods during his proffer session with the Middle District of Alabama. Woods, in the presence of his counsel, stated that he would go to trial on the case. I recall making is clear to Woods that after May 13, 2005, the Middle District of Alabama would not enter into any further plea negotiations with him.

Woods chose to go to trial and did so on May 23, 2005. I recall that on each occasion following Woods conviction, sentencing, appeal, cooperation with Florida, plea in Florida, sentencing in Florida, etc., counsel for Woods approached me about cooperation or "credit" for cooperation with Florida authorities. As there was no benefit to, nor cooperation with, the Middle District of Alabama, I declined to motion the Court for a downward departure based upon either.

Susan R. Redmond
Assistant United States Attorney

NOTARY PUBLIC

My commission expires 9. 23 09

GOVERNMENT
EXHIBIT

CASE
NO.

EXHIBIT  BB
NO.